BACZYNSKI LAW, PLLC
Daniel M. Baczynski, Bar No. 15530
12339 S. 800 E. Ste. 101
Draper UT 84020
(801) 255-5555 Phone
*dan@bskilaw.com*

LAW OFFICES OF TAD D. DRAPER P.C.
Tad D. Draper, Bar #4311
12339 South 800 East Ste. 101
Draper, Utah  84020
(801) 553-1700
(801) 255-5588 fax
*Legaljustice3@gmail.com*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CYNTHIA STELLA, and the ESTATE OF HEATHER MILLER, <br><br>     Plaintiffs, <br><br> vs. <br><br> DAVIS COUNTY, SHERIFF TODD RICHARDSON, MAVIN ANDERSON, JAMES ONDRICEK <br><br>     Defendants. | **MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No:  1:18-cv-002 <br><br> Judge:   Jill Parrish |

Plaintiffs' Cynthia Stella and the Estate of Heather Miller, by and through their attorneys, hereby submits this motion for partial summary judgment, requesting that the Court determine that Nurse Anderson, Nurse Ondricek, Sheriff Richardson, and Davis County acted with deliberate indifference to Heather Miller's medical needs during her stay at the Davis County Jail.

1

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| **INTRODUCTION** |  | 6 |
| **STATEMENT OF FACTS** |  | 8 |
| NURSE ANDERSON'S ASSESSMENT WAS DEFICIENT |  | 15 |
| JAIL LACKS PROTOCOLS AND FAILS TO SUPERVISE NURSES |  | 17 |
| **STANDARD OF REVIEW** |  | 21 |
| **ARGUMENT** |  | 23 |
| ***Nurse Anderson acted with deliberate indifference to Ms. Miller's medical needs.*** |  | 23 |
| I. | The objective element of deliberate indifference is satisfied where Nurse Anderson's initial failure and delay in monitoring Ms. Miller's vitals resulted in her death. | 25 |
| II. | The subjective standard of deliberate indifference is satisfied where Nurse Anderson was aware of the substantial risks associated with falls at the jail and chose to ignore personal and general standards of care on account of his admitted bias. | 26 |
| | a. *An inference of substantial risk of serious harm could be drawn from the fall and Ms. Miller's symptoms following the fall.* | 26 |
| | b. *Nurse Anderson was aware that failing to properly assess Ms. Miller carried a substantial risk of serious harm where he failed to monitor in violation of personal and general standards of care because he is biased against inmates.* | 28 |
| III. | Nurse Anderson acted with deliberate indifference. | 30 |
| ***Nurse Ondricek and Sheriff Richardson failed to adequately train and supervise medical staff and failed to implement the necessary policies to ensure detainees receive adequate medical care.*** |  | 31 |
| I. | Nurse Ondricek acted with deliberate indifference by failing to draft written protocols, failing to provide training on jail expectations, and burying his head through his failure to formally review care. | 31 |

| | | |
|---|---|---|
| II. | Sheriff Richardson's practice of operating Davis County Jail without medical protocols in violation of Davis County policy constitutes deliberate indifference to the medical needs of detainees. | 32 |
| | ***Davis County acted with deliberate indifference to its inmates by operating without medical protocols.*** | 33 |
| | **CONCLUSION** | 34 |

## TABLE OF AUTHORITY

| | PAGE |
|---|---|
| Federal Rule of Civil Procedure 56(a) | 21 |
| *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) | 23 |
| *Al-Turki v. Robinson*, 762 F.3d 1188 (10th Cir. 2014) | 27 |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) | 22 |
| *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321 (2d Cir. 1998) | 32 |
| *Bones v. Honeywell Int'l Inc.*, 366 F.3d 869 (10th Cir. 2004) | 23 |
| *Boyett v. Cty. of Wash.*, No. 2:04cv1173, 2006 U.S. Dist. LEXIS 86910 (D. Utah Nov. 28, 2006) | 31 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) | 22, 23 |
| *Cf. Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511 (10th Cir. 1987) | 23 |
| *City of Canton v. Harris*, 489 U.S. 378 (1989) | 32 |
| *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000) | 21-22 |
| *Estelle v. Gamble*, 429 U.S. 97 (1976) | 24, 25 |
| *Farmer v. Brennan,* 511 U.S. 825 (1994) | 24, 26, 28, 30 |
| *Garrett v. Stratman*, 254 F.3d 946 (10th Cir. 2001) | 25 |
| *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) | 33-34 |
| *Howell v. Evans*, 922 F.2d 712 (11th Cir. 1991) | 28 |
| *Jenkins v. Wood*, 81 F.3d 988 (10th Cir. 1996) | 22 |
| *Jones v. Norton*, 809 F.3d 564 (10th Cir. 2015) | 22 |
| *Kellum v. Mares*, 657 F. App'x 763 (10th Cir. 2016) | 27 |
| *Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999) | 24 |
| *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) | 24, 25-7, 29 |

| | |
|---|---|
| *Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996) | 28 |
| *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978) | 33 |
| *Nordwall v. PHC-Las Cruces, Inc.*, 960 F. Supp. 2d 1200 (D.N.M. 2013) | 32 |
| *Oxendine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001) | 25 |
| *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013) | 34 |
| *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) | 24, 25 |
| *Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013) | 21-22 |
| *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002) | 23 |
| *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405 (10th Cir. 2014) | 25, 28, 29 |

## INTRODUCTION

Ms. Miller, a twenty-eight year old girl, fell off her top bunk at Davis County Jail hitting her head and her side. When Nurse Anderson arrived to assess Ms. Miller, she complained of pain to her side, difficulty breathing, and severe nausea and dizziness. Ms. Miller was unable to walk thirty feet to the staircase without assistance. Nor was she able to descend the staircase on her own – instead she scooted down the steps on her butt with the assistance of an officer. Despite these obvious symptoms, as well as the history at Davis County Jail of serious injuries stemming from falls, Nurse Anderson did not complete a medical assessment of Ms. Miller. Had Nurse Anderson performed the medical assessment, he would have observed a drop in Ms. Miller's vital signs (the tattle tale signs of internal bleeding) caused by a ruptured spleen suffered during Ms. Miller's fall. Instead, Nurse Anderson assumed Ms. Miller was just detoxing and sent Ms. Miller to relax on a bottom bunk in a different unit with no medical observation. Ms. Miller died four hours later.

