# **<u>EXHIBIT 13</u>**

# In The Matter Of:

## *STELLA v.*
## *DAVIS COUNTY*

---

TODD MICHAEL
RICHARDSON
August 24, 2018



---

*Q & A Reporting, Inc.*

*1872 South Main Street*

*Salt Lake City, Utah  84115*

*801.484.2929*

*www.QAreport.com*

*Min-U-Script® with Word Index*

IN THE UNITED STATES DISTRICT COURT

STATE OF UTAH, CENTRAL DIVISION

_____

CYNTHIA STELLA, and the          )
ESTATE OF HEATHER MILLER,        )
                                 )
          Plaintiffs,            )
                                 )Case No:  1:18-cv-002
vs.                              )
                                 )Judge:  Jill Parish
DAVIS COUNTY, SHERIFF TODD       )
RICHARDSON, MARVIN               )
ANDERSON, JAMES ONDRICEK,        )
                                 )
          Defendants.            )
_____

DEPOSITION OF:  TODD MICHAEL RICHARDSON

August 24, 2018
9:58 a.m. to 11:13 a.m.


Location:  LAW OFFICES OF TAD D. DRAPER
12339 South 800 East, Suite 101
Draper, Utah 84020



Reporter:  Jennifer Nazer Braun, CSR, RPR

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1                    A P P E A R A N C E S

 2

 3

 4
    For the Plaintiffs:  TAD D. DRAPER
 5                       LAW OFFICES OF TAD D. DRAPER, P.C.
                         ATTORNEYS AT LAW
 6                       12339 South 800 East, #101
                         Draper, UT  84020
 7                       legaljustice3@gmail.com

 8
                         DANIEL BACZYNSKI
 9                       BACZYNSKI LAW, PLLC
                         ATTORNEYS AT LAW
10                       12339 South 800 East, #101
                         Draper, UT  84020
11                       dbaczyn2@gmail.com

12

13

14
    For the Defendants:  BRITTON R. BUTTERFIELD
15                       SUITTER AXLAND, PLLC
                         ATTORNEYS AT LAW
16                       8 East Broadway, #200
                         Salt Lake City, UT  84111
17                       bbutterfield@sautah.com

18

19

20
    Also Present:        CYNTHIA STELLA
21

22

23

24

25                    -o0o-
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1                          I N D E X

 2

 3

 4
     The Witness:   TODD MICHAEL RICHARDSON
 5

 6

 7

 8   Examination by                              Page

 9

10   MR. BACZYNSKI.......................................5

11

12

13

14

15                        -o0o-

16

17

18

19

20

21

22

23

24

25
```

TODD MICHAEL RICHARDSON - August 24, 2018



1            E X H I B I T S

2           (No exhibits were marked)

3

4

5

6

7                 -o0o-

8

9            R E Q U E S T S

10          (No items were requested)

11

12

13

14

15                -o0o-

16

17

18

19

20

21

22

23

24

25

TODD MICHAEL RICHARDSON - August 24, 2018

```
1   August 24, 2018                        9:58 a.m.
2                    P R O C E E D I N G S
3                TODD MICHAEL RICHARDSON,
4     called as a witness, having been duly sworn,
5        was examined and testified as follows:
6                       EXAMINATION
7   BY MR. BACZYNSKI:
8        Q.    Thank you for coming by, Sheriff.  To
9   start, how would you prefer that I address you;
10  Sheriff, or Mr. Richardson, or Todd?
11       A.    Whatever is shortest, sweetest and to the
12  point.
13       Q.    I think I'm going to go with sheriff --
14       A.    Okay.
15       Q.    -- just because I don't have the
16  opportunity to call people sheriff very often.
17       A.    No problem.
18       Q.    You can call me Dan.
19             Have you ever been deposed before?
20       A.    Yes.
21       Q.    I'm sure you're familiar with these kinds
22  of ground rules, but I'll just go over them again.
23  They help the deposition go by quicker.  It's
24  important when you're responding to my questions to
25  give a verbal response.  Yeses or noes are preferred,
```

TODD MICHAEL RICHARDSON - August 24, 2018

1   or whatever you want to say.

2        A.    Right.

3        Q.    Try to avoid uh-huh (affirmative) or head

4   nods or head shakes, because those are just very

5   difficult for her to put down on the record and make

6   it clear.

7        A.    All right.

8        Q.    If at any point you need a break, let me

9   know.  I'm more than happy to facilitate that.  I

10  don't expect to hold you here for very long, but that

11  being said, if you ever need a break, just let me

12  know.

13       A.    Okay.

14       Q.    If there's a question pending, I would ask

15  that you answer it before you take the break.  Other

16  than that, I'm not going to make this any more

17  arduous than it needs to be.

18       A.    Okay.

19       Q.    And then I will undoubtedly ask an unclear

20  question at some point.  If you don't understand what

21  I'm trying to get out of you, just let me know.  It's

22  better that way.  You know, that way you're answering

23  questions that I'm trying to get the answer to.

24             That being said, just a little bit of

25  background, Sheriff.  How long have you been the

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   sheriff?
 2              MR. DRAPER:  Do you want to have him state
 3   his name for the record?
 4              MR. BACZYNSKI:  Yes, let's start with
 5   that.
 6         Q.   (BY MR. BACZYNSKI:)  Why don't you state
 7   your name for the record.
 8         A.   Todd Richardson.  Do you want me to --
 9   Todd Michael Richardson.
10         Q.   Thank you.
11              How long have you been the sheriff?
12         A.   Since January of 2011.
13         Q.   What did you do prior to becoming sheriff?
14         A.   I was a deputy sheriff of Davis County.
15         Q.   For how long?
16         A.   Since 1996.  So it would have been January
17   of 1996.
18         Q.   As the sheriff, what are your
19   responsibilities in relation to the jail?
20         A.   I keep the jail.  In other words, I create
21   policy, enforce policy, just make sure that there's
22   appropriate food being given to the inmates and to
23   the individuals that are housed there, and proper
24   medical, proper law library, things like that.
25         Q.   I'm going to go over some of those things
```

TODD MICHAEL RICHARDSON - August 24, 2018

1    in a little bit more detail.

2           Is there anything else that you would

3    consider your responsibility?

4         A.    Well, basically, the overall governance of

5    the correctional facility is my responsibility.

6         Q.    Let me ask you this:  Did you have any

7    personal involvement in the medical treatment of

8    Heather Miller?

9         A.    No.

10        Q.    How familiar were you with the facts of

11   this case prior to the filing of this lawsuit?

12        A.    Other than --

13           MR. BUTTERFIELD:  Vague.

14           THE WITNESS:  Yeah, it's a little -- other

15   than being the sheriff and being notified that it

16   happened, that's about it.

17        Q.    (BY MR. BACZYNSKI:)  Did you, personally,

18   investigate the --

19        A.    No.

20        Q.    Do you know if there was any investigation

21   of the medical care that was provided to Heather

22   Miller after the fact?

23        A.    Internally.

24        Q.    What did that look like?

25           MR. BUTTERFIELD:  Vague.

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1                   Go ahead and answer.
 2                   THE WITNESS:  So we always do reviews, and
 3      those reviews is what occurred here, to make sure
 4      that we're providing the best care possible.
 5            Q.    (BY MR. BACZYNSKI:)  Is that standard
 6      practice in all jail deaths?
 7            A.    Not just in jail deaths.  It's any type of
 8      large incident.  We take a look at it and talk about
 9      it and make sure that our policies make sense, and
10      the way that we applied them.
11            Q.    But would there be a review for -- if
12      there was a death, there would be a review, correct?
13            A.    Absolutely.
14            Q.    Do you know who conducted the review in
15      this case?
16            A.    It would have been -- I don't know,
17      personally.  I can tell you, policy-wise, who reviews
18      it.
19            Q.    Who would review it?
20            A.    So it would have been the jail commander,
21      the captain, lieutenant, and then with an ultimate
22      resolution coming to me.
23            Q.    Do you remember receiving a resolution?
24            A.    Verbal.
25            Q.    And what was that?
```

TODD MICHAEL RICHARDSON - August 24, 2018

1          A.    Ultimately, that the policies that we had

2    had in place had worked.

3          Q.    So the medical care that was provided to

4    Heather Miller, that was within the confines of

5    policy?

6          A.    Yes, within our policy.

7          Q.    Do you know if there is any written

8    documentation of this review?

9          A.    Not to my knowledge.

10         Q.    What would be your expectation of what

11   goes into the review?  I mean, are there interviews?

12              MR. BUTTERFIELD:  Foundation.

13              Go ahead and answer.

14              THE WITNESS:  There are interviews so as

15   to be able to answer any questions that come up.  So

16   those interviews could take place, or they might not

17   take place.

18         Q.    (BY MR. BACZYNSKI:)  So there could be a

19   review, and there could be no interviews?

20         A.    Right.  It could be an internal policy

21   within the administrative body, or if there is some

22   facts that they find, then it will go into interviews

23   and other things.

24         Q.    Do you know if there were any interviews

25   done in this --

TODD MICHAEL RICHARDSON - August 24, 2018

