# **EXHIBIT 16**



**Todd Vinger & Associates LLC**
435 Shady Lane Ct.
Reno, NV. 89509
(775)846-3445
todd@toddvinger.com
TODDVINGER.COM

09-01-2018

**Tad D Draper, PC**
The Law Offices of Tad D Draper, PC
12339 S 800 E Ste 101
Draper, UT, 84020-8373


Mr. Draper,
Based upon my review of the documents that I've received in this case, re: Heather Ashton Miller, I have prepared this Summary of Opinion.

### SUMMARY:

- Based on the investigative reports, on December 20, 2016 around 04:19 hours, Heather Ashton Miller was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office. On December 21, 2016 around 17:56 hours, Ms. Miller was reported to have fallen from the top bunk in her cell(K-12). She was seen by medical personnel (Nurse Marvin Anderson), but no vital sign readings were taken and then was moved with wheelchair assistance to a different unit and cell(L-7) for medical observation and/or Bottom Bunk Bottom Tier status. The staffs' reports were inconsistent on why Heather Miller was moved either for medical observation or bottom bunk/bottom tier status. Regardless why, no addition observation or monitoring was initiated nor was Ms. Miller placed into the Medical Unit but rather placed unsupervised and alone in a cell within a Unit that only received a Safety and Security Check once an hour. Her condition continued to deteriorate and was later discovered bleeding from her chin, in pain and unable to move on her own. She was assisted into a wheelchair and moved to the Medical unit where Medical staff immediately requested an ambulance and Ms. Miller was transported while requiring CPR as well as defibrillation along the transport to the McKay Dee Hospital, where she was pronounced deceased at 22:06 hours.

### TIME-LINE OF EVETS:

December 20, 2016
04:19        Heather Ashton Miller was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office.
Medical vitals and assessment competed, and she was placed into General Housing.

December 21, 2016
17:56        Ms. Miller was reported to have fallen from the top bunk in her cell(K-12)

18:00        Ms. Miller was discovered by Deputy Lloyd during Safety and Security Check / Head Count for Kilo Unit. Lying on the floor of K-12 and told by Miller's cellmate that Ms. Miller had fallen from the top bunk onto the floor.
Deputy Lloyd calls for emergency medical Assistance via radio and Nurse Marvin Anderson arrives on scene without the medical equipment needed to obtain vitals readings

|       | |
|-------|---|
|       | from the patient. Nurse Marvin Anderson conducts a brief interview and visual assessment of Ms. Miller and decides to have Miller moved to another cell. |
| 18:18 | Ms. Miller was transported by wheelchair to another unit and cell(L-7) for medical observation and/or bottom bunk bottom tier status *(Some reports specify Bottom Bunk Bottom Tier and others discuss potential of double bunking in the medical unit which would indicate that they considered closer observation but filed to increase her observation).*<br>Cpl. Johnson's report stated that Ms. Miller stated that she "couldn't breath" and that she appeared to be hot due to the fact that she was sweating and was trying to lift up her shirt. He also noted that she seemed "Dizzy", so they had her sit at the top of the stairs. She later slowly slid herself down the steps one step at a time where the staff assisted her into a wheelchair to transport her to another unit (L-7). |
| 18:33 | Safety and Security Check (SS) in Lima Unit. |
| 19:32 | Safety and Security Check (SS) in Lima Unit. |
| 20:20 | Safety and Security Check (SS) in Lima Unit.<br>Deputy Lloyd discovers Ms. Miller on the floor of L-7 with little clothing on and a new laceration under her chin with blood on her arms and face.<br>Deputy Lloyd enters the POD (area Control) and called the medical unit to advise of Ms. Miller's status. Based on the Area Control Clerk who witnessed the phone conversation between Dep. Lloyd and Medical, Deputy Lloyd had been advised by medical, "not to think too hard about it". |
| 20:30 | Deputy Lloyd then contacts Deputy Lucius and advises him of his concerns and they both respond back to Lime-7 to check on Ms. Miller.<br>They requested Sgt. Wall to respond to L-7.<br>Upon arrival Sgt. Wall stated that she observed Ms. Miller lying on the floor and when asked if she was OK, Heather Miller moaned and "Thrashed about" on the floor. Sgt. Wall recalled Ms. Miller say, "I hurt everywhere" and that Heather kept repeating that she hurt. In Sgt. Wall's interview with AG investigators she stated that she called the medical unit via the radio asking if they had a bed for Ms. Miller the medical unit responded that they could "double bunk her". Sgt. Wall then instructed staff to move Ms. Miller by wheelchair to the medical unit.<br>Based on Cpl. Johnson's report, while in route to the Medical Unit Ms. Miller had to be assisted in staying in the wheelchair and seemed to suffer from a seizure. |
| 20:39 | Ms. Miller arrives in the medical unit and is seen by Medical personnel.<br>Nurse Marvin Anderson attempts to obtain vital signs for Ms. Miller but was unable to due to Ms. Miller's "thrashing around". |
| 20:43 | EMS was notified |
| 20:49 | EMS Medic 22 On Scene at Davis County Jail |
| 20:54 | Davis County Jail processed a Release from the Facility *(Computer Process)* with a Promise To Appear (PTA) |

