Jesse C. Trentadue (#4961)
Michael W. Homer (#1535)
Noah M. Hoagland (#11400)
Sarah Jenkins (#15640)
*SUITTER AXLAND, PLLC*
8 East Broadway, Suite 200
Salt Lake City, UT   84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
jesse32@sautah.com
mhomer@sautah.com
nhoagland@sautah.com
sjenkins@sautah.com
*Attorneys for Davis County Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CYNTHIA STELLA, and the ESTATE OF HEATHER MILLER,<br><br>  Plaintiffs,<br><br>  vs.<br><br>DAVIS COUNTY, SHERIFF TODD RICHARDSON, MAVIN ANDERSON, JAMES ONDRICEK,<br><br>  Defendants. | **DAVIS COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Civil No. 1:18-cv-00002-JNP<br><br>Judge Jill N. Parrish |

Plaintiffs Cynthia Stella and the Estate of Heather Miller (collectively "Plaintiffs") have moved for partial summary judgment against Davis County, Sheriff Todd Richardson, Marvin Anderson, and James Ondricek (collectively "Defendants") on their claims that Nurse Anderson, Sheriff Richardson, and Nurse Ondricek acted with

deliberate indifference to Heather Miller's medical needs during her incarceration at the Davis County Jail.

## **RELIEF REQUESTED**

The Court is requested to deny Plaintiffs' *Motion for Partial Summary Judgment* in its entirety.   The Court is also requested to grant Defendants' *Cross Motion for Summary Judgment* and, having done so, to decline to exercise supplemental jurisdiction to hear Plaintiffs' state claims.

## **INTRODUCTION**

This case arises out of the death of Heather Miller, who died of a ruptured spleen apparently sustained while she was incarcerated in the Davis County Jail.   Plaintiffs have brought civil rights claims against Nurse Anderson, Nurse Ondricek, Sheriff Richardson and Davis County, Utah under 42 U.S.C.§ 1983 and Article I, Section 9 of the Utah Constitution.   Plaintiffs have moved for partial summary judgment against all of the Defendants with respect to their federal civil rights claims.   Defendants have filed a *Cross Motion for Summary Judgment* with respect to Plaintiffs' federal civil rights claims and ask in that *Motion* to have the Court decline to exercise its supplemental jurisdiction over Plaintiffs' state civil rights claims.

Plaintiffs allege that Nurse Anderson acted with deliberate indifference to Ms. Miller's medical needs when he did not take Ms. Miller's vital signs or monitor her vital signs over the next hour following her fall.   However, Nurse Anderson was not

indifferent to Ms. Miller's medical needs.   Nurse Anderson examined Ms. Miller

immediately after her fall in the Kilo Unit where she was housed.   Nurse Anderson said

that when an inmate falls from his or her bunk, his primary focus is upon injury to their

back, neck or head, which he assessed on Ms. Miller.   He spoke with her in the cell to

get a feeling of her mental condition. Ms. Miller told him that she was "coming off meth"

and that she was nauseous, dizzy, kind of drowsy and overall "didn't feel well."   Nurse

Anderson palpated her head and her side because Ms. Miller told him that she had fallen

and hit her side.   Nurse Anderson did not see any lacerations or bumps that would have

indicated an injury, which finding was confirmed post mortem by the Medical

Examiner's autopsy of Ms. Miller.   Neither did Ms. Miller give Nurse Anderson any

specific complaints of pain.   She also never exhibited any indication of pain when Nurse

Anderson palpated her side; the most that Ms. Miller said was that "I got the wind

knocked out of me."

Nurse Anderson never thought that Ms. Miller needed to be transferred to the

Medical Unit.   She was listening to him and responding to his instructions.

Consequently, Nurse Anderson thought that "she was coming off of her meth, and the

trauma of the fall had just kind of made her overly excited."   She had not lost

consciousness as a result of the fall so Nurse Anderson prescribed Ibuprofen to help Ms.

Miller deal with the discomfort associated with withdrawing from Methamphetamine use.

Nurse Anderson transferred Ms. Miller to the Lima Unit because in the Medical Unit he

had only one bed available in a cell that Ms. Miller would have to share with an inmate who was vomiting. In Lima Unit Ms. Miller could have her own cell, including a bottom bunk, and be monitored.   Finally, Nurse Anderson testified that had he thought Ms. Miller had a serious medical condition, he would have immediately sent her to the hospital.   Based upon these facts and the law defining deliberate indifference to an inmate's medical needs, it is Nurse Anderson who is entitled to summary judgment.

Plaintiffs allege that Nurse Ondricek acted with deliberate indifference by not having written protocols, not training Nurse Anderson in "jail expectations," and not formally reviewing nursing care. The Davis County Jail did not have written protocols for responding to inmate falls from a bunk. Nurses at the jail are expected to respond according to professional nursing standards.   This is because each fall and resulting injury, if any, is different.   Simply stated it is not possible to write a protocol covering every conceivable injury that might result from an inmate falling out of his or her bunk. It is the Jail physician who determines the need for specific treatment protocols, not Nurse Ondricek and, more importantly, the absence of such a protocol for assessing inmate falls made no difference in Ms. Miller's case.

Ms. Miller's is the only reported case anywhere of a fatality due to a ruptured spleen caused by a fall from a top bunk. There is also no evidence that the alleged lack of training as to how to treat/assess inmates who have fallen from a bunk contributed in any way to Ms. Miller's death.   Based upon these facts and the law defining deliberate

indifference to an inmate's medical needs with respect to an alleged lack of policies and/or training, including a failure to supervise, it is Nurse Ondricek who is entitled to summary judgment.

Plaintiffs argue that Sheriff Richardson and Davis County acted with deliberate indifference by not having medical protocols in place for the treatment of inmates. However, because there was no deliberate indifference to Ms. Miller's medical needs by either Nurse Anderson or Nurse Ondricek, Davis County and Sheriff Richardson have no liability.   Additionally, Plaintiffs cannot show that Sheriff Richardson or Davis County's actions directly caused Ms. Miller's death.

## RESPONSES TO PLAINTIFFS' STATEMENT OF FACTS[1]

Plaintiffs have filed an *Appendix* containing Exhibits numbered 1 through 21.[2] Defendants have also filed an *Appendix* containing seven Exhibits, which are identified by the letters A through G.[3]   In responding to Plaintiffs' *Statement of Facts*, Defendants will reference their recitation of the facts by citation to an Exhibit number with respect to Plaintiffs' exhibits and by citation to the letter assigned to that Exhibit.

---

[1] Pursuant to *DUCivR.* 56-1(c)(3), Defendants will only respond to Plaintiffs' *Statement of Facts* with respect to which there is a genuine dispute. In addition, pursuant to *DUCivR* 7-1(b)(1)(B), Defendants object to the following exhibits submitted by Plaintiffs on the basis of hearsay (*Fed R. Evid.* 802) and lack of foundation (*Fed R. Evid.* 901): Exhibit 10, Dr. Starr's Expert Report; Exhibit 11, Nurse Schultz's Expert Report; Exhibit 16, Todd Vinger's Expert Report; Exhibit 20, Clerk Austin Roger's interview with the Attorney General; and Exhibit 21, Nurse Daniel Layton's interview with the Attorney General.

[2] Dkt. 31.

[3] Dkt. 40.

\* \* \*

7.     Falls from bunks happen fairly regularly at the Davis County Jail to the tune of about once a month.[4]

**Defendants' Response:** Undisputed.   However, this is the only reported case in which a fall from a height of approximately 6 feet resulted in a ruptured spleen and death,[5] and that fact most certainly impacts Plaintiffs' allegations as to the lack of training and/or treatment protocols.

8.   Because the floor is cement, inmates can and have suffered serious injuries from these falls.[6]

**Defendants' Response:** Disputed. The record cited by Plaintiffs does not support this fact. Such falls range in severity from mild contusions, ankle sprains, and minor injuries to severe head trauma, acute fractures and spinal injuries.   There is no standard medical protocol that can completely encompass the medical evaluation that should be done by an officer, nurse, or physician due to the multitude of medical conditions that can arise from this type of injury.   However,

---

[4] Exhibit 1 at 73 ("James [Nursing Supervisor at Davis County Jail] said that jail nurses respond to reports of a fall from a top bunk around one time per month").

