Jesse C. Trentadue (#4961)
Michael W. Homer (#1535)
Noah M. Hoagland (#11400)
Sarah Jenkins (#15640)
*SUTTER AXLAND, PLLC*
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
jesse32@sautah.com
mhomer@sautah.com
nhoagland@sautah.com
sjenkins@sautah.com
*Attorneys for Davis County Defendants*

### UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CYNTHIA STELLA, and the ESTATE OF HEATHER MILLER,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVIS COUNTY, SHERIFF TODD RICHARDSON, MAVIN ANDERSON, JAMES ONDRICEK,<br><br>Defendants. | **DAVIS COUNTY DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Civil No. 1:18-cv-00002-JNP<br><br>Judge Jill N. Parrish |

Defendants have moved for partial summary judgment.[1] Defendants are asking the Court to dismiss with prejudice Plaintiffs' federal civil rights claims, which constitute the *First* and *Second Causes of Action* in their *Amended Complaint,*[2] and to decline to exercise supplemental

---

[1] Dkt. 42.
[2] Dkt. 10.

jurisdiction over Plaintiffs' remaining state law claims.  Plaintiffs have opposed, in part,

Defendants *Motion*.[3]  Plaintiffs concede that the Court should enter summary judgment on their

official capacity claim against Sheriff Richardson and their punitive damages claim against

Davis County,[4] but oppose the Court's granting of summary judgment on their federal civil

rights claims.  Defendants, therefore, hereby submit the *Reply Memorandum* in further support

of their *Motion for Partial Summary Judgment*.

## CITATIONS TO RECORD

Plaintiffs filed an *Appendix* containing Exhibits numbered 1 through 21.[5]  Defendants

also filed an *Appendix* containing seven Exhibits, which are identified by the letters A through

G.[6]  In this *Reply Memorandum*, Defendants' will reference their recitation of the facts by

citation to an Exhibit number with respect to exhibits contained in Plaintiffs' Appendix, and by

the letter assigned to an exhibit contained in Defendants' Appendix.

## ADDITIONAL UNDISPUTED FACTS RELATED TO MEDICAL CARE

In support of their *Cross Motion for Partial Summary Judgment*, Defendants submitted

the following additional facts related to the medical care received by Heather Miller.

1.      On December 20, 2016, Heather Miller was arrested on charges for
possession of controlled substances and drug paraphernalia and booked into the Davis
County Jail.[7]

---

[3] Dkt. 44.
[4] *Id.* at p.3.
[5] Dkt. 31.
[6] Dkt. 40.
[7] *See Amended Complaint*, Dkt. 10, ¶ 11.

2.      Jail personnel conducted a medical screening of Miller, which included asking her if she was under the influence of drugs or alcohol or if she was going through withdrawal.[8]

3.      Miller told the medical screener that she was not under the influence of drugs or going through withdrawal.[9]

4.      The Davis County Correctional Facility Policy and Procedures Manual instructs the nurse who performs the health assessment to conduct follow-up care, including "initiating special housing recommendations for inmates that require them."

5.      An inmate who reports she is or expects to be going through withdrawal from drugs will be given a special housing recommendation in the form of a bottom bunk.[10]

6.      Ms. Miller did not report that she expected to be going through drug withdrawals and was assigned to a top bunk.[11]

7.      When Ms. Miller fell in Kilo Unit on December 21, 2016, Nurse Anderson responded to Deputy Lloyd's call for medical assistance. Nurse Anderson helped her sit up and "palpated her head, her side, because she said she fell and hit her side."[12]

8.      Nurse Anderson checked her head for lacerations and bumps but did not find any.[13]

9.      Miller told Nurse Anderson that she "got the wind knocked out of" her.[14]

10.     While in her cell, Miller "got up, she put her shirt on, she put her shoes on, unassisted."[15]

---

[8] Exhibits C and F.
[9] *Id.*
[10] Exhibit 3 at 30:18–34:9.
[11] *Id.* at 34:10–19.
[12] *Id.* 29:6–8.
[13] *Id.* 29:17–22.
[14] *Id.* 37:6–17.
[15] *Id.* 44:7–17.

