# <u>EXHIBIT 3</u>

Daniel M. Baczynski, Bar No. 15530
Baczynski Law
12339 S. 800 E. Ste. 101
Draper UT 84020
(801) 255-5555 Phone
dan@bskilaw.com

LAW OFFICES OF TAD D. DRAPER P.C.
Tad D. Draper, Bar #4311
12339 South 800 East Ste. 101
Draper, Utah  84020
(801) 553-1700
(801) 255-5588 fax
Legaljustice3@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CYNTHIA STELLA, and the ESTATE OF HEATHER MILLER, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVIS COUNTY, SHERIFF TODD RICHARDSON, MAVIN ANDERSON, JAMES ONDRICEK <br><br> Defendants. | **DECLARATION OF TODD VINGER IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT [DN 31]** <br><br> Case No:  1:18-cv-002 <br><br> Judge:   Jill Parrish |

I, Todd Vinger, declare:

1. Attached as Exhibit A is a true and accurate copy of my bio and CV.

2. Attached as Exhibit B is a true and accurate copy of my expert opinion provided to Plaintiffs' Counsel.

1

3. Prior to issuing my opinion. I reviewed both parties' initial disclosures, Davis County's response to Plaintiffs' first set of discovery, and the Attorney General's response to Plaintiffs' subpoena.

4. If called to testify at trial, I would testify to the facts and opinions contained in Exhibit B. Specifically, I would testify to the following:

**SUMMARY:**

5. Based on the investigative reports, on December 20, 2016 around 04:19 hours, Heather Ashton Miller was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office.

6. On December 21, 2016 around 17:56 hours, Ms. Miller was reported to have fallen from the top bunk in her cell (K-12). She was seen by medical personnel (Nurse Marvin Anderson), but no vital sign readings were taken and then was moved with wheelchair assistance to a different unit and cell (L-7) for medical observation and/or Bottom Bunk Bottom Tier status.

7. Her condition continued to deteriorate and was later discovered bleeding from her chin, in pain and unable to move on her own.

8. She was assisted into a wheelchair and moved to the Medical unit where Medical staff immediately requested an ambulance and Ms. Miller was transported while requiring CPR as well as defibrillation along the transport to the McKay Dee Hospital, where she was pronounced deceased at 22:06 hours.

**TIME-LINE OF EVENTS**

2

9. December 20, 2016 at 04:19 Heather Ashton Miller was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office. Medical vitals and assessment competed, and she was placed into General Housing.

10. December 21, 2016 at 17:56 Ms. Miller was reported to have fallen from the top bunk in her cell (K-12).

11. At 18:00, Ms. Miller was discovered by Deputy Lloyd during Safety and Security Check / Head Count for Kilo Unit. Lying on the floor of K-12 and told by Miller's cellmate that Ms. Miller had fallen from the top bunk onto the floor.

    Deputy Lloyd calls for emergency medical Assistance via radio and Nurse Marvin Anderson arrives on scene without the medical equipment needed to obtain vitals readings from the patient. Nurse Marvin Anderson conducts a brief interview and visual assessment of Ms. Miller and decides to have Miller moved to another cell.

12. At 18:18, Ms. Miller was transported by wheelchair to another unit and cell(L-7) for medical

    observation and/or bottom bunk bottom tier status (*Some reports specify Bottom Bunk Bottom Tier and others discuss potential of double bunking in the medical unit which would indicate that they considered closer observation*).

    Cpl. Johnson's report stated that Ms. Miller stated that she "couldn't breath" and that she appeared to be hot due to the fact that she was sweating and was trying to lift up her shirt. He also noted that she seemed "Dizzy", so they had her sit at the top of the stairs. She later slowly slid herself down the steps one step at a time where the staff assisted her into a wheelchair to transport her to another unit (L-7).

13. 18:33 Safety and Security Check (SS) in Lima Unit.

3

14. 19:32 Safety and Security Check (SS) in Lima Unit.

15. 20:20 Safety and Security Check (SS) in Lima Unit. Deputy Lloyd discovers Ms. Miller on the floor of L-7 with little clothing on and a new laceration under her chin with blood on her arms and face.

Deputy Lloyd enters the POD (area Control) and called the medical unit to advise of Ms. Miller's status. Based on the Area Control Clerk who witnessed the phone conversation between Dep. Lloyd and Medical, Deputy Lloyd had been advised by medical, "not to think too hard about it".

16. 20:30 Deputy Lloyd then contacts Deputy Lucius and advises him of his concerns and they both respond back to Lime-7 to check on Ms. Miller. They requested Sgt. Wall to respond to L-7.

Upon arrival Sgt. Wall stated that she observed Ms. Miller lying on the floor and when asked if she was OK, Heather Miller moaned and "Thrashed about" on the floor. Sgt. Wall recalled Ms. Miller say, "I hurt everywhere" and that Heather kept repeating that she hurt.

In Sgt. Wall's interview with AG investigators she stated that she called the medical unit via the radio asking if they had a bed for Ms. Miller the medical unit responded that they could "double bunk her". Sgt. Wall then instructed staff to move Ms. Miller by wheelchair to the medical unit.

Based on Cpl. Johnson's report, while in route to the Medical Unit Ms. Miller had to be assisted in staying in the wheelchair and seemed to suffer from a seizure.

17. 20:39 Ms. Miller arrives in the medical unit and is seen by Medical personnel. Nurse Marvin Anderson attempts to obtain vital signs for Ms. Miller but was unable to due to Ms. Miller's "thrashing around".

4

18. 20:43 EMS was notified.

19. 20:49 EMS Medic 22 On Scene at Davis County Jail.

20. 20:54 Davis County Jail processed a Release from the Facility (Computer Process) with a Promise To Appear (PTA).

21. 20:55 EMS Medic 22 staff arrive at Patient.

22. 21:03 EMS Medic 22 left the Davis County Jail and began transport to the McKay Dee Hospital.

23. 21:17 Ms. Miller went into Cardiac arrest during transport. Defibrillation and CPR begins.