When asked by the Attorney General's Office about the care Nurse Anderson provided, Anderson admitted he should have taken Ms. Miller's vitals and he should have taken her to medical. Indeed, checking and monitoring vitals following an injury satisfies the most minimal standard of nursing care. Checking and monitoring vitals following a fall and/or where an inmate is unable to walk are the expectations of his supervisor - Nurse Ondricek. Had Nurse Anderson monitored Ms. Miller's vitals, he would have caught her internal bleeding within an hour of her injury, leaving Ms. Miller with an excellent prognosis of surviving her ruptured spleen. Instead, Ms. Miller rapidly declined in her cell until she was eventually brought to medical, nearly dead, approximately three hours after her fall.

Though Nurse Anderson bears the brunt of the blame for his failure to even assess Ms. Miller following her injury, Nurse Anderson was only able to provide inadequate care because Davis County has no medical protocols instructing nurses on the care to be given. Though Davis County Jail's own policy manual explicitly requires and depends upon the creation of medical protocols (essentially checklist for nurses to follow, which the National Institute on Corrections describes as "essential" and "the first step to improve the delivery of care"), *Davis County Jail has operated without these protocols for the past six years*. Davis County's failure to implement this most basic foundation for medical care created the unavoidable consequence that nurses and medical staff would provide inadequate care. Sheriff Richardson's failure to remedy this obvious defect makes him liable for the inadequate care provided by the jail.

In addition to its failure to implement medical protocols, Davis County Jail encouraged inadequate medical care through its failure to supervise and train its nurses. Nurse Ondricek, appointed to supervise Davis County's nursing staff, provides no training to his staff and does not review whether his nurses meet jail expectations in providing care. Nurse Ondricek has expectations about the care to be provided when an inmate falls off her bunk, when an inmate is unable to walk, when an inmate is bleeding – none of those expectations were met by Nurse Anderson. However, how is Nurse Anderson to know his supervisor's expectations when his supervisor provides no training explaining the expectations? He cannot know. And to that effect, neither Nurse Ondricek nor Sheriff Richardson want to know if the jail is providing care that meets expectations, as evidenced by no formal internal investigation into Nurse Anderson's care, and no discipline issued to Nurse Anderson despite his blatant failures to abide by multiple jail expectations.

Davis County Jail operates in the dark. It has no medical protocols. It provides no training. It performs no formal internal reviews of the medical care that is being provided. And it does not discipline its nurses, even when the care falls far below Davis County Jail's own expectations. While Nurse Anderson's failure to provide medical care due to his own admitted bias against inmates is certainly inexcusable and the cause of Ms. Miller's death, Nurse Anderson was only allowed, and continues to be allowed, to provide inadequate medical care because Davis County Jail has no protocols, training, or supervision. Davis County Jail created the circumstances that allowed for Nurse Anderson's inadequate medical care, and for this reason all parties are liable for Ms. Miller's death.

## STATEMENT OF FACTS

1. On December 20, 2016, Heather Ashton Miller, a twenty-eight year old woman, was booked into the Davis County Jail. Attorney General's Report (Exhibit 1) at pg 15.

2. On December 21, 2016, around 17:56, Ms. Miller was reported to have fallen from the top bunk in her cell. *Id*.

3. Deputy Lloyd, who was a few doors down from Ms. Miller's cell, heard a thump while he was doing head count. Deputy Lloyd's Deposition (Exhibit 2) at 15:3-25.

4. When Deputy Lloyd checked in to investigate, Ms. Miller's cellmate informed Lloyd that Ms. Miller had fallen out of the top bunk onto the cement floor, hitting her head and side. Exhibit 2 at 16:1-8; Exhibit 1 at 56.

5. As Deputy Lloyd looked into Ms. Miller's cell, he could see Ms. Miller writhing on the floor. Exhibit 2 at 17:17-22, 18:8-17, 19:1-12.

6. Deputy Lloyd called medical to have Davis County's medical staff check Ms. Miller's status. Exhibit 2 at 17:15-22.

7. Falls from bunks happen fairly regularly at the Davis County Jail to the tune of about once a month. Exhibit 1 at 73 ("James [Nursing Supervisor at Davis County Jail] said that jail nurses respond to reports of a fall from a top bunk around one time per month").

8. Because the floor is cement, inmates can and have suffered serious injuries from these falls. Exhibit 2 at 12:9-13, 10:20 – 11:3 ("I mean, I've seen it a couple times. I know the first week I worked there, a kid fell off the bed and slipped, because he was wearing socks, and split his ear open"); Ondricek AG's Interview (Exhibit 18) at 12:05 – 12:55.

9. Ms. Miller suffered a ruptures spleen from her fall. Exhibit 1 at 27.

10. Nurse Ondricek, who is the supervising nurse at Davis County Jail, testified about his expectations regarding medical assessment following a fall from a bunk. He would expect an inmate would be transferred to the hospital (if exhibiting a significant injury) or for the nurse to monitor the inmate's status:

> "His expectation as a supervisor would be that the responding nurse check for visible injuries, most commonly head injuries. If there are serious injuries they transport to the hospital. If there are no visible injuries they will "monitor them", including monitoring vital signs.

Exhibit 1 at 73; James Ondricek Depo (Exhibit 4) at 29:22 – 30:25; Exhibit 18 at 12:30-12:55, 15:18-16:20.

11. Nurse Anderson arrived to check Ms. Miller's status. Nurse Anderson's Depo (Exhibit 3) at 27:5-16.

12. Though Nurse Anderson had access to medical supplies on Ms. Miller's unit, Nurse Anderson arrived at Ms. Miller's cell with no medical equipment. Exhibit 1 at 56 (Marvin said he has a 'jump bag' with equipment but he didn't take it with him…"); Exhibit 3 at 56:11-21 (Q: "You didn't even take the blood pressure jump bag… with you to Kilo" A. "I did not.").

9

13. Ms. Miller was complaining of pain to her side, difficulty breathing, dizziness, and nausea. Davis County Report Logs (Exhibit 5) at 2 ("I asked inmate Miller, Heather if she was okay and she stated she was hurting on her left side… She said her ribs were hurting. She said she couldn't breathe… She seemed dizzy); Exhibit 2 at 44:18-23 (And then once we got out of her cell and started to walk, she's like, I'm really dizzy… I'm really feeling really nauseous.").