```
1          A.    I don't, no.
2                MR. BUTTERFIELD:  I'm going to just ask
3    you -- you know what the question is, and he almost
4    has the whole question out.  Let him just finish
5    asking the question before you answer.
6                THE WITNESS:  Okay.
7                MR. BUTTERFIELD:  Just for a clear record.
8                MR. BACZYNSKI:  Thank you for that,
9    Britton.
10         Q.    (BY MR. BACZYNSKI:)  I should have
11   mentioned that for my fourth ground rule.  It helps
12   Jen put everything down when we're not talking over
13   each other.
14         A.    Yeah.
15         Q.    I know it's difficult.
16         A.    This is my problem, I try to answer too
17   quick.  So I will shut up.
18         Q.    It's okay.  It will happen.  I know I ask
19   questions during answers as well.
20               Okay.  So it seems like you've got kind of
21   the ultimate finding of the review.  Any other
22   information that you have about the review that we
23   haven't already talked about?
24         A.    No.
25         Q.    You said it was verbal.  Do you remember
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   who delivered the final decision on Heather Miller's
 2   care?
 3        A.   It would have been Kevin Fielding, the
 4   jail commander.
 5        Q.   Because you don't have any involvement in
 6   this, mostly I see your role here as kind of my
 7   guru --
 8        A.   Uh-huh (affirmative).
 9        Q.   -- through administration and how policies
10   work.  So that's kind of going to be the focus of the
11   deposition here today.
12             I wanted to get a sense of what the
13   hierarchy is like in terms of nursing.  So I know
14   there's nurses, and then Nurse Ondricek is kind of
15   the supervisor for the nurses.
16             Is that correct?
17        A.   Yes.
18        Q.   Is there anybody above Nurse Ondricek that
19   specifically supervises nursing?
20        A.   Who's over the nurse is the physician that
21   we have on contract.
22        Q.   Who is that?
23        A.   You would ask me.
24             MR. BUTTERFIELD:  Wood.
25             THE WITNESS:  Wood.  I keep on thinking --
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1              MR. BUTTERFIELD:  Sorry.  I'm not
 2   testifying.
 3              MR. BACZYNSKI:  No, that's okay.  I
 4   appreciate getting that answer.
 5              THE WITNESS:  Yes.
 6       Q.    (BY MR. BACZYNSKI:)  So he's the physician
 7   that you've contracted with?
 8       A.    Yes.
 9       Q.    What are his responsibilities?
10       A.    Generally, the health care provision to
11   our individuals we have in the facility.
12       Q.    Is his job limited to supervising the
13   nurses, or does he have other responsibilities in
14   addition to that?
15       A.    His responsibilities are medical and any
16   type of specific medical policy as to how he's going
17   to apply medicine.  The overall policies, again, fall
18   under the sheriff's office.
19       Q.    Just to make sure that I understand this
20   right, it seems like Dr. Wood -- in terms of his
21   responsibilities, there's an umbrella, and it's all
22   medical, and kind of like a slice of that is
23   supervising nursing.
24              Is that correct?
25       A.    Yes, to a point.  It's supervising nursing
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   specific to how medical is to be delivered.
 2        Q.   I guess let's talk about that a little
 3   bit.  Would you expect Dr. Wood to be training the
 4   nurses?
 5        A.   No.
 6        Q.   Would you expect Nurse Ondricek to be
 7   training the nurses?
 8        A.   Yes.
 9        Q.   Okay.  That gets the answer to my
10   question.
11             And then is there anybody above Dr. Wood?
12   Does he have a boss?
13        A.   Me.
14        Q.   How long has Davis County contracted with
15   Dr. Wood?
16        A.   I want to say it was -- because we
17   changed, and that would have been about 2014 or '15,
18   right in there.  I can't give you the specific date.
19        Q.   Did you contract with a physician prior to
20   Dr. Wood?
21        A.   Yes.
22        Q.   Do you know who that was?
23        A.   I can't remember his name.  I can get you
24   his name.
25        Q.   That's no problem.  I was just curious.
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1              So in discovery, we were provided with a
 2   Davis County policy and procedures manual.  Do you
 3   know if that policies and procedures manual was
 4   originally drafted during your tenure as sheriff?
 5        A.    It wasn't originally drafted.
 6        Q.    When you came on board as sheriff, you
 7   already had a policies and procedures manual?
 8        A.    Yes.
 9        Q.    Has it been rewritten during your tenure
10   as the sheriff?
11        A.    Updated.
12        Q.    What is that process like?
13        A.    If an incident happens and policies are --
14   can come in through a couple of different means.  In
15   other words, if there's a national policy change,
16   then we take a look at the policy and write it to
17   specifically help us and our correctional facility,
18   and then it's applied.
19              If the policy comes in from an incident
20   that occurs, then that's specific to our facility.
21   We'll look at the policy or write a policy to prevent
22   things from occurring in the future, and then we
23   apply that policy.
24              So there's kind of differing ways that
25   policies can be generated and applied.
```

TODD MICHAEL RICHARDSON - August 24, 2018

1      Q.    You talked about national policies
2   changing.  How would you become aware of that?
3      A.    So usually it's off of case law.  It's off
4   of what a -- a standard change that the physician
5   would come up and say, Hey, this is what, you know,
6   the standard is out there, and then we try to change
7   the policy and write the policy to fit what the best
8   practice is.
9      Q.    Are you or Dr. Wood or whoever is, I
10  guess, responsible -- is there a process by which
11  you're actively looking to see if there are changes
12  in the national standards?
13     A.    Yes.  I go to sheriff meetings once a
14  month.  Things come up there, and if we're notified
15  of a change, then we look into that change and see if
16  it applies to us or doesn't apply to us.
17            There are, you know, a multitude of things
18  that wouldn't apply to us.  The size of the facility.
19  It could be, you know, for very small facilities,
20  20-plus inmates, up to, you know, facilities that
21  hold, you know, thousands.  And we're kind of in the
22  middle.  So that's where -- there's a multitude of
23  factors that we have to take into consideration
24  before a policy is written and put into the policy
25  manual.

TODD MICHAEL RICHARDSON - August 24, 2018

1          Q.    When it comes to policies or practices

2     that are specifically medical, are you relying on

3     Dr. Wood or Dr. Ondricek to --

4                MR. DRAPER:  Nurse Ondricek.

5          Q.    (BY MR. BACZYNSKI:)  Yes, Nurse Ondricek.

6                -- to keep the jail up to date?

7          A.    Yes and no.

8          Q.    Okay.  Explain that.

9          A.    I've been a paramedic for over 30 years,

10    so I have a fairly significant medical background.

11    So if he writes a policy that generally he feels fits

12    a deficit that we need to get filled, I still read

13    through the policy and I'll make changes that I feel

14    need to be made in order to provide the best care to

15    our inmates.

16         Q.    So you mentioned monthly sheriff meetings

17    for you.

18         A.    Uh-huh (affirmative).

19         Q.    That's kind of how you keep up-to-date

20    with national standards?

21         A.    Uh-huh (affirmative).

22         Q.    Do you know if Dr. Wood or Nurse Ondricek

23    do something similar?

24               MR. BUTTERFIELD:  Foundation.

25               THE WITNESS:  No.

TODD MICHAEL RICHARDSON - August 24, 2018

1    Q.    (BY MR. BACZYNSKI:)  No, you don't know,
2    or no, they don't?
3    A.    I know what Nurse Ondricek does.  I don't
4    know what Dr. Wood does.
5    Q.    Tell me what Nurse Ondricek does.
6    A.    So, again, we pay for his certification
7    and licensure to be kept up, and so he has -- like
8    every other nurse in the state, has to maintain
9    training and keep current with those factors.
10   Q.    Do you know if he does anything specific
11   to nursing practices and policies in jail settings?
12            MR. BUTTERFIELD:  Foundation.
13            Go ahead.
14            THE WITNESS:  We've paid for him to go to
15   specific, you know, classes, specific to corrections.
16   I couldn't tell you when the last one was, though.
17   Q.    It sounds like it's not regular, though.
18   A.    No.  This is specific to, again,
19   certification.  That's being number one.
20   Q.    So the certification sounds regular, and
21   then when it comes to specifically in jail settings,
22   that's just as it comes up.  Is that a fair
23   description?
24   A.    Yes.  And relying on the core nursing
25   standards to be able to take care of specific -- how

TODD MICHAEL RICHARDSON - August 24, 2018

1   we apply our medical care inside the facility.
2       Q.    So say either you or Nurse Ondricek or
3   Dr. Wood -- you know, you see an issue, you see that
4   national standards are changing.  What's the next
5   step in the process?
6       A.    Writing a policy.
7       Q.    Do you have specific meetings or a
8   specific process for that?
9       A.    On a quarterly basis, policies can be
10  written or adjusted, and they're applied on a
11  quarterly basis.  So at least four times a year, our
12  policies will be updated.
13      Q.    Is there, like, a quarterly meeting?
14      A.    No.  It's basically -- when we review the
15  policies, they're put into kind of a hold.  As far as
16  if it has something generally due to general
17  operations, like what style of uniform you're going
18  to wear, things like this, those are not critical
19  types of policies, so those will come as the time,
20  you know, clicks.  If it's something to do specific
21  to the quality of care that we're giving or a
22  specific standard, a safety standard or things like
23  that, then it's instantaneously put in the policy,
24  but it's still updated on a quarterly basis so people
25  receive training on it.

TODD MICHAEL RICHARDSON - August 24, 2018

1    Q.    Let me ask it a little different.  So say
2  you notice that the standards are changing, you write
3  up a new policy.  What happens then?
4    A.    Again, if it's not critical, if it has
5  nothing to do with life or death or the safety of our
6  corrections officers, things like this, it will be
7  put in a queue and will be applied in the next
8  quarterly update.  If it's something to do -- that's
9  critical, it's implemented right away, and then it's
10  retrained on that next quarterly update.
11    Q.    So just to make sure that I'm
12  understanding this, you draft a policy.  Do you just
13  plug it into some software?
14    A.    It's Lexipol is what we use for our policy
15  manual.
16    Q.    Okay.
17    A.    And so it will be -- it will be written in
18  the queue and will be applied on that quarterly
19  basis.  Unless it's something critical, and then we
20  usually put out a memo, it's a sheriff's directive,
21  and that's -- that can be e-mailed out to everybody,
22  you know, within an hour.
23    Q.    So if you put together a policy, you put
24  it into the program, does anybody else review it, or
25  once you draft it, it's ready to go?

TODD MICHAEL RICHARDSON - August 24, 2018