20:55 EMS Medic 22 staff arrive at Patient

21:03 EMS Medic 22 left the Davis County Jail and began transport to the McKay Dee Hospital

21:17 Ms. Miller went into Cardiac arrest during transport. Defibrillation and CPR begins.

21:26 EMS Medic 22 arrives at McKay Dee Hospital
Paramedic Chase Harvey Meets Sgt. Hawkins of the Davis County Sheriff's Office at the Hospital and advises him that Ms. Miller had gone into Cardiac Arrest during transport from the Jail and that she had, "presented poorly".
Sgt. Hawkins Phones Sgt. Wall at the jail and advised that they should initiate the proper response to an in-custody death investigation but was frustrated with the jail's response that they felt that they didn't need to.

22:06 Ms. Miller was pronounced deceased.

December 22, 2016

00:20 Weber County Sheriff's Office investigators arrive at the Davis County Jail to begin their investigation and express their frustration that the scene at the jail was unable to be processed because the Staff had already had the areas that Ms. Miller was housed in cleaned.

10:15 Autopsy conducted.
Dr. Christensen's Opinion; Died as a result of blunt force injuries of abdomen sustained when she (Heather Miller) fell from the upper bunk in her cell while attempting to climb down about a day and a half after being booked into the jail.

**FINDINGS:**

As a result of reviewing the investigative reports of the Weber County investigators, the Utah Attorney General's Office Investigators, Office of the Medical Examiner Utah Department of Heath as well as the numerous witness and Officer reports and statements, I have noted the following findings.

- Policies and Procedures for Medical Staff;
  - In reviewing Davis County Correctional Facility Policy and Procedures Manual the Agency refers to National Commission on Correctional Heath Care (NCCHC) standards throughout its policies that refers to medical services but does not make clear if this reference is based of the County using these national best practices and standards to create their policies or if they are meant to be a reference to the standard within NCCHC that should be followed.
  - Based on Policy 401.01 and 401.03 which outlines that the Health Authority is responsible for the Policies and Procedures governing health care, health services, administration and management of the Davis County Jail heath care program policies and "will be developed and Written". Each policy, procedure and program "is reviewed annually and revised as necessary". The Heath Services Policy and Procedure Manual will be available to heath care staff on the X-drive. Medical staff will be responsible to follow these Heath Services Policy and Procedures.
    - I have not been provided with a copy of the Heath Services Policy and Procedures Manual, therefore I am unaware if it has been Written, Annually Reviewed, or followed in the case of Ms. Miller's fall and death? Or if the Jail's basic Policies and Procedures serve as the

Heath Services Policy and Procedures Manual? If the latter is the case, then why would there be directions to write and review the health service policy and procedure manual?
- In review of the AG report Pg. 73of 83 it should be noted that Nurse Supervisor James Ondricek advised Investigators that there is no medical policy beyond the jail policy. This is very inconsistent with the jail Policy 401 that outlines that a Heath Services Policy and Procedures Manual will be written and annually reviewed and followed by medical staff.