[5] Exhibit A, ¶19.

[6] Exhibit 2 at 12:9-13, 10:20 – 11:3 ("I mean, I've seen it a couple times. I know the first week I worked there, a kid fell off the bed and slipped, because he was wearing socks, and split his ear open"); Ondricek AG's Interview (Exhibit 18) at 12:05 – 12:55.

it would be expected that the officer contact medical if they witness a fall that results in obvious injury or offer medical assistance to the patient if requested. Deputy Lloyd did contact medical as soon as he recognized that Ms. Miller had fallen, thus meeting the standard of care for response to an injury.[7]   Furthermore, Nurse Anderson was not aware of the substantial risk of splenic laceration resulting from a fall from a bunk.   This is a rare and unusual event.   The incidence of splenic laceration resulting in exsanguination and death is so low that a nurse would not be expected to be able to diagnose it quickly in the early stages of the disease.   Therefore, even if Ms. Miller had been placed in the infirmary for close monitoring it is highly unlikely that the nursing staff would have been able to diagnose and treat this rapidly changing and insidious diagnosis.[8]

9.      Ms. Miller suffered a ruptures [sic] spleen from her fall.[9]

**Defendants' Response:** Undisputed for purposes of this *Motion for Partial Summary Judgment*. However, Ms. Miller fell twice. Once in her cell in the Kilo Unit and apparently again in Lima Unit which resulted in an injury to her chin. There is no evidence as to which of these falls may have resulted in the fatal injury to her spleen.   Nurse Anderson assessed Ms. Miller's injuries in the first fall in

---

[7] Exhibit A, ¶¶ 25 and 26.

[8] Exhibit A, ¶ 49.

[9] Exhibit 1 at 27.

Kilo Unit and concluded that she was not seriously injured.   Splenic lacerations and internal bleeding can develop so gradually that it is not well established before becoming obviously apparent.   As with the case of Ms. Miller, the bleeding was minor and not enough to cause pain or to suggest to Nurse Anderson the seriousness of Ms. Miller's injury.[10]

\*   \*   \*

12.     Though Nurse Anderson had access to medical supplies on Ms. Miller's unit, Nurse Anderson arrived at Ms. Miller's cell with no medical equipment.[11]

**Defendants' Response:** Undisputed. But, as Nurse Anderson explained, "The call was not a bleeding person, an unconscious person; it was just a fall, at that time."[12] Nurse Anderson did check Ms. Miller's side and head and moved her to a lower bunk in the Lima Unit cellblock that was used for medical observation, which was within the standard of care.[13]   Nurse Anderson did obtain a history of the event and completed a focused exam based on Miller's statement that she had fallen

---

[10] Exhibit A, ¶ 43.

[11] Exhibit 1 at 56 (Marvin said he has a 'jump bag' with equipment but he didn't take it with him…"); Exhibit 3 at 56:11-21 (Q: "You didn't even take the blood pressure jump bag… with you to Kilo" A. "I did not.").

[12] Exhibit 3 at 56:19 – 21.

[13] Exhibit A, ¶¶ 45 through 50.

from the bunk and hit her left side.   An examination by Nurse Anderson of Ms.

Miller's area of concern also yielded a negative exam.   This was confirmed by

Dr. Christensen when he stated that "there were no external injuries to the left

side/flank area of the body".[14]   The examination on autopsy was also negative for

external signs of trauma.[15]   Had Ms. Miller had findings of bruising, deformity,

lacerations, redness, or pain on exam it is likely that Nurse Anderson would have

considered Ms. Miller's injuries more severe in nature, but she did not present

with these symptoms.[16]

13.     Ms. Miller was complaining of pain to her side, difficulty breathing,

dizziness, and nausea.[17]

**Defendants' Response:** Disputed. While in her cell, Ms. Miller only complained

of her left side hurting. She was able to move around the cell on her own.[18]

\*   \*   \*

16.     Nurse Anderson did not take Ms. Miller's vital signs (blood pressure, pulse,

---

[14] Exhibit 1 at 28.

[15] Exhibit 9.

[16] Exhibit A, ¶¶29 and 30.

[17] Exhibit 5 at 2 ("I asked inmate Miller, Heather if she was okay and she stated she was hurting on her left side… She said her ribs were hurting. She said she couldn't breathe… She seemed dizzy); Exhibit 2 at 44:18-23 ("And then once we got out of her cell and started to walk, she's like, I'm really dizzy… I'm really feeling really nauseous.").

[18] Exhibit 3 at 44.

and temperature), even though Nurse Anderson testified that it is his own practice to take vital signs at nearly every medical encounter.[19]

**Defendants' Response:** Undisputed.   But it is also irrelevant pursuant to *Rule 402*.   It is irrelevant because it is highly unlikely that Ms. Miller's splenic laceration would have been apparent to Nurse Anderson based on findings of vital signs, especially vital signs taken immediately after her fall.   Typically, one would expect elevated blood pressure and pulse immediately following a traumatic event such as a fall, which means that it is highly unlikely that Ms. Miller would have been found hypotensive and tachycardic at the time of injury.[20]

*   *   *

22.     Once Nurse Anderson returned with the wheelchair, Corporal Johnson assisted Ms. Miller in plopping herself into the chair.[21]

**Defendants' Response:** Disputed. Ms. Miller was able to sit herself into the wheelchair.[22]

---

[19] Exhibit 3 at 18:5-14: Q. Now, maybe the jail doesn't have policies, but you told the attorney general that you generally, after a fall would take vitals. Is that correct? A. Yes. Q. And is that your policy? Your policy? A. I would say yes. Q. You didn't do that in this case, though, did you? A. I did not.

[20] Exhibit A, ¶ 28.

[21] Exhibit 6 at 6:14.28-6:15.48, Exhibit 3 at 46:13-21.

[22] *See id.*

23.     Clerk Rogers at Davis County Jail, who observed Ms. Miller as she hobbled to the stairs and scooted down on her butt, thought it was obvious Ms. Miller needed medical care and found it weird that Ms. Miller was not taken to medical.[23]

**Defendants' Response:** Objection, lack of foundation pursuant to Rule 901. It is likewise disputed. While Clerk Rogers offered his opinion on the events, he does not have medical training and was not qualified to determine whether Ms. Miller should be taken to medical.[24]

24.     Nurse Ondricek, the supervising nurse at Davis County Jail, further testified that it was his expectation that a nurse would bring an inmate who was unable to walk to the jail's medical wing for observation.[25]

**Defendants' Response:** Undisputed.   However, Ms. Miller was taken to a cellblock used for medical observation, as medical was nearly full. Deputy Lloyd walked through Lima Unit two times before he noticed any changes in Ms.Miller's condition just after 8:00 p.m.   The Davis County Jail is set up with emergent medical evaluation cells and Lima Housing Unit which houses less acute medical

---

[23] Exhibit 20 at 11:24:45 – 11:25:30.

[24] Exhibit 7 at 9:12–19.

[25] Exhibit 18 at 21:01 – 23:05; Exhibit 4 at 57:16-25: Q. And the second-to-last-paragraph I asked James if it would be his expectation, as a supervisor, for a nurse to bring an inmate to medical or provide medical observation if an inmate can't walk or if the inmate needs to be wheeled or carried out of a unit. He said quote, absolutely. Is that correct? A. [Nurse Ondricek]: Yes. Q. Do you still believe that? A. Yes.

and mentally ill patients.   The housing change of Ms. Miller from Kilo Unit to Lima Unit was in line with the policy of other jails.   Nurse Anderson's decision to house Ms. Miller in Lima Unit based on his initial evaluation and assessment was appropriate.   Moreover, had Nurse Anderson assessed Ms. Miller to be a more severe trauma it is likely that he would have housed her in the medical cell.[26]

25.   Nurse Anderson did not take Ms. Miller to medical even though a bed was available in medical.[27]

**Defendants' Response:** Undisputed. But, Nurse Anderson did not put Ms. Miller in the available bed in the medical unit because she would have shared the cell with an inmate who was withdrawing from Methamphetamine addiction and vomiting. Nurse Anderson believed Ms. Miller needed a clean, quiet cell to recover.[28]

26.   Instead, Nurse Anderson wheeled Ms. Miller off to the Lima unit so that Ms. Miller could have a bottom bunk.[29]

**Defendants' Response:** Disputed.   See response to paragraph 25 above.

27.   Nurse Anderson did not order any medical observation for Ms. Miller.[30]

---

[26] Exhibit A, ¶¶31 and 32.