11.     Nurse Anderson took Miller to a cell in Lima block, a cellblock which house female inmates for medical observation, where she would have a lower bunk.[16]

12.     Based on Miller's symptoms at the time, Nurse Anderson did not think there was an emergent medical need.[17]

13.     Approximately two hours later, Deputy Lloyd was doing a walk-through of Lima Unit when he saw Miller laying on the ground, wearing only a sports bra, with a spot of blood on her chin.[18]

14.     The nurse, Dan Layton, told Deputy Lloyd to keep an eye on her and let them know if her condition worsened.[19]

15.     Deputy Lloyd sought out Deputy Lucius, who called for Sergeant Wall to help them clothe and move Miller to medical. When Miller arrived in Medical, Nurse Anderson immediately told the officers to call for the paramedics.[20]

16.     Nurse Anderson described Miller as "totally flaccid," "pale," and "gray."[21]

17.     Nurse Anderson asked Miller where she was hurting. She responded "Everywhere."[22]

18.     Miller was "combative" with Nurse Anderson and the deputies as they attempted to put a blood pressure cuff on her and give her oxygen.[23]

19.     Paramedics took Miller to McKay-Dee Hospital.[24]

20.     While en route to the hospital, Miller went into cardiac arrest.[25]

---

[16] *Id.*
[17]  *Id.* 85:23–25.
[18] Exhibit 2 at 35:4–19.
[19] *Id.* 45:7–10.
[20] Exhibit 3 at 70:24–71:6.
[21]  *Id.* 70:1, 15–16.
[22]  *Id.* 71:7–11.
[23] *Id.* 71:12–17.
[24] Exhibit B.
[25] *Id.*

4

21.     Miller was pronounced dead at the hospital.[26]

22.     Dr. Erik D. Christensen, the Chief Medical Examiner, found that the cause of death was blunt force injuries of the abdomen,[27] which had resulted in acute trauma to Miller's spleen.[28]

23.     Dr. Christensen informed the Utah Attorney General's Office that "this type of injury would have been difficult to diagnose without being at a hospital. He said that a ruptured spleen is typically diagnosed in three ways: through an ultrasound, a blood count, or actually cutting open a patient. None of these things would have been done by a nurse at a jail. He also said that internal injury is often difficult to diagnose through an external examination because the patient often "does not know where the pain is."[29]

Plaintiffs never responded to the foregoing facts other than to incorporate by reference the "statement of facts, responses and replies" found in their *Motion for Partial Summary Judgment*.[30]  However, in the *Reply Memorandum* submitted in support of their *Motion for Partial Summary Judgment*, Plaintiffs do not address these *Additional Undisputed Facts*.[31]  As such, these facts are deemed admitted.[32]

## ADDITIONAL UNDISPUTED FACTS OF DR. TUBBS

In support of their *Cross Motion for Partial Summary Judgment*, Defendants also submitted the following additional facts related to the medical care received by Heather Miller, which were provided by their expert, Dr. Kennon Tubbs.

1.     On December 20, 2016 Ms. Miller was booked into jail on

---

[26] *Id.*
[27] Exhibit 9.
[28] *Id.*
[29] Exhibit 1 at 28.
[30] Dkt. 44, p. 3.
[31] *See* Dkt . 43 at p. 31.
[32] F.R.Civ.P. 56(e)(2).