24. 21:26 EMS Medic 22 arrives at McKay Dee Hospital. Paramedic Chase Harvey Meets Sgt. Hawkins of the Davis County Sheriff's Office at the Hospital and advises him that Ms. Miller had gone into Cardiac Arrest during transport from the Jail and that she had, "presented poorly".

Sgt. Hawkins Phones Sgt. Wall at the jail and advised that they should initiate the proper response to an in-custody death investigation but was frustrated with the jail's response that they felt that they didn't need to.

25. 22:06 Ms. Miller was pronounced deceased.

26. December 22, 2016 at 00:20, Weber County Sheriff's Office investigators arrive at the Davis County Jail to begin their investigation and express their frustration that the scene at the jail was unable to be processed because the Staff had already had the areas that Ms. Miller was housed in cleaned.

27. 10:15 Autopsy conducted. Dr. Christensen's Opinion; Died as a result of blunt force injuries of abdomen sustained when she (Heather Miller) fell from the upper bunk in her cell while attempting to climb down about a day and a half after being booked into the jail.

**FINDINGS:**

As a result of reviewing the investigative reports of the Weber County investigators, the Utah Attorney General's Office Investigators, Office of the Medical Examiner Utah Department of Heath as well as the numerous witness and Officer reports and statements, I have noted the following findings.

28. In reviewing Davis County Correctional Facility Policy and Procedures Manual the Agency refers to National Commission on Correctional Heath Care (NCCHC) standards throughout its policies that refers to medical services but does not make clear if this reference is based of the County using these national best practices and standards to create their policies or if they are meant to be a reference to the standard within NCCHC that should be followed.

29. Based on Policy 401.01 and 401.03 which outlines that the Health Authority is responsible for the Policies and Procedures governing health care, health services, administration and management of the Davis County Jail heath care program policies and "will be developed and Written". Each policy, procedure and program "is reviewed annually and revised as necessary". The Heath Services Policy and Procedure Manual will be available to heath care staff on the X-drive. Medical staff will be responsible to follow these Heath Services Policy and Procedures.

30. I have not been provided with a copy of the Heath Services Policy and Procedures Manual, therefore I am unaware if it has been Written, Annually Reviewed, or followed in the case of Ms. Miller's fall and death? Or if the Jail's basic Policies and Procedures serve as the Heath Services Policy and Procedures Manual? If the latter is the case, then why would there be directions to write and review the health service policy and procedure manual?

31. In review of the AG report Pg. 73of 83 it should be noted that Nurse Supervisor James Ondricek advised Investigators that there is no medical policy beyond the jail policy. This is

very inconsistent with the jail Policy 401 that outlines that a Heath Services Policy and Procedures Manual will be written and annually reviewed and followed by medical staff.

32. On 12-21-16 at 18:00 hours Deputy Lloyd requested medical respond to assess the injuries of Ms. Miller on the discovery of her fall from the top bunk to the floor. Nurse Marvin Anderson responded to evaluate the injured inmate but did not bring the needed equipment to check the vital signs of the patient.

33. Based on a review of the general jail policies 405.14 B1...3(a, b, c) it states that medical staff will a; Respond immediately carrying the necessary medical supplies and/or equipment with him, b; Evaluate the inmates status. c; provide emergency care.

34. In this case Nurse Marvin Anderson did not bring the needed equipment to obtain the vital signs of the injured inmate but did attempt to treat the patient by providing Ibuprofen. No vital signs were ever obtained for Ms. Miller after her fall until outside EMS staff arrived on scene at 20:55 and they began to assess the patient and transport Ms. Miller to the hospital.

35. In reviewing the reports of POD Clerk Rogers and Deputy Lloyd and the AG report pg. 65-66 it was noted that on 12-21-16 at approximately 20:30 hours while on rounds in Lima Unit Dep. Lloyd found Ms. Miller on the floor of her cell nearly naked with blood on her chin and arms. He immediately went into the control POD for Lima Unit and called the Medical Unit by phone. Clerk Rogers recalls hearing the conversation from Deputy Lloyd as he advised the nurses of the condition he had found Ms. Miller in. Clerk Rogers informed AG investigators that he heard Deputy Lloyd repeat back the nurse's comment of, "so I should just not think too much about it". Clerk Rogers further advised the AG Investigators that as Deputy Lloyd hung up the phone he told Rogers that he was going to get Deputy Lucious to

7

help check on Ms. Miller, which would indicate his heightened concern and seriousness of Mr. Millers condition.

36. Based on my nearly 27 years of public service and experience within corrections I find the deliberate lack of response and lack of attempting to check for any vital signs of the patient nor any continued monitoring or observation of the patient and of the indifferent concern from medical staff for the Patient's condition at that point to be in Clerk Rogers terms "being lazy".

37. In review of the AG Investigative report pg. 56 of 83, when asked by investigators if he is supposed to take vital signs in cases of inmates falling from bunks, Nurse Marvin Anderson stated that he should have done it when he saw her. When asked if he usually does vital signs on falls he stated, "yes". However, this common best practice was not followed in this case.

38. After the brief assessment of Ms. Miller in K-12 Nurse Marvin Anderson decided to have Ms. Miller moved to Lima-7 rather than to the Medical Unit. Based on the AG investigator's interview with Nurse Supervisor James Ondricek (pg. 73-74), Nurse Ondricek advised that the agency's standard process or his expectation for responding to a fall from the top buck ("which occurs approximately once a month") is to "monitor them" including monitoring vital signs. No vital signs were obtained in this case until outside EMS staff arrived and transported Ms. Miller.

39. When Ms. Miller was moved from K-12 she needed assistance to walk and Nurse Marvin Anderson had to obtain a wheelchair to move her to L-7 due to the fact that she was unable to walk on her own. In Nurse Supervisor Ondricek's interview, when asked if it would be his expectation as a supervisor for a nurse to bring an inmate to the medical unit or provide

further observation if an inmate can not walk or needs to be wheeled out of a unit, he responded with, "absolutely". No addition observation or monitoring was initiated nor was Ms. Miller placed into the Medical Unit but rather placed unsupervised and alone in a cell within a Unit that only received a Safety and Security Check once an hour.