14. After falling, Ms. Miller remained on the ground until Nurse Anderson and Sergeant Wall helped Ms. Miller up into a standing position. Exhibit 5 at 2; Nurse Anderson's AG Interview at 11:03:55-11:04:28.

15. Nurse Anderson decided to transfer Ms. Miller to a unit where she could have a lower bunk. *Id*.

16. Nurse Anderson did not take Ms. Miller's vital signs (blood pressure, pulse, and temperature), even though Nurse Anderson testified that it is his own practice to take vital signs at nearly every medical encounter. Exhibit 3 at 18:5-14:

> Q. Now, maybe the jail doesn't have policies, but you told the attorney general that you generally, after a fall would take vitals. Is that correct?
>
> A. Yes.
>
> Q. And is that your policy? Your policy?
>
> A. I would say yes.
>
> Q. You didn't do that in this case, though, did you?
>
> A. I did not.

17. During an interview with the AG's Office, Nurse Anderson admitted that he should have taken Ms. Miller's vitals. Nurse Anderson's AG Interview (Exhibit 19) at 11:29:56-11:31:05:

10

Q. [AG's Office]: At what point, with a person complaining of any given issue, sickness or injury, do you take physical vitals? Blood pressure, pulse, respirations, oxygen saturation?

A. [Nurse Anderson]: I should have done it when I first saw her.

Q. Why do you say that?

A. Because generally that's what you do…

Q. Do you usually do that on falls?

A. Yes I do.

18. Ms. Miller was unable to walk from her cell to the stairs, so Nurse Anderson and Corporal Johnson had to walk Ms. Miller to the stairs. Surveillance Video (Exhibit 6) at 6:13:20 – 6:14:04.

19. The Attorney General, who investigated Ms. Miller's death, noted that it took Ms. Miller twenty seconds to walk a mere 19 feet. Exhibit 1 at 42.

20. Nurse Anderson then ran off to acquire a wheelchair. Exhibit 3 at 45:23 – 46:2.

21. Ms. Miller, who was unable to walk down the stairs, scooted her butt down the staircase with the assistance of Corporal Johnson. Exhibit 6 at 6:14:28 – 6:15:48; Exhibit 3 at 46:13-21:

A. [Nurse Anderson]: If I remember right, she was sitting on the top of the stairs… And the she just scooted down, which –

Q. On her butt, step by step?

A. Yes. Which scared and shocked me.

22. Once Nurse Anderson returned with the wheelchair, Corporal Johnson assisted Ms. Miller in plopping herself into the chair. *Id*.

23. Clerk Rogers at Davis County Jail, who observed Ms. Miller as she hobbled to the stairs and scooted down on her butt, thought it was obvious Ms. Miller needed medical care and found it weird that Ms. Miller was not taken to medical. Clerk Roger's AG Interview (Exhibit 20) at 11:24:45 – 11:25:30.

24. Nurse Ondricek, the supervising nurse at Davis County Jail, further testified that it was his expectation that a nurse would bring an inmate who was unable to walk to the jail's medical wing for observation. Exhibit 18 at 21:01 – 23:05; Exhibit 4 at 57:16-25:

> Q. And the second-to-last-paragraph I asked James if it would be his expectation, as a supervisor, for a nurse to bring an inmate to medical or provide medical observation if an inmate can't walk or if the inmate needs to be wheeled or carried out of a unit. He said quote, absolutely. Is that correct?
>
> A. [Nurse Ondricek]: Yes.
>
> Q. Do you still believe that?
>
> A. Yes.

25. Nurse Anderson did not take Ms. Miller to medical even though a bed was available in medical. Exhibit 3 at 38:13 – 40:18.

26. Instead, Nurse Anderson wheeled Ms. Miller off to the Lima unit so that Ms. Miller could have a bottom bunk. Exhibit 3 at 26:24 – 27:1.

27. Nurse Anderson did not order any medical observation for Ms. Miller. Austin Rogers Depo (Exhibit 7) at 23:20-24:13.

28. At about 20:18, Deputy Lloyd did his scheduled observation and noticed that Ms. Miller was mostly naked, was lying on the floor, had a cut on her chin, and her body was in a strange position. Exhibit 2 at 35:4 – 36:7.

29. Deputy Lloyd, concerned about Ms. Miller, called medical to explain his observations. Exhibit 2 at 36:17-24.

30. Medical had the conversation on speaker phone. Exhibit 1 at 71; Nurse Layton's AG Interview (Exhibit 21) at 10:10-10:40.

31. Deputy Lloyd was speaking with Nurse Daniel Layton with Nurse Anderson in the room. *Id*.

32. Deputy Lloyd explained his observations and Daniel Layton, relying on Nurse Anderson's prior observations, told Deputy Lloyd" not to think about it too much". Exhibit 1 at 71, Exhibit 20 at 11:01-11:38; Exhibit 21 at 5:24-6:01.

33. Clerk Rogers documented this response in this report because he thought the nurses were being lazy, as just a week prior to Ms. Miller's death the nurses had taken "forever" to respond to an inmate suffering from a seizure. Exhibit 20 at 11:12:00 – 11:13:07.

34. Deputy Lloyd was not happy with that answer and immediately went to find another deputy for a second opinion. Exhibit 2 at 47:7 – 48:3.

35. Deputy Lucius returned with Deputy Lloyd to Ms. Miller's cell. Deputy Lucius' Depo (Exhibit 8 at 18:22 – 19:8):

> Q. Do you remember [Deputy Lloyd] talking about medical's response of "Don't look too much into it"?
>
> A. Yes.
>
> Q. What did you think of that response?
>
> A. That I needed to go and take a look at this girl and – I didn't care what medical thought. I was going to bring her to medical.
>
> Q. Why did you think that?
>
> A. Because she's on the floor, naked. She had already fallen once that – he said. So we don't need to keep her in the cell. She needs to be in medical.

Q. Even without seeing her you came to that conclusion?

A. Yeah.

36. Deputy Lloyd and Deputy Lucius found Ms. Miller lying on the floor naked, head down, and called Sergeant Wall (a female) to respond so that they officers could go and evaluate Ms. Miller. Exhibit 8 at 19:12 – 20:20.

37. When the officers entered the cell, Ms. Miller's skin was gray, she was cold to the touch, and she was sweating profusely. Exhibit 2 at 53:14 – 54:16.