```
1          A.    It depends on what the policy is.  If it
2    is something critical, I will have our civil
3    attorneys review it before it's implemented and
4    applied.  If it's general operations, we look at what
5    other agencies have done, and we'll review our policy
6    against other agencies, making sure that, you know,
7    the direction we're going makes sense and fixes the
8    issue that's at hand.
9               So, ultimately, I'm the one that finally
10   signs off on it and applies it.
11         Q.    So you mentioned a quarterly basis.  Is
12   that just -- there's no meeting or anything like
13   that, it's just on every quarter, that's when new
14   policies get enacted?
15         A.    And everybody knows it.
16         Q.    Is there a process in the jail where you
17   or Dr. Wood or Nurse Ondricek actively review the
18   policies that you have in place?
19         A.    Yes.  And it's done by me.
20         Q.    What does that look like?
21         A.    Again, if something comes up, I'll pull
22   the policies and I'll start going through the
23   policies and making sure -- if I'm told something at
24   a sheriffs meeting, I'll pull our policy and see how
25   it relates to what other sheriffs are doing.  And
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1    usually what happens is we have a -- the Sheriffs'
 2    Association developed a standard, and that standard
 3    is what we're tested on or evaluated on, on a regular
 4    basis.
 5            And so if we -- there's a couple of ways
 6    these policies can be driven.  One is off of a
 7    self-find.  We find that we're out of sync with the
 8    way a policy is written, we'll rewrite a policy and
 9    then apply it to make sure that we're in compliance
10    with the sheriffs' standard.  And/or if it's
11    something specific to the demographics of our
12    correctional facility, then, you know, again, we
13    write a policy and try to find the best way to apply
14    it to our facility, and then it's written and
15    implemented.
16       Q.    So it seems like -- and I'll let you
17    correct me if I'm wrong -- but you'll review the
18    policies if something comes up that makes you think,
19    Well, we might not be sufficient here.  But is there
20    any -- I mean, do you sit down every six months or
21    something like that, read through your policy manual
22    and make sure that everything there is right or --
23       A.    I would say it's probably more than 50
24    times a year.
25       Q.    But there's isn't anything regular in
```

TODD MICHAEL RICHARDSON - August 24, 2018

1   place?

2        A.    Huh-uh (negative).

3              MR. BUTTERFIELD:  Is that a no?

4              THE WITNESS:  No.  I'm sorry.

5              MR. BACZYNSKI:  Thank you.

6        Q.    (BY MR. BACZYNSKI:)  When we talked to

7   Nurse Ondricek, we asked about what kind of policies

8   and procedures are in place that govern medical care

9   at the jail, and he pointed to section 400 in your

10  policies and -- in your manual, but then he also

11  stated, when we asked about protocols, that there

12  wasn't anything further than what's in the manual.

13            Is that accurate?

14       A.    Yes.

15       Q.    Let's take a look at Exhibit 13.  You see

16  where it says Standing orders and protocol?

17       A.    Uh-huh (affirmative), yes.

18       Q.    Would you mind just reading that first

19  paragraph, and let me know when you're done?

20       A.    To provide a means for the identification

21  of medical conditions and the care of minor ailments

22  of the inmates in the Davis County Jail, treatment

23  protocols and first aid procedures will be developed

24  by the jail physician, psychiatrist and/or dentist

25  under the direction of the health authority to be

TODD MICHAEL RICHARDSON - August 24, 2018

1   utilized by the authorized personnel.

2        Q.   So Davis County hasn't drafted those

3   protocols, correct?

4        A.   I'm not sure what you're asking.

5        Q.   So this requires that Davis County put in

6   place treatment protocols and first aid procedures;

7   is that correct?

8        A.   No.

9        Q.   What does that mean, then?

10       A.   At this point -- prior to this, we had an

11  incident with the state health department, where --

12  this policy is still in effect, but the protocols

13  that we were using -- the health department didn't

14  want us to carry the protocols written the way they

15  were.  So the protocols were pulled out of this and

16  eliminated.

17       Q.   So at one point, you did have protocols?

18       A.   Yes.

19       Q.   Do you know when they were pulled out?

20       A.   I can give you a rough guess.  I can find

21  an exact answer if you want me to, but I want to say

22  it was six years ago.

23       Q.   Six years ago?

24       A.   (The witness is nodding his head in the

25  affirmative.)

TODD MICHAEL RICHARDSON - August 24, 2018

1        Q.     So you had protocols.  Were these things

2     that specifically said, If you encounter this kind of

3     situation, you need to do A, B, C and D?

4        A.     Yes.  It was a procedural order.  Yeah.

5        Q.     And you said the state health department

6     didn't want you to --

7        A.     Yeah.  If I remember right --

8               MR. BUTTERFIELD:  Let him finish that

9     question.  Sorry.  Just so it's clear on the record.

10       Q.     (BY MR. BACZYNSKI:)  You said the state

11    health department didn't want you using those

12    protocols anymore?

13       A.     It was -- I believe it was DOPL, the state

14    DOPL system.

15       Q.     You were sheriff at that time, right?

16       A.     Yeah, I was a green sheriff.

17       Q.     Just for the record, what does that mean?

18       A.     That means I was brand-new.

19       Q.     Do you remember why DOPL told you that --

20              MR. BUTTERFIELD:  Foundation.

21       Q.     (BY MR. BACZYNSKI:)  -- or the state

22    health department?

23              MR. BUTTERFIELD:  Foundation.

24              THE WITNESS:  So my understanding was that

25    they didn't like the way the procedural order was set

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   up, and the things that the nurses were doing inside
 2   of not just our facility, but facilities all around
 3   the state of Utah.  So my understanding was that they
 4   wanted to get rid of the procedural order to make it
 5   so that the nurse would have to call the physician on
 6   a case-by-case basis on what he wanted to have done.
 7        Q.   (BY MR. BACZYNSKI:)  At that time, were
 8   there -- did the jails share protocols, then?  Were
 9   there uniform protocols throughout the jails?
10             MR. BUTTERFIELD:  Foundation.
11             THE WITNESS:  Throughout the state of
12   Utah?
13        Q.   (BY MR. BACZYNSKI:)  Throughout the state
14   of Utah.
15        A.   Not to my understanding.
16        Q.   So did DOPL specifically have an issue
17   with the way Davis County Jail's protocols were
18   drafted?
19             MR. BUTTERFIELD:  Foundation.
20             THE WITNESS:  There was a couple instances
21   on what happened -- occurred inside the jail.  And so
22   the -- DOPL came back and did a review, and when they
23   reviewed it, they didn't like the flexibility that
24   the nurses were given, so they tightened it up.
25        Q.   You mentioned instances.  Do you remember
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
1    what those instances were?
2         A.    Again, it was right at the very beginning
3    of my tenure as sheriff.  They weren't anything big,
4    and I -- if I remember right, they weren't even
5    directed at the inmates and how we applied medicine
6    with the inmates.  It was some of the other things
7    that we had the nurses do, such as checking
8    tuberculosis tests with employees and, you know,
9    things like that.
10        Q.    I see.  I see.
11              What, specifically, did DOPL tell you to
12   do?  Drop the protocols?  Not have any more
13   protocols?
14        A.    Procedural orders, yeah.  Yes.
15        Q.    So they tell you to drop the protocols.
16   This is kind of a remnant, then, of back then --
17        A.    Yes.
18        Q.    -- this 405.10?
19        A.    Yes.
20        Q.    If it's a remnant of that, why hasn't this
21   been removed from the policy and procedural manual?
22        A.    We have a lot of policies that I review on
23   a regular basis, and this just has been one that has
24   not been updated following the removal of that.
25        Q.    You say you have these sheriffs' meetings
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   on a monthly basis.
 2        A.    (The witness is nodding his head in the
 3   affirmative.)
 4        Q.    Is it your understanding that protocols
 5   are pretty standard in other jails?
 6        A.    Yeah.
 7             MR. BUTTERFIELD:  Foundation.
 8        Q.    (BY MR. BACZYNSKI:)  So when we deposed
 9   Nurse Ondricek, he said that he was in the process of
10   developing new protocols.
11        A.    Yes.
12        Q.    You're aware of that?
13        A.    Yes.
14        Q.    Who ordered that?
15        A.    I did.
16        Q.    Why?
17        A.    Again, following an incident -- we've had
18   an incident that brought this up to light again, and
19   so we, meaning my -- I had my new jail commander look
20   into, again, the specifics of having a procedural
21   order, and they couldn't come up with any good reason
22   for me, and so I instructed them to rewrite them,
23   since they deleted the whole thing, and we're going
24   to go back in that direction.
25        Q.    Do you know if there is any record of
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   these old protocols?

 2        A.    My understanding was that they were

 3   deleted.  That's why he's --

 4        Q.    He's starting --

 5        A.    -- having to rewrite them all.  Yes.

 6        Q.    That communication with DOPL six years

 7   ago, where they said to drop the protocols, was that

 8   verbal, was there written communication?  Do you

 9   recall?

10        A.    I don't know.

11        Q.    Do you know who at DOPL would have

12   contacted you?

13        A.    It would have been the division's

14   licensing for nursing.

15        Q.    Going back to something you just

16   mentioned.  You said there was an incident that kind

17   of brought the lack of protocols into light.  What

18   was that incident?

19        A.    We had a few of them.  This case here on

20   Ms. Miller, and then we had some other cases where

21   we're bringing -- we're taking in inmates, and we

22   take -- right when we book them in -- right when we

23   allow them to be booked in, we take full

24   responsibility.  Now, again, it's our goal to give

25   them the best medical care that we possibly can, and
```

TODD MICHAEL RICHARDSON - August 24, 2018

1    sometimes you'll find that when we book people in,

2    when we accept them, they're not telling us the truth

3    about their medical history, about medications that

4    they've been on or illegal drugs that they're using.

5    And so that has been one of my concerns, and so,

6    again, we came back to -- it was my decision to start

7    back into a procedural order and work with the doctor

8    to set up screening processes and how many times

9    somebody would be screened, and a procedural order as

10   to how we're going to handle this to ensure, you

11   know, medical care.

12        Q.    So is Dr. Wood also working on putting

13   together these protocols?

14        A.    He approves the protocols.  He'll say,

15   Yeah, I can work with this, or No, I can't.  Yeah.

16        Q.    When did you make this decision to start

17   drafting protocols?

18        A.    I want to say it was about 18 months ago.

19        Q.    How do you ensure that your employees are

20   complying with the practices and policies in the

21   manual?

22        A.    There are several ways.  I mean, that's

23   why we have supervisors out there.  So you have

24   visual inspections, the reports are read that

25   they're -- how they're applying and what they're

TODD MICHAEL RICHARDSON - August 24, 2018

1    doing.  In specifically our correctional facility, we

2    have video, you know, throughout that, and so

3    sometimes it's brought to our attention through

4    video, compliance issues and things like this.  And

5    then over and above all those, we get inspected by

6    the Federal Bureau of Prisons, we get inspected by

7    the federal marshals, we get inspected by the state

8    Department of Corrections, and we get inspected by

9    our own internal audits and the Sheriffs' Association

10   audits.

11          So through all those audits, and internal

12   inspections, and video, and supervisors, that's how

13   we ensure compliance with policies and procedures.

14        Q.    I just kind of want to touch on each of

15   those briefly.

16        A.    Uh-huh (affirmative).

17        Q.    You mentioned the Bureau of Corrections,

18   the -- did you call them audit?  Is that a fair

19   characterization of that?

20        A.    Yes.  But which one?

21        Q.    Bureau of Corrections?

22        A.    So they have the federal bureau of

23   corrections, FBOP.  They come in and do their audits.

24        Q.    How often do they do that?

25        A.    It's a minimum of twice a year.

TODD MICHAEL RICHARDSON - August 24, 2018

1    Q.    And what do they look at?

2    A.    Again, they have standards that we have to

3   hold to, and they have their set standards that they

4   come out and run through.  So we get inspected off of

5   those standards.

6    Q.    Do they look at your nursing practices and

7   policies?

8    A.    Yes.  They look at medical.  They look at

9   living conditions.  They look at cleanliness.  They

10  look at everything.

11   Q.    Have you passed all of those?

12   A.    Yes.

13   Q.    You mentioned the marshals.  Do they also

14  do an audit?

15   A.    Yes.

16   Q.    How often is that?

17   A.    At least twice a year.

18   Q.    Are they looking for similar things as the

19  bureau of corrections?

20        MR. BUTTERFIELD:  Just for correction, I

21  think it's the Federal Bureau of Prisons, not the

22  bureau of corrections.

23        MR. BACZYNSKI:  Oh.  I don't know where

24  I'm coming up with that, then.  Bureau of

25  corrections.