- Nurse Marvin Anderson's response to the medical emergency called via radio by Deputy Lloyd.
  - On 12-21-16 at 18:00 hours Deputy Lloyd requested medical respond to assess the injuries of Ms. Miller on the discovery of her fall from the top bunk to the floor. Nurse Marvin Anderson responded to evaluate the injured inmate but did not bring the needed equipment to check the vital signs of the patient.
    - Based on a review of the general jail policies 405.14 B1…3(a, b, c) it states that medical staff will a; Respond immediately carrying the necessary medical supplies and/or equipment with him, b; Evaluate the inmates status. c; provide emergency care.
      - In this case Nurse Marvin Anderson did not bring the needed equipment to obtain the vital signs of the injured inmate but did attempt to treat the patient by providing Ibuprofen. No vital signs were ever obtained for Ms. Miller after her fall until outside EMS staff arrived on scene at 20:55 and they began to assess the patient and transport Ms. Miller to the hospital.
  - In reviewing the reports of POD Clerk Rogers and Deputy Lloyd and the AG report pg. 65-66 it was noted that on 12-21-16 at approximately 20:30 hours while on rounds in Lima Unit Dep. Lloyd found Ms. Miller on the floor of her cell nearly naked with blood on her chin and arms. He immediately went into the control POD for Lima Unit and called the Medical Unit by phone. Clerk Rogers recalls hearing the conversation from Deputy Lloyd as he advised the nurses of the condition he had found Ms. Miller in. Clerk Rogers informed AG investigators that he heard Deputy Lloyd repeat back the nurse's comment of, "so I should just not think too much about it". Clerk Rogers further advised the AG Investigators that as Deputy Lloyd hung up the phone he told Rogers that he was going to get Deputy Lucious to help check on Ms. Miller, which would indicate his heightened concern and seriousness of Mr. Millers condition.
    - Based on my nearly 27 years of public service and experience within corrections I find the deliberate lack of response and lack of attempting to check for any vital signs of the patient nor any continued monitoring or observation of the patient and of the indifferent concern from medical staff for the Patient's condition at that point to be in Clerk Rogers terms "being lazy".
  - In review of the AG Investigative report pg. 56 of 83, when asked by investigators if he is supposed to take vital signs in cases of inmates falling from bunks, Nurse Marvin Anderson stated that he should have done it when he saw her. When asked if he usually does vital signs on falls he stated, "yes".
    - However, this common best practice was not followed in this case.

- Move to Lima-7 rather than the Medical Unit for closer observation.
  - After the brief assessment of Ms. Miller in K-12 Nurse Marvin Anderson decided to have Ms. Miller moved to Lima-7 rather than to the Medical Unit. Based on the AG investigator's interview with Nurse Supervisor James Ondricek (pg. 73-74), Nurse Ondricek advised that the agency's standard process or his expectation for responding to a fall from the top buck ("which occurs approximately once a month") is to "monitor them" including monitoring vital signs. No vital signs were obtained in this case until outside EMS staff arrived and transported Ms. Miller.

- When Ms. Miller was moved from K-12 she needed assistance to walk and Nurse Marvin Anderson had to obtain a wheelchair to move her to L-7 due to the fact that she was unable to walk on her own. In Nurse Supervisor Ondricek's interview, when asked if it would be his expectation as a supervisor for a nurse to bring an inmate to the medical unit or provide further observation if an inmate can not walk or needs to be wheeled out of a unit, he responded with, "absolutely". No addition observation or monitoring was initiated nor was Ms. Miller placed into the Medical Unit but rather placed unsupervised and alone in a cell within a Unit that only received a Safety and Security Check once an hour.
- In the interview by AG Investigators with Corporal Johnson, he advised that is common practice for falls from the top bunk to take the inmate to the medical unit to be assessed. She also said that if someone reported withdrawals they were placed on the bottom bunk or in sever cases placed in the medical unit. Neither was done in this case.
  - Cpl. Johnson advised investigators that she thought that there were no available bunks in the medical unit at that time, so they moved her to a lower bunk(L-7). (Pg.63 AG report)
- In reviewing Davis County Correctional Facility Policy and Procedures Manual section 405.03 (D) it outlines the requirements for the importance of proper housing of inmates based on medical initial assessment. However, when Nurse Marvin Anderson conducted a brief cursory non-vital signs assessment in K-12 he stated that he felt she was suffering from withdrawals. Based on this assessment the policy 405.03(D) would dictate that, "identifying inmates that require housing in the medical infirmary due to a serious medical condition, such as withdrawals or a contagious disease".
  - The inability to walk on their own, dizziness and a complaint of "hurting everywhere" could be considered to a prudent person to potentially be a serious medical condition.
- In reviewing the provided reports there is a question as to the ability to move Ms. Miller into the Medical Unit due to maximum capacity of that unit. Based on the statements from the Medical Unit to Sgt. Wall that they could "double bunk her" this could indicate that the Medical Unit was at capacity that night and that would have been a reason why Ms. Miller was not moved there for closer observation from K-12.
  - In the AG investigators interview with Nurse Supervisor Ondricek, Ondricek explains that the Medical Unit generally remains full, "90% of the time". He also advised that the jail was expanded from 180 inmate capacity to around 900 inmates but the medical unit remained untouched with only 6 medical cells.
  - Cpl. Johnson advised investigators that she thought that there were no available bunks in the medical unit at that time, so they moved her to a lower bunk(L-7). (Pg.63 AG report)
  - When asked by AG Investigators if there were and bunks available in the medical unit that night, Nurse Layton advised investigators that they typically run, "Pretty full".
- Nearly two (2) months after the Death of Ms. Miller, AG investigator Downey received an email from Lt. Callister of the Davis County Sheriff's Office stating that there are six medical cells in the Davis County Jail. He stated that at the time of Ms. Miller's death, one of the medical cells was unoccupied. He sent Investigator Downey the booking sheets of the individuals housed in the medical unit at the time of the incident.
  - This information seems inconsistent due to the fact that the booking sheets provided shows that there were 7 inmates housed in the 6 cells of the Medical Unit that day.
    - Inmates; Rhoades, Torres, Turner, Valdez, Pazell, Bunch, & Kirchgater.