[27] Exhibit 3 at 38:13 – 40:18.

[28] *Id.* at 54.

[29] *Id.* at 26:24 – 27:1.

**Defendants' Response:** Undisputed.   But Nurse Anderson did tell Ms. Miller to contact medical if her condition worsened.[31]  Wellbeing checks were completed as scheduled and Deputies Lloyd frequently checked on Miller.   When he noticed a change in her behavior and appearance, he quickly notified medical.[32]

28.      At about 20:18, Deputy Lloyd did his scheduled observation and noticed that Ms. Miller was mostly naked, was lying on the floor, had a cut on her chin, and her body was in a strange position.[33]

**Defendants' Response:** Undisputed.   But this was the same behavior that is exhibited by inmates who are withdrawing from Methamphetamine.

29.      Deputy Lloyd, concerned about Ms. Miller, called medical to explain his observations.[34]

**Defendants' Response:** Undisputed.   However, wellbeing checks were made by the officers in the housing unit at 18:33 and 19:32 without noted verbal or physical concern from Miller.   At 20:20 a routine wellbeing check of Ms. Miller was laying naked in her cell with blood on her chin.   Deputy Lloyd asked her if she

---

[30] Exhibit 7 at 23:20-24:13.

[31] *See* Exhibit 3 at 53.

[32] Exhibit A, ¶ 35.

[33] Exhibit 2 at 35:4 – 36:7.

[34] Exhibit 2 at 36:17-24.

was "ok"and Ms. Miller "gave him a wave."[35]

\*   \*   \*

31.      Deputy Lloyd was speaking with Nurse Daniel Layton with Nurse Anderson in the room.[36]

**Defendants' Response:** Undisputed.   But Nurse Anderson testified that he did not hear all of the phone call and was not aware it was about Ms. Miller.[37]

32.      Deputy Lloyd explained his observations and Daniel Layton, relying on Nurse Anderson's prior observations, told Deputy Lloyd "not to think about it too much".[38]

**Defendants' Response:** Disputed. Nurse Layton asked if there was any sign of cut or injury and was told "No" by Deputy Lloyd. Nurse Anderson did not learn of the content of the call until after the call ended.[39]

33.      Clerk Rogers documented this response in this report because he thought the nurses were being lazy, as just a week prior to Ms. Miller's death the nurses had taken

---

[35] Exhibit 1 at 61.

[36] *Id.*

[37] Exhibit 3 at 61.

[38] Exhibit 2 at 36:17-24.

[39] Exhibit 5 at 63–64.

"forever" to respond to an inmate suffering from a seizure.[40]

    **Defendants' Response:**   Objection based on hearsay (Rule 802) and the lack of foundation (Rule 901).   Rogers is not a medically trained person.   It is likewise irrelevant (Rule 402) because there is no evidence Nurse Anderson was one of the nurses that Rogers was criticizing.

34.   Deputy Lloyd was not happy with that answer and immediately went to find another deputy for a second opinion.[41]

    **Defendants' Response:** Disputed.[42]

*   *   *

43.   Though Davis County does not have the means to diagnose a ruptured spleen, the Jail would have diagnosed internal bleeding had the Jail monitored Ms. Miller's vital signs.[43]

---

[40] Exhibit 20 at 11:12:00 – 11:13:07.

[41] Exhibit 2 at 47:7 – 48:3.

[42] *See* Exhibit 1 at 61.

[43] Exhibit 4 at 57:3-10 ("Q. [T]he only way [Davis County Jail] would have to identify internal bleeding at the jail would be by monitoring blood pressure which would drop over time… Do you agree with that? Nurse Ondricek: Yes"); Exhibit 10:

    Heather's fall from the top bunk ruptured her spleen to the point of near complete transection. In the span of 3 hours, Ms. Miller experienced hemodynamically significant deterioration. If vital signs had been obtained, there would certainly be evidence of her deterioration within 1 hour of her injury, hence "The Golden Hour of Trauma Care".

**Defendants' Response:** Disputed. Dr. Tubbs opined that "Miller's diagnosis likely would not have been apparent to Nurse Anderson based on findings of vital signs. Typically, one would expect elevated blood pressure and pulse immediately following a traumatic event and it is unlikely that Miller would have been found hypotensive and tachycardic at the time of injury."[44]

44.     Blood loss will result in a high pulse rate, anxiety, narrow pulse pressure, elevated respiratory rate, and increased anxiety or confusion, signs which would have been observable within 1 hour of Ms. Miller's injury.[45]

**Defendants' Response:**   Objection based on hearsay (Rule 802) and the lack of foundation (Rule 901).   It is also disputed. Deputy Lloyd walked through Lima Unit two times before he noticed any changes in Miller just after 8:00 P.M.

45.     General nursing standards require nurses to take and monitor vital signs following a suspected injury.[46]

**Defendants' Response:** Undisputed.   But there was no suspected injury. "Anderson did obtain a history of the event and completed a focused exam based on Miller's concern of left sided pain. . . . An examination by Anderson of Ms. Miller's area of concern yielded a negative exam. This was confirmed by Dr.

---

[44] Exhibit A at ¶ 28.

[45] Exhibit 10.

[46] Exhibit 11.

Christensen when he stated that there were no external injuries to the left/side flank area of the body . . . . Had Miller had findings of bruising, deformity, lacerations, redness or pain on exam it is likely that Anderson would have considered Miller's injuries more severe in nature."[47]

46.     Davis County Jail's expectation of nurses requires nurses to take and monitor vital signs following a suspected injury.[48]

**Defendants' Response:** Undisputed.   See response to paragraph 45 above.

47.     Nurse Anderson's personal practice is to take and monitor vital signs following a suspected injury.[49]

**Defendants' Response:** Undisputed. There was, however, no suspected injury

\* \* \*

50.     In fact, Defendants' hired expert has indicated that "Nursing staff should include vital signs with each nursing evaluation" and that "Anderson's initial evaluation did not include vital signs which should have been completed."[50]

---

[47] *See* Exhibi3 at 82.

[48] Exhibit 4 at 56:21 – 57:2: Q. …[I]n responding to a request for treatment, the nurses always do first responder things like check for vitals, checking pupils, and neuro checks if they have hit their head. That's correct, right? A. [Nurse Ondricek]: That is correct. That is my expectation.

[49] Exhibit 3 at 18:5-11: Q. Now, maybe the jail doesn't have policies, but you told the attorney general that you generally after a fall would take vitals. Is that correct? A. [Nurse Anderson]: Yes. Q. And is that your policy? Your policy? A. I would say yes.
[50] Exhibit 12.

**Defendants' Response:** Undisputed.   However Defendants' expert, Dr. Tubbs, further indicated that taking Ms. Miller's vital signs at the time of the event would not have shown any injury, etc.[51]   Nurse Anderson had the same opinion.[52]

51.     Nurse Anderson stated he normally would have taken Ms. Miller to medical following a fall but he did not in this case.[53]

**Defendants' Response:** Undisputed.   However, Nurse Anderson explained that there was no sign of injury, that Ms. Miller had told him she was withdrawing from Methamphetamine, and that the only available bed in Medical was in a cell with an inmate who was vomiting. Accordingly, Nurse Anderson appropriately transferred Ms. Miller to Lima cellblock, which was used for medical observation of female inmates.

52.     Nurse Anderson stated that the nurses normally would have gone to examine an inmate who is reported to be bleeding – but Nurse Anderson did not respond to Deputy Lloyd's phone call that Ms. Miller was bleeding.[54]

---

[51] Exhibit A at 28.

[52]   Exhibit 1 at 57.

[53] Exhibit 19 at 11:40:00-11:41:20.

[54] Exhibit 19 at 11:41:48 – 11:42:46.

**Defendants' Response:** Disputed. The call was not received by Nurse Anderson and the information given to medical was that there was a "spot of blood" on Ms. Miller's chin. Deputy Lloyd also answered in the negative when asked by Nurse Layton if she was cut or injured.[55]

53.     Nurse Anderson admitted he is biased in the way he provides medical care to jail inmates.[56]

**Defendants' Response:** Disputed. Nurse Anderson's response that he was "biased" in the process of explaining that Ms. Miller's symptoms manifested as drug withdrawal—something he sees every day in the Jail and that Ms. Miller self-

---

[55] Exhibit 1 at 72.