Methamphetamine-related charges.  On December 21, 2016 around 17:56 hours, Ms. Miller was reported to have fallen from the top bunk during stand-up count.[33]

2.      Medical was contacted by Deputy Lloyd to respond to the scene, and Nurse Marvin Anderson responded.[34]

3.      Nurse Anderson completed a nursing assessment at the cell, which consisted of a verbal assessment and history taking which included speaking with the cellmate, officers, and Ms. Miller.[35]

4.      Nurse Anderson noted, "While standing up for a count Miller fell off her top bunk hitting her left side of her ribs on the table.  No bruising, redness or scrapes noticed.  She denies losing consciousness or hurting anywhere else."[36]

5.      Nurse Anderson responded promptly to Ms. Miller's bedside when he was asked to come to the unit and assess her recent fall.[37]

6.      Upon arrival at the unit, Nurse Anderson went to Ms. Miller's cell and rendered assistance and made a clinical assessment of her overall health at that time.  The assessment did include palpation of the area of concern and a visual screening of the skin for local bleeding, bruising, or possible fracture.[38]

7.      Ms. Miller reported to Nurse Anderson pain on the left side of her

---

[33] Dkt. 40-1, Exhibit A at ¶9.
[34] *Id.* at ¶10.
[35] *Id.*
[36] *Id.*
[37] *Id.* at ¶45.
[38] *Id.*

abdomen, which pain was consistent with the injury at that time.[39]

8.   Nurse Anderson did evaluate Ms. Miller for head and neck injuries of which she denied having at the time.[40]

9.   Having satisfactorily triaged her emergent need for EMS at the time, Nurse Anderson then went to get a wheelchair to render assistance to change the housing for Miller.[41]

10.   Ms. Miller was assessed by a qualified registered nurse at the scene of her accident, Nurse Anderson, and a clinical assessment was made to house Ms. Miller in a safer environment.[42]

11.   Nurse Anderson fulfilled his duty to Ms. Miller by responding to the scene, evaluating her for injuries and made a clinical assessment to house her based on his knowledge at the time and the clinical facts available to him.[43]

12.   Admittedly, vital signs were not obtained at the scene as customary care would have dictated.

13.   However, there is no evidence that Miller's vital signs would have been significantly altered at that time to suggest to Nurse Anderson that she had suffered a rare and complicated splenic laceration.[44]

14.   Nurse Anderson was not aware of the substantial risk of splenic

---

[39] *Id.* at ¶46.
[40] *Id.*
[41] *Id.*
[42] *Id.* at ¶47.
[43] *Id.*
[44] *Id.*

laceration resulting from a fall from a bunk.  This is a rare and unusual event.[45]

15.    In fact, the incidence of splenic laceration resulting in exsanguination and death is so low that a nurse would not be expected to be able to diagnose it quickly in the early stages of the disease.[46]

16.    Therefore, even if Ms. Miller was placed in the infirmary for close monitoring it is highly unlikely that the nursing staff would have been able to diagnose and treat this rapidly changing and insidious diagnosis.[47]

17.    When she was transferred to the Lima Housing Unit, Nurse Anderson instructed Ms. Miller to contact medical if the housing was not sufficient or if her condition worsened in any way.[48]

18.    Nurse Anderson did not delay or deny treatment to Ms. Miller for the complaints: a fall from the top bunk.[49]

19.    It is Dr. Tubbs' opinion, to a reasonable degree of medical certainty, that Nurse Anderson made appropriate clinical decisions based on the information and interactions that he had at the time.[50]

20.    Nurse Ondricek serves as the nursing administrator at the Davis County Jail.[51]

---

[45] *Id.* at ¶49.
[46] *Id.*
[47] *Id.*
[48] *Id.* at ¶50.
[49] *Id.*
[50] *Id.*
[51] *Id.* at ¶51.

21.     It is not the responsibility of either the Sheriff or Nurse Ondricek to draft protocols for the Jail.[52]

22.     NCCHC policy J-A-02 states that the responsible physician has the final authority at a given facility regarding clinical issues.[53]

23.     Nursing protocols are nursing directives from a licensed physician to the nursing staff.[54]

24.     These orders must be written and approved by the responsible physician and then implemented by both Nurse Ondricek and Sheriff Richardson.[55]

25.     The responsible physician is responsible for nursing direction. NCCHC J-A-02 states, "Final clinical judgements rest with a single, designated, licensed responsible physician."[56]