40. In the interview by AG Investigators with Corporal Johnson, he advised that is common practice for falls from the top bunk to take the inmate to the medical unit to be assessed. She also said that if someone reported withdrawals they were placed on the bottom bunk or in sever cases placed in the medical unit. Neither was done in this case.

41. Cpl. Johnson advised investigators that she thought that there were no available bunks in the medical unit at that time, so they moved her to a lower bunk(L-7). (Pg.63 AG report).

42. In reviewing Davis County Correctional Facility Policy and Procedures Manual section 405.03 (D) it outlines the requirements for the importance of proper housing of inmates based on medical initial assessment. However, when Nurse Marvin Anderson conducted a brief cursory non-vital signs assessment in K-12 he stated that he felt she was suffering from withdrawals. Based on this assessment the policy 405.03(D) would dictate that, "identifying inmates that require housing in the medical infirmary due to a serious medical condition, such as withdrawals or a contagious disease".

43. The inability to walk on their own, dizziness and a complaint of "hurting everywhere" could be considered to a prudent person to potentially be a serious medical condition.

44. In reviewing the provided reports there is a question as to the ability to move Ms. Miller into the Medical Unit due to maximum capacity of that unit. Based on the statements from the Medical Unit to Sgt. Wall that they could "double bunk her" this could indicate that the

Medical Unit was at capacity that night and that would have been a reason why Ms. Miller was not moved there for closer observation from K-12.

45. In the AG investigators interview with Nurse Supervisor Ondricek, Ondricek explains that the Medical Unit generally remains full, "90% of the time". He also advised that the jail was expanded from 180 inmate capacity to around 900 inmates but the medical unit remained untouched with only 6 medical cells.

46. Cpl. Johnson advised investigators that she thought that there were no available bunks in the medical unit at that time, so they moved her to a lower bunk(L-7). (Pg.63 AG report).

47. When asked by AG Investigators if there were and bunks available in the medical unit that night, Nurse Layton advised investigators that they typically run, "Pretty full".

48. Nearly two (2) months after the Death of Ms. Miller, AG investigator Downey received an email from Lt. Callister of the Davis County Sheriff's Office stating that there are six medical cells in the Davis County Jail. He stated that at the time of Ms. Miller's death, one of the medical cells was unoccupied. He sent Investigator Downey the booking sheets of the individuals housed in the medical unit at the time of the incident.

49. This information seems inconsistent due to the fact that the booking sheets provided shows that there were 7 inmates housed in the 6 cells of the Medical Unit that day. Inmates; Rhoades, Torres, Turner, Valdez, Pazell, Bunch, & Kirchgater.

50. In reviewing the reports, it seems alarming that there were several staff members advising that falls from the top bunks is very common. Yet, I have not found within the documents provided that any attempts have been made to reduce the number of falls or to help lessen the effects of these falls.

10

51. In response to the question of how many falls from top bunks the Davis County Jail has had over the past 5 years, the response from Rebecca Abbott, records Manager for Davis County dated December 29, 2017; Davis County Sheriff's personnel have indicated that there have been thirty (30) "injuries reported at the Davis County Jail from inmates falling of the top bunk" between the dates of November 26, 2013 and the date of this letter. {These numbers would average approximately 7 1/2 falls from top bunks a year.}

52. These numbers seem to be inconsistent with the statements in the provided reports of jail

53. medical and correctional staff. When asked by AG Investigator Downey about inmate falls from top bunks, Nurse Layton advised that inmates fall off their bunks beds, "a few times a month". Nurse Supervisor James Ondricek stated in his interview with the AG Investigators,

54. that jail nurses respond to reports of a fall from a top bunk around one time per month. Nurse Marvin Anderson advised investigators, that people fall from bunks regularly.

55. Weber County Investigator notes his frustration with the lack of maintaining the sight as potential evidence in the In-custody death protocol.

56. Patrol Sergeant Hawkins had contacted Sergeant Wall shortly after Ms. Miller had arrived at the Hospital. Sgt. Hawkins advised of Ms. Millers serious condition and informed Sgt. Wall that she should secure that scenes in response to the common practice for death investigations. However, Sgt. Wall not only failed to secure any areas but later advised Weber County Investigators that all areas had been cleaned.

## CONCLUSIONS:

57. Based on the above-mentioned events and actions I can conclude that the nurse's actions in this event did not conform with the expected practices as outlined by Nursing supervisor Ondricek in his interview with AG Investigators as to his expectations and the common

11

practices for response and treatment of a person suffering from a fall from a top bunk. It is difficult to conclude that the medical policies were followed due to the fact that it is unknown if the Health and Safety Policy and Procedures Manual was ever written or reviewed annually and followed by staff as defined in Davis County Corrections Policy 401.

58. Based upon the provided reports and interview recaps there appears to be a long term and widely known problem with individuals falling from the top bunks causing injury and now death. I did not notice in any report or interview recap that any efforts have been taken to resolve or reduce this issue. In several facilities including my former agency risk management reviews are conducted after major events like this one resulting in changes to the configuration of bunks to reduce the risk of falls and severity of injury.

I declare under penalty of perjury in the State of Utah that the foregoing is true and correct. Executed on May 17TH, 2019 in ~~Utah~~ Nevada.

Todd Vinger

EXHIBIT A

**Bio of;**



Todd Vinger
Todd Vinger & Associates LLC
435 Shady Lane Ct.
Reno, NV. 89509
Phone (775)846-3445
E-mail todd@toddvinger.com
TODDVINGER.COM

**Todd Vinger** is the Owner and Manager of Todd Vinger and Associates LLC.

Todd consults on Leadership, Labor Relations, Contract Negotiations, Law Enforcement and Jail management and budgeting issues facing us today. He is a certified instructor in "*Everything DiSC Work of Leaders, Workplace & DiSC Management Style®*" and can help your organization excel with a personalized learning experience based on best practices. *Work of Leaders* connects to real-world demands, generating powerful conversations that provide a clear path for action.