38. The deputies and Corporal Johnson transferred Ms. Miller to Medical at 20:39, where Nurse Anderson immediately ruled that Ms. Miller needed to be taken to the hospital. Exhibit 1 at 43; Exhibit 3 at 69:1 – 71:17:

Q. Okay. So when they get [Ms. Miller] to medical. What happens next? What did you observe?

A. [Nurse Anderson]: She was in a wheelchair and she was totally flaccid. She was pale. I thought – I thought she was dead. I'm like, Really, guys, you're bringing her here dead?
...
A. Okay. So I immediately told – I can't remember what deputy – Sergeant Wall or one of them, to call for paramedics right now. Obviously, I could tell that she did not look good.

39. Ms. Miller was taken out of the jail by EMS at 20:58. Exhibit 1 at 43.

40. Ms. Miller was pronounced dead at 22:06. OME Report (Exhibit 9) at 1.

41. The medical examiner opined that Ms. Miller died as a result of blunt force injuries of abdomen sustained when she reportedly fell from the upper bunk in her cell. *Id* at 1.

42. The medical examiner further noted a near complete transection of Ms. Miller's spleen, which resulted in 1.3 liters of internal bleeding. *Id* at 1.

## NURSE ANDERSON'S ASSESSMENT WAS DEFICIENT

43.  Though Davis County does not have the means to diagnose a ruptured spleen, the Jail

would have diagnosed internal bleeding had the Jail monitored Ms. Miller's vital signs.

Exhibit 4 at 57:3-10 ("Q. [T]he only way [Davis County Jail] would have to identify

internal bleeding at the jail would be by monitoring blood pressure which would drop

over time… Do you agree with that? Nurse Ondricek: Yes"); Dr. Starr's Expert Report

(Exhibit 10):

> Heather's fall from the top bunk ruptured her spleen to the point of near complete
> transection. In the span of 3 hours, Ms. Miller experienced hemodynamically
> significant deterioration. If vital signs had been obtained, there would certainly be
> evidence of her deterioration within 1 hour of her injury, hence "The Golden Hour
> of Trauma Care".

44. Blood loss will result in a high pulse rate, anxiety, narrow pulse pressure, elevated

respiratory rate, and increased anxiety or confusion, signs which would have been

observable within 1 hour of Ms. Miller's injury. Exhibit 10.

45. General nursing standards require nurses to take and monitor vital signs following a

suspected injury. Nurse Schultz's Expert Report (Exhibit 11).

46. Davis County Jail's expectation of nurses requires nurses to take and monitor vital signs

following a suspected injury. Exhibit 4 at 56:21 – 57:2:

> Q. …[I]n responding to a request for treatment, the nurses always do first
> responder things like check for vitals, checking pupils, and neuro checks if they
> have hit their head. That's correct, right?
>
> A. [Nurse Ondricek]: That is correct. That is my expectation.

47. Nurse Anderson's personal practice is to take and monitor vital signs following a

suspected injury. Exhibit 3 at 18:5-11:

Q. Now, maybe the jail doesn't have policies, but you told the attorney general that you generally after a fall would take vitals. Is that correct?

A. [Nurse Anderson]: Yes.

Q. And is that your policy? Your policy?

A. I would say yes.

48. Nurse Anderson did not take a baseline vital sign or monitor Ms. Miller's vital signs following her fall. Exhibit 3 at 18:5-14.

49. The expert disclosure deadline has passed and Defendants have not disclosed an expert that refutes taking vital signs is the nursing standard of care.

50. In fact, Defendants' hired expert has indicated that "Nursing staff should include vital signs with each nursing evaluation" and that "Anderson's initial evaluation did not include vital signs which should have been completed". Dr. Tubbs' Expert Report (Exhibit 12).

51. Nurse Anderson stated he normally would have taken Ms. Miller to medical following a fall but he did not in this case. Exhibit 19 at 11:40:00-11:41:20.

52. Nurse Anderson stated that the nurses normally would have gone to examine an inmate who is reported to be bleeding – but Nurse Anderson did not respond to Deputy Lloyd's phone call that Ms. Miller was bleeding. Exhibit 19 at 11:41:48 – 11:42:46.

53. Nurse Anderson admitted he is biased in the way he provides medical care to jail inmates. Exhibit 19 at 83:9 – 84:6.

> [Nurse Anderson]: Like I said before, what I see at the jail is a lot of what she presented of this – the wat she acted, the detoxing, whatnot. And so that's what kind of took me into that, that feeling of where she was. I didn't get this feeling that she was having this traumatic injury…

Q. What you're saying is that these people are not normal patients, and so you see enough of this behavior to where you're?

A. **I'm biased.**

Q. But that's what I'm asking. You're biased—

A. To what I see.

Q. –and that affects the way you're able to provide nursing case?

A. In the jail setting, it is…

54. Rather than take Ms. Miller's vitals or take Ms. Miller to medical as required by nursing standards, jail standards, and personal standards, Nurse Anderson did not provide Ms. Miller with medical care under the assumption that Ms. Miller was just going through drug withdrawal. Exhibit 19 at 11:40:00 – 11:41:20.

<u>DAVIS COUNTY LACKS PROTOCOLS AND FAILS TO SUPERVISE NURSES</u>

55. James Ondricek and Sheriff Todd Richardson are in charge of implementing medical policies and practices within Davis County Jail that ensure detainees receive adequate medical care. Sheriff Richardson's Deposition (Exhibit 13) at 7: 18 – 8:19; 12:12-17; 14:6-8; 37:1-21.

56. At the time of Heather Miller's fall, Davis County Jail's medical care was governed by the 400 chapter of the Policy Manual. Exhibit 13 at 23:6-14.

57. These policies provide broad and general instructions for providing medical care at the Jail. Exhibit 14 – Chapter 400 of Policy Manual.

58. Policy 405.10 provides for the creation of treatment protocols and first aid procedures:

> To provide a means for the identification of medical conditions and the care of minor ailments of the inmates in the Davis County Jail treatment protocols and first aid procedures will be developed by the jail physician, psychiatrist and/or dentist under the direction of the health authority to be utilized by authorized personnel.
>
> Exhibit 14 at 46.

59. Policy 405.10 further states:

Protocols will:

1. Be appropriate to the level of skill and preparation of the practitioner who will carry them out.

2. Comply with relevant State practice acts.

3. Be documented in the inmate's chart with time, date and signature of the personnel providing the care.

4. Be countersigned in the medical record by the responsible physician.

   Exhibit 14 at 46.