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1                 THE WITNESS:  It's Bureau of Prison --
 2    FBOP.
 3                 MR. BACZYNSKI:  I've got to --
 4                 THE WITNESS:  Federal Bureau of Prisons.
 5                 MR. BACZYNSKI:  Bureau of Prisons.  Okay.
 6                 THE WITNESS:  And that's basically the
 7    federal prison system.
 8         Q.    (BY MR. BACZYNSKI:)  So marshals do at
 9    least twice a year?  Is that what you said?
10         A.    Yes.
11         Q.    And are they looking for similar things as
12    the Bureau of Prisons?
13         A.    Yes.
14         Q.    And you've passed all those?
15         A.    Yes.
16         Q.    You also mentioned the -- is it Department
17    of Corrections?
18         A.    Yes.
19         Q.    That's probably where I was getting
20    confused.
21               How often do they do audits?
22         A.    It's about the same.
23         Q.    And they're looking for similar things?
24         A.    They have a little varying standards.  In
25    fact, they're rewriting their standards right now.
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
1   But again, they're looking for the same -- overall,
2   the end result is the same.  The standards might vary
3   in how they're worded.
4        Q.    Is that a federal entity or is it a state
5   entity?
6        A.    State entity.
7        Q.    For the three that we just discussed, the
8   Bureau of Prisons, the marshals and the Department of
9   Corrections, do those audits include somebody coming
10  into your jail and doing walk-through or anything
11  like that?
12       A.    Yes.
13       Q.    You mentioned an internal review.
14       A.    (The witness is nodding his head in the
15  affirmative.)
16       Q.    What does that look like?
17       A.    So we have 614 standards for the Utah
18  Sheriffs' Association.  We do an internal audit to
19  see our compliance with those standards.  And so we
20  have an internal audit that we do ourselves.  And
21  then the Utah Sheriffs' Association's contract --
22  they contract out with a third party to come in and
23  do a separate review that enforces those 614
24  standards.
25       Q.    So for the internal review, who conducts
```

TODD MICHAEL RICHARDSON - August 24, 2018

1  that?  Is that you?

2          A.    We have one of our lieutenants that does

3  that investigation.

4          Q.    How often is that done?

5          A.    He sets up his own schedule, as far as

6  compliance-wise.  So he can break it up, you know.

7  So you're not just taking three weeks and that's all

8  he does.  He breaks it up.  And I've given him the

9  authority to just make sure that we're compliant with

10 those 614 standards.

11         Q.    So it's not like a set -- it's kind of

12 ongoing, is what it sounds like.

13         A.    Yes.

14         Q.    Is it yearly, or is it less often

15 than that?

16         A.    No.  Our internal is more often than that.

17         Q.    Then you mentioned an external one by the

18 Sheriffs' Association.  What does that look like?

19         A.    Again, it's a third party that comes in,

20 and they inspect those 614 standards to make sure

21 that we have compliance.

22         Q.    And have you always passed that one?

23         A.    Yes.

24               MR. DRAPER:  Ultimately.

25               THE WITNESS:  There was a little bit more

TODD MICHAEL RICHARDSON - August 24, 2018

1    to it than saying that you've passed.  You know,
2    you -- I don't know if you --
3         Q.   (BY MR. BACZYNSKI:)  Tell me a little bit
4    more about that process, then.  What does that look
5    like?
6         A.    So every one of those standards -- again,
7    there's critical standards, and those critical
8    standards you have to have compliance with.  There's
9    some other standards that are part of those 614 that
10   are not, you know, security standards or not critical
11   standards, but they're still important to have as a
12   standard.  And sometimes we find that we have one or
13   two -- when we do that 614 inspection, we have one or
14   two that we have to adjust our standards in order to
15   make sure that we're in compliance with those
16   standards.
17            So, yes, we overall pass, but I don't
18   think there's ever a time when we don't have to make
19   some small, little adjustments here and there to make
20   sure that we're in full compliance with every one of
21   the standards.
22        Q.    So let's talk about in-depth incidents in
23   general.  Following an in-depth incident, you've
24   already mentioned that there's kind of an internal
25   review that you ultimately get the decision from.

TODD MICHAEL RICHARDSON - August 24, 2018

1           Do you expect Nurse Ondricek to also do

2    his own review and make sure that nursing practices

3    were followed appropriately?

4           A.    Yes.

5           Q.    What would you expect from that?

6           A.    Again, my expectations are that -- the

7    quality of care.  What is the best practices out

8    there in nursing standards?  What's the best

9    practices in treating, you know, certain types of

10   medical conditions?  That we're in compliance with

11   those best practices and/or that we've got a plan in

12   progress to improve, you know, in those areas.  And

13   so that's my expectation from his -- on his section,

14   is to make sure that we're always doing

15   self-inspections to make sure we're getting better.

16          Q.    Is there a formal process for compliance

17   for somebody like Nurse Ondricek?

18          A.    The formal compliance is with me.  So,

19   ultimately, when he does a review, if they find an

20   area that we need to improve on, I'm notified and

21   then we make those changes.

22          For instance -- and I'll -- we did a look

23   as to generally how fast and the types of services

24   that we provide in our correctional facility, and it

25   was determined that it would be better if we

TODD MICHAEL RICHARDSON - August 24, 2018

1   cross-trained some of our corrections officers as

2   EMTs.  So for the last eight months, we've been

3   cross-training EMTs into our corrections staff so

4   that we're providing a higher level of care in these

5   instances where we have accidents that happen.

6           Q.    So it sounds to me like you expect Nurse

7   Ondricek to check and make sure that proper

8   procedures were followed.  There isn't any sort of

9   strict checklist that he needs to follow in order to

10  do that; it's left to his discretion.  Is that

11  correct?

12          A.    Yeah, using the normal healthcare

13  standards that are out there.  What are the

14  reasonable healthcare standards that are out there?

15          Q.    After an incident like that, would you

16  expect Nurse Ondricek, in his review, to be familiar

17  with all the facts of the medical care that was

18  provided?

19          A.    Yes.

20          Q.    That's kind of just a baseline?

21          A.    Yeah.

22          MR. BACZYNSKI:  Let's take a short break.

23  I know these guys have a bunch of notes for me.  But

24  I think we're pretty close to being done.

25          (Off the record from 10:41 a.m. to

TODD MICHAEL RICHARDSON - August 24, 2018

1   10:52 a.m.)

2        Q.    (BY MR. BACZYNSKI:)  I've just got a

3   couple of cleanup questions here.  I want to just get

4   a better understanding of -- you know, you've changed

5   your course, you're going to put in new protocols

6   now, which I think is great.  You mentioned a

7   conversation that you had with -- I think it was your

8   jail commander, where you'd asked him about, you

9   know, the pros and cons, I guess, of protocols.  Can

10  you tell me a little bit more about that?

11       A.    You're going to have to bring me to

12  what -- what was the context of what we were talking

13  about?

14       Q.    So I had previously asked you what was

15  kind of the spark for putting in protocols now, and

16  you had mentioned there had been a couple incidences.

17  I thought you had said that you had talked to your

18  jail commander about, you know, is there a reason why

19  we shouldn't have them.

20            Is that accurate?

21       A.    To an extent, yes.  What I have them do is

22  review again all the reasons why we did not have a

23  procedural order in place.  And then he referred to a

24  couple, you know, minor instances as to why they

25  ended up getting rid of the procedural order.  And

TODD MICHAEL RICHARDSON - August 24, 2018

1   again, that was when I was a green sheriff, right?
2   At that point, it really didn't seem, when we were
3   reviewing it, that there was no reason why we should
4   not have a procedural order.  So I instructed them
5   to -- my jail commander, which is Arnold Butcher now,
6   and his captain, which is Jeff Jensen, and instructed
7   them to -- I don't care if you have to start at
8   ground zero, you start writing a procedural order.
9        Q.    What kind of guidance did you give them on
10  what this should look like?
11       A.    So on any medical procedural order, the
12  things that I like to see is, again, that you work
13  with our physician and that we go out and look to see
14  what best practices are in correctional facilities
15  our size, and what those procedural orders should
16  look like.  And so that's the guidance that I gave
17  them, is to see what's out there, see what the best
18  practice is, and start at ground zero and build
19  something that would be able to make sense for us for
20  the next decade.
21       Q.    So did they give that task to Nurse
22  Ondricek, or are they working with Nurse Ondricek to
23  put together the protocols?
24       A.    So they're working with Nurse Ondricek.
25  They're also talking to the doctor.

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1              Again, the doctor is another delicate
 2    balance, because medically, when you perform
 3    something, you're performing under his license.  It's
 4    not -- you know, we contract with him to do that.  So
 5    you can't come in, for instance, with something that,
 6    say, we're going to do C-sections in the jail, you
 7    know, and then the doctor is sitting there, Whoa,
 8    whoa, whoa, you know.
 9              What we do is -- again, they're writing up
10    a procedural order.  Then it will go to the doctor.
11    The doctor reviews it and says, Well, that makes
12    sense, and then that's the procedure.
13              So Nurse Ondricek, his job would be to
14    enforce the policies, the procedural order, as
15    they're written.  So not really to write it, but to
16    review it, know it, understand it when it's finally
17    up and running.  He has his opportunity to say
18    things, but I've got the -- Arnold Butcher, the jail
19    commander, has been a paramedic for umpteen years,
20    and he works for AirMed and writes medical policies
21    all the time, so that's who's initially tasked for
22    it.
23         Q.    Other than the people we've talked
24    about -- Nurse Ondricek, Butcher and Jeff Jensen --
25    is there anybody else working on these protocols?
```

TODD MICHAEL RICHARDSON - August 24, 2018

1          A.     Other than the physician to review it.

2          Q.     Yes, yes.  That's right.  Okay.

3                 When you were making your decision to

4    reinstate protocols, what were kind of the pros and

5    cons of protocols, in your mind?

6          A.     Well, my feeling of protocols is they

7    give, you know, general direction.  Ultimately,

8    you're paying for the experience of an individual, so

9    you're paying for the experience and the

10   certification for an RN.  You're paying for the

11   experience and the certification of a paramedic.

12                I can write whatever protocols I want to

13   write, but if you have somebody with zero experience,

14   it's -- you're not going to, you know, get an

15   application that you're looking for, you're not going

16   to get the result that you're looking for.

17                So the protocols have to make sense, as

18   far as structurally, where you start and where you

19   begin; who's going to be transported out, and why;

20   what are the things that you can handle within the

21   facility, and why.  And it gives guidance to the

22   application of -- in that sense.  And so that's

23   really what my expectation is, in the end, is to say,

24   under procedural order, these are the individuals

25   that will be handled this way, and this is the

TODD MICHAEL RICHARDSON - August 24, 2018

1   expected outcome from it.

2        Q.    Let me kind of give you some thoughts, and

3   tell me if you agree with them.  Do you think that

4   protocols will help ensure that a minimum standard of

5   care gets provided?

6        A.    In my view, protocols make sure the best

7   care is provided, not a minimum standard.

8        Q.    You had previously mentioned some

9   incidents that sparked this conversation.  You

10  mentioned this case.  You mentioned what sounded like

11  an intake.  Was there a death involved there?

12       A.    No.  You know, there's -- it's not even

13  just this case.  It's -- generally, we're dealing

14  with hundreds of people a month, and out of those

15  hundreds of people, we get maybe one of us that tells

16  them the truth -- tells us the truth of what they're

17  on, what they've been taking, blah, blah, blah.  And

18  you know, even the times -- their understanding of

19  medicine and how the medicine is applied, is skewed.

20            So when we -- when I looked at this, it

21  was to say, in general, when things occur -- and I

22  know, again, things are occurring, you get somebody

23  that comes in and they're mad because they're not

24  getting Naprosyn, but they're given naproxen.  Well,

25  they don't know that, you know, Naprosyn and naproxen

TODD MICHAEL RICHARDSON - August 24, 2018

1    are the very same thing, you know.

2            That's really the discussions that we're

3    having.  Part of the discussion is just educating the

4    people on what they're actually getting, with an

5    understanding that there's been no delay in medical

6    service to them and, you know, things like this.  And

7    that's all spelled out in the new procedural order,

8    the way that we're working is to make sure that

9    you're half educating at the same time we're -- what

10   they should be doing with medical-wise -- the

11   direction, medical-wise.

12       Q.    Have the protocols been finished yet, or

13   are they --

14       A.    No, they're still -- yeah, when they had

15   to start from ground zero, it --

16       Q.    It takes some time.

17       A.    They were a little agitated, but -- you're

18   the one that hit delete, so -- yeah.

19       Q.    In terms of your expectation for the

20   protocols, I just kind of want to run over a couple

21   of things.  I'm wondering if you're looking for

22   something specific that addresses these things.

23            Traumatic injuries.  Are you looking for a

24   specific protocol that addresses that?

25            MR. BUTTERFIELD:  I'm going to object just

```
1    to the extent that all of this is subsequent remedial
2    measures and potentially not admissible.
3              But go ahead and answer the question.
4              THE WITNESS:  You're talking about
5    everything from traumatic injuries to, I pushed my
6    toothbrush too far into the back of my mouth and now
7    I've got a lesion, you know, by my gums.  It should
8    cover everything.
9         Q.   (BY MR. BACZYNSKI:)  Okay.  But that would
10   also include falls from bunks in the jail?
11        A.   Falls, in general, yes.
12             MR. BACZYNSKI:  I might have just one or
13   two more questions.
14             THE WITNESS:  That's okay.
15             MR. BACZYNSKI:  I'm trying to state
16   them --
17             MR. DRAPER:  Let's take a short break.
18             (Off the record from 11:02 a.m. to
19   11:08 a.m.)
20             MR. BACZYNSKI:  Let's go back on the
21   record.
22        Q.   (BY MR. BACZYNSKI:)  I wanted to just
23   briefly talk to you big picture.  Why does the jail
24   have policies and procedures and protocols?
25             MR. BUTTERFIELD:  Object just on vague.
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1              Go ahead.
 2              MR. DRAPER:  He'll clear it up for you.
 3    No, I'm just kidding.
 4              THE WITNESS:  Again, we have policies and
 5    procedures for a multitude of reasons, from how to
 6    provide safety/security, for our staff, how to
 7    provide safety/security for those individuals that
 8    are in our correctional facility.  Policies on how,
 9    when and why you feed people, and the standard that
10    we're going to use to feed people.  Medical, you've
11    got just a multitude of standards.  And part of that
12    is, again, written and developed and directed in a
13    way that even outside sources can come in and check
14    on you and see, you know, where you're at.
15              I believe that, ultimately, it's to --
16    again, to ensure that you're doing the best you can
17    with what's, you know, given you to accomplish your
18    task.
19         Q.    Specifically in the medical context --
20    because you've said that these individuals have
21    experience, and that's kind of the best benefit of
22    having them there.
23         A.    Uh-huh (affirmative).
24         Q.    What is the benefit of having these
25    specific policies and --
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1              MR. DRAPER:  Procedures, you mean?
 2              MR. BACZYNSKI:  Yes, and procedures.
 3              MR. BUTTERFIELD:  Vague.
 4              Go ahead.
 5              THE WITNESS:  The benefit is, again,
 6   there's clarity.  More clear than just, you know,
 7   solely going off of your experience and -- but at the
 8   same time, experience means a lot of things in the
 9   medical field.  For instance, here it is:  Being a
10   paramedic for 20 years, I walk into a house, I look
11   at somebody.  Your general first impression, specific
12   and separate from what my policies are for a chest
13   pain protocol, for a -- somebody that has diabetes,
14   you know, things like this, you'll look at somebody
15   and you generally can look and see where they are on
16   that scale, how critical they are or how sick they
17   are, and/or the beginning or the end of a disease
18   process.  And so you can go into a situation and look
19   at them and say, Well, he's doing fairly well, and it
20   generally takes you two or three seconds.
21              Well, a policy, again, makes sure that
22   when you come back and you're writing things out,
23   that you can make sure and specifically articulate
24   everything that you've done, and to just generally
25   have an idea of if, you know, you left something out
```

1  and how critical that would be, you know, to the
2  whole process.
3          Ultimately, for me, again, that procedural
4  order is the ability to send a report to me, saying,
5  I went in there, I did this evaluation, and when I
6  did my evaluation, this is how healthy or, you know,
7  how unhealthy the person was.  And that's really what
8  the benefit to a procedural order is.
9      Q.    (BY MR. BACZYNSKI:)  Okay.  I appreciate
10 that.
11         Clearly, there's -- if you have a bad
12 policy, that's not great, but are there any other
13 negatives associated with putting into place policies
14 and practices and protocols?
15         MR. BUTTERFIELD:  Vague, speculation,
16 incomplete hypothetical.
17         You can answer.
18         THE WITNESS:  The downside to putting in
19 policies is that you can over-policy things, and you
20 can put so much stuff in there that -- and it's so
21 onerous that there's just no reasonable way that
22 somebody is going to be able to cover all those
23 factors in a call.
24         MR. BACZYNSKI:  Okay.  Thank you.  Those
25 are all my questions.