- The amount of inmate falls from top bunks.
  - In reviewing the reports, it seems alarming that there were several staff members advising that falls from the top bunks is very common. Yet, I have not found within the documents provided

that any attempts have been made to reduce the number of falls or to help lessen the effects of these falls.
- In response to the question of how many falls from top bunks the Davis County Jail has had over the past 5 years, the response from Rebecca Abbott, records Manager for Davis County dated December 29, 2017; Davis County Sheriff's personnel have indicated that there have been thirty (30) "injuries reported at the Davis County Jail from inmates falling of the top bunk" between the dates of November 26, 2013 and the date of this letter.
{These numbers would average approximately 7 ½ falls from top bunks a year.}
  - These numbers seem to be inconsistent with the statements in the provided reports of jail medical and correctional staff.
    - When asked by AG Investigator Downey about inmate falls from top bunks, Nurse Layton advised that inmates fall off their bunks beds, "a few times a month".
    - Nurse Supervisor James Ondricek stated in his interview with the AG Investigators, that jail nurses respond to reports of a fall from a top bunk around one time per month.
    - Nurse Marvin Anderson advised investigators, that people fall from bunks regularly.

- Lack of securing the scene for an In-Custody Death review and investigation.
  - Weber County Investigator notes his frustration with the lack of maintaining the sight as potential evidence in the In-custody death protocol.
  - Patrol Sergeant Hawkins had contacted Sergeant Wall shortly after Ms. Miller had arrived at the Hospital. Sgt. Hawkins advised of Ms. Millers serious condition and informed Sgt. Wall that she should secure that scenes in response to the common practice for death investigations. However, Sgt. Wall not only failed to secure any areas but later advised Weber County Investigators that all areas had been cleaned.

**CONCLUSIONS:**
Based on the above-mentioned events and actions I can conclude that the nurse's actions in this event did not conform with the expected practices as outlined by Nursing supervisor Ondricek in his interview with AG Investigators as to his expectations and the common practices for response and treatment of a person suffering from a fall from a top bunk. It is difficult to conclude that the medical policies were followed due to the fact that it is unknown if the Health and Safety Policy and Procedures Manual was ever written or reviewed annually and followed by staff as defined in Davis County Corrections Policy 401.

Based upon decades of experience working within a detention facility, serving as a supervisor within a detention facility, holding the position as a jail commander as well as being a policy maker as an executive administrator of a detention facility I would find it extremely irresponsible to not have written, annually audited and to not regularly trained staff on a Health and Safety Policy and Procedures Manual. In my 30 plus years of experience, I would find it to be an indifferent choice to the health and safety of the inmates housed in the Davis County Jail if the Davis County Jail's leadership has failed to follow their own written policy (401) to create and maintain a Health and Safety Policy and Procedures Manual which is a common and best practice within jails nationwide. My opinion is further supported by the statement below from the National Institute of Corrections.

*"Establishing a written policy and procedures manual to govern correctional health services is essential. If one does not exist, its development is the first step the systemwide health services director should take to improve the delivery of care." (Pg. 307)*
*CORRECTIONAL HEALTH CARE*
*Guidelines for the Management of an Adequate Delivery System*

2001 Edition
U.S. Department of Justice
National Institute of Corrections
320 First Street NW. Washington, DC 20534

Based upon the provided reports and interview recaps there appears to be a long term and widely known problem with individuals falling from the top bunks causing injury and now death. I did not notice in any report or interview recap that any efforts have been taken to resolve or reduce this issue. In several facilities including my former agency risk management reviews are conducted after major events like this one resulting in changes to the configuration of bunks to reduce the risk of falls and severity of injury.


Todd Vinger
Owner/Manager, Todd Vinger and Associates LLC