[56] Exhibit 19 at 83:9 – 84:6.

> [Nurse Anderson]: Like I said before, what I see at the jail is a lot of what she presented of this – the way she acted, the detoxing, whatnot. And so that's what kind of took me into that, that feeling of where she was. I didn't get this feeling that she wat having this traumatic injury…
>
> Q. What you're saying is that these people are not normal patients, and so you see enough of this behavior to where you're?
>
> A. **I'm biased.**
>
> Q. But that's what I'm asking. You're biased—
>
> A. To what I see.
>
> Q. –and that affects the way you're able to provide nursing case?
>
> A. In the jail setting, it is…

reported—and not as internal injury—something with which he has very little

experience and rarely sees at the jail.[57]

54.     Rather than take Ms. Miller's vitals or take Ms. Miller to medical as

required by nursing standards, jail standards, and personal standards, Nurse Anderson did

not provide Ms. Miller with medical care under the assumption that Ms. Miller was just

going through drug withdrawal.[58]

> **Defendants' Response:** Disputed. Nurse Anderson checked Ms. Miller's side and
>
> head, transferred her to a cell with a lower bunk where she could recover, and
>
> offered additional assistance. Ms. Miller did not complain of any pain or injury
>
> that would have been associated with traumatic injury. He also prescribed
>
> Ibuprofen to lessen her discomfort caused by the withdrawing from
>
> Methamphetamine.[59]

55.     James Ondricek and Sheriff Todd Richardson are in charge of

implementing medical policies and practices within Davis County Jail that ensure

detainees receive adequate medical care.[60]

---

[57]   Exhibit 5 at 83 – 84.

[58]  Exhibit 19 at 11:40:00 – 11:41:20.

[59]  Exhibit 3 at 53.

[60]  Exhibit 1 at 7: 18 – 8:19; 12:12-17; 14:6-8; 37:1-21.

**Defendants' Response:** Disputed. Dr. Wood is in charge of medical treatment

protocols at the Davis County Jail.[61]

\*   \*   \*

58.     Policy 405.10 provides for the creation of treatment protocols and first aid

procedures:

> To provide a means for the identification of medical conditions and the care
> of minor ailments of the inmates in the Davis County Jail treatment
> protocols and first aid procedures will be developed by the jail physician,
> psychiatrist and/or dentist under the direction of the health authority to be
> utilized by authorized personnel.[62]

**Defendants' Response:** Undisputed.   But it should be noted from the Policy

quoted by Plaintiffs that treatment protocols and first aid procedures are the

responsibility of the physician.[63]

59.     Policy 405.10 further states:

Protocols will:

1. Be appropriate to the level of skill and preparation of the practitioner

who will carry them out.

2. Comply with relevant State practice acts.

---

[61] Exhibit A, ¶¶ 51–54; Exhibit 13 at 12:18-13:18 and at 23:18-24:1'

[62] Exhibit 14 at 46.

[63] *See also* Exhibit A at ¶¶ 51–54.

3. Be documented in the inmate's chart with time, date and signature of the personnel providing the care.

4. Be countersigned in the medical record by the responsible physician.[64]

**Defendants' Response:** Undisputed.   Again, the language quoted by Plaintiffs clearly shows that protocols are written by the physician, and at his or her discretion.

\*   \*   \*

62.     Maintaining written medical protocols is the standard of care for jails across the country.[65]

**Defendants' Response:** Objection based on hearsay (Rule 802) and the lack of foundation (Rule 901).   It is likewise disputed.   Dr. Tubbs, for example, has written many medical protocols but never a protocol for treating injuries from

---

[64] Exhibit 14 at 46.

[65] Exhibit 16 at 9:

> In my thirty plus years of experience, I would find it to be an indifferent choice to the health and safety of the inmates housed in the Davis County Jail if the Davis County Jail's leadership has failed to follow their own written policy to create and maintain a Health and Safety Policy and Procedures Manual which is a common and best practice within jails nationwide. My opinion is further supported by the statement from the National Institute of Corrections.

> "*Establishing a written policy and procedures manual to govern correctional health services is essential. If one does not exist, its development is the first step the systemwide health services director should take to improve the delivery of care.*"

bunk falls in a jail.[66]   Falls in jails happen frequently but the injuries sustained are

wide ranging.[67]   It would not be possible to write a protocol that would be

comprehensive and inclusive of all possible pathology that could result from a

fall.[68]

63.     For the last six years, Davis County Jail has operated without any medical

or nursing protocols in violation of written policy 401.[69]

**Davis County Defendants' Response:** Disputed. They do not have written

protocols.

64.     Because Davis County does not maintain written protocols, Davis County

relies on medical providers to provide care pursuant to their discretion.[70]

**Defendants' Response:** Disputed. This so-called fact is not supported by the

record. The unwritten policy is that medical care is set at professional nursing

standards.[71]

65.     With no written protocols, Nurse Ondricek maintains "expectations" of

---

[66] Exhibit A, ¶ 53.

[67] *Id.*

[68] *Id.*; Exhibt 3 at 15:15-16:2.

[69] Exhibit 13 at 24:17-25.

[70] Exhibit 4 at 17:25 – 18:13.

[71] Exhibit 3 at 13:18-24.

how medical care is to be provided within the jail.[72]

> **Defendants' Response:**   Disputed. As the Director of Nursing at the Davis
>
> County Jail, it is reasonable for Nurse Ondricek to have expectations about how
>
> medical care is to be provided, regardless of written protocols, and that
>
> expectation is the staff will comply with professional nursing standards.

*   *   *

67.     Though expected to provide training, Nurse Ondricek does not provide

training to his nurses regarding his expectations.[73]

> **Defendants' Response:** Disputed. Nurse Ondricek does not do the training.   He
>
> schedules the training which others do, and it can be both in-house and outside of
>
> the institution in a seminar type setting.[74]

68.     Nurse Ondricek is also expected to review nursing care after a death at the

jail.[75]

> **Defendants' Response:**   Objection lack of relevance (Rule 402) and lack of
>
> probative value (Rule 403).   More importantly, whatever Nurse Ondricek was

---

[72] Exhibit 1 at 73-74; Exhibit 4 at 35:2-9.

[73] Exhibit 4 at 7:3-6 ("Q. Do you do any training? [Nurse Ondircek]: I don't directly do training. I attend training, schedule training, occasionally, but no, I don't do any training myself"); Exhibit 3 at 68:2-6 ("Q. How do you know that that's what [Nurse Ondricek] expects from you? Have you had any training meetings? ... (Nurse Anderson): No.").

[74] *See* Exhibit 4 at 7.

[75] Exhibit 13 at 37:1-4.

expected to do, required to do, and/or did not do after Ms. Miller's death has no bearing on Plaintiffs' claims.

69.     There is no formal procedure governing Nurse Ondricek's after-death reviews.[76]

**Defendants' Response:**   Objection lack of relevance (Rule 402) and lack of probative value (Rule 403). Again, whatever Nurse Ondricek was expected to do, required to do, and/or did not do after Ms. Miller's death has no bearing on Plaintiffs' claims.

70.     Nurse Ondricek did not do a substantive review of the nursing care provided to Ms. Miller.[77]

**Defendants' Response:**   Objection lack of relevance (Rule 402) and lack of probative value (Rule 403).   Once more, whatever Nurse Ondricek was expected to do, required to do, and/or did not do after Ms. Miller's death has no bearing on Plaintiffs' claims.   Also, disputed since Nurse Ondricek reviewed the incident reports, chart notes, and spoke with Nurse Anderson.[78]

71.     Sheriff Richardson claims that Davis County Jail did an informal internal

---

[76] Exhibit 13 at 37:1 – 38:19; Exhibit 4 at 50:5 – 51:1.

[77] Exhibit 4 at 50:5-7.

[78] *Id.* at 50:8–51:4.

review of Ms. Miller's death but that there was no written documentation of this review.[79]

**Defendants' Response:**   Objection lack of relevance (Rule 402) and lack of

probative value (Rule 403). Whatever the Davis County Jail was expected to do,

required to do, and/or did not do after Ms. Miller's death has no bearing on

Plaintiffs' claims.