26.     As a physician, Dr. Tubbs knows from experience that it is not possible to write a protocol for every scenario.[57]

27.     He, for example, has written many medical protocols but does not have a protocol for bunk falls in a jail.[58]

28.     Falls in jails happen frequently but the injuries sustained are wide

---

[52] *Id.*
[53] *Id.* at ¶52.
[54] *Id.*
[55] *Id.* at ¶52.
[56] *Id.*
[57] *Id.* at ¶53.
[58] *Id.*

ranging.[59]

29.     It would not be possible to write a protocol that would be comprehensive and inclusive of all possible pathology that could result from a fall.[60]

30.     Sheriff Richardson did contract with a local physician, Dr. Wood, to provide medical care to the Jail's inmate population.[61]

31.     Written medical protocols are nursing orders from a physician.  Many physicians want standardized nursing care but others do not.[62]

32.     It is at the discretion of the facility physician, Dr. Wood, as to which protocols are to be written and followed.[63]

33.     This was not the responsibility of the Nurse Ondricek, Sheriff Richardson or Davis County, Utah.[64]

34.     Furthermore, Dr. Tubbs sees no clinical evidence that a protocol governing the assessment and/or treatment of a falls within the Davis County Jail would have changed Ms. Miller's tragic outcome.[65]

35.     In Dr. Tubbs' opinion, by the time that Ms. Miller presented with symptoms of a splenic laceration, which the Jail's nursing staff would not have recognized nor could anyone have diagnosed without internal scanning via CT, MRI,

---

[59] *Id.*
[60] *Id.*
[61] *Id.* at ¶54.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.* at ¶55.

or ultrasound, it would have been too late to have changed the outcome.[66]

36.     In other words, the absence of such a protocol made no difference in Ms. Miller's case.[67]

Rather than dispute any of the foregoing facts as required by  F.R.Civ.P. 56(e)(2), Plaintiffs state in conclusory fashion and without either explanation or example, that "Dr. Tubb's affidavit exceeds the scope of his expert report,"[68] even though Dr. Tubbs was responding to Plaintiffs' factual contentions.  Plaintiffs then proceed to allege that "[f]ortunately, the additional facts and opinions included in his affidavit are not material to the question of deliberate indifference."[69]  Plaintiffs, however, are mistaken about the materiality of these facts.  Dr. Tubbs' *Declaration* speaks directly and dispositively to the issues of deliberate indifference, especially the subjective component,  which is Nurse Anderson's lack of knowledge as to Ms. Miller's medical condition, and to the absence of causation.

## ARGUMENT

### I.     Defendants Did Not Violate Ms. Miller's Civil Rights

The crucial issue before the Court on Plaintiffs' *Motion for Partial Summary Judgment* and Defendants' *Cross Motion for Partial Summary Judgment* is whether Nurse Anderson's treatment of Ms. Miller sunk to the level of deliberate indifference?  If not, then there was no violation of Ms. Miller's civil rights, which means that all Defendants are entitled to summary

---

[66] *Id.*
[67] *Id.*
[68] Dkt. 43, p. 8.
[69] *Id.*

judgment.[70]

  **A.**  **The Undisputed Facts Demonstrate That Defendants Were Not Deliberately Indifferent.**

  The starting point in addressing this question is the admissions made by Plaintiffs in the *Reply Memorandum* which they submitted in support of their *Motion for Partial Summary Judgment*. Specifically, the admissions contained in the paragraph 43 of their "Undisputed Facts" and Defendants' responses thereto. In paragraph 43, Plaintiffs concede that "Davis County does not have the means to diagnose a ruptured spleen [however] the Jail would have diagnosed internal bleeding had the Jail monitored Ms. Miller's vital signs."[71] That the nursing staff, including Nurse Anderson, could not have diagnosed Ms. Miller's ruptured spleen is consistent with the undisputed evidence in this case. For example, Dr. Christensen from the Utah Medical Examiner's Office, stated that "this type of injury would have been difficult to diagnose without being at a hospital. He said that a ruptured spleen is typically diagnosed in three ways: through an ultrasound, a blood count, or actually cutting open a patient. None of these things would have been done by a nurse at a jail. He also said that internal injury is often difficult to diagnose through an external examination because the patient often "does not know where the pain is."[72]