Todd Vinger began his public service in the military and then joined the Washoe County Sheriff's Office located in Reno, Nevada in 1988. He retired July 2013 after more than a quarter century of service to the Citizens of Washoe County and the Washoe County Sheriff's Office and having achieved the rank of Undersheriff, second in command of the Sheriff's Office.

While serving as Undersheriff for nearly 8 years, Todd gained command and executive experience in all aspects of law enforcement from Patrol to Detention. As the Undersheriff, he was responsible for the managerial and operational oversight of all operations and fiscal management throughout the entire Sheriff's Office and represented the Agency on behalf of the Sheriff of Washoe County in any event in his absence.

He is a graduate of the University of Louisville's Southern Police Institute's 116th Administrative Officers Course and the Police Executive Leadership Undergraduate Program as well as a graduate of the Senior Management Institute for Police Executives' Strategic Management Course sponsored by Harvard University. Todd is a graduate of the Nevada State Instructors Development certification course and holds a Project Management Professional Certificate from the University of Nevada, Reno.

Todd Vinger had been a long time active member of the National Sheriff's Association, International Association of Chiefs of Police, the Western States Sheriff's Association, the American Jail Association and the Nevada Sheriffs' and Chiefs' Association. Todd is a Life Member and Past-President(2015) of the Southern Police Institute's Alumni Association at the University of Louisville and had served as an executive Board member of the Nevada Sheriff's and Chief's Association and remains a Life-Member of that organization. Todd is a proud graduate of the Reno-Sparks Leadership Academy program sponsored by the Chamber. Todd was appointed by Governor Sandoval to served as a member of the State of Nevada 700 MHz Broadband Wireless Network Committee (SONNet) of the Nevada Commission on Homeland Security.

Todd Vinger is a long-time Nevadan who is active in the community as a member of Lions Clubs International for over 20 years and had served as Past President of the Reno Arch Lions Club, Director, Vice President and Zone-Chairman for Northern Nevada and elected to serve as chairman of the State Convention Management team. Todd Vinger has also worked with and assists the Leukemia and Lymphoma Society as well as other charitable organizations. Todd is a proud member of the Reno Prospectors' Club and The International Wine and Food Society.

Throughout his years of service to Washoe County, Todd Vinger has been recognized for and awarded the National Acts of Caring Award 2002 from the National Association of Counties, the Vincent G. Sweeney Award of Excellence in Search and Rescue, two Meritorious Service Medals, The Sheriff's Star, numerous Exemplary Service ribbons as well as a Certificate of Recognition from Washoe County for "Excellence in Team Work". As a duty-connect Disabled U.S. Veteran, Todd Vinger is extremely proud to have received Recognition from the Department of Defense as a "Patriotic Employer" and continues to assist other Veterans in our community. Through his service in Lions Club International, he has received a Dwight E. Stanford Fellowship and is a Life Member in the Lions Eye Foundation of Lions Clubs International. Todd Vinger has the distinct honor of being Honorably Commissioned into the Order of "Kentucky Colonels" since September 27, 2006 and was humbled to be honored by Washoe County Search and Rescue in receiving the inaugural "*The Todd Vinger Award of Merit*" presented January 11, 2014. He was also named a Life Member of Washoe County Search and Rescue.



Todd Vinger & Associates LLC
435 Shady Lane Ct.
Reno, NV. 89509
(775)846-3445
todd@toddvinger.com
TODDVINGER.COM

# Todd Vinger

## Professional experience:

### July 2013- Present

Todd Vinger & Associates LLC    Reno, NV.

Current Position: **Owner / Manager**

Owner and Manager of Todd Vinger and Associates LLC, &
An Independent Licensed Insurance Agent.

I consult and teach numerous courses on Leadership, Law Enforcement, Labor Relations, Jail Management and Public Sector Budgeting.  I'm a certified instructor in "*Everything DiSC Work of Leaders, Workplace & DiSC Management Style*®" as well as DiSC Workplace and can help any organization excel with a personalized learning experience based on best practices.  *Work of Leaders* as well as Workplace connects to real-world demands, generating powerful conversations that provide a clear path for action.

I consult and provide training on several topics;
- Law Enforcement Leadership
- Labor Contract Negotiations
- Investigations
- Promotional Testing and Assessment Centers
  - Police and Fire
- Strategic Planning
- Budgeting Principles
- Jail Management
- Policies and Proceedures
- Staffing analysis
- *Everything DiSC Work of Leaders*® Leadership Training.
- *Everything DiSC Workplace*® Training
- *Everything DiSC Management*® Training.
- Time Management
- Jail Medical Services
- Court Security
- Business Organization and leadership

I possess a broad knowledge and experience in contract negotiations as well as disciplinary processes from years of participating and leading these processes as an executive and manager within Washoe County.  I have experience as the lead negotiator representing several bargaining groups throughout Nevada as well as assisted numerous agencies with staffing analysis, salary surveys and benefits assessments.  Over the past few years, I have assisted local law firms in reviewing and providing advice based on my knowledge and experience on departmental policies and disciplinary processes used within the county for clients they represent through the arbitration process.

### February 1988 – July 2013

**Washoe County Sheriff's Office**          **Reno, NV**.

Last Position Held: **UNDERSHERIFF** (approx. 8 years)

**Undersheriff, Washoe County Sheriff's Office:**
Oversee the overall operations of the Washoe County Sheriff's Office. Assume the duties of the Sheriff in their absence.

- o Plan, assign, supervise, and direct the operations of the Sheriff's Office, including oversight in criminal investigation activities and/or the preparation of both criminal and civil cases for submission to the District Attorney or the courts as well as oversee all aspects of the Detention and Courts operations.
- o Represent the Sheriff's Office in Labor negotiations.
- o Oversee the operations and investigations of the Office of Professional Integrity (Internal Affairs).
- o Recommend proposed laws and ordinances to appropriate jurisdictions.
- o Evaluate agency performance, reviewing work methods and procedures, and developing and implementing changes in work processes and/or equipment used to improve efficiency.
- o Supervise staff including training, work assignment and review, employee discipline, and performance evaluations, oversee all internal investigations within the agency.
  - o (Employees- 850+ authorized)
- o Oversee the development and preparation of reports and records.
- o Plan and develop the overall Department budget.
  - o (Budget responsibility $90,000,000.00+)
- o Monitor the status of designated funding and expenditures during the fiscal year, ensuring proper maintenance of fiscal controls and reviewing/approving purchase orders and recommending purchase, repair, or replacement of equipment.
- o Oversee the recruitment, selection, and training of new employees.
- o Coordinate duties of organization, County departments, and other government agencies.
- o Oversee the design, planning, and implementation of training programs for Agency.
- o Ensure that agency personnel perform duties and responsibilities in a safe and prudent manner that does not expose them or others to unnecessary harm, risk or excess liability.