60. Protocols provide medical staff with step-by-step instructions for providing medical care in specific circumstances. See Dr. Tubbs' Protocols[1] (Exhibit 15).

---

[1] Example of a Protocol drafted by Defendants' Expert Dr. Tubbs in place at Utah County Jail for abdominal pain:

- When an inmate complains of abdominal pain, the nurse shall:
  - Perform an assessment of the affected/involved area(s):
    - Visualization, auscultation, palpation and percussion of the abdomen as indicated.
  - Obtain a history of the complaint.
  - **Obtain a set of vital signs.**
  - Refer to more specific protocols, such as NVD, Constipation, etc. as indicated.
  - Contact the medical provider for orders, as needed.
  - Carry out orders, if any, as instructed.
  - Document assessment, orders, and any treatment provided in the inmate's electronic medical record (EMR).
  - Reassess as needed.

- If ordered to be sent to the hospital for diagnostic tests etc., the nurse shall:

61. The Jail Policy Manual mentions and relies on protocols throughout, including:

    1. 405.06(D) SICK CALL: <u>Nursing protocol</u> will be followed by the medical department in the absence of a physician.

    2. 405.05(D)(2)(b) DAILY HANDLING OF NON-EMERGENCY MEDICAL REQUESTS: <u>Initiate treatment per protocols</u>, for conditions that can be treated by a nurse when following facility doctor authorized medical protocols. Have treatment record co-signed by physician or PA at next regular sick call.

    3. 402.04(D)(8) MEDICAL STAFF RESPONSIBILITIES: Reviewing policies, procedures and <u>protocols</u>.

    4. 401.04(B)(5) INTERNAL QUALITY ASSURANCE: Committee members will review and report on implementation and countersigning <u>of treatment protocols</u>.

    5. 406.11(D)(3) PREGNANT INMATES: <u>In the event of conflicts between security needs and medical protocols</u> transportation officers should contact the jail administrator or officer-in-charge for instructions.

    Exhibit 15 at 44, 41, 16, 6, 71. (Emphasis added).

62. Maintaining written medical protocols is the standard of care for jails across the country.

    Todd Vinger's Expert Report (Exhibit 16) at 9:

> In my thirty plus years of experience, I would find it to be an indifferent choice to the health and safety of the inmates housed in the Davis County Jail if the Davis County Jail's leadership has failed to follow their own written policy to create and maintain a Health and Safety Policy and Procedures Manual which is a common and best practice within jails nationwide. My opinion is further supported by the statement from the National Institute of Corrections.

---

      o  Call the hospital with report.
      o  Notifying the Housing Sergeant to arrange for transport via Sheriff's Office vehicle or ambulance as deemed appropriate.

Exhibit 15 at 1 (emphasis added).

> "*Establishing a written policy and procedures manual to govern correctional health services is essential. If one does not exist, its development is the first step the systemwide health services director should take to improve the delivery of care.*"

63. For the last six years, Davis County Jail has operated without any medical or nursing protocols in violation of written policy 401. Exhibit 13 at 24:17-25.

64. Because Davis County does not maintain written protocols, Davis County relies on medical providers to provide care pursuant to their discretion. Exhibit 4 at 17:25 – 18:13.

65. With no written protocols, Nurse Ondricek maintains "expectations" of how medical care is to be provided within the jail. Exhibit 1 at 73-74; Exhibit 4 at 35:2-9.

66. Nurse Ondricek's expectations following a fall are for detainees to be taken to the hospital or medical for observation and for vitals to be monitored. Furthermore, if a detainee is unable to walk after suffering an injury, the medical providers is expected to transfer the detainee to medical for observation and assessment. Exhibit 4 at 29:22 – 31:5.

67. Though expected to provide training, Nurse Ondricek does not provide training to his nurses regarding his expectations. Exhibit 4 at 7:3-6 ("Q. Do you do any training? [Nurse Ondircek]: I don't directly do training. I attend training, schedule training, occasionally, but no, I don't do any training myself"); Exhibit 3 at 68:2-6 ("Q. How do you know that that's what [Nurse Ondricek] expects from you? Have you had any training meetings? ... (Nurse Anderson): No.").

68. Nurse Ondricek is also expected to review nursing care after a death at the Jail. Exhibit 13 at 37:1-4.

69. There is no formal procedure governing Nurse Ondricek's after-death reviews. Exhibit 13 at 37:1 – 38:19; Exhibit 4 at 50:5 – 51:1.

70. Nurse Ondricek did not do a substantive review of the nursing care provided to Ms. Miller. Exhibit 4 at 50:5-7.

71. Sheriff Richardson claims that Davis County Jail did an informal internal review of Ms. Miller's death but that there was no written documentation of this review. Exhibit 4 at 10:7-9. ("Q. Do you know if there is any written documentation of this review? (Sheriff Richardson: Not to my knowledge").

72. Sheriff Richardson claims the findings of the internal review were that the policies Davis County Jail had in place worked and that the medical care provided to Ms. Miller complied with jail policy. Exhibit 4 at 9:23 – 10:6.

73. However, Nurse Ondricek claims he is unaware of any internal review into Ms. Miller's death and that he has never been involved in an internal review of medical care. Exhibit 4 at 51:5-10:

> Q. Does the jail itself do a review of inmate deaths? Do you know if they do?
>
> A. Not that I know of, no. We've never done one that I've been involved in.

74. Though Nurse Anderson violated Jail's expectations regarding the standard of medical care, Nurse Anderson was not disciplined for his failures. Exhibit 17 at 5.

## **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), courts grant summary judgment if the movant shows no genuine dispute as to any material fact exists, and "the movant is entitled to judgment as a matter of law." "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 703

F.3d 1206, 1215 (10th Cir. 2013) (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). In evaluating a motion for summary judgment, the Court reviews "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id* at 248. Moreover, an issue of fact is genuine only if "a reasonable jury could return a verdict for the non-movant." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996) (citation omitted). If there is no genuine issue of material fact in dispute, the Court grants summary judgment according to the substantive law.  *Id* at 990.