TODD MICHAEL RICHARDSON - August 24, 2018

1          MR. DRAPER:  Okay, great.  Thanks, guys.

2          MR. BUTTERFIELD:  Thank you.  I don't have

3    any questions.

4          We'll read and sign.

5          (The deposition proceedings were concluded

6    at 11:13 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1                    REPORTER CERTIFICATE

 2

 3

     STATE OF UTAH              )
 4                              )
     COUNTY OF SALT LAKE        )
 5

 6

 7        I, Jennifer Nazer Braun, Certified Shorthand
     Reporter and Registered Professional Reporter
 8   for the State of Utah, do hereby certify:

 9        That the foregoing proceedings were taken before
     me at the time and place set forth herein; and that
10   the proceedings were taken down by me in stenograph
     and thereafter transcribed into typewriting under my
11   direction and supervision;

12        That the foregoing pages contain a true and
     correct transcription of my said notes so taken.
13
          I further certify that I am not of kin or
14   otherwise associated with any of the parties, nor do
     I have a financial interest in said action.
15

16

17   _____
18   Jennifer Nazer Braun, CSR, RPR

19

20

21

22

23

24

25
```

TODD MICHAEL RICHARDSON - August 24, 2018

```
 1   Case:  STELLA VS. DAVIS COUNTY, ET AL.
     Case No:  1:18-cv-002    Date:  August 24, 2018
 2   Reporter:  Jennifer Nazer Braun, Q&A Reporting, Inc.
     1872 South Main St., Salt Lake City, Utah  84115
 3
                      WITNESS CERTIFICATE
 4
     STATE OF UTAH               )
 5                               )
     COUNTY OF SALT LAKE         )
 6
             I, TODD MICHAEL RICHARDSON, HEREBY DECLARE
 7   UNDER PENALTY OF PERJURY:  That I am the witness
     referred to in the transcript; that I have read the
 8   transcript and know the contents thereof; that with
     these corrections, I have noted this transcript truly
 9   and accurately reflects my testimony.

10   PAGE LINE        CHANGE/CORRECTION          REASON
     ____ ____   _____ _____
11
     ____ ____   _____ _____
12
     ____ ____   _____ _____
13
     ____ ____   _____ _____
14
     ____ ____   _____ _____
15
     ____ ____   _____ _____
16
     ____ ____   _____ _____
17
     ____ ____   _____ _____
18
     ____ ____   _____ _____
19
        ____        No corrections were made
20
                         _____
21                       TODD MICHAEL RICHARDSON

22   SUBSCRIBED AND SWORN to before me

23   this _____ day of _____, 2018.