72.   Sheriff Richardson claims the findings of the internal review were that the

policies Davis County Jail had in place worked and that the medical care provided to Ms.

Miller complied with jail policy.[80]

**Defendants' Response:** Undisputed.

73.   However, Nurse Ondricek claims he is unaware of any internal review into

Ms. Miller's death and that he has never been involved in an internal review of medical

care.[81]

---

[79] Exhibit 4 at 10:7-9. ("Q. Do you know if there is any written documentation of this review? (Sheriff Richardson: Not to my knowledge").

[80] Exhibit 4 at 9:23 – 10:6.

[81] Exhibit 4 at 51:5-10:

Q. Does the jail itself do a review of inmate deaths? Do you know if they do?

A. Not that I know of, no. We've never done one that I've been involved in.

**Defendants' Response:** Undisputed. However, Sheriff Richardson did not testify that Nurse Ondricek was part of that review. He testified that the review is conducted by the jail commander, the captain and the lieutenant.[82]

74.     Though Nurse Anderson violated Jail's expectations regarding the standard of medical care, Nurse Anderson was not disciplined for his failures.[83]

**Defendants' Response:** Disputed.   There is no evidence that Nurse Anderson breached professional nursing standards in his assessment and evaluation of Ms. Miller. Moreover, Nurse Anderson did not violate the Jail's expectations regarding the standard of medical care. He evaluated Ms. Miller's condition—which at the time of her fall was a sore left side, no evidence of other trauma, and Ms. Miller's self-reported withdrawal from methamphetamine—and moved her to a bottom bunk to recover. He did not take the phone call that reported Ms. Miller was lying partially naked on the ground, with a spot of blood on her chin. As soon as Ms. Miller was brought to medical, he instructed for paramedics to be called and attempted to treat her with the knowledge of her new symptoms.[84]

## ADDITIONAL UNDISPUTED FACTS RELATED TO MEDICAL CARE

1.     On December 20, 2016, Heather Miller was arrested on charges for

---

[82] *See* Exhibit 13 at 9:4-10:6.

[83] Exhibit 17 at 5.

[84] *See* Exhibit 3.

possession of controlled substances and drug paraphernalia and booked into the Davis County Jail.[85]

2.     Jail personnel conducted a medical screening of Miller, which included asking her if she was under the influence of drugs or alcohol or if she was going through withdrawal.[86]

3.     Miller told the medical screener that she was not under the influence of drugs or going through withdrawal.[87]

4.     The Davis County Correctional Facility Policy and Procedures Manual instructs the nurse who performs the health assessment to conduct follow-up care, including "initiating special housing recommendations for inmates that require them."

5.     An inmate who reports she is or expects to be going through withdrawal from drugs will be given a special housing recommendation in the form of a bottom bunk.[88]

6.     Ms. Miller did not report that she expected to be going through drug withdrawals and was assigned to a top bunk.[89]

---

[85] *See Amended Complaint*, Dkt. 10, ¶ 11.

[86] Exhibits C and F.

[87] *Id.*

[88] Exhibit 3 at 30:18–34:9.

[89] *Id.* at 34:10–19.

7.      When Ms. Miller fell in Kilo Unit on December 21, 2016, Nurse Anderson responded to Deputy Lloyd's call for medical assistance. Nurse Anderson helped her sit up and "palpated her head, her side, because she said she fell and hit her side."[90]

8.      Nurse Anderson checked her head for lacerations and bumps but did not find any.[91]

9.      Miller told Nurse Anderson that she "got the wind knocked out of" her.[92]

10.     While in her cell, Miller "got up, she put her shirt on, she put her shoes on, unassisted."[93]

11.     Nurse Anderson took Miller to a cell in Lima block, a cellblock which house female inmates for medical observation, where she would have a lower bunk.[94]

12.     Based on Miller's symptoms at the time, Nurse Anderson did not think there was an emergent medical need.[95]

13.     Approximately two hours later, Deputy Lloyd was doing a walk-through of Lima Unit when he saw Miller laying on the ground, wearing only a sports bra, with a

---

[90] *Id.* 29:6–8.

[91] *Id.* 29:17–22.

[92] *Id.* 37:6 – 17.

[93] *Id.* 44:7–17.

[94] *Id.*

[95] *Id.* 85:23–25.

spot of blood on her chin.[96]

14.     The nurse, Dan Layton, told Deputy Lloyd to keep an eye on her and let them know if her condition worsened.[97]

15.     Deputy Lloyd sought out Deputy Lucius, who called for Sergeant Wall to help them clothe and move Miller to medical. When Miller arrived in Medical, Nurse Anderson immediately told the officers to call for the paramedics.[98]

16.     Nurse Anderson described Miller as "totally flaccid," "pale," and "gray."[99]

17.     Nurse Anderson asked Miller where she was hurting. She responded "Everywhere."[100]

18.     Miller was "combative" with Nurse Anderson and the deputies as they attempted to put a blood pressure cuff on her and give her oxygen.[101]

19.     Paramedics took Miller to McKay-Dee Hospital.[102]

---

[96] Exhibit 2 at 35:4–19.

[97] *Id.* 45:7–10.

[98] Exhibit 3 at 70:24–71:6.

[99] *Id*. 70:1, 15–16.

[100] *Id.* 71:7–11.

[101] *Id.* 71:12–17.

[102] Exhibit B.

20.     While en route to the hospital, Miller went into cardiac arrest.[103]

21.     Miller was pronounced dead at the hospital.[104]

22.     Dr. Erik D. Christensen, the Chief Medical Examiner, found that the cause of death was blunt force injuries of the abdomen,[105] which had resulted in acute trauma to Miller's spleen.[106]

23.     Dr. Christensen informed the Utah Attorney General's Office that "this type of injury would have been difficult to diagnose without being at a hospital. He said that a ruptured spleen is typically diagnosed in three ways: through an ultrasound, a blood count, or actually cutting open a patient. None of these things would have been done by a nurse at a jail. He also said that internal injury is often difficult to diagnose through an external examination because the patient often "does not know where the pain is."[107]

### ADDITIONAL UNDISPUTED FACTS OF DR. TUBBS

Dr. Tubbs is family practice physician and has practiced at the Utah State Prison for 15 years.   He is a certified provider by the National Correctional Commission on Health Care (NCCHC).   As such, he is currently the medical director for ten county jails

---

[103] Exhibit B.

[104] *Id.*

[105] Exhibit 9.

[106] *Id.*

[107] Exhibit 1 at 28.

throughout Utah and Wyoming.   The county jails in Utah at which he is the medical director include Utah, Juab, Duchesne, Daggett, Wasatch, and Summit Counties.   In Wyoming, the county jails at which Dr. Tubbs is the medical director include Lincoln, Uintah, Sweetwater and Teton Counties.

Dr. Tubbs supervises three Physician Assistants and two nurse practitioners who provide the majority of patient care at these facilities.   He also supervises thirty-five nurses and establishes protocols for nursing care at these facilities.   Dr. Tubbs has extensive experience with supervision of correctional facilities as well as appropriate health care triage, he is also familiar with the standard of care required of nursing staff in a correctional facility, and has responded, triaged, treated, and cared for patients who have fallen from the top bunk in a correctional setting.   Dr. Tubbs is a board-certified family physician by the American Board of Family Physicians and upholds its practices and values as the standard of care in correctional facilities.

Dr. Tubbs has been designated as an expert witness by Defendants and has provided the following opinions about Ms. Miller's medical care:

1.      On December 20, 2016 Ms. Miller was booked into jail on Methamphetamine-related charges.   On December 21, 2016 around 17:56 hours, Ms. Miller was reported to have fallen from the top bunk during stand-up count.[108]

2.      Medical was contacted by Deputy Lloyd to respond to the scene, and Nurse

---

[108] Exhibit A at ¶9.