  Similarly, Dr. Tubbs said a ruptured spleen is a rare and unusual event.[73] According to dr. Tubbs, the incidence of splenic laceration resulting in exsanguination and death is so low that

---

[70] *See Martinez v. Beggs*, 563 F.3d 1082, 1091-1092 (10th Cir. 2009)(If there is no underlying civil rights violation there is no supervisory or municipal liability either).
[71] Dkt. 43, p. 4 at ¶ 43.
[72] Exhibit 1 at 28.
[73] *Id.* at ¶49.

a nurse would not be expected to be able to diagnose it quickly in the early stages of the

disease.[74]  Therefore, even if Ms. Miller was placed in the infirmary for close monitoring it is

highly unlikely that the nursing staff would have been able to diagnose and treat this rapidly

changing and insidious diagnosis.[75]

        The second crucial admission by Plaintiffs is their response to Defendants' statement

that:

>        Miller's diagnosis [ruptured spleen] likely would not have been
> apparent to Nurse Anderson based on findings of vital signs.  Typically, one
> would expected elevated blood pressure and pulse immediately following a
> traumatic event and it is unlikely that Miller would have been found
> hypotensive and tachycardic at the time of injury.[76]

In their response, Plaintiffs admit that "While true that the initial vital signs would not

have indicated internal bleeding, the value of vital signs is charting their progression over a

period of time."  Plaintiffs insist that Ms. Miller's "vital signs ultimately would have decreased

overtime due to the internal bleeding. . . .[and that t]he decrease over time would have alerted

Davis County to the internal bleeding."[77]  But Nurse Anderson's conduct is to be judged by what

he knew and/or objectively and reasonably believed at the time that he examined Ms. Miller in

the K-Unit, which was that she hd not been injured in the fall and was in fact withdrawing from

methamphetamine.  Simply stated, Nurse Anderson examined Ms. Miller for injuries, found no

injuries, and saw no medical reason to thereafter take her vital signs on an hourly basis.  More

importantly, Dr. Tubbs stated that there is no evidence that Miller's vital signs would have been

---

[74] *Id.*

[75] *Id.*

[76] Dkt. 43, p. 4 at ¶ 43.

[77] Id.

significantly altered immediately following her fall to suggest to Nurse Anderson that she had suffered a rare and complicated splenic laceration.[78]  Plaintiffs, nevertheless, contend that Nurse Anderson acted with deliberate indifference to Ms. Miller's medical needs when he did not immediately take her vital signs or monitor her vital signs over the next hour following her fall,[79] which is not supported by either the facts and/or the law.

**B.     Defendants Did Not Act With Deliberate Indifference as a Matter of Law.**

With respect to a claim of deliberate indifference to a prisoner's medical needs, the Supreme Court has set forth "a two-pronged inquiry, comprised of an objective and subjective component."[80]   In order to satisfy the objective component, the medical need must be one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,[81] and a rupture spleen clearly meets this requirement.  Whereas the subjective component has not been met and cannot be met under the facts of this case.

In order to meet the subjective component, the Nurse Anderson must have had a "sufficiently culpable state of mind."[82]  The subjective component is only satisfied if Nurse Anderson knew of and disregarded the excessive risk that a ruptured spleen posed to Ms. Miller, which means that he must have been aware of: (1) facts from which the inference could be drawn that there existed a substantial risk of serious harm to Ms. Miller from a ruptured spleen

---

[78] *Id.*

[79] *See* Dkt. 31 at 23–24.

[80] *Self*, 439 F.3d at 1230.