**Services Captain**- Exercises direct supervision over Lieutenants, Sergeants, Deputy Sheriffs, and civilian support staff. Plan, coordinate, schedule, assign and direct the work of sworn personnel and civilians and activities within one or more units of a Bureau. Establish and implement goals, objectives, policies and procedures within the assigned unit. Evaluate attainment of goals and objectives through productivity and other studies; recommend program changes or additional programs which result in the efficient achievement of goals and objectives. Evaluate the performance of staff; administer the performance evaluation program for the unit, including counseling employees, recommending and/or reviewing disciplinary action, appointments and transfers, ensuring that staff follow acceptable protocol, policies and procedures. Prepare and monitor the unit budget, which includes reviewing, and approving expenditures, and the recommendation and justification for supplies, equipment and personnel. Negotiate contracts for services; interact with representatives of employee associations, County legal advisers and Risk Management. Direct investigations and recommend dispositions on complaints received by the unit relative to employees. Review and approve paperwork and documentation prepared by assigned personnel for completeness, accuracy and compliance with applicable regulations. Directs operations at crime scenes, emergencies and other serious incidents. Conduct periodic inspections to ensure that equipment, uniforms and facilities are maintained, clean and operational at all times. Represent the Sheriff's Office at civic affairs and other public and governmental forums and make presentations as necessary.

**Watch Commander, Operation's Administrative Lieutenant in Detention, Services Lieutenant**- Oversee all operations of a working Shift within the Washoe County Sheriff's Office Detention Facility and its personnel during the hours of duty. Oversee the Training & Compliance and Inmate Management Units of the Detention Facility. Served as the project manager and coordinator for the expansion of the Washoe County Detention Facility. Oversaw the design and construction of a 55,000-sq. ft. jail expansion expended approx. $19,000,000.00.

**Search and Rescue Coordinator**- Coordinate all Search and Rescue operations, manage any lost person incidents, Maintain and control the operational budget of the Search and Rescue Unit, represent the Washoe County Sheriff on several State and local boards and committees, inform and educate the community in safety and Search and Rescue operations. Created and updates all lesson plans for SAR teams and Citizens on Search and Rescue related topics.

**Boot Camp Sergeant**- Manage the overall operation of the Correctional Boot Camp operations within the Washoe County Detention Center. Select, train, and supervise the Drill Instructors. Created all lesson plans and training for program as well as developed the Life Skills Training Curriculum for program participants.

**Detention Sergeant**- Oversee and supervise the daily operations of the Detention center, supervise and counsel Detention Staff, conducted OPI investigations involving Detention staff.

**Patrol Deputy**- possessed a working knowledge of patrol functions, state and county criminal and traffic laws, and current legal updates and case law.

**Field Training Officer**- Responsible for training new Deputies and Sergeants in police skills, Departmental Policies and Procedures, applicable laws and enforcement and supervision.

**Fire Arms Instructor / Range Master**- Responsible for training officers in the proper use, care, and function of police firearms.

**Detention Response Team member**- Involved in cell extractions, high security transports, and heightened trial security.

**Correctional Drill Instructor**- Instructed in Life Skills, Drill and Ceremony, & fitness.  Founding member of H.I.S.T.E.P, created the Drill Instructor & Inmate Manuals.

**District Court Bailiff**- Maintained security of court, supervised jurors, assisted in organizing the court docket, and enforced the orders of the court.

**Detention Deputy**- Booking, housing and transportation of inmates.


**1984- 1988     United States Air Force                                        USA**
**Sergeant**
Worked in the capacity of a Security Specialist.

Certified as world-wide capable with a Top Secret SBI/SCI clearance and assigned to the Tonopah Test Range, Nevada. Responsible for the security of and crash & recovery of classified resources within and outside of the Nevada Tonopah Test Range.

Duty-Connected Disabled U.S. Veteran.


# Professional memberships/Committees:

- Southern Police Institute Alumni Association, University of Louisville
  - Executive Board Member of the Southern Police Institute Alumni Association (LIFE MEMBER)
    - President 2014-15
- Nevada Sheriffs' and Chiefs' Association –  Life member
  - Past Executive Board member of the Nevada Sheriffs' and Chiefs' Association.
- Past member of the American Jail Association
- Past member National Sheriffs' Association
- Past member International Association of Chiefs or Police
- Past member Western States Sheriffs' Association
- Reno Spark Leadership Program, The Chamber
- Past voting member of the State of Nevada 700 MHz Broadband Wireless Network Committee (SONNet) of the Nevada Commission on Homeland Security.


# Community Activities:

- Member of Lions Club International

    Offices held-

    - Director, Vice President, President of the Reno Arch Lions Club,

    - Secretary of the USA/Canada Leadership Forum

    - Zone-Chairman for Northern Nevada

    Elected to-

    - District Convention Management Chairman for the State of Nevada and Eastern California.

- Works with the Leukemia and Lymphoma Society

- Member of the Washoe County Sheriff's Office Honorary Deputies Association

- Proud Member of the Reno Prospectors Club


# Awards or Recognition:

USAF-
USAF Training Ribbon, AF Longevity Service Award, Good Conduct Medal, Small Arms Expert ribbon with two oak leaf clusters, AF Outstanding Unit Award with one oak leaf cluster, Medal of Military Merit, Duty-Connected Disabled Veteran.