A party seeking summary judgment always has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believe demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Furthermore, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id* at 324. In such instances, the moving party has no obligation to present extrinsic evidence or supporting affidavits to sustain its assertion that no genuine disputes of material fact exist. *Id.*

Once a moving party satisfies its initial summary judgment burden by pointing to a lack of evidence in the record, the burden of production shifts to a non-moving party to come forward with admissible evidence to demonstrate the existence of a genuine dispute of material fact. *See Celotex Corp., 477* U.S. at 330 (Brennan, J, dissenting) (the burden of production shifts to the non-moving party once the moving party "demonstrate[s] to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim"); *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) ("Once the moving party has [met its initial burden], the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial.") (citation omitted). The non-moving party "may not rely on mere allegations, or denials, contained in its pleadings or briefs" to defeat summary judgment. *See Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir. 2002). And when a jury would be required to speculate to find in favor of the non-moving party, summary judgment is appropriate. *See Bones v. Honeywell Int'l Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.... To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.") (citations omitted). *Cf. Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987) (reversing jury verdict where essential elements of plaintiffs claim were "supported only by speculation and conjecture" rather than admissible evidence).

## **ARGUMENT**

### *Nurse Anderson's conduct constituted deliberate indifference to Ms. Miller's medical needs.*

Nurse Anderson violated general nursing standards, jail expectations, and his personal practice when he failed to check Ms. Miller's vitals as part of his assessment of Ms. Miller

following her fall. He failed to adequately assess Ms. Miller even though her symptoms and prior history of falls at Davis County Jail indicated the possibility that Ms. Miller had suffered a serious injury. By failing to monitor Ms. Miller's vitals, Nurse Anderson did not catch that Ms. Miller was suffering from internal bleeding stemming from a ruptured spleen. His failures constitute a deliberate indifference to Ms. Miller's medical needs.

Deliberate indifference of a serious medical need contains both an objective and subjective component. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Farmer v. Brennan, 511 U.S. 825, 834, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)* (citations omitted). "We have said that a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. See *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." *Farmer*, 511 U.S. at 837. A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper

role." *Sealock*, 218 F.3d at 1211; see also *Estelle*, 429 U.S. at 104-105 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care").

Both the objective and subjective elements have been satisfied. Objectively, Ms. Miller's medical need was sufficiently serious because she suffered a ruptured spleen that caused her death four hours later. Subjectively, Nurse Anderson disregarded an excessive risk by failing to fulfill his gatekeeper role where he did not provide a proper medical assessment to Ms. Miller. With these elements satisfied, Nurse Anderson's conduct reaches the level of deliberate indifference.

I.  <u>The objective element of deliberate indifference is satisfied where Nurse Anderson's initial failure and delay in monitoring Ms. Miller's vitals resulted in her death.</u>

Under general nursing standards, Davis County Jail's expectations, and his own personal practice, Nurse Anderson should have taken and monitored Ms. Miller's vitals following her fall. Nurse Anderson failed to check her vitals. Instead, Ms. Miller's vitals remained unchecked until deputies Lloyd and Lucius brought Ms. Miller to medical three hours later with Ms. Miller in poor condition. The 10th Circuit has repeatedly held that even a brief delay can constitute deliberate indifference. See *Mata*, 427 F.3d at 755; *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 432 (10th Cir. 2014) (3 minutes delay could be deliberative indifference). Nurse Anderson's delay of almost three hours in performing the most basic, initial assessment can be the basis for deliberate indifference.

In addition to the delay, deliberate indifference requires the delay to result in substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001). Substantial harm is general categorized as "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001). By failing to initially monitor Ms. Miller's vitals, Nurse Anderson significantly delayed the diagnosis of internal injury. Ms. Miller would have exhibited

signs of internal bleeding detectable in her vitals within an hour of her injury. Had Ms. Miller

been transported to the neighboring hospital, she would have had a very high likelihood of

survival. Ms. Miller could have been saved, but the significant delay in her care contributed to

her death. As death is a sufficiently substantial harm, plaintiffs have satisfied the objective

standard of deliberate indifference.

II.     The subjective standard of deliberate indifference is satisfied where Nurse Anderson was
        aware of the substantial risks associated with falls at the jail and chose to ignore personal
        and general standards of care on account of his admitted bias.

Nurse Anderson failed and delayed in properly assessing Ms. Miller following her fall

despite knowledge that failure to properly assess Ms. Miller created a substantial risk of serious

harm. Under the subjective component, the detainee must establish deliberate indifference to his

serious medical needs by "present[ing] evidence of the prison official's culpable state of

mind." *Mata*, 427 F.3d at 751. The detainee must show that the prison "official acted or failed to

act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. The

official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and she must also draw the inference." *Farmer*, 511 U.S. at 837.

Where Nurse Anderson was aware of the serious of falls at the jail, was aware of symptoms that

suggested serious harm had occurred, and where Nurse Anderson's personal practice required

the monitoring of vitals as basic assessment, Ms. Miller has established the subjective element of

her claim.

> a.  *An inference of substantial risk of serious harm could be drawn from the fall and Ms.*
>     *Miller's symptoms following the fall.*

The subjective element first requires that the detainee demonstrate facts from which an

inference of substantial risk of serious harm can be drawn. Nurse Anderson was aware that Ms.

Miller had fallen from her bunk. While Nurse Anderson could not have known that Ms. Miller

had ruptured her spleen during the fall, Anderson was aware that falls from bunks can result in serious injuries, including head injuries (Exhibit 3 at 6:10-15). The concern is so great with these falls that the expected care is to transfer a detainee either to the hospital or to medical for monitoring. Ms. Miller's cellmate explained that Ms. Miller fell twice, once hitting her side on a desk and once hitting her head. Considering head injuries are of greatest concern following a fall, Nurse Anderson was put on notice that Ms. Miller could have been significantly harmed from the fall once it was identified that Ms. Miller had hit her head. So the fall itself, regardless of Miller's condition, put Nurse Anderson on notice that failure to assess Ms. Miller put her at substantial risk of serious harm.

Ms. Miller also exhibited symptoms that indicated she had suffered a significant injury. Ms. Miller's side was in pain, she had difficulty breathing, she was dizzy and nauseous, she could not walk on her own, and she could not descend the stirs without help. The inability to walk, by itself, would have required Nurse Anderson under jail expectations to transfer Ms. Miller to medical. The combination of Ms. Miller's fall with symptoms of a serious injury is sufficient to infer a substantial risk of serious harm.