24            Notary Public: _____

25   My Commission Expires: _____
```

# A

**ability (1)**
48:4
**able (4)**
10:15;18:25;40:19;
48:22
**above (3)**
12:18;14:11;31:5
**Absolutely (1)**
9:13
**accept (1)**
30:2
**accidents (1)**
38:5
**accomplish (1)**
46:17
**accurate (2)**
23:13;39:20
**accurately (1)**
51:9
**actively (2)**
16:11;21:17
**actually (1)**
44:4
**addition (1)**
13:14
**address (1)**
5:9
**addresses (2)**
44:22,24
**adjust (1)**
36:14
**adjusted (1)**
19:10
**adjustments (1)**
36:19
**administration (1)**
12:9
**administrative (1)**
10:21
**admissible (1)**
45:2
**affirmative (10)**
6:3;12:8;17:18,21;
23:17;24:25;28:3;
31:16;34:15;46:23
**again (30)**
5:22;13:17;18:6,
18;20:4;21:21;22:12;
27:2;28:17,18,20;
29:24;30:6;32:2;
34:1;35:19;36:6;
37:6;39:22;40:1,12;
41:1,9;43:22;46:4,12,
16;47:5,21;48:3
**against (1)**
21:6
**agencies (2)**
21:5,6
**agitated (1)**
44:17

**ago (4)**
24:22,23;29:7;
30:18
**agree (1)**
43:3
**ahead (6)**
9:1;10:13;18:13;
45:3;46:1;47:4
**aid (2)**
23:23;24:6
**ailments (1)**
23:21
**AirMed (1)**
41:20
**AL (1)**
51:1
**allow (1)**
29:23
**almost (1)**
11:3
**always (3)**
9:2;35:22;37:14
**And/or (4)**
22:10;23:24;37:11;
47:17
**anymore (1)**
25:12
**application (2)**
42:15,22
**applied (9)**
9:10;15:18,25;
19:10;20:7,18;21:4;
27:5;43:19
**applies (2)**
16:16;21:10
**apply (7)**
13:17;15:23;16:16,
18;19:1;22:9,13
**applying (1)**
30:25
**appreciate (2)**
13:4;48:9
**appropriate (1)**
7:22
**appropriately (1)**
37:3
**approves (1)**
30:14
**arduous (1)**
6:17
**area (1)**
37:20
**areas (1)**
37:12
**Arnold (2)**
40:5;41:18
**around (1)**
26:2
**articulate (1)**
47:23
**associated (1)**
48:13
**Association (4)**

22:2;31:9;34:18;
35:18
**Association's (1)**
34:21
**attention (1)**
31:3
**attorneys (1)**
21:3
**audit (4)**
31:18;32:14;34:18,
20
**audits (6)**
31:9,10,11,23;
33:21;34:9
**August (1)**
5:1
**authority (2)**
23:25;35:9
**authorized (1)**
24:1
**avoid (1)**
6:3
**aware (2)**
16:2;28:12
**away (1)**
20:9

# B

**back (9)**
26:22;27:16;28:24;
29:15;30:6;7;45:6,
20;47:22
**background (2)**
6:25;17:10
**BACZYNSKI (34)**
5:7;7:4,6;8:17;9:5;
10:18;11:8,10;13:3,
6;17:5;18:1;23:5,6;
25:10,21;26:7,13;
28:8;32:23;33:3,5,8;
36:3;38:22;39:2;
45:9,12,15,20,22;
47:2;48:9,24
**bad (1)**
48:11
**balance (1)**
41:2
**baseline (1)**
38:20
**basically (3)**
8:4;19:14;33:6
**basis (9)**
19:9,11,24;20:19;
21:11;22:4;26:6;
27:23;28:1
**become (1)**
16:2
**becoming (1)**
7:13
**begin (1)**
42:19
**beginning (2)**

27:2;47:17
**benefit (4)**
46:21,24;47:5;48:8
**best (13)**
9:4;16:7;17:14;
22:13;29:25;37:7,8,
11;40:14,17;43:6;
46:16,21
**better (4)**
6:22;37:15,25;39:4
**big (2)**
27:3;45:23
**bit (6)**
6:24;8:1;14:3;
35:25;36:3;39:10
**blah (3)**
43:17,17,17
**board (1)**
15:6
**body (1)**
10:21
**book (2)**
29:22;30:1
**booked (1)**
29:23
**boss (1)**
14:12
**brand-new (1)**
25:18
**Braun (1)**
51:2
**break (6)**
6:8,11,15;35:6;
38:22;45:17
**breaks (1)**
35:8
**briefly (2)**
31:15;45:23
**bring (1)**
39:11
**bringing (1)**
29:21
**Britton (1)**
11:9
**brought (3)**
28:18;29:17;31:3
**build (1)**
40:18
**bunch (1)**
38:23
**bunks (1)**
45:10
**Bureau (13)**
31:6,17,21,22;
32:19,21,22,24;33:1,
4,5,12;34:8
**Butcher (3)**
40:5;41:18,24
**BUTTERFIELD (22)**
8:13,25;10:12;
11:2,7;12:24;13:1;
17:24;18:12;23:3;
25:8,20,23;26:10,19;

27:2;47:17
**benefit (4)**
46:21,24;47:5;48:8
**28:7;32:20;44:25;**
45:25;47:3;48:15;
49:2

# C

**call (5)**
5:16,18;26:5;
31:18;48:23
**called (1)**
5:4
**came (3)**
15:6;26:22;30:6
**can (24)**
5:18;9:17;14:23;
15:14,25;19:9;20:21;
22:6;24:20,20;29:25;
30:15;35:6;39:9;
42:12,20;46:13,16;
47:15,18,23;48:17,
19,20
**captain (2)**
9:21;40:6
**care (9)**
8:21;9:4;10:3;
12:2;13:10;17:14;
18:25;19:1,21;23:8,
21;29:25;30:11;37:7;
38:4,17;40:7;43:5,7
**carry (1)**
24:14
**case (7)**
8:11;9:15;16:3;
29:19;43:10,13;51:1
**case-by-case (1)**
26:6
**cases (1)**
29:20
**certain (1)**
37:9
**certification (5)**
18:6,19,20;42:10,
11
**change (5)**
15:15;16:4,6,15,15
**CHANGE/CORRECTION (1)**
51:10
**changed (2)**
14:17;39:4
**changes (3)**
16:11;17:13;37:21
**changing (3)**
16:2;19:4;20:2
**characterization (1)**
31:19
**check (2)**
38:7;46:13
**checking (1)**
27:7
**checklist (1)**
38:9
**chest (1)**
47:12

STELLA V.
DAVIS COUNTY

TODD MICHAEL RICHARDSON
August 24, 2018

**civil (1)**
21:2
**clarity (1)**
47:6
**classes (1)**
18:15
**cleanliness (1)**
32:9
**cleanup (1)**
39:3
**clear (5)**
6:6;11:7;25:9;
46:2;47:6
**Clearly (1)**
48:11
**clicks (1)**
19:20
**close (1)**
38:24
**coming (4)**
5:8;9:22;32:24;
34:9
**commander (7)**
9:20;12:4;28:19;
39:8,18;40:5;41:19
**Commission (1)**
51:25
**communication (2)**
29:6,8
**compliance (11)**
22:9;31:4,13;
34:19;35:21;36:8,15,
20;37:10,16,18
**compliance-wise (1)**
35:6
**compliant (1)**
35:9
**complying (1)**
30:20
**concerns (1)**
30:5
**concluded (1)**
49:5
**conditions (3)**
23:21;32:9;37:10
**conducted (1)**
9:14
**conducts (1)**
34:25
**confines (1)**
10:4
**confused (1)**
33:20
**cons (2)**
39:9;42:5
**consider (1)**
8:3
**consideration (1)**
16:23
**contacted (1)**
29:12
**contents (1)**
51:8

**context (2)**
39:12;46:19
**contract (5)**
12:21;14:19;34:21,
22;41:4
**contracted (2)**
13:7;14:14
**conversation (2)**
39:7;43:9
**core (1)**
18:24
**correction (1)**
32:20
**correctional (7)**
8:5;15:17;22:12;
31:1;37:24;40:14;
46:8
**corrections (13)**
18:15;20:6;31:8,
17,21,23;32:19,22,
25;33:17;34:9;38:1,3
**County (8)**
7:14;14:14;15:2;
23:22;24:2,5;26:17;
51:1
**couple (7)**
15:14;22:5;26:20;
39:3,16,24;44:20
**course (1)**
39:5
**cover (2)**
45:8;48:22
**create (1)**
7:20
**critical (10)**
19:18;20:4,9,19;
21:2;36:7,7,10;
47:16;48:1
**cross-trained (1)**
38:1
**cross-training (1)**
38:3
**C-sections (1)**
41:6
**curious (1)**
14:25
**current (1)**
18:9

**D**

**Dan (1)**
5:18
**date (2)**
14:18;17:6
**Davis (8)**
7:14;14:14;15:2;
23:22;24:2,5;26:17;
51:1
**day (1)**
51:23
**dealing (1)**
43:13

**death (3)**
9:12;20:5;43:11
**deaths (2)**
9:6,7
**decade (1)**
40:20
**decision (5)**
12:1;30:6,16;
36:25;42:3
**deficit (1)**
17:12
**delay (1)**
44:5
**delete (1)**
44:18
**deleted (2)**
28:23;29:3
**delicate (1)**
41:1
**delivered (2)**
12:1;14:1
**demographics (1)**
22:11
**dentist (1)**
23:24
**department (8)**
24:11,13;25:5,11,
22;31:8;33:16;34:8
**depends (1)**
21:1
**deposed (2)**
5:19;28:8
**deposition (3)**
5:23;12:11;49:5
**deputy (1)**
7:14
**description (1)**
18:23
**detail (1)**
8:1
**determined (1)**
37:25
**developed (3)**
22:2;23:23;46:12
**developing (1)**
28:10
**diabetes (1)**
47:13
**different (2)**
15:14;20:1
**differing (1)**
15:24
**difficult (2)**
6:5;11:15
**directed (2)**
27:5;46:12
**direction (5)**
21:7;23:25;28:24;
42:7;44:11
**directive (1)**
20:20
**discovery (1)**
15:1

**discretion (1)**
38:10
**discussed (1)**
34:7
**discussion (1)**
44:3
**discussions (1)**
44:2
**disease (1)**
47:17
**division's (1)**
29:13
**doctor (6)**
30:7;40:25;41:1,7,
10,11
**documentation (1)**
10:8
**done (8)**
10:25;21:5,19;
23:19;26:6;35:4;
38:24;47:24
**DOPL (8)**
25:13,14,19;26:16,
22;27:11;29:6,11
**down (3)**
6:5;11:12;22:20
**downside (1)**
48:18
**Dr (13)**
13:20;14:3,11,15,
20;16:9;17:3,3,22;
18:4;19:3;21:17;
30:12
**draft (2)**
20:12,25
**drafted (4)**
15:4,5;24:2;26:18
**drafting (1)**
30:17
**DRAPER (7)**
7:2;17:4;35:24;
45:17;46:2;47:1;49:1
**driven (1)**
22:6
**Drop (3)**
27:12,15;29:7
**drugs (1)**
30:4
**due (1)**
19:16
**duly (1)**
5:4
**during (3)**
11:19;15:4,9

**E**

**educating (2)**
44:3,9
**effect (1)**
24:12
**eight (1)**
38:2

**either (1)**
19:2
**eliminated (1)**
24:16
**else (3)**
8:2;20:24;41:25
**e-mailed (1)**
20:21
**employees (2)**
27:8;30:19
**EMTs (2)**
38:2,3
**enacted (1)**
21:14
**encounter (1)**
25:2
**end (3)**
34:2;42:23;47:17
**ended (1)**
39:25
**enforce (2)**
7:21;41:14
**enforces (1)**
34:23
**ensure (5)**
30:10;19;31:13;
43:4;46:16
**entity (3)**
34:4,5,6
**ET (1)**
51:1
**evaluated (1)**
22:3
**evaluation (2)**
48:5,6
**even (4)**
27:4;43:12,18;
46:13
**everybody (2)**
20:21;21:15
**exact (1)**
24:21
**EXAMINATION (1)**
5:6
**examined (1)**
5:5
**Exhibit (1)**
23:15
**expect (7)**
6:10;14:3,6;37:1,5;
38:6,16
**expectation (4)**
10:10;37:13;42:23;
44:19
**expectations (1)**
37:6
**expected (1)**
43:1
**experience (7)**
42:8,9,11,13;
46:21;47:7,8
**Expires (1)**
51:25

**Explain (1)**
  17:8
**extent (2)**
  39:21;45:1
**external (1)**
  35:17

## F

**facilitate (1)**
  6:9
**facilities (4)**
  16:19,20;26:2;
  40:14
**facility (13)**
  8:5;13:11;15:17,
  20;16:18;19:1;22:12,
  14;26:2;31:1;37:24;
  42:21;46:8
**fact (2)**
  8:22;33:25
**factors (3)**
  16:23;18:9;48:23
**facts (3)**
  8:10;10:22;38:17
**fair (2)**
  18:22;31:18
**fairly (2)**
  17:10;47:19
**fall (1)**
  13:17
**falls (2)**
  45:10,11
**familiar (3)**
  5:21;8:10;38:16
**far (4)**
  19:15;35:5;42:18;
  45:6
**fast (1)**
  37:23
**FBOP (2)**
  31:23;33:2
**Federal (7)**
  31:6,7,22;32:21;
  33:4,7;34:4
**feed (2)**
  46:9,10
**feel (1)**
  17:13
**feeling (1)**
  42:6
**feels (1)**
  17:11
**few (1)**
  29:19
**field (1)**
  47:9
**Fielding (1)**
  12:3
**filing (1)**
  8:11
**filled (1)**
  17:12

**final (1)**
  12:1
**finally (2)**
  21:9;41:16
**find (7)**
  10:22;22:7,13;
  24:20;30:1;36:12;
  37:19
**finding (1)**
  11:21
**finish (2)**
  11:4;25:8
**finished (1)**
  44:12
**first (4)**
  23:18,23;24:6;
  47:11
**fit (1)**
  16:7
**fits (1)**
  17:11
**fixes (1)**
  21:7
**flexibility (1)**
  26:23
**focus (1)**
  12:10
**follow (1)**
  38:9
**followed (2)**
  37:3;38:8
**following (3)**
  27:24;28:17;36:23
**follows (1)**
  5:5
**food (1)**
  7:22
**formal (2)**
  37:16,18
**Foundation (8)**
  10:12;17:24;18:12;
  25:20,23;26:10,19;
  28:7
**four (1)**
  19:11
**fourth (1)**
  11:11
**full (2)**
  29:23;36:20