Marvin Anderson responded.[109]

3. Nurse Anderson completed a nursing assessment at the cell, which consisted of a verbal assessment and history taking which included speaking with the cellmate, officers, and Ms. Miller.[110]

4. Nurse Anderson noted, "While standing up for a count Miller fell off her top bunk hitting her left side of her ribs on the table.   No bruising, redness or scrapes noticed.   She denies losing consciousness or hurting anywhere else."[111]

5. Nurse Anderson responded promptly to Ms. Miller's bedside when he was asked to come to the unit and assess her recent fall.[112]

6. Upon arrival at the unit, Nurse Anderson went to Ms. Miller's cell and rendered assistance and made a clinical assessment of her overall health at that time. The assessment did include palpation of the area of concern and a visual screening of the skin for local bleeding, bruising, or possible fracture.[113]

7. Ms. Miller reported to Nurse Anderson pain on the left side of her abdomen, which pain was consistent with the injury at that time.[114]

---

[109] *Id.* at ¶10

[110] *Id.*

[111] *Id.*

[112] *Id.* at ¶45.

[113] *Id.*

[114] *Id.* at ¶46.

8.     Nurse Anderson did evaluate Ms. Miller for head and neck injuries of which she denied having at the time.[115]

9.     Having satisfactorily triaged her emergent need for EMS at the time, Nurse Anderson then went to get a wheelchair to render assistance to change the housing for Miller.[116]

10.    Ms. Miller was assessed by a qualified registered nurse at the scene of her accident, Nurse Anderson, and a clinical assessment was made to house Ms. Miller in a safer environment.[117]

11.    Nurse Anderson fulfilled his duty to Ms. Miller by responding to the scene, evaluating her for injuries and made a clinical assessment to house her based on his knowledge at the time and the clinical facts available to him.[118]

12.    Admittedly, vital signs were not obtained at the scene as customary care would have dictated.

13.    However, there is no evidence that Miller's vital signs would have been significantly altered at that time to suggest to Nurse Anderson that she had suffered a rare

---

[115] *Id.*

[116] *Id.*

[117] *Id.* at ¶47.

[118] *Id.*

and complicated splenic laceration.[119]

14.     Nurse Anderson was not aware of the substantial risk of splenic laceration resulting from a fall from a bunk.   This is a rare and unusual event.[120]

15.     In fact, the incidence of splenic laceration resulting in exsanguination and death is so low that a nurse would not be expected to be able to diagnose it quickly in the early stages of the disease.[121]

16.     Therefore, even if Ms. Miller was placed in the infirmary for close monitoring it is highly unlikely that the nursing staff would have been able to diagnose and treat this rapidly changing and insidious diagnosis.[122]

17.     When she was transferred to the Lima Housing Unit, Nurse Anderson instructed Ms. Miller to contact medical if the housing was not sufficient or if her condition worsened in any way.[123]

18.     Nurse Anderson did not delay or deny treatment to Ms. Miller for the complaints: a fall from the top bunk.[124]

---

[119] *Id.*

[120] *Id.* at ¶ 49.

[121] *Id.*

[122] *Id.*

[123] *Id.* at ¶ 50.

[124] *Id.*

19.     It is Dr. Tubbs' opinion, to a reasonable degree of medical certainty, that Nurse Anderson made appropriate clinical decisions based on the information and interactions that he had at the time.[125]

20.     Nurse Ondricek serves as the nursing administrator at the Davis County Jail.[126]

21.     It is not the responsibility of either the Sheriff or Nurse Ondricek to draft protocols for the Jail.[127]

22.     NCCHC policy J-A-02 states that the responsible physician has the final authority at a given facility regarding clinical issues.[128]

23.     Nursing protocols are nursing directives from a licensed physician to the nursing staff.[129]

24.     These orders must be written and approved by the responsible physician and then implemented by both Nurse Ondricek and Sheriff Richardson.[130]

25.     The responsible physician is responsible for nursing direction.   NCCHC J-

---

[125] *Id.*

[126] *Id.* at ¶51.

[127] *Id.*

[128] *Id.* at ¶52.

[129] *Id.*

[130] *Id.* at ¶52.

A-02 states, "Final clinical judgements rest with a single, designated, licensed responsible physician."[131]

26.     As a physician, Dr. Tubbs knows from experience that it is not possible to write a protocol for every scenario.[132]

27.     He, for example, has written many medical protocols but does not have a protocol for bunk falls in a jail.[133]

28.     Falls in jails happen frequently but the injuries sustained are wide ranging.[134]

29.     It would not be possible to write a protocol that would be comprehensive and inclusive of all possible pathology that could result from a fall.[135]

30.     Sheriff Richardson did contract with a local physician, Dr. Wood, to provide medical care to the Jail's inmate population.[136]

31.     Written medical protocols are nursing orders from a physician.  Many physicians want standardized nursing care but others do not.[137]

---

[131] *Id.*

[132] *Id.* at ¶ 53.

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.* at ¶ 54.

32.     It is at the discretion of the facility physician, Dr. Wood, as to which protocols are to be written and followed.[138]

33.     This was not the responsibility of the Nurse Ondricek, Sheriff Richardson or Davis County, Utah.[139]

34.     Furthermore, Dr. Tubbs sees no clinical evidence that a protocol governing the assessment and/or treatment of a falls within the Davis County Jail would have changed Ms. Miller's tragic outcome.[140]

35.     In Dr. Tubbs' opinion, by the time that Ms. Miller presented with symptoms of a splenic laceration, which the Jail's nursing staff would not have recognized nor could anyone have diagnosed without internal scanning via CT, MRI, or ultrasound, it would have been too late to have changed the outcome.[141]

36.     In other words, the absence of such a protocol made no difference in Ms. Miller's case.[142]

---

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.* at ¶ 55.

[141] *Id.*

[142] *Id.*

## ARGUMENT: NURSE ANDERSON
## WAS NOT DELIBRATELY INDIFFERENT

Plaintiffs argue that Nurse Anderson acted with deliberate indifference to Ms. Miller's medical needs when he did not immediately take Ms. Miller's vital signs or monitor her vital signs over the next hour following her fall.[143] "The Eighth Amendment provides prisoners the right to be free from cruel and unusual punishments. This right is violated if prison officials show 'deliberate indifference to an inmate's serious medical needs.'"[144] "A prison official does not violate this standard, however, 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"[145] It is not enough to claim "inadvertent failure to provide adequate medical care" or "that a physician has been negligent in diagnosing or treating a medical condition."[146] However, a "prison medical official who serves 'solely . . . as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she

---

[143] *See* Dkt. 31 at 23–24.

[144] *Boyett v. Cty. of Washington*, 282 Fed. Appx. 667, 672 (10th Cir. 2008) (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

[145] *Id.* (quoting *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006)).

[146] *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

'delays or refuses to fulfill that gatekeeper role.'"[147]

The Supreme Court has set forth "a two-pronged inquiry, comprised of an objective and subjective component."[148]  "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension."[149]  The Tenth Circuit has said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[150]

Under the subjective inquiry, the prison official must have a "sufficiently culpable state of mind."[151]  "The subjective component is satisfied if the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'"[152]

Tenth Circuit "cases recognize two types of conduct constituting deliberate

---

[147]  *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)).

[148]  *Self*, 439 F.3d at 1230.

[149]  *Id.*

[150]  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

[151]  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[152]  *Id.*

indifference."[153] The first applies here:[154] "a medical professional may fail to treat a serious medical condition properly. Where this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent."[155]

Objectively, Ms. Miller's medical needs were sufficiently serious to meet the first part of the *Farmer* inquiry—her fall resulted in blunt force trauma to her side that ruptured her spleen. However, Plaintiffs cannot meet the second part of the *Farmer* inquiry, which requires Davis County Defendants to have acted with a "sufficiently culpable state of mind."

In order for Nurse Anderson to have had a "sufficiently culpable state of mind,"[156] he must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he "'must also draw the inference.'"[157] While in hindsight, it is possible to say that an inmate who falls from a top bunk may experience an emergent injury, the facts presented to Nurse Anderson at the time of Ms. Miller's fall

---

[153] *Sealock*, 218 F.3d at 1211.