[81] *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

[82] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

when he first examined Ms. Miller; and (2) that Nurse Anderson actually drew that inference.[83]

Furthermore, in these kind of cases there is also available to the medical care provider the

defense that he or she was merely negligent in diagnosing or treating the medical condition,

rather than deliberately indifferent."[84]  This is a defense because the fact that a medical care

provider was negligent in diagnosing and/or treating a prisoner's medical condition does not give

rise to a civil rights violation.  In other words, negligence or malpractice is not deliberate

indifference otherwise actionable as a civil rights violation.[85]

More importantly, while in hindsight, it is possible to say that an inmate who falls from a

top bunk may experience an emergent injury, the facts presented to Nurse Anderson at the time

of Ms. Miller's fall did not suggest such an injury—and he accordingly did not draw such an

inference. As the Tenth Circuit has explained, "deliberate indifference is assessed at the time of

the alleged omission."[86] "[A]ny assessment of [plaintiff's] condition conducted several hours

after her encounter with [the nurse] is irrelevant to whether [the nurse] knew of and disregarded

an excessive risk to [plaintiff's] safety."[87]  The record and law make clear that Nurse Anderson

was not deliberately indifferent in terms of assessing and responding to Ms. Miller's medical

needs, which is supported by the Tenth Circuit decisions in *Martinez v. Beggs,*[88] and  *Stafford v.*

---

[83]  *Id.*

[84]  *Id.*

[85]  *See Estelle v. Gamble,* 429 U.S. 97, 105-106 (1976)("an inadvertent failure to provide adequate medical care" does not rise to the level of a civil rights violation)*; Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000); *Riddle v. Mondragon*, 83 F.3d 1197, 1203)(10th Cir. 1996).(  *See also McRaven v. Sanders*, 577 F.3d 974, 983(8th Cir. 2009)(Negligently mistaking drug intoxication as alcohol intoxication is not deliberate indifference).

[86] *Kellum v. Mares*, 657 Fed. Appx. 763, 769 (10th Cir. 2016) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 433 (10th Cir. 2014)).

[87] *Estate of Booker*, 745 F.3d at 433.

[88]  563 F.3d 1082 (10 th Cir. 2009).

*Stewart*.[89]

In *Beggs*, the family of a prisoner found dead in his cell a few hours after his arrest for public intoxication sued the arresting officers, sheriff and county for a civil rights violation premised upon the deliberate indifference to the decedent's serious medical needs by the arresting officers, and supervisory/policy liability on behalf of the sheriff and county. An autopsy revealed that the prisoner died of a heart attack and that his .32% blood alcohol level was a contributing factor to his death. Plaintiffs contended that had the decedent been taken to a hospital instead of jail, he would have survived. The District Court granted the defendants' *Motion for Summary Judgment,* and the Tenth Circuit affirmed because while the arresting officers subjectively knew that the prisoner was intoxicated they had no knowledge of or even reason to know that he faced an imminent heart attack and death.[90] With respect to the sheriff, who had been sued in both his individual and official capacity, the *Beggs* Court affirmed the grant of summary judgment because without an underlying violation by the officers, the sheriff had no liability under either theory and the same was true of the county.[91]

Similarly, in *Stafford*, the Tenth Circuit reversed the District Court's denial of summary judgment in a case of alleged deliberate indifference to prisoner's serious medical needs. The prisoner, Cheryl Stafford, who was admitted to the detention center on a drug charge, reported a history of high blood pressure, for which she was treated with medication while incarcerated. During her incarceration the prisoner allegedly complained of headaches, dizziness, and a stiff neck to the jail staff, but the jail staff supposedly ignored her requests to see a nurse. Ms.

---

[89] 461 Fed. Appx. 767 (10th Cir. 2012)(unpublished.)
[90] *Id.* at 1090.
[91] *Id.* at 1091-92.

Stafford eventually suffered a subarachnoid hemorrhage that left her disabled, and she sued Ms. Stewart, a member of the jail staff, for being deliberately indifferent to her serious medical needs.