Washoe County Sheriff's Office-
National Acts Of Caring Award 2002 from the National Assoc. of Counties, The Sheriff's Star, The Vincent G. Sweeney Award of Excellence in Search And Rescue, Meritorious Service Medal (twice), Exemplary Service ribbon, Special Unit ribbon with four stars, Training Ribbon, Special Assignment ribbon, Idea/Community Ribbon, Operations Service ribbon, Detention Service ribbon.

- Certificate of Recognition from Washoe County for "Excellence in Team Work".
- Certificate of Recognition from the Department of Defense for "Patriotic Employer".
- Washoe County Search and Rescue: "The Todd Vinger Award of Merit" presented the inaugural year January 11, 2014.
- Life Member of Washoe County Search and Rescue.

Lions Club International-
Dwight E. Stanford Fellowship,
Life Member in the Lions Eye Foundation of Lions Clubs International.
Commissioned into the Order of "Kentucky Colonels" September 27, 2006

## Professional Training:

BASIC, INTERMEDIATE, ADVANCED, MANAGEMENT & EXECUTIVE P.O.S.T. Certificates
| | | |
|---|---|---|
| Senior Management Institute for Police (SMIP) | July 9th- 28th, 2005 | Harvard University, Boston, Mass. |
| Nevada Instructor Development Course | Dec. 15, 1995 | Reno, NV. |
| Project Management Certificate- University of Nevada | March 11, 2006 | University of Nevada, Reno |
| Southern Police Institute's 116th AOC | Aug. 14th - Nov. 10th 2006 | University of Louisville, KY. |
| Licensed for Life, Health and Annuities (California & Nevada) | July 2016 | |

EXHIBIT B



**Todd Vinger & Associates LLC**
435 Shady Lane Ct.
Reno, NV. 89509
(775)846-3445
todd@toddvinger.com
TODDVINGER.COM

07-30-2018

**Tad D Draper, PC**
The Law Offices of Tad D Draper, PC
12339 S 800 E Ste 101
Draper, UT, 84020-8373

Mr. Draper,
Based upon my review of the documents that I've received in this case, re: Heather Ashton Miller, I have prepared this Summary of Opinion.

**SUMMARY:**
Based on the investigative reports, on December 20, 2016 around 04:19 hours, Heather Ashton Miller was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office.  On December 21, 2016 around 17:56 hours, Ms. Miller was reported to have fallen from the top bunk in her cell(K-12).  She was seen by medical personnel (Nurse Marvin Anderson), but no vital sign readings were taken and then was moved with wheelchair assistance to a different unit and cell(L-7) for medical observation and/or Bottom Bunk Bottom Tier status.  Her condition continued to deteriorate and was later discovered bleeding from her chin, in pain and unable to move on her own.  She was assisted into a wheelchair and moved to the Medical unit where Medical staff immediately requested an ambulance and Ms. Miller was transported while requiring CPR as well as defibrillation along the transport to the McKay Dee Hospital, where she was pronounced deceased at 22:06 hours.

**TIME-LINE OF EVETS:**
December 20, 2016
04:19            Heather Ashton Miller was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office.
                 Medical vitals and assessment competed, and she was placed into General Housing.

December 21, 2016
17:56            Ms. Miller was reported to have fallen from the top bunk in her cell(K-12)

18:00            Ms. Miller was discovered by Deputy Lloyd during Safety and Security Check / Head Count for Kilo Unit. Lying on the floor of K-12 and told by Miller's cellmate that Ms. Miller had fallen from the top bunk onto the floor.
                 Deputy Lloyd calls for emergency medical Assistance via radio and Nurse Marvin Anderson arrives on scene without the medical equipment needed to obtain vitals readings from the patient. Nurse Marvin Anderson conducts a brief interview and visual assessment of Ms. Miller and decides to have Miller moved to another cell.

18:18            Ms. Miller was transported by wheelchair to another unit and cell(L-7) for medical observation and/or bottom bunk bottom tier status (*Some reports specify Bottom Bunk*

*Bottom Tier and others discuss potential of double bunking in the medical unit which would indicate that they considered closer observation).*
Cpl. Johnson's report stated that Ms. Miller stated that she "couldn't breath" and that she appeared to be hot due to the fact that she was sweating and was trying to lift up her shirt. He also noted that she seemed "Dizzy", so they had her sit at the top of the stairs. She later slowly slid herself down the steps one step at a time where the staff assisted her into a wheelchair to transport her to another unit (L-7).

18:33          Safety and Security Check (SS) in Lima Unit.

19:32          Safety and Security Check (SS) in Lima Unit.

20:20          Safety and Security Check (SS) in Lima Unit.
               Deputy Lloyd discovers Ms. Miller on the floor of L-7 with little clothing on and a new laceration under her chin with blood on her arms and face.
               Deputy Lloyd enters the POD (area Control) and called the medical unit to advise of Ms. Miller's status.   Based on the Area Control Clerk who witnessed the phone conversation between Dep. Lloyd and Medical, Deputy Lloyd had been advised by medical, "not to think too hard about it".

20:30          Deputy Lloyd then contacts Deputy Lucius and advises him of his concerns and they both respond back to Lime-7 to check on Ms. Miller.
               They requested Sgt. Wall to respond to L-7.
               Upon arrival Sgt. Wall stated that she observed Ms. Miller lying on the floor and when asked if she was OK, Heather Miller moaned and "Thrashed about" on the floor. Sgt. Wall recalled Ms. Miller say, "I hurt everywhere" and that Heather kept repeating that she hurt. In Sgt. Wall's interview with AG investigators she stated that she called the medical unit via the radio asking if they had a bed for Ms. Miller the medical unit responded that they could "double bunk her". Sgt. Wall then instructed staff to move Ms. Miller by wheelchair to the medical unit.
               Based on Cpl. Johnson's report, while in route to the Medical Unit Ms. Miller had to be assisted in staying in the wheelchair and seemed to suffer from a seizure.

20:39          Ms. Miller arrives in the medical unit and is seen by Medical personnel.
               Nurse Marvin Anderson attempts to obtain vital signs for Ms. Miller but was unable to due to Ms. Miller's "thrashing around".