The 10th Circuit has found similar symptoms sufficient. In *Mata v. Saiz*, the court found complaints of serve chest pain could satisfy this element. 427 F.3d at 755. In *Al-Turki v. Robinson*, Type II diabetes coupled with severe abdominal pain and nausea put defendant on notice that detainee could be suffering from a serious and potentially life-threatening conditions. 762 F.3d 1188, 1191 (10th Cir. 2014). The court found profuse sweating, difficulty breathing, and an inability to stand were obvious symptoms of severe illness in *Kellum v. Mares*, 657 F. App'x 763, 766 (10th Cir. 2016).

In *Walton v. Gomez (In re Estate of Booker)*, the Court found the subjective component satisfied where detainee was subjected to a taser and a neckhold and subsequently appeared limp. 745 F.3d at 431. The combination of known risks associated with tasers and neck holds and symptom was enough for a reasonable jury to conclude the detainee needed immediate medical attention. Similarly, Nurse Anderson's knowledge of the severity of falls coupled with symptoms verifying an injury indicated Ms. Miller required, at the very least, a basic assessment.

> b. *Nurse Anderson was aware that failing to properly assess Ms. Miller carried a substantial risk of serious harm where he failed to monitor in violation of personal and general standards of care because he is biased against inmates.*

With sufficient facts for Nurse Anderson to infer the substantial risk of harm, the subjective element of deliberate indifference further requires evidence that Nurse Anderson realized the risk. Deliberate indifference does not require a finding of express intent to harm. *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996).  Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842. The circumstantial evidence (Nurse Anderson's failure to abide by nursing and personal standards, his admission of bias), together with the obvious signs of medical need (Ms. Miller's inability to walk, claims of pain), establish Nurse Anderson was aware of a substantial risk.

VIOLATIONS OF NURSING STANDARDS

Nurse Anderson's violation of nursing standards provides circumstantial evidence that Nurse Anderson knew of a substantial risk of serious harm. *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991). General nursing standards, the jail's expectations, and Nurse Anderson's personal standards all required that Nurse Anderson, at a minimum, monitor vitals following an

injury. Nurse Anderson understood these standards, and therefore understood the risks associated with violating the standards. By failing to abide by jail expectations following a fall, Nurse Anderson knowingly disregarded the risks associated.

The 10th Circuit has consistently relied on violations of training and practice as evidence that a medical provider knew of a substantial risk of serious harm. In *Walton*, the Court found sufficient evidence to survive summary judgment where officers were trained to perform a medical assessment following the use of force but failed to do so after administering a taser and chokehold. *Walton*, 745 F.3d at 431. Similarly in *Mata*, plaintiff presented sufficient evidence of deliberate indifference where a nurse failed to refer a detainee suffering from severe chest pains in violation of contemporary nursing standards. *Mata*, 427 F.3d at 757. Contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care. By refusing to administer a medical assessment in violation of nursing standards, Nurse Anderson acted with reckless disregard for Ms. Miller's health.

### NURSE ANDERSON ADMITS HE IS BIASED

Nurse Anderson testified that he normally takes and monitors vitals following even the most minor of injuries. He deviated from his standard in Ms. Miller's case because he assumed Ms. Miller was just detoxing off of drugs. Nurse Anderson admitted that he is biased against detainees in providing medical care because many of the inmates present with symptoms of withdrawal. The concern with bias, as noted by supervising nurse Ondricek, is that medical providers would provide bad care, would not provide care, or would refuse care to someone based on prejudice. Ex 4 at 27:2-17. These concerns manifested themselves in Nurse Anderson's treatment of Ms. Miller. Nurse Anderson's bias, coupled with his blatant disregard for nursing

standards, demonstrates Nurse Anderson was aware of the substantial risks associated with his failure to adequately assess Ms. Miller.

Ms. Miller's medical need was Obvious to a lay person

Nurse Anderson's knowledge of the risk can also be established if the facts are so obvious that a lay person would easily recognize the need for medical attention. *Farmer*, 511 U.S. at 842. Where Ms. Miller fell off her bed and hit the concrete, hit both her head and her side, complained of pain, and was not longer able to walk or got down the stairs without assistance, even a layperson would recognize the need for, at minimum, a medical assessment. Clerk Rogers, a layperson with no medical training who observed Ms. Miller following her fall, came to the conclusion that Ms. Miller should have gone to medical. Nurse Anderson's failure to provide a basic assessment considering Ms. Miller's condition solidifies his comprehension of the substantial risks of his action.

III.    <u>Nurse Anderson acted with deliberate indifference.</u>

Plaintiffs have established Nurse Anderson's deliberate indifference to Ms. Miller's medical needs. Objectively, Ms. Miller ruptured spleen presented was sufficiently serious to warrant protection under the 8th and 14th Amendment. Subjectively, Nurse Anderson was on notice that his failure to assess Ms. Miller presented a substantial risk of serious harm considering falls from bunks cause serious injuries and Ms. Miller presented with symptoms following her fall of a serious injury. Nurse Anderson's absolute failure to follow the standards of care and his personal practice on account of his bias is inexcusable and constitutes a violation of Ms. Miller's constitutional rights.

***Nurse Ondricek and Sheriff Richardson failed to adequately train and supervise medical staff and failed to implement the necessary policies to ensure detainees receive adequate medical care.***

I.   <u>Nurse Ondricek acted with deliberate indifference by failing to draft written protocols, failing to provide training on jail expectations, and burying his head through his failure to formally review care.</u>

Nurse Ondricek is liable for his failures as supervisor. A finding of supervisor liability is premised on the plaintiff establishing, first, that the supervisor's subordinates violated the Constitution. Next, the plaintiff must draw an affirmative link between the inferior officer's civil rights violation and the supervisor's acts or omissions. To create this link, the plaintiff must show the supervisor actively participated or acquiesced in the constitutional violations. "[T]he supervisor's state of mind is a critical bridge between the conduct of a subordinate and his own behavior" -- the supervisor must have acted with knowledge, or at least deliberate indifference, that a constitutional violation would occur. *Boyett v. Cty. of Wash.*, No. 2:04cv1173, 2006 U.S. Dist. LEXIS 86910, at *70-71 (D. Utah Nov. 28, 2006).

The first element of supervisor liability has been satisfied. As established, Nurse Anderson acted with deliberate indifference to Ms. Miller's needs when he failed to adequately assess Ms. Miller following her fall.

There is also an affirmative link between Nurse Anderson's care and Nurse Ondricek's failings as a supervisor. Nurse Ondricek was responsible under Davis County Jail's policy for drafting nursing protocols. Had nursing protocols been in place requiring the monitoring of vitals, Nurse Anderson would not have abdicated this responsibility. Instead, Nurse Ondricek relied on his expectations to ensure nurses provided adequate medical care. However, Nurse Ondricek never trained his nurses on Davis County Jail expectations. Without any guidance from the jail, nurses were destined to fall short of Jail's expectations.