**further (1)**
  23:12
**future (1)**
  15:22

## G

**gave (1)**
  40:16
**general (7)**
  19:16;21:4;36:23;
  42:7;43:21;45:11;
  47:11
**Generally (8)**

13:10;17:11;19:16;
37:23;43:13;47:15,
20,24
**generated (1)**
  15:25
**gets (2)**
  14:9;43:5
**given (5)**
  7:22;26:24;35:8;
  43:24;46:17
**gives (1)**
  42:21
**giving (1)**
  19:21
**goal (1)**
  29:24
**goes (1)**
  10:11
**good (1)**
  28:21
**govern (1)**
  23:8
**governance (1)**
  8:4
**great (3)**
  39:6;48:12;49:1
**green (2)**
  25:16;40:1
**ground (5)**
  5:22;11:11;40:8,
  18;44:15
**guess (4)**
  14:2;16:10;24:20;
  39:9
**guidance (3)**
  40:9,16;42:21
**gums (1)**
  45:7
**guru (1)**
  12:7
**guys (2)**
  38:23;49:1

## H

**half (1)**
  44:9
**hand (1)**
  21:8
**handle (2)**
  30:10;42:20
**handled (1)**
  42:25
**happen (2)**
  11:18;38:5
**happened (2)**
  8:16;26:21
**happens (3)**
  15:13;20:3;22:1
**happy (1)**
  6:9
**head (5)**
  6:3,4;24:24;28:2;

34:14
**health (7)**
  13:10;23:25;24:11,
  13;25:5,11,22
**healthcare (2)**
  38:12,14
**healthy (1)**
  48:6
**Heather (4)**
  8:8,21;10:4;12:1
**help (3)**
  5:23;15:17;43:4
**helps (1)**
  11:11
**Hey (1)**
  16:5
**hierarchy (1)**
  12:13
**higher (1)**
  38:4
**history (1)**
  30:3
**hit (1)**
  44:18
**hold (4)**
  6:10;16:21;19:15;
  32:3
**hour (1)**
  20:22
**house (1)**
  47:10
**housed (1)**
  7:23
**Huh-uh (1)**
  23:2
**hundreds (2)**
  43:14,15
**hypothetical (1)**
  48:16

## I

**idea (1)**
  47:25
**identification (1)**
  23:20
**illegal (1)**
  30:4
**implemented (3)**
  20:9;21:3;22:15
**important (2)**
  5:24;36:11
**impression (1)**
  47:11
**improve (2)**
  37:12,20
**Inc (1)**
  51:2
**incidences (1)**
  39:16
**incident (10)**
  9:8;15:13,19;
  24:11;28:17,18;

29:16,18;36:23;
38:15
**incidents (2)**
  36:22;43:9
**include (2)**
  34:9;45:10
**incomplete (1)**
  48:16
**in-depth (2)**
  36:22,23
**individual (1)**
  42:8
**individuals (5)**
  7:23;13:11;42:24;
  46:7,20
**information (1)**
  11:22
**initially (1)**
  41:21
**injuries (2)**
  44:23;45:5
**inmates (7)**
  7:22;16:20;17:15;
  23:22;27:5,6;29:21
**inside (3)**
  19:1;26:1,21
**inspect (1)**
  35:20
**inspected (5)**
  31:5,6,7,8;32:4
**inspection (1)**
  36:13
**inspections (2)**
  30:24;31:12
**instance (3)**
  37:22;41:5;47:9
**instances (5)**
  26:20,25;27:1;
  38:5;39:24
**instantaneously (1)**
  19:23
**instructed (3)**
  28:22;40:4,6
**intake (1)**
  43:11
**internal (9)**
  10:20;31:9,11;
  34:13,18,20,25;
  35:16;36:24
**Internally (1)**
  8:23
**interviews (6)**
  10:11,14,16,19,22,
  24
**into (17)**
  10:11,22;16:15,23,
  24;19:15;20:13,24;
  28:20;29:17;30:7;
  34:10;38:3;45:6;
  47:10,18;48:13
**investigate (1)**
  8:18
**investigation (2)**

8:20;35:3
**involved (1)**
43:11
**involvement (2)**
8:7;12:5
**issue (3)**
19:3;21:8;26:16
**issues (1)**
31:4

**J**

**jail (23)**
7:19,20;9:6,7,20;
12:4;17:6;18:11,21;
21:16;23:9,22,24;
26:21;28:19;34:10;
39:8,18;40:5;41:6,
18;45:10,23
**jails (3)**
26:8,9;28:5
**Jail's (1)**
26:17
**January (2)**
7:12,16
**Jeff (2)**
40:6;41:24
**Jen (1)**
11:12
**Jennifer (1)**
51:2
**Jensen (2)**
40:6;41:24
**job (2)**
13:12;41:13

**K**

**keep (5)**
7:20;12:25;17:6,
19;18:9
**kept (1)**
18:7
**Kevin (1)**
12:3
**kidding (1)**
46:3
**kind (23)**
11:20;12:6,10,14;
13:22;15:24;16:21;
17:19;19:15;23:7;
25:2;27:16;29:16;
31:14;35:11;36:24;
38:20;39:15;40:9;
42:4;43:2;44:20;
46:21
**kinds (1)**
5:21
**knowledge (1)**
10:9
**knows (1)**
21:15

**L**

**lack (1)**
29:17
**large (1)**
9:8
**last (2)**
18:16;38:2
**law (2)**
7:24;16:3
**lawsuit (1)**
8:11
**least (3)**
19:11;32:17;33:9
**left (2)**
38:10;47:25
**lesion (1)**
45:7
**less (1)**
35:14
**level (1)**
38:4
**Lexipol (1)**
20:14
**library (1)**
7:24
**license (1)**
41:3
**licensing (1)**
29:14
**licensure (1)**
18:7
**lieutenant (1)**
9:21
**lieutenants (1)**
35:2
**life (1)**
20:5
**light (2)**
28:18;29:17
**limited (1)**
13:12
**LINE (1)**
51:10
**little (11)**
6:24;8:1,14;14:2;
20:1;33:24;35:25;
36:3,19;39:10;44:17
**living (1)**
32:9
**long (5)**
6:10,25;7:11,15;
14:14
**look (26)**
8:24;9:8;15:16,21;
16:15;21:4,20;23:15;
28:19;32:1,6,8,8,9,
10;34:16;35:18;36:4;
37:22;40:10,13,16;
47:10,14,15,18
**looked (1)**
43:20

**looking (9)**
16:11;32:18;33:11,
23;34:1;42:15,16;
44:21,23
**lot (2)**
27:22;47:8

**M**

**mad (1)**
43:23
**maintain (1)**
18:8
**makes (4)**
21:7;22:18;41:11;
47:21
**making (3)**
21:6,23;42:3
**manual (10)**
15:2,3,7;16:25;
20:15;22:21;23:10,
12;27:21;30:21
**many (1)**
30:8
**marshals (4)**
31:7;32:13;33:8;
34:8
**maybe (1)**
43:15
**mean (6)**
10:11;22:20;24:9;
25:17;30:22;47:1
**meaning (1)**
28:19
**means (4)**
15:14;23:20;25:18;
47:8
**measures (1)**
45:2
**medical (25)**
7:24;8:7,21;10:3;
13:15,16,22;14:1;
17:2,10;19:1;23:8,
21;29:25;30:3,11;
32:8;37:10;38:17;
40:11;41:20;44:5;
46:10,19;47:9
**medically (1)**
41:2
**medical-wise (2)**
44:10,11
**medications (1)**
30:3
**medicine (4)**
13:17;27:5;43:19,
19
**meeting (3)**
19:13;21:12,24
**meetings (4)**
16:13;17:16;19:7;
27:25
**memo (1)**
20:20

**mentioned (16)**
11:11;17:16;21:11;
26:25;29:16;31:17;
32:13;33:16;34:13;
35:17;36:24;39:6,16;
43:8,10,10
**MICHAEL (3)**
5:3;7:9;51:21
**middle (1)**
16:22
**might (4)**
10:16;22:19;34:2;
45:12
**Miller (4)**
8:8,22;10:4;29:20
**Miller's (1)**
12:1
**mind (2)**
23:18;42:5
**minimum (3)**
31:25;43:4,7
**minor (2)**
23:21;39:24
**month (2)**
16:14;43:14
**monthly (2)**
17:16;28:1
**months (3)**
22:20;30:18;38:2
**more (11)**
6:9,16;8:1;22:23;
27:12;35:16,25;36:4;
39:10;45:13;47:6
**mostly (1)**
12:6
**mouth (1)**
45:6
**much (1)**
48:20
**multitude (4)**
16:17,22;46:5,11

**N**

**name (4)**
7:3;7:14:23,24
**Naprosyn (2)**
43:24,25
**naproxen (2)**
43:24,25
**national (5)**
15:15;16:1,12;
17:20;19:4
**Nazer (1)**
51:2
**need (4)**
6:8,11;17:12,14;
25:3;37:20
**needs (2)**
6:17;38:9
**negative (1)**
23:2
**negatives (1)**

**48:13**
**new (6)**
20:3;21:13;28:10,
19;39:5;44:7
**next (4)**
19:4;20:7,10;40:20
**nodding (3)**
24:24;28:2;34:14
**nods (1)**
6:4
**noes (1)**
5:25
**normal (1)**
38:12
**Notary (1)**
51:24
**notes (1)**
38:23
**notice (1)**
20:2
**notified (3)**
8:15;16:14;37:20
**number (1)**
18:19
**Nurse (24)**
12:14,18,20;14:6;
17:4,5,22;18:3,5,8;
19:2;21:17;23:7;
26:5;28:9;37:1,17;
38:6,16;40:21,22,24;
41:13,24
**nurses (8)**
12:14,15;13:13;
14:4,7;26:1,24;27:7
**nursing (10)**
12:13,19;13:23,25;
18:11,24;29:14;32:6;
37:2,8

**O**

**object (2)**
44:25;45:25
**occur (1)**
43:21
**occurred (2)**
9:3;26:21
**occurring (2)**
15:22;43:22
**occurs (1)**
15:20
**off (8)**
16:3,3;21:10;22:6;
32:4;38:25;45:18;
47:7
**office (1)**
13:18
**officers (2)**
20:6;38:1
**often (7)**
5:16;31:24;32:16;
33:21;35:4,14,16
**old (1)**

29:1
**once (2)**
    16:13;20:25
**Ondricek (22)**
    12:14,18;14:6;
    17:3,4,5,22;18:3,5;
    19:2;21:17;23:7;
    28:9;37:1,17;38:7,
    16;40:22,22,24;
    41:13,24
**one (18)**
    18:16,19;21:9;
    22:6;24:17;27:23;
    30:5;31:20;35:2,17,
    22;36:6,12,13,20;
    43:15;44:18;45:12
**onerous (1)**
    48:21
**ongoing (1)**
    35:12
**operations (2)**
    19:17;21:4
**opportunity (2)**
    5:16;41:17
**order (20)**
    17:14;25:4,25;
    26:4;28:21;30:7,9;
    36:14;38:9;39:23,25;
    40:4,8,11;41:10,14;
    42:24;44:7;48:4,8
**ordered (1)**
    28:14
**orders (3)**
    23:16;27:14;40:15
**originally (2)**
    15:4,5
**ourselves (1)**
    34:20
**out (21)**
    6:21;11:4;16:6;
    20:20,21;22:7;24:15,
    19;30:23;32:4;34:22;
    37:7;38:13,14;40:13,
    17;42:19;43:14;44:7;
    47:22,25
**outcome (1)**
    43:1
**outside (1)**
    46:13
**over (7)**
    5:22;7:25;11:12;
    12:20;17:9;31:5;
    44:20
**overall (4)**
    8:4;13:17;34:1;
    36:17
**over-policy (1)**
    48:19
**own (3)**
    31:9;35:5;37:2

**P**

**PAGE (1)**
    51:10
**paid (1)**
    18:14
**pain (1)**
    47:13
**paragraph (1)**
    23:19
**paramedic (4)**
    17:9;41:19;42:11;
    47:10
**part (3)**
    36:9;44:3;46:11
**party (2)**
    34:22;35:19
**pass (1)**
    36:17
**passed (4)**
    32:11;33:14;35:22;
    36:1
**pay (1)**
    18:6
**paying (3)**
    42:8,9,10
**PENALTY (1)**
    51:7
**pending (1)**
    6:14
**people (9)**
    5:16;19:24;30:1;
    41:23;43:14,15;44:4;
    46:9,10
**perform (1)**
    41:2
**performing (1)**
    41:3
**PERJURY (1)**
    51:7
**person (1)**
    48:7
**personal (1)**
    8:7
**personally (2)**
    8:17;9:17
**personnel (1)**
    24:1
**physician (8)**
    12:20;13:6;14:19;
    16:4;23:24;26:5;
    40:13;42:1
**picture (1)**
    45:23
**place (9)**
    10:2,16,17;21:18;
    23:1,8;24:6;39:23;
    48:13
**plan (1)**
    37:11
**plug (1)**
    20:13
**point (7)**
    5:12;6:8,20;13:25;
    24:10,17;40:2

**pointed (1)**
    23:9
**policies (36)**
    9:9;10:1;12:9;
    13:17;15:3,7,13,25;
    16:1;17:1;18:11;
    19:9,12,15,19;21:14,
    18,22,23;22:6,18;
    23:7,10;27:22;30:20;
    31:13;32:7;41:14,20;
    45:24;46:4,8,25;
    47:12;48:13,19
**policy (36)**
    7:21,21;10:5,6,20;
    13:16;15:2,15,16,19,
    21,21,23;16:7,7,24,
    24;17:11,13;19:6,23;
    20:3,12,14,23;21:1,5,
    24;22:8,8,13,21;
    24:12;27:21;47:21;
    48:12
**policy-wise (1)**
    9:17
**possible (1)**
    9:4
**possibly (1)**
    29:25
**potentially (1)**
    45:2
**practice (3)**
    9:6;16:8;40:18
**practices (10)**
    17:1;18:11;30:20;
    32:6;37:2,7,9,11;
    40:14;48:14
**prefer (1)**
    5:9
**preferred (1)**
    5:25
**pretty (2)**
    28:5;38:24
**prevent (1)**
    15:21
**previously (2)**
    39:14;43:8
**prior (4)**
    7:13;8:11;14:19;
    24:10
**Prison (2)**
    33:1,7
**Prisons (6)**
    31:6;32:21;33:4,5,
    12;34:8
**probably (2)**
    22:23;33:19
**problem (3)**
    5:17;11:16;14:25
**procedural (20)**
    25:4,25;26:4;
    27:14,21;28:20;30:7,
    9;39:23,25;40:4,8,11,