[154] "The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

[155] *Id.*

[156] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[157] *Mata*, 427 F.3d at 751 (quoting *Farmer*, 511 U.S. at 837).

did not suggest such an injury—and he accordingly did not draw such an inference. As

the Tenth Circuit has explained, "deliberate indifference is assessed at the time of the

alleged omission."[158]  "[A]ny assessment of [plaintiff's] condition conducted several

hours after her encounter with [the nurse] is irrelevant to whether [the nurse] knew of and

disregarded an excessive risk to [plaintiff's] safety."[159]

     Nurse Anderson was called to see an inmate who had fallen from a bunk. In most

falls from bunks, he is concerned about the inmate's head, neck, and back.[160] Ms. Miller

told him that "she fell and hit her side."[161] Nurse Anderson "palpated her head, her side,"

checking Ms. Miller for any sign of injury.[162] He "couldn't see any lacerations, any

bumps."[163] Ms. Miller "was talking to" Nurse Anderson, but not about any pain she was

experiencing.[164] What she did tell him was that "I got the wind knocked out of me"[165]

and that she "was coming off meth."[166] When he "palpated her side and touched her, . . .

---

[158] *Kellum v. Mares*, 657 Fed. Appx. 763, 769 (10th Cir. 2016) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 433 (10th Cir. 2014)).

[159] *Estate of Booker*, 745 F.3d at 433.

[160] Exhibit 3 at 24:10–14.

[161] *Id.* 29:7 – 8.

[162] *Id.* 29:6 – 8.

[163] *Id.* 29:17–22.

[164] *Id.* 37:4 – 12.

[165] *Id.* 37:13 – 15.

there wasn't this guarding and wincing in pain."[167]  While in her cell, Ms. Miller was able to sit up on the bottom bunk,[168] speak with Nurse Anderson,[169] stand up, "put her shirt on, [and] put her shoes on, unassisted."[170]  "[S]he was kind of looking in the mirror, kind of like looking at her hair."[171]  Ms. Miller was concerned about gathering her things because she was being moved to another cell, but Nurse Anderson told her not to worry about it.[172]

After she left her cell and began walking, Ms. Miller said that she was "really dizzy" and "really feeling really nauseous."[173]  It was then that Nurse Anderson and Corporal Johnson "each got under her arm and helped her walk."[174]  It took Ms. Miller twenty seconds to walk nineteen feet, aided by Nurse Anderson and Corporal Johnson— something Nurse Anderson would expect from someone "sick" and "nauseous," which is

---

[166] *Id.* 29:10 – 12.

[167] *Id.* 37:15–17.

[168] *Id.* 43:4 – 5.

[169] *Id.* 43:4.

[170] *Id.* 44:7 – 10.

[171] *Id.* 44:10 – 12.

[172] *Id.* 44:14 – 17.

[173] *Id.* 44:18 – 21.

[174] *Id.* 44:18 – 45:8.

why he was assisting her.[175]  When they reached the top of the stairs, Nurse Anderson

went to get Ms. Miller a wheelchair.[176]  When he returned, he saw her taking the stairs by

scooting down them.[177]  "[A]fter she got to the bottom [of the stairs], she just stood up

and [Nurse Anderson] had the chair right there for her to sit down."[178]  Nurse Anderson,

knowing that the only available bed in medical was with an inmate who was vomiting,

chose to transfer Ms. Miller to a lower bunk in the Lima Unit cell block, which was used

for medical observation of female inmates.[179]  He told her to contact medical if her pain

or breathing changed.[180]

     Nurse Anderson's assessment of Ms. Miller's medical condition at this time was

informed by the fact that she had fallen from her bunk but showed no signs of injury and

did not complain of any pain or symptoms other than having the wind knocked out of her,

and the fact that Ms. Miller had told him that she was coming off of meth. The symptoms

he then witnessed as he moved Ms. Miller to Lima unit—dizziness, difficulty walking,

nauseous—were all in line with Ms. Miller's self-reported withdrawal from meth.[181]

---

[175] *Id.* 45:9 – 21.

[176] *Id.* 45:23 – 46:2.

[177] *Id.* 46:8 – 21.

[178] *Id.* 49:20 – 22.

[179] *Id.* 54:9 – 25.

[180] *Id.* 53:23 – 24.

Nurse Anderson gave Ms. Miller the treatment he believed she needed based on the facts he knew at the time.[182] "Whether a delay in providing medical treatment has negatively affected a plaintiff's well-being is an assessment that is made in hindsight, so it cannot affect an officer's initial decision to seek treatment for an inmate."[183] Nurse Anderson cannot, therefore, be said to have shown deliberate indifference to Ms. Miller's medical needs.[184]

Plaintiffs emphasize cases where "similar symptoms" to Ms. Miller's symptoms led to a finding of a substantial risk of harm. But the question is not limited to the symptoms, but how a medical provider responded to those symptoms and the context of those symptoms. For example, in *Mata v. Saiz*, an inmate complained of chest pains to four different nurses.[185] The first nurse told the inmate that she could do nothing for her, failing to perform even a gatekeeper role of notifying a physician or other medical provider of the inmate's chest pain.[186] The Tenth Circuit found that this nurse could be

---

[181] *See id.* 51:9 – 14 ("I thought she was coming off of her meth, and the trauma of the fall had just kind of made her overly excited, maybe made her really tired. But that's what I couldn't figure out, is I was not getting anything of—an indication that she was in this trauma, this pain."). *See also* Exhibit A

[182] *See Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) ("The main flaw in Defendant's argument is that she is focusing on the facts we now know about the duration and cause of Plaintiff's pain, while the pertinent question for determining her entitlement to qualified immunity *depends on the facts that were known at the time*." (Emphasis added)).
[183] *Id.* at 1195 (citation omitted).

[184] *See* Dkt. 31, p. 27.

[185] 437 F.3d at 750.

found to be deliberately indifferent to the inmate's serious medical needs, as she knew severe chest pain posed a serious risk and she failed to act.[187]   However, the three other nurses—who assessed the inmate, administered EKGs, and sent the EKG for a physician to review—all acted in response to the inmate's medical condition at the time they saw her.[188]   Accordingly, the court held that they could not be found to have been deliberately indifferent to the inmate's medical needs.[189]   Although the end result was the same for each nurse—it was determined that the inmate had suffered a heart attack and required an ultimately unsuccessful heart surgery—what determined whether each nurse was deliberately indifferent to the inmate's medical needs was how she responded. Those who treated the symptoms they were presented with were not deliberately indifferent.[190]

Nurse Anderson did not have a "sufficiently culpable state of mind,"[191] He treated

---

[186]   *Id.* at 755–56.

[187]   *Id.* at 759.

[188]   *Id.* at 759–61

[189]   *Id.*

[190]   *See also Al-Turki v. Robinson*, 762 F.3d 1188 (10th Cir. 2014) (Even though ultimate medical diagnosis was not serious, nurse was deliberately indifferent who chose to ignore inmate's request for medical treatment, despite being presented with a diabetic who had collapsed on the floor, repeatedly vomited, and complained of severe abdominal pain.); *Kellum v. Mares*, 657 Fed. Appx. 763 (10th Cir. 2016) (Inmate's claims that nurses knew inmates was seriously ill and failed to provide treatment was sufficient to overcome motion to dismiss for failure to state a claim of deliberate indifference.).

[191]   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Ms. Miller according to the facts he knew at the time he was called to assess Ms. Miller, checking her for injuries usually associated with falls from bunks and reassigning her to a lower bunk in a cell block used for medical observation to allow her to go through withdrawal from meth. He did not take her vital signs at the time, but there was nothing that indicated that he needed to and, even if he had, they would not have suggested that Ms. Miller required further monitoring. Accordingly, Plaintiffs' claim that Nurse Anderson was deliberately indifferent to Ms. Miller's serious medical needs must fail.

## ARGUMENT: NURSE ONDRICEK WAS NOT DELIBERATELY INDIFFERENT

Plaintiffs argued that "Nurse Ondricek is liable for his failure as a supervisor."[192] Plaintiffs have failed to establish an "'affirmative link' between the supervisor [Nurse Ondricek] and the constitutional violation."[193] "This notion is embodied in the three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation, and (3) state of mind."[194]

It is not enough to say that the supervisor's subordinate violated the Constitution. In *Ashcroft v. Iqbal*, the Supreme Court explained that "[b]ecause vicarious liability is

---

[192] Dkt. 31, p. 31.

[193] *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).

[194] *Id.*

inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[195] Plaintiffs have only argued that Nurse Anderson's alleged constitutional violation must also be attributed to his supervisor, Nurse Ondricek.[196]  Even if Nurse Anderson had acted with deliberate indifference to Ms. Miller's medical needs—which he did not—this is insufficient to establish that Nurse Ondricek also violated Ms. Miller's constitutional rights.