The District Court denied Ms. Stewart's *Motion for Summary Judgment* because it believed that there was a material issue of fact over whether Ms. Stafford had in fact complained to Ms. Stewart, but the Court of Appeals disagreed.  Emphasizing that the case against Ms. Stewart depended upon whether the symptoms displayed by Ms. Stafford were such that Ms. Stewart actually knew of the risk to Ms. Stafford and chose to ignore that risk, the *Stafford* Court concluded that the evidence did not support the claim that she knew of the serious risk of harm to Ms. Stafford yet chose to deny Ms. Stafford access to medical care.[92]

## II.      Plaintiffs' Supervisor Liability and Failure to Train Claims Against Nurse Ondricek Fail as a Matter of Law.

Plaintiffs also contend that "Nurse Ondricek is liable for his failure as a supervisor."[93] But they have failed to establish an "'affirmative link' between the supervisor [Nurse Ondricek] and the constitutional violation."[94] To prevail on a §1983 supervisory liability claim, Plaintiffs must prove three things: (1) personal involvement; (2) causation; and (3) state of mind."[95] It is not enough to say that the supervisor's subordinate violated the Constitution because, in *Ashcroft v. Iqbal*, the Supreme Court explained that "vicarious liability is inapplicable to . . . § 1983 suits,

---

[92]  *Id.* at 770-771.  It is noteworthy, too, that in both *Beggs* and *Stafford*, the individual officers were granted summary judgment based upon qualified immunity, which disposes of Plaintiffs' claim that qualified immunity and it's objectively reasonable component do not apply to a case alleging the denial of medical care.
[93] Dkt. 31, p. 31.
[94] *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).
[95] *Id.*

a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[96] Whereas, Plaintiffs have only argued that Nurse Anderson's alleged constitutional violation must also be attributed to his supervisor, Nurse Ondricek.[97]  Even if Nurse Anderson had acted with deliberate indifference to Ms. Miller's medical needs—which he did not—this is insufficient to establish that Nurse Ondricek also violated Ms. Miller's constitutional rights.

   In addition to establishing personal involvement, Plaintiffs must "establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights,'"[98] and this they also have not done. Plaintiffs argue that Nurse Ondricek failed to provide nursing protocols or clear expectations to Nurse Anderson, which in turn resulted in Nurse Anderson failing to take Ms. Miller's vital signs after her fall.[99] But it is not Nurse Ondricek's responsibility to provide nursing protocols—it is the responsibility of the jail's physician,[100] who is referred to as the health authority in the Davis County Correctional Facility's Policy and Procedures Manual.  Furthermore, it is unlikely that nursing protocols or even "clear expectations" in this case would have prevented Ms. Miller's death. "[T]here is no evidence that Ms. Miller's vital signs would have been significantly altered at that time to suggest to Nurse Anderson that she had suffered a rare and complicated splenic injury."[101] And

---

[96] 556 U.S. 662, 676 (2009).

[97] *See Motion for Partial Summary Judgment*, Doc. No. 31, p. 31; *Amended Complaint*, Dkt. No. 10, ¶ 42.

[98] *Schneider*, 717 F.3d at 768 (citation omitted).

[99] *Motion for Partial Summary Judgment*, Doc. No. 31, p. 31.

[100] *See* Dkt. 40-1, *Declaration of Kennon Tubbs, M.D.*, ¶¶ 51 – 52.

[101] *Id.* ¶ 48.

"even if Ms. Miller was placed in the infirmary for close monitoring it is highly unlikely that the nursing staff would have been able to diagnose and treat the rapidly changing and insidious diagnosis."[102] Accordingly, Plaintiffs cannot establish a causal connection between Nurse Ondricek's actions that led to Nurse Anderson's alleged deliberate indifference.

"The third element requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind,"[103] which is deliberate indifference. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[104] It requires a showing that the actor "both be aware of facts from which the inference could be drawn that a substantial risk of harm exists" and that the actor drew the inference.[105] But Plaintiffs have not and cannot establish that Nurse Ondricek disregarded a known or obvious consequence of his actions or that he was aware of facts that would lead him to infer there was a substantial risk of harm to Ms. Miller. In fact, Nurse Ondricek understood and expected that jail staff would follow professional nursing standards, which they did.