20:43          EMS was notified

20:49          EMS Medic 22 On Scene at Davis County Jail

20:54          Davis County Jail processed a Release from the Facility *(Computer Process)* with a Promise To Appear (PTA)

20:55          EMS Medic 22 staff arrive at Patient

21:03          EMS Medic 22 left the Davis County Jail and began transport to the McKay Dee Hospital

| 21:17 | Ms. Miller went into Cardiac arrest during transport. Defibrillation and CPR begins. |

21:26            EMS Medic 22 arrives at McKay Dee Hospital
Paramedic Chase Harvey Meets Sgt. Hawkins of the Davis County Sheriff's Office at the Hospital and advises him that Ms. Miller had gone into Cardiac Arrest during transport from the Jail and that she had, "presented poorly".
Sgt. Hawkins Phones Sgt. Wall at the jail and advised that they should initiate the proper response to an in-custody death investigation but was frustrated with the jail's response that they felt that they didn't need to.

22:06            Ms. Miller was pronounced deceased.

December 22, 2016
00:20            Weber County Sheriff's Office investigators arrive at the Davis County Jail to begin their investigation and express their frustration that the scene at the jail was unable to be processed because the Staff had already had the areas that Ms. Miller was housed in cleaned.
10:15            Autopsy conducted.
Dr. Christensen's Opinion; Died as a result of blunt force injuries of abdomen sustained when she (Heather Miller) fell from the upper bunk in her cell while attempting to climb down about a day and a half after being booked into the jail.


**FINDINGS:**
As a result of reviewing the investigative reports of the Weber County investigators, the Utah Attorney General's Office Investigators, Office of the Medical Examiner Utah Department of Heath as well as the numerous witness and Officer reports and statements, I have noted the following findings.

- Policies and Procedures for Medical Staff;
    - In reviewing Davis County Correctional Facility Policy and Procedures Manual the Agency refers to National Commission on Correctional Heath Care (NCCHC) standards throughout its policies that refers to medical services but does not make clear if this reference is based of the County using these national best practices and standards to create their policies or if they are meant to be a reference to the standard within NCCHC that should be followed.
    - Based on Policy 401.01 and 401.03 which outlines that the Health Authority is responsible for the Policies and Procedures governing health care, health services, administration and management of the Davis County Jail heath care program policies and "will be developed and Written". Each policy, procedure and program "is reviewed annually and revised as necessary". The Heath Services Policy and Procedure Manual will be available to heath care staff on the X-drive. Medical staff will be responsible to follow these Heath Services Policy and Procedures.
        - I have not been provided with a copy of the Heath Services Policy and Procedures Manual, therefore I am unaware if it has been Written, Annually Reviewed, or followed in the case of Ms. Miller's fall and death?  Or if the Jail's basic Policies and Procedures serve as the Heath Services Policy and Procedures Manual? If the latter is the case, then why would there be directions to write and review the health service policy and procedure manual?
        - In review of the AG report Pg. 73of 83 it should be noted that Nurse Supervisor James Ondricek advised Investigators that there is no medical policy beyond the jail policy.  This

is very inconsistent with the jail Policy 401 that outlines that a Heath Services Policy and Procedures Manual will be written and annually reviewed and followed by medical staff.

- Nurse Marvin Anderson's response to the medical emergency called via radio by Deputy Lloyd.
  - On 12-21-16 at 18:00 hours Deputy Lloyd requested medical respond to assess the injuries of Ms. Miller on the discovery of her fall from the top bunk to the floor. Nurse Marvin Anderson responded to evaluate the injured inmate but did not bring the needed equipment to check the vital signs of the patient.
    - Based on a review of the general jail policies 405.14 B1…3(a, b, c) it states that medical staff will a; Respond immediately carrying the necessary medical supplies and/or equipment with him, b; Evaluate the inmates status. c; provide emergency care.
      - In this case Nurse Marvin Anderson did not bring the needed equipment to obtain the vital signs of the injured inmate but did attempt to treat the patient by providing Ibuprofen. No vital signs were ever obtained for Ms. Miller after her fall until outside EMS staff arrived on scene at 20:55 and they began to assess the patient and transport Ms. Miller to the hospital.
  - In reviewing the reports of POD Clerk Rogers and Deputy Lloyd and the AG report pg. 65-66 it was noted that on 12-21-16 at approximately 20:30 hours while on rounds in Lima Unit Dep. Lloyd found Ms. Miller on the floor of her cell nearly naked with blood on her chin and arms. He immediately went into the control POD for Lima Unit and called the Medical Unit by phone. Clerk Rogers recalls hearing the conversation from Deputy Lloyd as he advised the nurses of the condition he had found Ms. Miller in. Clerk Rogers informed AG investigators that he heard Deputy Lloyd repeat back the nurse's comment of, "so I should just not think too much about it". Clerk Rogers further advised the AG Investigators that as Deputy Lloyd hung up the phone he told Rogers that he was going to get Deputy Lucious to help check on Ms. Miller, which would indicate his heightened concern and seriousness of Mr. Millers condition.
    - Based on my nearly 27 years of public service and experience within corrections I find the deliberate lack of response and lack of attempting to check for any vital signs of the patient nor any continued monitoring or observation of the patient and of the indifferent concern from medical staff for the Patient's condition at that point to be in Clerk Rogers terms "being lazy".
  - In review of the AG Investigative report pg. 56 of 83, when asked by investigators if he is supposed to take vital signs in cases of inmates falling from bunks, Nurse Marvin Anderson stated that he should have done it when he saw her. When asked if he usually does vital signs on falls he stated, "yes".
    - However, this common best practice was not followed in this case.