In addition to providing insufficient guidance to nurses as to the appropriate standard of care, Nurse Ondricek also failed to adequately investigate nursing care following death at the jail. Not only were nurses not trained on jail expectation, but they also knew that failure to adhere to the expectations – just as Nurse Anderson suffered no consequences despite multiple violations of jail expectations.

A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Nurse Ondricek's failure to train his nurses, with no formal training on expectations, no written protocols guiding nurses, and no formal review process to determine adherence to expectations, was so reckless that misconduct was inevitable.

II. <u>Sheriff Richardson's practice of operating Davis County Jail without medical protocols in violation of Davis County policy constitutes deliberate indifference to the medical needs of detainees.</u>

Sheriff Richardson was the established policy maker at Davis County Jail. Sheriff Richardson operated Davis County without written medical protocols, in violation of Davis County Jail's own policy manual, for six years, thereby establishing a policy or practice of operation without written protocols. Similar to Nurse Anderson, Sheriff Richardson can be liable for his conduct (creating policies) if he have acted with 'at least deliberate indifference to the strong likelihood [of] a violation of federally protected rights . . . from the implementation of the [challenged] policy . . . [or] custom.'" *Nordwall v. PHC-Las Cruces, Inc.*, 960 F. Supp. 2d 1200, 1217 (D.N.M. 2013) (citing *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998).

The practice of not maintaining written protocols violates the standard of care in jails and serves as evidence that Sheriff Richardson was aware of the risks associated with the practice. Davis County Jail's own policy manual requires written protocols and relies on written protocols for the administration of medical care. Yet, Sheriff Richardson abolished the prior written protocols in his first year as sheriff and allowed Davis County Jail to operate without protocols for six years. As stated by the NCCHC (referenced by Davis County's Policy Manual) and by Plaintiff's expert, written protocols are the standard of care in jails.

Furthermore, Sheriff Richardson testified that he reviewed the Davis County policy manual upwards of fifty times a year. By reviewing the policy manual so frequently, Sheriff Richardson would have been on notice that Davis County Jail was in compliance with its own policies by operating without a medical protocols. Yet despite this knowledge, Sheriff Richardson failed to implement medical protocols for over six years. By knowingly operating the Jail without medical protocols in violation of Davis County policy, Sheriff Richardson acted with deliberate indifference to the medical needs of his Jail.

### *Davis County acted with deliberate indifference to its inmates by operating without medical protocols.*

Davis County is liable for its unconstitutional policy of operating without medical protocols. Though a municipality may not be held liable under Section 1983 solely because its employees inflicted injury on the plaintiff, it can be liable for an "action pursuant to official municipal policy" caused their injury. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691,4 (1978). To establish municipal liability, a plaintiff must (1) identify a policy or custom that caused the injury, and (2) establish that there is a direct causal link between the

policy or custom and the injury alleged. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

A policy or custom may take the form of a "formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Sheriff Richardson is the municipal policymaker for Davis County Jail. His decision to eliminate medical protocols and operate the Jail without medical protocols for six years constitutes a final decision that serves as a basis for municipal liability.

The failure to implement medical protocols allowed for Nurse Anderson to deviate from accepted medical standards. As seen in the medical protocols produced by Defendants' expert Dr. Tubbs, medical protocols would have required Nurse Anderson to have checked and monitored Ms. Miller following her fall. Monitoring her vitals would have in turn altered Davis County Jail to internal bleeding, which would have allowed Davis County to transfer Ms. Miller to the hospital for appropriate care. Nurse Anderson did not take vitals in part because he was not required to take vitals - he assumed that Ms. Miller was detoxing. With medical protocols in place, Nurse Anderson would have been precluded from using his medical discretion as to the minimal standard of care. There is a direct casual link between Davis County's practice of operating without medical protocols and Nurse Anderson's failure to abide by minimum medical standards.

## **CONCLUSION**

Plaintiff Aus respectfully requests that the Court find Nurse Anderson, Nurse Ondricek, Sheriff Richardson, and Davis County acted with deliberate indifference to Ms. Miller's medical needs where:

- Nurse Anderson refused to assess Ms. Miller who fell off a bunk, was in pain, had troubled breathing, was dizzy and nauseous, and could not walk or descend stairs;

- Nurse Anderson admitted he should have taken Ms. Miller's vitals and taken Ms. Miller to medical;

- Nurse Anderson violated general nursing practices, jail expectations, and personal practice in failing to monitor Ms. Miller's vitals and/or take her to medical;

- Nurse Anderson transferred Ms. Miller to another unit without ordering medical observation;

- Nurse Anderson admitted he was biased against inmates;

- Nurse Anderson's failure to monitor Ms. Miller's vitals caused Ms. Miller to die from a ruptured spleen;

- Davis County nurses, including Nurse Anderson, refused to see Ms. Miller after Deputy Lloyd indicated she was bleeding and naked in her cell in violation of jail expectations;

- Davis County, in violation of its own policies, removed and operated without medical protocols for six years;

- Sheriff Richardson was aware that Davis County was operating in violation of Davis County's policies due to his elimination of medical protocols and never remedied this deficiency in his past six years as sheriff;

- Nurse Ondricek did not train Davis County Jail nurses on jail expectations;

- Nurse Ondricek did not review his nurses actions to determine whether the medical care being provided was appropriate;

- Nurse Ondricek did not discipline Nurse Anderson for his care even though he violated multiple jail expectations regarding medical care.

DATED this 21st day of November, 2018.

/s/ Daniel Baczynski
Attorney for Plaintiffs


**CERTIFICATE OF SERVICE**

I certify that on this 21st day of November, 2018, I caused **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** to be filed with the Court through the ECF system, with service provided on the following:

Jesse C. Trentadue
Noah M. Hoagland
Britton R. Butterfield
Sarah E. Jenkins
jesse32@sautah.com
nhoagland@sautah.com
bbutterfield@sautah.com
sjenkins@sautah.com
SUITTER AXLAND, PLLC
8 East Broadway, Suite 200
Salt Lake City, Utah 84111
Tel: (801) 532-7300
Fax: (801) 532-7355


/s/      Daniel Baczynski