    15;41:10,14;42:24;
    44:7;48:3,8

**procedure (1)**
    41:12
**procedures (12)**
    15:2,3,7;23:8,23;
    24:6;31:13;38:8;
    45:24;46:5;47:1,2
**proceedings (1)**
    49:5
**process (10)**
    15:12;16:10;19:5,
    8;21:16;28:9;36:4;
    37:16;47:18;48:2
**processes (1)**
    30:8
**program (1)**
    20:24
**progress (1)**
    37:12
**proper (3)**
    7:23,24;38:7
**pros (2)**
    39:9;42:4
**protocol (3)**
    23:16;44:24;47:13
**protocols (40)**
    23:11,23;24:3,6,12,
    14,15,17;25:1,12;
    26:8,9,17;27:12,13,
    15;28:4,10;29:1,7,17;
    30:13,14,17;39:5,9,
    15;40:23;41:25;42:4,
    5,6,12,17;43:4,6;
    44:12,20;45:24;
    48:14
**provide (5)**
    17:14;23:20;37:24;
    46:6,7
**provided (6)**
    8:21;10:3;15:1;
    38:18;43:5,7
**providing (2)**
    9:4;38:4
**provision (1)**
    13:10
**psychiatrist (1)**
    23:24
**Public (1)**
    51:24
**pull (2)**
    21:21,24
**pulled (2)**
    24:15,19
**pushed (1)**
    45:5
**put (13)**
    6:5;11:12;16:24;
    19:15,23;20:7,20,23,
    23;24:5;39:5;40:23;
    48:20
**putting (4)**
    30:12;39:15;48:13,
    18

**Q**

**Q&A (1)**
    51:2
**quality (2)**
    19:21;37:7
**quarter (1)**
    21:13
**quarterly (8)**
    19:9,11,13,24;20:8,
    10,18;21:11
**queue (2)**
    20:7,18
**quick (1)**
    11:17
**quicker (1)**
    5:23

**R**

**read (4)**
    17:12;22:21;30:24;
    49:4
**reading (1)**
    23:18
**ready (1)**
    20:25
**really (5)**
    40:2;41:15;42:23;
    44:2;48:7
**reason (4)**
    28:21;39:18;40:3;
    51:10
**reasonable (2)**
    38:14;48:21
**reasons (2)**
    39:22;46:5
**recall (1)**
    29:9
**receive (1)**
    19:25
**receiving (1)**
    9:23
**record (10)**
    6:5;7:3,7;11:7;
    25:9,17;28:25;38:25;
    45:18,21
**referred (1)**
    39:23
**reflects (1)**
    51:9
**regular (5)**
    18:17,20;22:3,25;
    27:23
**reinstate (1)**
    42:4
**relates (1)**
    21:25
**relation (1)**
    7:19
**relying (2)**
    17:2;18:24

**remedial (1)**
45:1
**remember (7)**
9:23;11:25;14:23;
25:7,19;26:25;27:4
**remnant (2)**
27:16,20
**removal (1)**
27:24
**removed (1)**
27:21
**report (1)**
48:4
**Reporter (1)**
51:2
**Reporting (1)**
51:2
**reports (1)**
30:24
**requires (1)**
24:5
**resolution (2)**
9:22,23
**responding (1)**
5:24
**response (1)**
5:25
**responsibilities (5)**
7:19;13:9,13,15,21
**responsibility (3)**
8:3,5;29:24
**responsible (1)**
16:10
**result (2)**
34:2;42:16
**retrained (1)**
20:10
**review (27)**
9:11,12,14,19;10:8,
11,19;11:21,22;
19:14;20:24;21:3,5,
17;22:17;26:22;
27:22;34:13,23,25;
36:25;37:2,19;38:16;
39:22;41:16;42:1
**reviewed (1)**
26:23
**reviewing (1)**
40:3
**reviews (4)**
9:2,3,17;41:11
**rewrite (3)**
22:8;28:22;29:5
**rewriting (1)**
33:25
**rewritten (1)**
15:9
**RICHARDSON (5)**
5:3,10;7:8,9;51:21
**rid (2)**
26:4;39:25
**Right (16)**
6:2,7;10:20;13:20;

14:18;20:9;22:22;
25:7,15;27:2,4;29:22,
22;33:23;25;40:1;42:2
**RN (1)**
42:10
**role (1)**
12:6
**rough (1)**
24:20
**rule (1)**
11:11
**rules (1)**
5:22
**run (2)**
32:4;44:20
**running (1)**
41:17

**S**

**safety (2)**
19:22;20:5
**safety/security (2)**
46:6,7
**same (6)**
33:22;34:1,2;44:1,
9;47:8
**saying (2)**
36:1;48:4
**scale (1)**
47:16
**schedule (1)**
35:5
**screened (1)**
30:9
**screening (1)**
30:8
**seconds (1)**
47:20
**section (2)**
23:9;37:13
**security (1)**
36:10
**seem (1)**
40:2
**seems (3)**
11:20;13:20;22:16
**self-find (1)**
22:7
**self-inspections (1)**
37:15
**send (1)**
48:4
**sense (7)**
9:9;12:12;21:7;
40:19;41:12;42:17,
22
**separate (2)**
34:23;47:12
**service (1)**
44:6
**services (1)**
37:23

**set (4)**
25:25;30:8;32:3;
35:11
**sets (1)**
35:5
**settings (2)**
18:11,21
**several (1)**
30:22
**shakes (1)**
6:4
**share (1)**
26:8
**Sheriff (20)**
5:8,10,13,16;6:25;
7:1,11,13,14,18;8:15;
15:4,6,10;16:13;
17:16;25:15,16;27:3;
40:1
**sheriffs (2)**
21:24,25
**Sheriffs' (7)**
22:1,10;27:25;
31:9;34:18,21;35:18
**sheriff's (2)**
13:18;20:20
**short (2)**
38:22;45:17
**shortest (1)**
5:11
**shut (1)**
11:17
**sick (1)**
47:16
**sign (1)**
49:4
**significant (1)**
17:10
**signs (1)**
21:10
**similar (4)**
17:23;32:18;33:11,
23
**sit (1)**
22:20
**sitting (1)**
41:7
**situation (2)**
25:3;47:18
**six (4)**
22:20;24:22,23;
29:6
**size (2)**
16:18;40:15
**skewed (1)**
43:19
**slice (1)**
13:22
**small (2)**
16:19;36:19
**software (1)**
20:13
**solely (1)**

47:7
**somebody (9)**
30:9;34:9;37:17;
42:13;43:22;47:11,
13,14;48:22
**sometimes (3)**
30:1;31:3;36:12
**Sorry (3)**
13:1;23:4;25:9
**sort (1)**
38:8
**sounded (1)**
43:10
**sounds (4)**
18:17,20;35:12;
38:6
**sources (1)**
46:13
**spark (1)**
39:15
**sparked (1)**
43:9
**specific (18)**
13:16;14:1,18;
15:20;18:10,15,15,
18,25;19:7,8,20,22;
22:11;44:22,24;
46:25;47:11
**specifically (10)**
12:19;15:17;17:2;
18:21;25:2;26:16;
27:11;31:1;46:19;
47:23
**specifics (1)**
28:20
**speculation (1)**
48:15
**spelled (1)**
44:7
**staff (2)**
38:3;46:6
**standard (13)**
9:5;16:4,6;19:22,
22;22:2,2,10;28:5;
36:12;43:4,7;46:9
**standards (29)**
16:12;17:20;18:25;
19:4;20:2;32:2,3,5;
33:24,25;34:2,17,19,
24;35:10,20;36:6,7,8,
9,10,11,14,16,21;
37:8;38:13,14;46:11
**Standing (1)**
23:16
**start (10)**
5:9;7:4;21:22;30:6,
16;40:7,8,18;42:18;
44:15
**starting (1)**
29:4
**state (15)**
7:2,6;18:8;24:11;
25:5,10,13,21;26:3,

11,13;31:7;34:4,6;
45:15
**stated (1)**
23:11
**STELLA (1)**
51:1
**step (1)**
19:5
**still (5)**
17:12;19:24;24:12;
36:11;44:14
**strict (1)**
38:9
**structurally (1)**
42:18
**stuff (1)**
48:20
**style (1)**
19:17
**SUBSCRIBED (1)**
51:22
**subsequent (1)**
45:1
**sufficient (1)**
22:19
**supervises (1)**
12:19
**supervising (3)**
13:12,23,25
**supervisor (1)**
12:15
**supervisors (2)**
30:23;31:12
**sure (23)**
5:21;7:21;9:3,9;
13:19;20:11;21:6,23;
22:9,22;24:4;35:9,
20;36:15,20;37:2,14,
15;38:7;43:6;44:8;
47:21,23
**sweetest (1)**
5:11
**sworn (2)**
5:4;51:22
**sync (1)**
22:7
**system (2)**
25:14;33:7

**T**

**talk (4)**
9:8;14:2;36:22;
45:23
**talked (5)**
11:23;16:1;23:6;
39:17;41:23
**talking (4)**
11:12;39:12;40:25;
45:4
**task (2)**
40:21;46:18
**tasked (1)**

41:21
**telling (1)**
30:2
**tells (2)**
43:15,16
**tenure (3)**
15:4,9;27:3
**terms (3)**
12:13;13:20;44:19
**tested (1)**
22:3
**testified (1)**
5:5
**testifying (1)**
13:2
**testimony (1)**
51:9
**tests (1)**
27:8
**Thanks (1)**
49:1
**thereof (1)**
51:8
**thinking (1)**
12:25
**third (2)**
34:22;35:19
**though (2)**
18:16,17
**thought (1)**
39:17
**thoughts (1)**
43:2
**thousands (1)**
16:21
**three (3)**
34:7;35:7;47:20
**throughout (4)**
26:9,11,13;31:2
**tightened (1)**
26:24
**times (4)**
19:11;22:24;30:8;
43:18
**today (1)**
12:11
**TODD (5)**
5:3,10;7:8,9;51:21
**together (3)**
20:23;30:13;40:23
**told (2)**
21:23;25:19
**toothbrush (1)**
45:6
**touch (1)**
31:14
**training (4)**
14:3,7;18:9;19:25
**transcript (1)**
51:8
**transported (1)**
42:19
**Traumatic (2)**

44:23;45:5
**treating (1)**
37:9
**treatment (3)**
8:7;23:22;24:6
**truth (3)**
30:2;43:16,16
**Try (4)**
6:3;11:16;16:6;
22:13
**trying (3)**
6:21,23;45:15
**tuberculosis (1)**
27:8
**twice (3)**
31:25;32:17;33:9
**two (4)**
36:13,14;45:13;
47:20
**type (2)**
9:7;13:16
**types (3)**
19:19;37:9,23

**U**

**ultimate (2)**
9:21;11:21
**Ultimately (8)**
10:1;21:9;35:24;
36:25;37:19;42:7;
46:15;48:3
**umbrella (1)**
13:21
**umpteen (1)**
41:19
**unclear (1)**
6:19
**under (5)**
13:18;23:25;41:3;
42:24;51:7
**undoubtedly (1)**
6:19
**unhealthy (1)**
48:7
**uniform (2)**
19:17;26:9
**Unless (1)**
20:19
**up (24)**
10:15;11:17;16:5,
14,20;17:6;18:7,22;
20:3;21:21;22:18;
26:1,24;28:18,21;
30:8;32:24;35:5,6,8;
39:25;41:9,17;46:2
**update (2)**
20:8,10
**Updated (4)**
15:11;19:12,24;
27:24
**up-to-date (1)**
17:19

use (2)
20:14;46:10
**using (4)**
24:13;25:11;30:4;
38:12
**usually (3)**
16:3;20:20;22:1
**Utah (5)**
26:3,12,14;34:17,
21
**utilized (1)**
24:1

**V**

**Vague (5)**
8:13,25;45:25;
47:3;48:15
**vary (1)**
34:2
**varying (1)**
33:24
**verbal (4)**
5:25;9:24;11:25;
29:8
**video (3)**
31:2,4,12
**view (1)**
43:6
**visual (1)**
30:24
**VS (1)**
51:1

**W**

**walk (1)**
47:10
**walk-through (1)**
34:10
**way (12)**
6:22,22;9:10;22:8,
13;24:14;25:25;
26:17;42:25;44:8;
46:13;48:21
**ways (3)**
15:24;22:5;30:22
**wear (1)**
19:18
**weeks (1)**
35:7
**weren't (2)**
27:3,4
**What's (5)**
19:4;23:12;37:8;
40:17;46:17
**Whoa (3)**
41:7,8,8
**whole (3)**
11:4;28:23;48:2
**Who's (3)**
12:20;41:21;42:19
**within (5)**

10:4,6,21;20:22;
42:20
**witness (26)**
5:4;8:14;9:2;
10:14;11:6;12:25;
13:5;17:25;18:14;
23:4;24:24;25:24;
26:11,20;23:2;33:1,4,
6;34:14;35:25;45:4,
14;46:4;47:5;48:18;
51:7
**wondering (1)**
44:21
**Wood (14)**
12:24,25;13:20;
14:3,11,15,20;16:9;
17:3,22;18:4;19:3;
21:17;30:12
**worded (1)**
34:3
**words (2)**
7:20;15:15
**work (4)**
12:10;30:7,15;
40:12
**worked (1)**
10:2
**working (5)**
30:12;40:22,24;
41:25;44:8
**works (1)**
41:20
**write (8)**
15:16,21;16:7;
20:2;22:13;41:15;
42:12,13
**writes (2)**
17:11;41:20
**Writing (4)**
19:6;40:8;41:9;
47:22
**written (10)**
10:7;16:24;19:10;
20:17;22:8,14;24:14;
29:8;41:15;46:12
**wrong (1)**
22:17

**Y**

**year (5)**
19:11;22:24;31:25;
32:17;33:9
**yearly (1)**
35:14
**years (6)**
17:9;24:22,23;
29:6;41:19;47:10
**Yeses (1)**
5:25

**Z**

**zero (4)**
40:8,18;42:13;
44:15

**1**

**10:41 am (1)**
38:25
**10:52 (1)**
39:1
**11:02 am (1)**
45:18
**11:08 (1)**
45:19
**11:13 (1)**
49:6
**13 (1)**
23:15
**15 (1)**
14:17
**18 (1)**
30:18
**1996 (2)**
7:16,17

**2**

**20 (1)**
47:10
**2011 (1)**
7:12
**2014 (1)**
14:17
**2018 (2)**
5:1;51:23
**20-plus (1)**
16:20
**24 (1)**
5:1

**3**

**30 (1)**
17:9

**4**

**400 (1)**
23:9
**405.10 (1)**
27:18

**5**

**50 (1)**
22:23

**6**

**614 (6)**
34:17,23;35:10,20;
36:9,13

**9**

**9:58 (1)**
   5:1

801.484.2929  **Q & A Reporting, Inc.**