In addition to establishing personal involvement, Plaintiffs must "establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"[197]  Plaintiffs argue that Nurse Ondricek failed to provide nursing protocols or clear expectations to Nurse Anderson, which in turn resulted in Nurse Anderson failing to take Ms. Miller's vital signs after her fall.[198] But it is not Nurse Ondricek's responsibility to provide nursing protocols—it is the responsibility of the jail's physician,[199]  who is referred to as the health authority in the Davis County

---

[195]  556 U.S. 662, 676 (2009).

[196]  *See Motion for Partial Summary Judgment*, Doc. No. 31, p. 31; *Amended Complaint*, Dkt. No. 10, ¶

[197]  *Schneider*, 717 F.3d at 768 (citation omitted).

[198]  *Motion for Partial Summary Judgment*, Doc. No. 31, p. 31.

[199]  *See Declaration of Kennon Tubbs, M.D.*, ¶¶ 51 – 52 ("It is not the responsibility of either the Sheriff or Nurse Ondricek to draft protocols for the Jail. NCCHC policy J-A-02 states that the responsible physician has the final authority at a given facility regarding clinical issues. Nursing protocols are nursing directives from a licensed physician to the nursing staff. These orders must

Correctional Facility's Policy and Procedures Manual. Furthermore, it is unlikely that nursing protocols or even "clear expectations" in this case would have prevented Ms. Miller's death. "[T]here is no evidence that Ms. Miller's vital signs would have been significantly altered at that time to suggest to Nurse Anderson that she had suffered a rare and complicated splenic injury."[200] And "even if Ms. Miller was placed in the infirmary for close monitoring it is highly unlikely that the nursing staff would have been able to diagnose and treat the rapidly changing and insidious diagnosis."[201] Accordingly, Plaintiffs cannot establish a causal connection between Nurse Ondricek's actions that led to Nurse Anderson's alleged deliberate indifference.

 "The third element requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind."[202] Here, the requisite state of mind is deliberate indifference. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[203] It requires a showing that the actor "both be aware of facts from which the

---

be written and approved by the responsible physician and then implemented by both Nurse Ondricek and Sheriff Richardson. The responsible physician is responsible for nursing direction. NCCHC J-A-02 states, 'Final clinical judgments rest with a single, designated, licensed responsible physician.'").

[200] *Id.* ¶ 48.

[201] *Id.* ¶ 49.

[202] *Schneider*, 717 F.3d at 769.

[203] *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).

inference could be drawn that a substantial risk of harm exists" and that the actor drew the inference.[204]  But Plaintiffs have not and cannot establish that Nurse Ondricek disregarded a known or obvious consequence of his actions or that he was aware of facts that would lead him to infer there was a substantial risk of harm to Ms. Miller. In fact, Nurse Ondricek understood and expected that jail staff would follow professional nursing standards, which they did.

Plaintiffs also argue that Nurse Ondricek failed to train his nurses on jail expectations and that nurses "knew that failure to adhere to expectations" would have no consequences.[205]  Failure to train may serve as a basis of § 1983 liability "where the failure to train amounts to a deliberate indifference to the rights of persons with whom the [medical staff] come into contact."[206]  The Tenth Circuit has "confirmed that this deliberate indifference standard may be satisfied 'when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm.'"[207]  "The official position must operate as the 'moving force' behind the violation, and the plaintiff must demonstrate a 'direct causal link' between the action and

---

[204] *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

[205] *Motion for Partial Summary Judgment*, Doc. No. 31, p. 31 – 32.

[206] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

[207] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002)(citation omitted).

the right violation."[208]  "That is, '[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"

Plaintiffs have failed to demonstrate the direct causal link between the action and the alleged violation, as discussed above. Furthermore, training is not Nurse Ondricek's responsibility. The Davis County Correctional Facility Policy and Procedures Manual states that the "Davis County health authority in cooperation will provide training in orientation and in the policies and procedures manual to ensure their understanding and to achieve proper implementation of their purpose."   Nurse Ondricek explained that while he does not train the nurses directly, he does attend training and schedule training, bringing in outside educators to work with the nurses and jail personnel.[209]  The fact that Nurse Ondricek himself does not train the nurses does not establish a failure to train and it certainly doesn't reach the level of deliberate indifference to the constitutional rights of Ms. Miller and other inmates.

Plaintiffs have failed to establish an affirmative link between Nurse Ondricek and the alleged constitutional violation. They rely on Nurse Anderson's alleged constitutional violation, rather than arguing that Nurse Ondricek also committed a constitutional violation. They failed to establish a causal connection between Nurse Ondricek's actions and Ms. Miller's death. And they failed to establish the requisite state of mind, deliberate

---

[208] *Id.* (quoting *Brown*, 520 U.S. at 399).

[209] Exhibit 4 at 7:3 – 6 ("Q. Do you do any training? A. I don't directly do training. I attend training, schedule training, occasionally, but no, I don't do any training myself.").

indifference, on the part of Nurse Ondricek. Plaintiffs have not demonstrated the necessary facts and law for this Court to find supervisory liability or failure to train. Accordingly, this Court should not grant partial summary judgment regarding Nurse Ondricek.

### ARGUMENT: SHERIFF RICHARDSON AND DAVIS COUNTY WERE NOT DELIBERATELY INDIFFERENT

Plaintiffs argue that Sheriff Richardson and Davis County acted with deliberate indifference by not having medical protocols in place for the treatment of inmates.[210] "[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."[211]   However, a municipality will not be liable "when there was no underlying constitutional violation by any of its officers."[212]

"[T]his deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." [213]  Moreover, "**a single incident generally will not give rise to**

---

[210] *See* Doc. No. 31 at 32 – 33.

[211] *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

[212] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002).

[213] *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1999)

**liability**."[214]  "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation."[215]  In order to meet these burdens, Plaintiff must show that the municipality's "official position must operate as the 'moving force' behind the violation, and the plaintiff must demonstrate a 'direct causal link' between the action and the right violation."[216]  Plaintiffs cannot meet these standards as a matter of law.

The Davis County Jail's Policy Manual provides that treatment protocols will be developed by the jail physician. Nurses at the jail are expected to respond according to professional nursing standards. Plaintiffs' reference to the single incident of alleged misconduct in this case is insufficient to prove liability of either Sheriff Richardson or Davis County.  Davis County's policy of requiring nurses to respond according to their professional standards is not a "moving force" behind Plaintiffs' claim.  Plaintiffs have failed to show that Davis County and/or Sheriff Richardson had knowledge that its policy requiring nurses to treat inmate injuries was "substantially certain" to result in injury.

---

[214] *Olsen*, 312 F.3d at 1318 (citing *Okla. City v. Tuttle,* 471 U.S. 808, 823 (1985)) (emphasis added).

[215] *Tuttle*, 471 U.S. at 824.

[216] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002).

Conversely, Davis County's policies were constitutional and summary judgment should be granted for both Sheriff Richardson and Davis County.

DATED this 11th day of January, 2019.

SUITTER AXLAND, PLLC


 /s/ jesse c. trentadue
Jesse C. Trentadue
Michael W. Homer
Noah M. Hoagland
Sarah Jenkins
*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

**Section 1**.   **Word Count**

As required by *DUCivR* 56-1, I certify that this brief is proportionally spaced and contains 9,247 words.

Complete one of the following:

_____X_____   I relied on my word processor to obtain the count and it is Microsoft Word, version 1812 (Build 11126.20188), and is updated daily.

_____   I counted five characters per word, counting all characters including citations and numerals.

**Section 2**.   **Line Count**

My brief was prepared in a monospaced typeface and contains 886 lines of text.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

 /s/ jesse c. trentadue____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 11, 2019, 2019 I electronically filed the foregoing **DAVIS COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which sent electronic notification to the following parties:

Daniel M. Baczynski, Esq.
12339 South 800 East, Suite 101
Draper, Utah 84020
*Attorney for Plaintiffs*

Tad D. Draper, Esq.
Law Offices of Tad D. Draper, P.C.
12339 South 800 East, Suite 101
Draper, Utah 84020
*Attorney for Plaintiffs*

  /s/ jesse c. trentadue