Plaintiffs also argue that Nurse Ondricek failed to train his nurses on jail expectations and that nurses "knew that failure to adhere to expectations" would have no consequences.[106] Failure to train may serve as a basis of § 1983 liability but only "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of

---

[102] *Id.* ¶ 49.
[103] *Schneider*, 717 F.3d at 769.
[104] *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).
[105] *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).
[106] *Motion for Partial Summary Judgment*, Doc. No. 31, p. 31 – 32.

harm.'"[107]   In other words, plaintiffs must demonstrate a "direct causal link" between the action

and the right violated."[108]  "That is, '[w]ould the injury have been avoided had the employee been

trained under a program that was not deficient in the identified respect?'  And that Plaintiffs

have likewise failed to do.

### III.   Sheriff Richardson and Davis County Are Not Liable.

Plaintiffs argue that Sheriff Richardson and Davis County acted with deliberate

indifference by not having medical protocols in place for the treatment of inmates.[109]  However,

deliberate indifference only exists if "the municipality has actual or constructive notice that its

action or failure is substantially certain to result in a constitutional violation, and it consciously

and deliberately chooses to disregard the risk of harm." [110]  And, "**a single incident generally**

**will not give rise to liability**."[111]  Furthermore when, as in he instant case, "the policy relied

upon is not itself unconstitutional, considerably more proof than the single incident will be

necessary in every case to establish both the requisite fault on the part of the municipality, and

the causal connection between the 'policy' and the constitutional deprivation."[112]  The Davis

County Jail's Policy Manual provides that treatment protocols will be developed by the jail

physician. Nurses at the jail are expected to respond according to professional nursing standards.

Plaintiffs' reference to the single incident of alleged misconduct in this case is insufficient to

prove liability of either Sheriff Richardson or Davis County.

---

[107] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002)(citation omitted).
[108] *Id.* (quoting *Brown*, 520 U.S. at 399).
[109] *See* Doc. No. 31 at 32 – 33.
[110] *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1999).
[111] *Olsen*, 312 F.3d at 1318 (citing *Okla. City v. Tuttle,* 471 U.S. 808, 823 (1985)) (emphasis added).
[112] *Tuttle*, 471 U.S. at 824.

## CONCLUSION

The Court is requested to grant Defendants' *Cross Motion for Summary Judgment* on Plaintiffs' federal civil rights claims and, having done so, to decline to exercise supplemental jurisdiction to hear Plaintiffs' state claims.

DATED this 1ˢᵗ day of March , 2019.

SUITTER AXLAND, PLLC

 /s/ jesse c. trentadue
Jesse C. Trentadue
Michael W. Homer
Noah M. Hoagland
Sarah Jenkins
*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

<u>**Section 1**</u>.  **Word Count**

As required by *DUCivR* 56-1, I certify that this brief is proportionally spaced and contains 5,148 words.

Complete one of the following:

____X____        I relied on my word processor to obtain the count and it is Microsoft Word, version 1812 (Build 11126.20188), and is updated daily.

_____        I counted five characters per word, counting all characters including citations and numerals.

<u>**Section 2**</u>.        **Line Count**

My brief was prepared in a monospaced typeface and contains 514 lines of text.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

/s/ jesse c. trentadue

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 1, 2019, I electronically filed the foregoing **DAVIS COUNTY DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which sent electronic notification to the following parties:

Daniel M. Baczynski, Esq.
12339 South 800 East, Suite 101
Draper, Utah 84020
*Attorney for Plaintiffs*

Tad D. Draper, Esq.
Law Offices of Tad D. Draper, P.C.
12339 South 800 East, Suite 101
Draper, Utah 84020
*Attorney for Plaintiffs*

 /s/ jesse c. trentadue