- Move to Lima-7 rather than the Medical Unit for closer observation.
  - After the brief assessment of Ms. Miller in K-12 Nurse Marvin Anderson decided to have Ms. Miller moved to Lima-7 rather than to the Medical Unit. Based on the AG investigator's interview with Nurse Supervisor James Ondricek (pg. 73-74), Nurse Ondricek advised that the agency's standard process or his expectation for responding to a fall from the top buck ("which occurs approximately once a month") is to "monitor them" including monitoring vital signs. No vital signs were obtained in this case until outside EMS staff arrived and transported Ms. Miller.
  - When Ms. Miller was moved from K-12 she needed assistance to walk and Nurse Marvin Anderson had to obtain a wheelchair to move her to L-7 due to the fact that she was unable to walk on her own. In Nurse Supervisor Ondricek's interview, when asked if it would be his expectation as a supervisor for a nurse to bring an inmate to the medical unit or provide further observation if

an inmate can not walk or needs to be wheeled out of a unit, he responded with, "absolutely".  No addition observation or monitoring was initiated nor was Ms. Miller placed into the Medical Unit but rather placed unsupervised and alone in a cell within a Unit that only received a Safety and Security Check once an hour.

o   In the interview by AG Investigators with Corporal Johnson, he advised that is common practice for falls from the top bunk to take the inmate to the medical unit to be assessed.  She also said that if someone reported withdrawals they were placed on the bottom bunk or in sever cases placed in the medical unit.  Neither was done in this case.

▪   Cpl. Johnson advised investigators that she thought that there were no available bunks in the medical unit at that time, so they moved her to a lower bunk(L-7). (Pg.63 AG report)

o   In reviewing Davis County Correctional Facility Policy and Procedures Manual section 405.03 (D) it outlines the requirements for the importance of proper housing of inmates based on medical initial assessment.  However, when Nurse Marvin Anderson conducted a brief cursory non-vital signs assessment in K-12 he stated that he felt she was suffering from withdrawals. Based on this assessment the policy 405.03(D) would dictate that, "identifying inmates that require housing in the medical infirmary due to a serious medical condition, such as withdrawals or a contagious disease".

▪   The inability to walk on their own, dizziness and a complaint of "hurting everywhere" could be considered to a prudent person to potentially be a serious medical condition.

o   In reviewing the provided reports there is a question as to the ability to move Ms. Miller into the Medical Unit due to maximum capacity of that unit.  Based on the statements from the Medical Unit to Sgt. Wall that they could "double bunk her" this could indicate that the Medical Unit was at capacity that night and that would have been a reason why Ms. Miller was not moved there for closer observation from K-12.

▪   In the AG investigators interview with Nurse Supervisor Ondricek, Ondricek explains that the Medical Unit generally remains full, "90% of the time". He also advised that the jail was expanded from 180 inmate capacity to around 900 inmates but the medical unit remained untouched with only 6 medical cells.

▪   Cpl. Johnson advised investigators that she thought that there were no available bunks in the medical unit at that time, so they moved her to a lower bunk(L-7). (Pg.63 AG report)

▪   When asked by AG Investigators if there were and bunks available in the medical unit that night, Nurse Layton advised investigators that they typically run, "Pretty full".

o   Nearly two (2) months after the Death of Ms. Miller, AG investigator Downey received an email from Lt. Callister of the Davis County Sheriff's Office stating that there are six medical cells in the Davis County Jail.  He stated that at the time of Ms. Miller's death, one of the medical cells was unoccupied.  He sent Investigator Downey the booking sheets of the individuals housed in the medical unit at the time of the incident.

▪   This information seems inconsistent due to the fact that the booking sheets provided shows that there were 7 inmates housed in the 6 cells of the Medical Unit that day.

•   Inmates; Rhoades, Torres, Turner, Valdez, Pazell, Bunch, & Kirchgater.

• The amount of inmate falls from top bunks.

o   In reviewing the reports, it seems alarming that there were several staff members advising that falls from the top bunks is very common.  Yet, I have not found within the documents provided that any attempts have been made to reduce the number of falls or to help lessen the effects of these falls.

o   In response to the question of how many falls from top bunks the Davis County Jail has had over the past 5 years, the response from Rebecca Abbott, records Manager for Davis County dated

December 29, 2017; Davis County Sheriff's personnel have indicated that there have been thirty (30) "injuries reported at the Davis County Jail from inmates falling of the top bunk" between the dates of November 26, 2013 and the date of this letter.

{These numbers would average approximately 7 ½ falls from top bunks a year.}

- These numbers seem to be inconsistent with the statements in the provided reports of jail medical and correctional staff.
    - When asked by AG Investigator Downey about inmate falls from top bunks, Nurse Layton advised that inmates fall off their bunks beds, "a few times a month".
    - Nurse Supervisor James Ondricek stated in his interview with the AG Investigators, that jail nurses respond to reports of a fall from a top bunk around one time per month.
    - Nurse Marvin Anderson advised investigators, that people fall from bunks regularly.

- Lack of securing the scene for an In-Custody Death review and investigation.
    - Weber County Investigator notes his frustration with the lack of maintaining the sight as potential evidence in the In-custody death protocol.
    - Patrol Sergeant Hawkins had contacted Sergeant Wall shortly after Ms. Miller had arrived at the Hospital. Sgt. Hawkins advised of Ms. Millers serious condition and informed Sgt. Wall that she should secure that scenes in response to the common practice for death investigations. However, Sgt. Wall not only failed to secure any areas but later advised Weber County Investigators that all areas had been cleaned.

**CONCLUSIONS:**

Based on the above-mentioned events and actions I can conclude that the nurse's actions in this event did not conform with the expected practices as outlined by Nursing supervisor Ondricek in his interview with AG Investigators as to his expectations and the common practices for response and treatment of a person suffering from a fall from a top bunk. It is difficult to conclude that the medical policies were followed due to the fact that it is unknown if the Health and Safety Policy and Procedures Manual was ever written or reviewed annually and followed by staff as defined in Davis County Corrections Policy 401.

Based upon the provided reports and interview recaps there appears to be a long term and widely known problem with individuals falling from the top bunks causing injury and now death. I did not notice in any report or interview recap that any efforts have been taken to resolve or reduce this issue. In several facilities including my former agency risk management reviews are conducted after major events like this one resulting in changes to the configuration of bunks to reduce the risk of falls and severity of injury.

Todd Vinger
Owner/Manager, Todd Vinger and Associates LLC