

# UTAH ATTORNEY GENERAL'S OFFICE
### GENERAL OFFENSE HARDCOPY

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

## General Offense Information

Operational status: **CLOSED/COMPLETED**
Reported on: **Feb-09-2017  (Thu.) 700**
Occurred between: **Dec-20-2016  (Tue.) 400** and **Dec-21-2016  (Wed.) 2330**
Report submitted by: **183987  -  Downey, Tyson**
Org unit: **Special Investigations**
Address: **800 W STATE ST**
          Municipality: **FARMINGTON**
Bias: **Unknown**
Family violence: **NO**

## Offenses (Completed/Attempted)

Offense: # **1   5599-0   HEALTH-HEALTH AND SAFTEY FRE T  -  COMPLETED**
Location: **Government/Public Bldg**
Offender suspected of using: **Not Applicable**

## Related Person(s)

**1.  Witness # 1 - CHRISTENSEN, ERIK**

**(Case Specific Information)**

Sex: **MALE**
Race: **Unknown**
Address: **4451 S 2700 W**
          Municipality: **TAYLORSVILLE** , **Utah**
**Phone Numbers**
     Business:   **(801)  816-3850**

**Particulars**

Occupation: **MEDICAL EXAMINE**
Employer: **UTAH OME**

**Master Name Index Reference**

Name: **CHRISTENSEN, ERIK**
Sex: **MALE**
Race: **Unknown**
Address: **4451 S 2700 W**
          Municipality: **TAYLORSVILLE** , **Utah**
**Phone numbers**
Business:  **(801)  816-3850**

**Linkage factors**

Resident status : **Resident**
Age range : **Unknown**

**2.  Witness # 2 - LANGSTON, SONYA**

**(Case Specific Information)**

Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ████████
Address: **1186 N 3000 W**
          Municipality: **CLINTON** , **Utah**
**Phone Numbers**
     Cellular: ████████████
**Master Name Index Reference**

Name: **LANGSTON, SONYA**
Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ████████
Address: **1186 N 3000 W**
          Municipality: **CLINTON** , **Utah**

**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Phone numbers**
Cellular:  (⬛⬛⬛⬛⬛⬛⬛

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 3.  Witness # 3 - MONTOYA, JESSICA

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ⬛⬛⬛⬛⬛
Address: **139 N 630 E**
            Municipality: **TOOELE** , **Utah**
**Phone Numbers**
    Home:  ⬛⬛⬛⬛⬛

**Master Name Index Reference**

Name: **MONTOYA, JESSICA**
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ⬛⬛⬛⬛⬛
Address: **139 N 630 E**
            Municipality: **TOOELE** , **Utah**
**Phone numbers**
Home: ⬛⬛⬛⬛⬛

**Linkage factors**

Resident status : **Resident**
Age range : **22-29 Years**

## 4.  Witness # 4 - MCCUBBIN, DANA

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ⬛⬛⬛⬛
Address: **1320 N 200 E**    Apartment: **528**
            Municipality: **LOGAN** , **Utah**
**Phone Numbers**
    Cellular:  ⬛⬛⬛⬛⬛

**Master Name Index Reference**

Name: **MCCUBBIN, DANA  LYNN**
Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ⬛⬛⬛⬛



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Address: **1320 N 200 E**   Apartment: **528**
Municipality: **LOGAN** , **Utah**
**Phone numbers**
Home: ▋▋▋▋▋▋▋▋
Cellular: ▋▋▋▋▋▋▋▋

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 5.  Witness # 5 - TEJERO, ADELINA CHANTE

### (Case Specific Information)
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ▋▋▋▋▋▋**4**
Address: **1893 W 300 N**
Municipality: **WEST POINT** , **Utah**
**Phone Numbers**
Home: ▋▋▋▋▋▋

**Master Name Index Reference**

Name: **TEJERO, ADELINA  CHANTE**
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ▋▋▋▋▋▋
Address: **1893 W 300 N**
Municipality: **WEST POINT** , **Utah**
**Phone numbers**
Home: ▋▋▋▋▋▋

**Linkage factors**

Resident status : **Resident**
Age range : **22-29 Years**

## 6.  Witness # 6 - SLATER, KIMBERLY ANN

### (Case Specific Information)
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ▋▋▋▋▋▋
Address: **893 N 900 W**
Municipality: **WEST BOUNTIFUL** , **Utah**   **84087-**
**Phone Numbers**
Home: ▋▋▋▋▋▋

**Particulars**

Occupation: **SERVER**



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Employer: **VILLAGE INN N SALT LAKE**

**Master Name Index Reference**

Name: **SLATER, KIMBERLY  ANN  KIM**
Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ███████
Ethnicity: **Unknown**
Address: **893 N 900 W**   Apartment: **1**
        Municipality: **WEST BOUNTIFUL** , Utah   **84087-**
**Phone numbers**
Cellular: ███████
Home: ███████
Cellular: ███████
Home: ███████

**Alias(es)/AKA**

| Name: | Address: | Sex: | DOB: |
|---|---|---|---|
| **SLATER, KIM ANNE** | | **F** | **May-22-1981** |
| **ROBERTS, KIMBERLY** | | **F** | **May-22-1987** |

**Linkage factors**

Resident status : **Resident**
Age range : **22-29 Years**

## 7.  Witness # 7 - WEBB, CASSIE MARIE

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ███████
Address: **1537 N 300 W**
        Municipality: **BOUNTIFUL** , Utah
**Phone Numbers**
        Home: ███████

**Particulars**

Employer: **THURSTON TRUCKING   N SALT LAKE**

**Master Name Index Reference**

Name: **WEBB, CASSIE  MARIE**
Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ███████
Address: **493 E 700 S**
        Municipality: **VERNAL** , Utah   **84078**
**Phone numbers**
Home: ███████

**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**
GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 8. Witness # 8 - JOHNSON, JAMIE

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ███████
Address: **325 ALAMEDA**
          Municipality: **POCATELLO** , Idaho   83201-
**Phone Numbers**
          Home: ███████

**Particulars**

Employer: **POOL AND SPA SERVICES**

**Master Name Index Reference**

Name: **JOHNSON, JAMIE**
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ███████
Address: **325 ALAMEDA**
          Municipality: **POCATELLO** , Idaho   83201-
**Phone numbers**
Home: ███████

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 9. Witness # 9 - LLOYD, ZACKERY

### (Case Specific Information)

Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ███████
Address: ███████
          Municipality: ███████
**Phone Numbers**
          Cellular: ███████

**Master Name Index Reference**

Name: **LLOYD, ZACKERY  TAYLOR**
Sex: **MALE**
Race: **Caucasian/White**



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED       5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Date of birth: ▮▮▮▮▮
Address: ▮▮▮▮▮
     Municipality: ▮▮▮▮▮
**Phone numbers**
Home: ▮▮▮▮▮
Cellular: ▮▮▮▮▮

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 10.  Witness # 10 - JOHNSON, TRACY

### (Case Specific Information)

Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ▮▮▮▮▮
Address: ▮▮▮▮▮
     Municipality: ▮▮▮▮▮
**Phone Numbers**
     Cellular:  (▮▮▮▮▮

**Master Name Index Reference**

Name: **JOHNSON, TRACY  ANN**
Sex: **FEMALE**
Race: **Caucasian/White**
Date of birth: ▮▮▮▮▮
Address: ▮▮▮▮▮
     Municipality: ▮▮▮▮▮
**Phone numbers**
Cellular: ▮▮▮▮▮

**Linkage factors**

Resident status : **Resident**
Age range : **50-64 Years**

## 11.  Witness # 11 - ROGERS, AUSTEN

### (Case Specific Information)

Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ▮▮▮▮▮
Address: ▮▮▮▮▮
     Municipality: ▮▮▮▮▮
**Phone Numbers**
     Cellular: ▮▮▮▮▮

**Master Name Index Reference**



Name: **ROGERS, AUSTEN**
Sex: **MALE**
Race: **Caucasian/White**
Date of birth: █████████
Address: ███████████
          Municipality: ████████████████
**Phone numbers**
Cellular: ██████████

## Linkage factors

Resident status : **Resident**
Age range : **18-21 Years**

## 12. Witness # 12 - HARVEY, CHASE

### (Case Specific Information)

Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ████████████
Address: ███████████
          Municipality: ████████████████
**Phone Numbers**
          Cellular: ████████████
### Master Name Index Reference

Name: **HARVEY, CHASE**
Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ████████████
Address: █████████████
          Municipality: █████████████████
**Phone numbers**
Home: ████████████
Other: ██████████████
Cellular: ██████████████

## Linkage factors

Resident status : **Resident**
Age range : **22-29 Years**

## 13. Witness # 13 - ANDERSON, MARVIN

### (Case Specific Information)

Sex: **MALE**
Race: **Unknown**
Date of birth: ████████████
Address: ████████████

**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED        5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Municipality: █████████

**Phone Numbers**
Cellular: ████████

**Master Name Index Reference**

Name: **ANDERSON, MARVIN  W**
Sex: **MALE**
Race: **Unknown**
Date of birth: ████████
Address: ███████
Municipality: ████████████

**Phone numbers**
Cellular: █████████

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 14.  Witness # 14 - ACKERMAN, SHERRY

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ████████
Address: ███████
Municipality: ████████████

**Phone Numbers**
Cellular: ████████

**Master Name Index Reference**

Name: **ACKERMAN, SHERRY**
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ████████
Address: ███████
Municipality: ████████████

**Phone numbers**
Cellular: █████████

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 15.  Witness # 15 - LAYTON, DANIEL

### (Case Specific Information)

Sex: **MALE**
Race: **Caucasian/White**

Date of birth: ███████
Address: ███████
    Municipality: ███████

**Phone Numbers**
    Cellular: ███████

**Master Name Index Reference**

  Name: **LAYTON, DANIEL B**
Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ███████
Address: ███████
    Municipality: ███████

**Phone numbers**
Cellular: ███████

**Linkage factors**

  Resident status : **Resident**
Age range : **30-49 Years**

## 16. Witness # 16 - ONDRICEK, JAMES

### (Case Specific Information)

  Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ███████
Address: ███████
    Municipality: ███████

**Phone Numbers**
    Business: **(801) 451-4430**
    Cellular: ███████

**Master Name Index Reference**

  Name: **ONDRICEK, JAMES**
Sex: **MALE**
Race: **Caucasian/White**
Date of birth: ███████
Address: ███████
    Municipality: ███████

**Phone numbers**
Business: **(801) 451-4430**
Cellular: ███████

**Linkage factors**

  Resident status : **Resident**
Age range : **50-64 Years**

## 17. Witness # 17 - LUCIUS, LAWRENCE



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**(Case Specific Information)**
Sex: **MALE**
Race: **Unknown**
Date of birth: ███████
Address: ███   Municipality: ████████ -
**Phone Numbers**
 Home: ████████
**Master Name Index Reference**
 Name: **LUCIUS, LAWRENCE**
 Sex: **MALE**
 Race: **Unknown**
 Date of birth: ███████
 Address: ███   Municipality: ████████ -
**Phone numbers**
Home: ████████
**Linkage factors**

 Resident status : **Resident**
 Age range : **50-64 Years**

## 18.  Witness # 18 - LOPEZ, BLAKE

**(Case Specific Information)**
Sex: **MALE**
Race: **Unknown**
Date of birth: ███████
Address: ██   Municipality: ████████
**Phone Numbers**
 Home: (███████
**Master Name Index Reference**
 Name: **LOPEZ, BLAKE  D**
 Sex: **MALE**
 Race: **Unknown**
 Date of birth: ███████
 Ethnicity: **Hispanic**
 Address: ███   Municipality: ████████
**Phone numbers**
Home: ████████
Business: **(801)  532-7530**
Home: ███████



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED                    5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Home: ███████████
Business: **(801) 954-0739**

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 19.  Witness # 19 - POLLOCK, NICHOLAS

### (Case Specific Information)

Sex: **MALE**
Race: **Unknown**
Date of birth: ███████████
Address: ████████████████        Apartment: ███
        Municipality: ███████████████ -

**Phone Numbers**
        Home: ██████████████

**Master Name Index Reference**

Name: **POLLOCK, NICHOLAS  KENNETH**
Sex: **MALE**
Race: **Unknown**
Date of birth: ███████████
Ethnicity: **Unknown**
Address: ████████████████        Apartment: ████
        Municipality: ███████████████ -

**Phone numbers**
Home: ███████████
Home: ███████████

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 20.  Witness # 20 - WALL, ROBERTA

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ███████████
Address: █████████
        Municipality: ████████████████ -

**Phone Numbers**
        Home: ██████████████

**Master Name Index Reference**

Name: **WALL, ROBERTA**
Sex: **FEMALE**



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Race: **Unknown**
Date of birth: ███████
Address: ███████
          Municipality: ███████-
**Phone numbers**
Home: ███████

**Linkage factors**

Resident status : **Resident**
Age range : **30-49 Years**

## 21.  Killed In # 1 - MILLER, HEATHER ASHTON

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Date of birth: ███████
Address: ███████
          Municipality: ███████-

**Master Name Index Reference**

Name: **MILLER, HEATHER  ASHTON  MARIE**
Sex: **FEMALE**
Race: **Unknown**
Date of birth: ███████
Address: ███████
          Municipality: ███████
**Phone numbers**
Home: ███████
Home: ███████

**Linkage factors**

Resident status : **Resident**
Age range : **22-29 Years**

## 22.  Next of Kin # 1 - FARNHAM-STELLA, CINDY

### (Case Specific Information)

Sex: **FEMALE**
Race: **Unknown**
Address: **810 LAHONTAN WY**
          Municipality: **RENO** , **Nevada   89509-**
**Phone Numbers**
          Cellular: ███████

**Master Name Index Reference**

Name: **FARNHAM-STELLA, CINDY**
Sex: **FEMALE**



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

Race: **Unknown**
Address: **810 LAHONTAN WY**
          Municipality: **RENO** , **Nevada   89509-**
**Phone numbers**
Cellular: ████████████

## Linkage factors

Resident status : **Non-Resident**
Age range : **Unknown**



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED                    5599-0 HEALTH-HEALTH AND SAFTEY FRE T

## Related Text Page(s)

Document: **INITIAL R/O**
Author: **183987 - Downey, Tyson**
Subject: **ORIGINAL COMPLAINT**
Related date/time: **Feb-14-2017  (Tue.) 1712**

On February 8, 2017, I was assigned this case for review and further investigation. The case report outlines the investigation of an "in-custody death" that occurred as the result of an incident at the Davis County Jail on December 21, 2016. The original investigation was conducted by the Weber County Sheriff's Office and is documented under Weber County Sheriff's Office case number 16WC34013. The case was referred to our office by the Davis County Attorney's Office.

On December 20, 2016 around 0419 hours, Heather Ashton Miller (04/04/1988) was booked into the Davis County Jail on drug-related charges following a traffic stop conducted by the Davis County Sheriff's Office.

According to the investigative report, on December 21, 2016 around 1756 hours, Ms. Miller was reported to have fallen from the top bunk in her cell. She was transported to a different cell for medical observation but her condition continued to deteriorate. At some point, medical personnel were summoned and she was transported to the McKay Dee Hospital, where she was pronounced deceased at 2206 hours. See the Weber County Sheriff's Office investigator's report, which is contained in the case file, for further information into their investigation.

Upon reviewing the complaint, it was determined that some additional investigative steps should be undertaken. See supplemental reports for further information.

Case ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

## Related Text Page(s)

Document: **INVSTGTR F/U**
Author: **105196 - Varoz, Eric**
Subject: **INFO-CELLMATE SHERRY ACKERMAN**
Related date/time: **Feb-14-2017  (Tue.)**

On February 14, 2017, Special Agent (SA) Tyson Downey requested my assistance in obtaining background information and conduct research regarding the cell mate of the victim in this case.  SA Downey provided me with the cell mates name, Sherry Lee Ackerman, date of birth 08/01/1970.  SA Downey also provided me a copy of the Davis County Sheriff's Office Booking Information for Sherry Lee Ackerman.

On this date, I conducted a Google search regarding information related to Sherry Lee Ackerman.  I discovered information related to her arrest and booking into the Davis County Jail on 11/13/2016.  I also obtained several media articles published regarding this case.  I provided a copy of the information to SA Downey.

I also conducted a check of Utah Criminal Justice Information System (UCJIS) information.  I conducted a check of Interstate Identification Index (III) history records, Utah Criminal History Records, Utah Driver License records, Utah Court records and NCIC and state warrant records.  I provided a copy of the information obtained to SA Downey.

I conducted a check on Utah Court Exchange and Accurint records for Sherry Lee Ackerman.  I provided a copy of the information obtained to SA Downey.  I also conducted a check of Versadex and Utah Department of Corrections (UDC) O-Track database records.  The checks did not reveal any records related to Sherry Lee Ackerman.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED                    5599-0 HEALTH-HEALTH AND SAFTEY FRE T

## Related Text Page(s)

Document: **INVSTGTR F/U**
Author: **199632 - Thompson, Matthew**
Subject: **INMATE INTERVIEWS**
Related date/time: **Feb-21-2017  (Tue.) 1504**

**Agent: M. Thompson**
**Case: 17-86**

On February 15th 2017 I assisted with scene documentation at the Davis County Jail and with interviews at the Farmington Police Department.  I interviewed Cassie Webb, Kimberly Slater and Jamie (Thompson) Johnson who were current inmates of the Davis County Jail.  This report outlines those details.

I assisted Agent Downey with documenting the scene of this incident, which was in the K and L sections of the Davis County Jail.  Corrections personnel permitted access to the areas of the jail where we conducted the investigation.

I assisted with taking measurements and a sketch of the involved cells in this case in the K and L sections.  I also assisted with measurements and the set-up and take down of the equipment utilized to document the sections.

Kimberly Ann Slater

At about 1248 hours, Agent Walden and I began interviews with some of the inmates who were reportedly present in the K and L sections when the incident with the decedent occurred.  Corrections personnel transported the inmates to the Farmington Police Department.  The interviews were recorded.

We first met with Kimberly Slater.  Agent Walden and I introduced ourselves to Kimberly. When asked, Kimberly said she did speak with an investigator about this incident already. I asked Kim if she had anything more to add about what happened.  Kimberly said what she told the investigator last time was about all she knew.  Heather added that she had herself been withdrawing from heroin and was "pretty sick" during that particular time.

Kimberly said of the incident, that she was in an adjacent cell, cell 10, and she heard [Heather] hit the floor. Kimberly said she heard a thump. Kimberly said [Heather's] cellmate called to the corrections officer, "She fell off the bunk." Kimberly said it happened during standing head count.  Kimberly said that a guard went into [Heather's] cell.  Kimberly said she did not hear any of the interaction between the corrections officer and people in the cell.  Kimberly said she went and lay back down and therefore did not see when [Heather] was moved from the cell.
Kimberly said, of the day before the incident with Heather, that she did not have any interaction with [Heather].  Kimberly said she didn't spend much time outside of her own cell and that she did not see [Heather].  Kimberly said she was not aware that any strife or unusual drama was happening in the section at the time.

Cassie Webb

At about 1303 hours, Agent Walden and I met with Cassie Webb. After introductions, I asked Cassie if she was aware of why we wanted to speak with her. Cassie said she was aware and agreed, when asked, that she had already talked to an investigator about the matter.

Cassie said she was in L section at the jail at the time. Cassie said she was housed on the second floor. Cassie said they were locked down when [Heather] came in. Cassie said she didn't see [Heather] come in, but she heard the doors open and close.

Cassie said that between the time [Heather] first arrived into L section and dinner, she heard a thud from where she believed was [Heather's] cell.

Cassie said when they were all let out for trays (meals), they went by [Heather's] cell to see who the new girl was and see if she needed anything. Cassie said that [Heather] was lying on her back on the floor. Cassie said she assumed that [Heather] was coming off of drugs. Cassie said it was not unusual for inmates to lie on the floor because it's cooler there.

Cassie said that [Heather's] color was grayish, but she could see that [Heather] was breathing. Cassie said she did not see that [Heather] was obviously injured. Cassie said that [Heather] did not respond when she tried to talk to her through the door to ask her name or see if she was ok. Cassie said that [Heather] was wearing only socks and a bra.

I asked Cassie if she or any of the other inmates tried to summon corrections staff. Cassie said that no one tried to get staff's attention. Cassie said she assumed [Heather] was coming off of drugs and it was why she looked and acted the way she did. Cassie said she wasn't concerned at that point with what she saw when she looked into [Heather's] cell.

Cassie said they were all locked down again and at about 1730 hours, an officer was doing rounds and apparently saw that [Heather] was down. Cassie said that she then noticed several corrections staff at [Heather's] cell. Cassie said they were standing over [Heather]. Cassie said the corrections staff then put [Heather] in a wheelchair. Cassie said that one of the corrections staff was holding [Heather's] head and another was slapping [Heather]. Cassie said it was apparent to her from her view that [Heather] was already gone.

Cassie said, of the view from her cell, that other than a view of the common area, she cannot see anything of the cells below hers but for a reflection from the main section windows and doors back to the cells below.

Jamie (Thompson) Johnson

In the interview with Jamie, we found that she had not yet been (formally) interviewed regarding this matter. Jamie said she came to the Davis County Jail on December 8th. Jamie said she was housed in K section in cell 11. Jamie said that [Heather] would have been in cell 13.

Jamie said, of the incident, that it occurred during lock down and standing head count. Jamie said she heard the officer come in and to the second floor.  Jamie said she first thought that the noise she heard was an officer pounding on [Heather's] door.  Jamie said she soon after heard the officer asking [Heather] if she was ok.

Jamie said that a little later when the staff were bringing [Heather] out of her cell, she heard [Heather] tell the staff that she was dizzy and couldn't walk.  Jamie said she saw [Heather] walk to the stairs and then sit.  Jamie said she watched as [Heather] scooted down on her rear end to the bottom of the stairs where she waited until staff brought in a wheelchair.

Jamie said that the day after the incident with [Heather], she talked with Officer Garcia, who she believed was a Davis County officer.  Jamie said that Garcia pulled her out to an interview room to talk with her about a pen (administrative issue).  Jamie said that Garcia asked her if she knew the inmate (Heather) or if she saw what happened.

Jamie said, when asked about the day before the incident with Heather, that she was out to court in Juab County and therefore was not present at the Davis County Jail to see or hear if there had been any issues in section K.

Jamie said that she understood generally that [Heather] was in drug withdrawal.  Jamie said that once back from Juab County Court, she talked with [Heather's] cellmate.  Jamie said the cellmate expressed her general angst that she had to share a cell with [Heather].  Jamie explained that when a new inmate comes in, is assigned to the top bunk, and is in drug withdrawal, particularly heroin withdrawal, the cellmate who is on the bottom bunk is invariably put out.  Jamie explained that the inmate in withdrawal is constantly going up and down the bunk for the toilet.

Jamie said it wasn't a unique situation - that anyone who has shared a cell with someone in withdrawal would have the same reservations.

I asked Jamie more about what she had thought was a sound of an officer banging on [Heather's] door.  Jamie said when she heard the noise, she heard a scream.  Jamie said she thinks it was [Heather's] cellmate who screamed.

I asked Jamie of the noise she thought was the officer banging on the door, if it was a single sound or more than one.  Jamie said it was a single noise (- one thump or similar sort of noise).

Jamie said the standing head count and lock down related to the incident with [Heather] was afternoon head count, and probably around 5:30 (PM). Jamie said when she heard the single noise, head count was in progress.

Jamie said that when the officer asked if [Heather] was ok, she saw [Heather's] cellmate come out of the cell. Jamie said she saw an inmate at the cell with a mop.  Jamie said when the inmate came out of the cell with the mop, she saw that the mop had blood on it.


**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

I asked Jamie if, after all was settled, she had occasion to talk with [Heather's] cellmate about what had happened.  Jamie agreed that she had.  Jamie said that [Heather's] cellmate said that [Heather] fell off the top bunk and hit her face.  Jamie said that the cellmate explained that [Heather] was seated on the top bunk with her legs hanging over and was going jump down for standing head count, but "face planted" into the floor.  Jamie said the cellmate told her there was blood everywhere.

I later asked Jamie if she saw blood on [Heather] as officers moved [Heather] from the section.  Jamie said she saw blood on [Heather's] hair.  Jamie added that she thought [Heather] had blonde hair.

Jamie added that she is frustrated that staff would put someone who was suffering from withdrawals on a top bunk. Jamie talked about how, in drug withdrawal, one could feel sick and dizzy, sometimes for over a week, and that they should not be expected to negotiate a top bunk or stairs.
End report.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

## Related Text Page(s)

Document: **INVSTGTR F/U**
Author: **199632 - Thompson, Matthew**
Subject: **STAFF INTERVIEWS**
Related date/time: **Feb-27-2017  (Mon.) 1013**

**Agent: Matt Thompson**
**Case: AG2017-86**

On February 22nd 2017, I interviewed Davis County Sheriff's staff, Sgt. Roberta (Bobbi) Wall, Deputy Lawrence Lucius, Deputy Blake Lopez and Deputy Paramedic Nicholas Pollock.  The interviews took place at the Farmington Police Station and were recorded.  SSA Sperry was present in the interviews.  Britton Butterfield, an attorney who represented Davis County Corporation, also was present in the interviews.  This report is a summary of the interviews.  Refer to recordings for other information
.

Sgt. Roberta Wall

At about 0900 hours, I met and talked with Sgt. Roberta Wall.  I explained to Sgt. Wall that she was not under arrest, that she was free to leave and that she was not obligated to speak with me about the case.  Sgt. Wall reported to me, among other things, that she has worked in corrections since 2004; that the extent of her medical training is basic first aid; and that she was the ranking officer at the jail on the particular day and shift of the Heather Miller incident.

I asked Sgt. Wall to tell me what happened in the Heather Miller incident.  Sgt. Wall said she started shift at about 1745 hours. Sgt. Wall said she got a call over the radio from Deputy Lucius at about 2000 hours, asking her to come to L unit to help with rounds because an inmate was lying naked on the floor of her cell.

Sgt. Wall said she responded to L unit and met with Deputies Lucius and Lloyd.  Sgt. Wall said she went to [Heather's] cell and looked in through the window.  Sgt. Wall said she saw [Heather] lying on the floor of the cell.  Sgt. Wall said that [Heather] was moving around a little bit.  Sgt. Wall said that [Heather] was lying on her stomach, but she could see that there was some blood on her hand or arm.  Sgt. Wall said she asked Deputy Lloyd about the blood to which he replied that he didn't know.

Sgt. Wall said she had the operator in the pod open [Heather's] cell door.  Sgt. Wall said that [Heather] rolled over and she noticed the cut on [Heather's] chin.  Sgt. Wall said she asked Heather if she was ok.  Sgt. Wall said that Heather moaned and "thrashed about" on the floor.  Sgt. Wall recalled that Heather said, "I hurt everywhere."  Sgt. Wall said she told Heather that they needed to get some underwear on her in order to then get her to medical for some attention.  Sgt. Wall reported that Heather claimed she couldn't and repeated again that she hurt.  Sgt. Wall said that Heather's legs were "all over . . . on the desk, in the toilet . . ." Sgt. Wall said that Heather kept repeating that she was hurt.

Sgt. Wall said she withdrew from the cell and called over the radio to medical, asking if they had a bed for Heather.  Sgt. Wall said that the response from medical personnel was that they would "double bunk her."  Sgt. Wall said she had Deputy Lucius retrieve a wheelchair in order to move Heather to the medical area.

Sgt. Wall said that once they arrived near the medical treatment area and Nurse Marvin saw [Heather], he immediately remarked, "We got to get her out of here."  Sgt. Wall said she used the phone in the medical area to call dispatch for an ambulance.

I asked Sgt. Wall if she was aware of the fall incident in K unit.  Sgt. Wall answered that she was not involved with the fall component of the incident with Heather and she could not remember if Corporal Johnson briefed her of the fall incident near the time that it happened.

I asked Sgt. Wall about basic protocol as it related to moving an inmate from one place to another within the jail.  Sgt. Wall said that in an emergency, anyone can make the decision to move an inmate.  She went on, saying that in this situation she thought it was collaboration between the floor officers and the medical staff to move [Heather] from K unit to L unit.  Sgt. Wall said that in the end, corrections officers have the final say on whether an inmate is moved from one place to another within the jail.

I asked Sgt. Wall about the jail logs.  Sgt. Wall said, of the inmate management system, that any jail staff, clerks, officers, medical staff, can make entries in the system.  Sgt. Wall said that nearly any interaction with an inmate is logged.  She said that counts, meals, movement, intake, etc. is logged.

I asked Sgt. Wall about a particular log entry on Miller's records: 1451 hours on 12/21 "back from pumping, Willhite."  Sgt. Wall said that the entry was mistakenly put on Miller's log.  Sgt. Wall said the entry referred to an officer, Willhite, allowing or otherwise making a breast pump available to an inmate.  Sgt. Miller said that the officer must have clicked on the wrong inmate when making an entry.

Sgt. Wall said, of medical complaints from inmates, they usually defer to medical personnel.  In other words, when an inmate complains of illness or injury, officers generally defer or report issues to medical.

Sgt. Wall said, regarding Miller's release to paramedics, that as the medics and nurse worked with Miller in the medical area of the jail, she called Lt. Meldrum and notified him of the situation and asked for direction on a manner in which to release Miller, whether with a deputy escort or on a promise to appear.  Sgt. Wall said that the Lt. asked about Miller's charges and in the end said to release Miller on a promise to appear.  I asked Sgt. Wall if the administrative issue held the medics up from leaving with Miller.  Sgt. Wall denied that it did.  Sgt. Wall said she had everything taken care of as the medics were still working on Miller in the medical area of the jail.

Sgt. Wall said she later got a call from a nurse at Mckay Dee, informing her that Miller was in full arrest.  Mckay Dee was requesting emergency contact information from Miller's records.  Sgt. Wall said she looked up Miller's information in the system and saw that there was no one listed for contact in her records.  Sgt. Wall said she

looked back over what she thought were previous booking records for Miller and provided a contact from that record.  Sgt. Wall said she later found that it was from a different Heather Miller's booking sheet.

Sgt. Wall said that some time later, Lt. Meldrum called her and notified her that the Chief and Captain had ordered that in in-custody death protocol should be followed.  Sgt. Wall said she was ordered to contact the Weber County Jail investigators and request that they investigate the Miller incident.

Sgt. Wall said it was around midnight when she called the Weber County Jail.  Sgt. Wall said it took several calls before she got hold of the appropriate personnel. Sgt. Wall said when she finally spoke with a Weber Jail investigator; the investigator questioned her over the phone about why they needed to investigate and where the death occurred.  Sgt. Wall said the investigator told her that he needed to make a call.

Sgt. Wall said she got a call from her superiors, telling her that Weber County investigators were on the way and that they, Davis County Jail administration, were also enroute to the jail.

Sgt. Wall said she started gathering records, reports, etc. that she knew the investigators would need.  Sgt. Wall said that the chief arrived at the jail and instructed her to get the investigators whatever they needed to conduct their investigation.  Sgt. Wall said that when the two Weber County Jail investigators arrived, she provided them with everything from intake through to discharge records for Miller.  Sgt. Wall said that the investigators spoke with Deputy Lopez, the Davis Jail investigator, and received Miller's records.  Sgt. Wall said the investigators left the jail.
I asked Sgt. Wall if the Weber investigators requested to look around at involved areas of the jail or requested anything further.  Sgt. Wall said they did not ask for anything more from her, but she wasn't sure if they'd asked anything of anyone else at the jail while there.

Asked if she had anything more to add, Sgt. Wall said that when she'd arrived in L unit following Deputy Lucius calling her to the unit concerning Heather, Deputy Lloyd told her that he'd reported, when he saw the blood on the inmate, he'd called medical and that whomever he spoke with in medical told him to more or less not worry about it.

Lawrence Lucius

At about 0856 hours, I spoke with Deputy Lawrence Lucius. I began the interview with Deputy Lucius by explaining to him that he was not under arrest, that he was not obligated to speak with me and that he was free to leave at any time.

Deputy Lucius said, when asked, that he had been a Corrections Deputy for nine years and that he was an FTO and OIC for the jail.  Deputy Lucius said that the extent of his medical training was basic first aid.  Deputy Lucius also offered that he had field-trained Deputy Lloyd, another involved Deputy to this incident.

Deputy Lucius said, of the incident, that he was walking down legacy hallway in the jail when Deputy Lloyd stopped him and commented about [Heather].  Deputy Lucius said that Deputy Lloyd told him that he had found

[Heather] on the floor in L unit with a cut on her chin. Deputy Lucius said that Deputy Lloyd said he'd called medical about it and medical's response was to "don't look too much into it."

Seeing that Deputy Lloyd was concerned about the situation, Deputy Lucius said he offered to go with Deputy Lloyd to check on [Heather]. Deputy Lucius said he and Lloyd went to L unit and saw that [Heather] was naked and lying on the floor. Deputy Lucius said he could see that [Heather] was breathing and that she was moving. Deputy Lucius said he didn't see a pool of blood and he didn't see her chin at that point.

Deputy Lucius said he called for Sgt. Wall to come to L unit to see if they could get some clothes on [Heather] and find out if anything was wrong with her. Deputy Lucius said that when Sgt. Wall arrived, Sgt. Wall entered [Heather's] cell and began talking to Heather. Deputy Lucius said that Sgt. Wall told him to go get a wheelchair because she wanted to move Heather to medical.

Deputy Lucius said he returned with a wheelchair and that Corporal Johnson and Sgt. Wall tried to lift Heather into the chair, but were unable. Deputy Lucius said he and Deputy Lloyd helped to get Heather into the wheelchair.

Deputy Lucius said he noticed that Heather was cold and gray. Deputy Lucius said supported Heather's head as they wheeled her to medical. Deputy Lucius said he noticed that Heather's head/hair was (sweat) soaked.

Deputy Lucius said he helped with Heather until the point that he ambulance personnel took Heather away.

Blake Lopez

At about 1112 hours, I met and spoke with Deputy Blake Lopez. I explained to Deputy Lopez that he was not under arrest, not obligated to speak with me, and that he was free to leave at any time.

Deputy Lopez said, of his involvement in this incident, that he got a phone call from Lt. Meldrum that night and that he was asked to come in regarding an in-custody death. Deputy Lopez explained that his role as a jail investigator in these situations was to assist the outside agency investigators with access to needed information, personnel, areas, etc.

Deputy Lopez said when he arrived at the jail, the decedent was already gone from the jail and he said it seemed that everything was back to normal. Deputy Lopez said he began gathering records, video, reports, etc. that he knew the Weber County Investigators would need.

Deputy Lopez said the Weber County Investigators arrived and met with he and Sgt. Wall. Deputy Lopez said he provided everything to the investigators that they had requested. Deputy Lopez said that in the days following, he took calls and fulfilled requests for the investigators for additional records, arranging inmate interviews, etc.

Deputy Lopez said, when asked, that he did not conduct interviews or otherwise investigate this incident himself. Deputy Lopez said he talked briefly with Sherry Ackerman, the decedent's cellmate. Deputy Lopez said that at


one point in the days following the incident he arranged for and walked with Sherry Ackerman to an interview with the Weber County Investigators. Deputy Lopez said as he waited with Sherry, Sherry shared with him that [Heather] had fallen from her bunk while getting up for standing head count. Sherry reportedly shared that she did not actually see the initial fall, but heard the noise. Sherry reportedly said that Heather then had difficulty keeping her balance after trying to recover from the fall.

I asked Deputy Lopez if he had prepared any reports or had notes made of his activity on this case. Deputy Lopez said he did not have notes or a report for this incident.

I asked Deputy Lopez if he had asked inmate Jamie Johnson at any time if she knew anything about what had happened to Heather Miller. Deputy Lopez said it was possible, but he did not remember. Deputy Lopez said he did investigate a contraband issue in the unit at around the same time, so it was possible that he may have asked [Johnson] about it, but that he did not remember anything in particular about it.

<u>Nicholas Pollock</u>

At about 1307 hours, I interviewed Deputy Nicholas Pollock. I explained to Deputy Pollock that he was not under arrest, that he was free to leave and that he was not under any obligation to speak with me. Deputy Pollock was one of the Deputy Paramedics who responded to the call for medical service at the Davis County Jail on the Heather Miller incident.

I showed Deputy Pollock a copy of the paramedic report associated to the Miller incident, D16-11603. Deputy Pollock went through the report, explaining the entries in the report and what his part in it was. He explained, of the usual procedure with a medical incident, that he would take notes on paper while working the incident, and then transcribe the notes to the report. Deputy Pollock said that once the report is complete, he usually shreds his notes.

Deputy Pollock expressed his general frustrations with the incident, which were that it seemed that the jail staff seemed to lack a sense of urgency in this case and that he was frustrated that they would not bring the patient to the sally port area for treatment which could have given them more treatment time with the patient. Refer to interview recording for other detail.

End report.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

## Related Text Page(s)

Document: **OTHER F/U**
Author: **122870 - Hensley, Luther**
Subject: **HOLD FOR OWNER/2 CELL PHONES**
Related date/time: **Apr-19-2017  (Wed.) 1113**

On April 19, 2017 SA Tyson Downey came into the AG Evidence Office and handed me (2) cell phones, (1) Samsung and (1) LG cell phone. SA Tyson informed me these are hold for owner. I took the (2) cell phones sealed in a plastic evidence bag and entered the item into the Versadex Evidence Management System and AG ID tag AG 3941-1 was printed out. I attached the AG 3941-1 ID tag to the outside of the sealed plastic evidence bag, placing the items at storage location Phone Box.Report concluded LH.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

# Follow Up Report # AG  1

### Assignment Information

Assigned to: **183987 - Downey, Tyson**    Rank: **AG Investigator**
Capacity: **Investigate/Case Manager**    Org unit: **Special Investigations**
Assigned on: **Feb-09-2017  (Thu.) 1102**  by: **183987 -  Downey, Tyson**
Report due on: **May-10-2017  (Wed.)**

### Submission Information

Submitted on: **May-02-2017  (Tue.) 842**
Checked by: **183987 -  Downey, Tyson**
Approved on: **May-02-2017  (Tue.)**    by: **183987 -  Downey, Tyson**
**Follow Up Conclusion**
Follow Up concluded: **YES**

---

### Narrative Text Report # 1

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **OME INTERVIEW**
Related date/time: **Feb-14-2017  (Tue.) 1725**

On February 14, 2017 around 1400 hours, SA M. Thompson and I met with Dr. Erik D. Christensen, Chief Medical Examiner for the Utah Office of the Medical Examiner. We met at his office, located at 4451 South 2700 West in Taylorsville, Utah. Dr. Christensen conducted the autopsy on the decedent, Ms. Miller.

Upon arriving, Dr. Christensen escorted us to the examination room, where Ms. Miller's body was on an examination table covered by a sheet. He removed the sheet for us to view and examine the body. Dr. Christensen showed us the exterior left side/flank area of the body where the injured spleen would have been located.

We discussed the information provided to him at the time of the examination, outlining the suspicion that Ms. Miller had fallen from the top bunk in her cell and struck her side on the floor or table. Dr. Christensen stated that the internal injury he located during the examination was consistent with a blow to the side/flank area of the body. He stated that a fall could cause this type of injury. Dr. Christensen stated that there were no external injuries to the left side/flank area of the body and he felt that, had Ms. Miller struck a sharp corner of a table, there would have possibly been have a visible mark, bruise, or welt, but that this isn't a certainty. He also stated that a fall to the ground could cause the injury. Dr. Christensen also confirmed that, other than the obvious injury to the chin, he did not locate any other injury to the head.

---


**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

| GO# AG 2017-86 CLOSED/COMPLETED | 5599-0 HEALTH-HEALTH AND SAFTEY FRE T |
|---|---|

Follow Up Report # AG  1

We then went to Dr. Christensen's office, where we reviewed the OME report and autopsy photos taken at the time of the examination. One of the items he highlighted was the amount of internal bleeding noted during the examination. He stated that the 1.3 liters of blood recovered is significant but that an individual could possibly live through that amount of blood loss. He did say this was the amount of blood collected but that there could have been uncollected blood within the cavity of the body.

Dr. Christensen stated that the trauma to the spleen was significant and would have needed medical repair that would consist of removal of the spleen to survive. He also stated that the injury was "acute". He stated that the injury was not indicative of something that would have occurred days prior. He felt that the roughly four-hour time frame he had been given from incident to death was consistent with the injury.

Dr. Christensen stated that there is some indication that the blood tried to clot but that the severity of the injury made it impossible to clot completely and that, without medical care, the injury was fatal.

Dr. Christensen stated that this type of injury would have been difficult to diagnose without being at a hospital. He said that a ruptured spleen is typically diagnosed in three ways; through an ultrasound, a blood count, or actually cutting open a patient. None of these things would have been done by a nurse at a jail. He also said that internal injury is often difficult to diagnose through an external examination because the patient often does not know where the pain is.

Dr. Christensen stated that toxicology results reported the presence of both methamphetamine and THC in Ms. Miller's body. He stated that heart arrhythmia is common with the presence of methamphetamine and the presence of methamphetamine in a traumatic event like this could create a higher likelihood of fatality.

Dr. Christensen stated that he noted the Manner of Death as "Accident" due to a number of factors, including his review of the jail medical records, code information, mental health evaluation information, medical notes from the injury, Ms. Miller's arrest PC Statement, toxicology results, EMS reports, hospital reports, and statements of jail staff and witnesses. He stated that, taking all of this into consideration and weighing it against what he observed during the autopsy, he felt that the information was consistent.

End of Statement.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 2

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **DAVIS COUNTY JAIL**
Related date/time: **Feb-17-2017  (Fri.) 1257**

On February 15, 2017, Special Agents A. Jones, M. Thompson, C. Walden, and I went to the Davis County Jail to collect photos, measurements, and Panoscan photos of the sections and two cells related to this case. I had spoken with Davis County Chief Deputy K. Fielding the previous day to arrange the visit and to request his assistance in coordinating transport of witness inmates to the Farmington Police Department for interviews. I had briefly viewed the available surveillance footage of the incident collected by the original investigators prior to going to the jail.

When we arrived at the jail we made contact with Chief Deputy Fielding. He provided us with a tour of the jail, from intake/booking to the Kilo section of the jail. He explained the process from booking to housing. We were then able to conduct an inspection of the involved jail cells. We were escorted by Deputy Clark and, occasionally by Chief Deputy Fielding, while inspecting the cells.

The first cell we inspected was K-12, which is located on the second tier of the Kilo unit. As we entered, I observed a cell with a sink and toilet to the immediate right and a metal desk and secured bench affixed to the wall on the right. The desk had fairly sharp corners and was within a foot of the bunk beds, which were affixed to the far wall. I observed that there was no step or stool to get to the top bunk, which was around five feet high.

SA Walden took photographs of the section and cell. SA Jones and I took basic measurements of the cell while SA Thompson drew a rough sketch, noting the measurements. We then took Panoscan photographs of the section and of the inside of the cell.

We then went to the Lima section, which is also located in the same pod of the jail, just one section over from Kilo. The two sections are divided by a cement "yard". We were told the Lima section is the "max" section for females. This is the section Heather Miller was transported to following her reported fall in K-12. We inspected cell L-7, which was the cell she had been placed in. The layout of the cell appeared to be identical to K-12, with the exception of a small window high on the far wall, over the bunk beds. We took basic measurements and the room appeared to be the same size as K-12.

SA Walden took photos of this cell and then we took Panoscan photos of the section and cell.

While we were working in the section, I asked Chief Deputy questions regarding the first report. I requested a copy of the original arrest report and dash camera video for the arrest of Heather Miller prior to her recent stay in the jail. I also asked for a copy of the EMS report documenting the EMS response by Davis County deputies.

Chief Deputy Fielding provided me with the above documentation, as well as copies of schematics for the entire jail, the women's pod containing sections Kilo and Lima, and the medical area. They are contained in the case

file. He also provided me with a list of deputies and other jail staff who had likely interacted with Ms. Miller for the duration of her recent stay.

I asked Chief Deputy Fielding if there would be any recordings of deputy radio traffic of the event available. He stated that the radio traffic within the jail is not monitored or recorded and were not available.

Deputy Chief Fielding told me that the staff was just changing shifts from the day to the night shift when the incident occurred. The shifts run as 12 hour shifts, from 0600 to 1800, then 1800 to 0600 hours. He said that Sgt. Roberta Wall was the jail commander the night of the incident. Deputy Chief Fielding also said that he was still at work, although he was not in the jail at the time, but was in administration. He told me that he had directed Sgt. Wall to contact the Weber County investigators after the incident. Weber County had conducted investigations into incidents at the Davis County Jail previously.

Deputy Chief Fielding then escorted us to the medical wing of the jail, where Ms. Miller had been taken following the discovery of her physical distress while in the Lima section. After doing this we went to the Farmington Police Department, where we had previously arranged to interview a number of witness inmates who had heard or seen something related to the incident. Deputy Chief Fielding arranged for transportation of the inmates to the Farmington Police Department for interviews.

The day prior, I had sent Deputy Chief Fielding the names of the inmates we desired to speak further with, which included those who had been interviewed briefly the night of the incident. My hope was to gain further detail and information than was previously documented. I had requested to speak with the following inmates:

- Jessica Montoya
- Kimberly Ann Slater
- Cassie Marie Webb
- Dana McCubbin,
- Adelina Tejero
- Kenndra Follett
- Genna Castillo

Sherry Ackerman, Ms. Miller's cell mate, as well as Sonya Langston, had already been released and were not present to be interviewed at the jail. Chief Deputy Fielding also told me that Kenndra Follett was suffering from medical and other issues and was not going to be in a condition to speak. He also said that Genna Castillo attended group meetings outside of the jail all day during the week and was only at the jail in the evenings. Also, an inmate I wasn't aware of and who apparently had not been spoken with, Jamie Johnson, was also transported to the Farmington Police Department for interview.

SA Jones and I interviewed Jessica Montoya, Dana McCubbin, and Adelina Tejero while SA Thompson and SA Walden interviewed Kimberly Slater, Cassie Webb, and Jaimie Johnson. The interviews were audio and video recorded. See memo of interview and recordings for further information.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED        5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

Lieutenant Parrish of the Farmington Police Department offered to burn the interviews onto a disc and for pick up at a later time.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

---

### Narrative Text Report # 3

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **AMBULANCE REPORT**
Related date/time: **Feb-17-2017  (Fri.) 1446**

---

On February 15, 2017, I left a voice mail message with Farmington Fire Chief Smith, requesting a copy of the ambulance report of the incident.

On February 21, 2017, I made telephone contact with Chief Smith. I explained the purpose of my call and he requested that I send an email to him requesting the case report. I did this but, upon doing so, I noticed that the case number provided by initial investigators for the Farmington Fire report was the same case number listed on the EMS report.

I requested that Chief Smith provide a Farmington report if there was one existing.

On February 22, 2017 I received the ambulance report and added it to the case file.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

### Narrative Text Report # 4

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **JAIL STAFF SCHEDULES**
Related date/time: **Feb-17-2017  (Fri.) 1448**

Upon reviewing the document titled "Heather Miller DCSO Personnel Interactions on Dec 21, 2016" provided to me by Chief Deputy Fielding, I noticed that Ms. Miller had likely had contact with a number of Davis County Jail personnel.

The document shows that, at the time of the incident, Deputy Zak Lloyd was the assigned Pod 4 Deputy. The Clerk at the time, who I was told is the civilian employee in the command center of Pod 4 at the time of the incident, was Austen Rogers. He showed to have been on duty until 2300 hours. The listed "Emergency Responding Staff" was Sergeant Roberta Wall, Corporal Tracy Johnson, Deputy Zackery Lloyd (who had made the initial call), and Deputy Larry Lucius (responded to initial call to assist). The listed medical staff was Jaimie Hatch (conducted initial housing assessment) and Marvin Anderson (responded and assessed, treated Ms. Miller).

The personnel interactions document was added to the case file.

On February 17, 2017, I sent an email to Davis County Lieutenant W. Callister requesting a copy of the entire jail staff schedule for at least December 11 through the 24th, 2016. He sent me the entire month of December for deputies and nurses.

### Deputy Schedule

The schedule shows the deputies to run a rotating 3 on, 2 off, 2 on, 3 off type of schedule. The deputies on duty during this incident were just coming on duty for a two day work week after a two day weekend.

The schedule shows the jail typically runs scheduled shifts of between 18 and 23 deputies, including supervisors. The actual schedule shows that there was typically between 16 and 22 deputies working at one time, with the occasional shift of 14 or 15 deputies.

The schedule shows the following staffing numbers for the 20th and 21st:

*December 20, 2016*

0600-1800 hours: 22 scheduled, 16 working
1800-0600 hours: 23 scheduled, 22 working

*December 21, 2016*

0600-1800 hours: 18 scheduled, 16 working
1800-0600 hours: 23 scheduled, 17 working ***shift where incident occurred



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

## Nurse Schedule

The nurse schedule shows that on a typical day, 5 nurses are scheduled around the clock on overlapping shifts. It shows that each nurse is typically scheduled to work three 12-13 hours shifts per workweek (Friday-Thursday). Nurse Marvin was working shift three of three for the week at the time of this incident.

*December 21, 2016*

0800-1700 hours: James (Supervisor)
0600-1900 hours: Celesta
0600-1900 hours: Jaimie
0800-2100 hours: Darryl
1300-0200 hours: Marvin ***responding nurse
1800-0700 hours: Daniel

## Clerk Schedule

The clerks appear to work a 5 on, 2 off schedule. Austen Rogers was working a "swing shift" at the time of the incident and it appears that he was scheduled to work beginning at 4 pm. It was his first shift back from a two day weekend.

The schedules were added to the case file.

This case is ACTIVE.



# UTAH ATTORNEY GENERAL'S OFFICE
## GENERAL OFFENSE HARDCOPY

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 5

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/CINDY FARNHAM-STEL**
Related date/time: Feb-17-2017  (Fri.) 1555

On February 16, 2017 at 0810 hours, SA M. Thompson and I visited with Cindy Farnham-Stella by telephone. Cindy is the biological aunt and adopted mother of Heather Miller. Cindy currently lives in Reno, Nevada. The interview was audio-recorded, which recording is contained in the case file. Cindy provided us with the following information about Heather:

Heather's biological mother was Cindy's sister, who passed away many years ago. Heather's biological father was never present in her life and, according to Cindy, was "transient". Cindy said she was "in Heather's life" since Heather was about four years old. Heather had two children, both of whom are currently adopted out. She had a third baby who died of "SIDS".

Heather was, generally speaking, a healthy child. Cindy said that Heather had minor medical issues as a child such as colds, allergies, and bronchitis but no major medical issues to speak of. Cindy said that Heather did suffer from PTSD, bipolar disorder, and ADHD. Cindy said that Heather was not good about taking her medications. When asked what her PTSD was caused by, Cindy only said that when Heather was very young, her father and mother would leave her alone at various locations for days at a time. She also mentioned sexual abuse that had possibly taken place by her father. According to Cindy, Heather had no other medical history and had no primary care physician.

Cindy said that Heather generally worked in IT jobs. Heather had also worked in selling timeshares and had just gotten involved in prostitution, which was one of her reasons for moving away from Reno.

Cindy said that when Heather was in her early 20's, Heather began using marijuana. In her mid to late 20's, Heather began using methamphetamine. Heather did not use any other drugs that Cindy was aware of. Cindy said that Heather moved to Oregon and then Idaho for a short time. Heather had moved back to Reno and lived with Cindy until around April or May of 2016. Heather then moved to Utah in September or October of 2016.

Cindy said Heather moved away from Reno to get away from poor influences and to "change her life". Heather had moved to Utah with a female who Cindy didn't know. Cindy did say that the female she moved to Utah with was the sister of the male Heather had been arrested with and was the female listed as Heather's emergency contact with the jail. Heather wanted to get a job in Utah in the IT field but found this to be difficult. Cindy said that she and Heather "didn't speak often", but that they last spoke around 3 weeks prior to Heather's death. Heather expressed to Cindy that she had met a "guy" whom she "seemed to like". She also told Cindy that she was "having trouble here" and that she didn't like Utah. Heather said she was "trying to stay away from people involved in drugs" but that this was difficult.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

Follow Up Report # AG  1

Cindy said that she learned of Heather's death the following day from another daughter, who had apparently spoken with the female friend Heather moved to Utah with. Cindy expressed confusion about what had happened based on the fragments of information she had received from the various agencies involved in the investigation.

Cindy stated that she had the two cell phones Heather was arrested in possession of. We requested that she send them to us and she said she would. Cindy also said that she wasn't aware of much of Heather's social media information, but that Heather did have a Facebook account under the name "HM Miller". Cindy said that she had another account under some name similar to "happy on the outside, lonely on the inside".

I thanked Cindy for her time and encouraged her to contact me with any questions she might have.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

**Narrative Text Report # 6**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **JAIL CALL INFORMATION**
Related date/time: **Feb-17-2017  (Fri.) 1555**

On February 16, 2017, the original investigators for Weber County Sheriff's Office notified me that they had requested any available jail phone calls made by Heather Miller during her stay and were told that she had not made any and none were available.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**      **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG 1**

### Narrative Text Report # 7

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **FACEBOOK**
Related date/time: **Feb-17-2017 (Fri.) 1611**

On February 17, 2017, I located a Facebook page under the name of "HM Miller" for Heather Miller. There were a handful of comments from friends related to speculation and rumors surrounding her death. I printed out the comments and they are contained in the case file.

I also located photos Ms. Miller with Jason Johnson beginning in October of 2016. Nothing else of note was located on the page.

I could not locate any other social media accounts for Ms. Miller.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

**Narrative Text Report # 8**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **JAIL REPORT**
Related date/time: **Feb-17-2017  (Fri.) 1652**

On February 17, 2017, I was reviewing the jail report provided by the initial investigators and it seemed as though the jail report was missing a couple of pages. I contacted Lt. Callister, who forwarded me my own copy of the jail report.

The report (incident #12490, Spillman #D16-11606) contains the written statements of the following staff members:

- A. Rogers
- T. Johnson
- R. Wall
- L. Lucius
- Z. Lloyd

The report was added to the case file.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

### Narrative Text Report # 9

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **EMS REPORT**
Related date/time: **Feb-17-2017  (Fri.) 1700**

On February 17, 2017, I reviewed the EMS Patient Care Report for this incident. The report shows that Medic22 responded "lights and sirens". The crew members listed are C. Harvey and N. Pollock. The times given show that notification was made on December 21, 2016 at 2043 hours and medics responded on scene at the jail at 2049 hours. They left the scene with the patient at 2103 hours and arrived at the hospital at 2126 hours.

The dispatch complain listed is "ingestion/poisoning", with possible injury caused by a "fall". The report narrative, entered by C. Harvey, states that dispatch information was that the patient was "not conscious, but was breathing". On arrival, she was found to not be alert but was "breathing on her own with shallow respirations" and a "weak radial pulse".

Jail staff and medical advised that the patient had fallen and hit a table with her "left ribs" and that, when no marks or bruising were seen, she was transferred to a new cell. She was later found to be in distress.

The report notes that the patient was pronounced deceased at McKay-Dee Hospital at 2206 hours.

I added the EMS report to the case file.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

### Narrative Text Report # 10

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **SURVEILLANCE REVIEW**
Related date/time: **Feb-21-2017  (Tue.) 1102**

On February 21/2017 I, in greater detail, reviewed the surveillance footage provided by jail staff to the original investigators. I had originally noticed that there are times where the footage skips forward, sometimes many minutes. I inquired about this and was told by Lt. Callister that the footage only records when movement within the section is noticed. This accounts for the skips in the footage.

As I compared the footage for December 21, 2016 to the notes in the investigator report, I noticed the times noted and events matched. However, for the sake of further detail, I made my own notes relative to the footage, which are provided below:

### Kilo Unit

1638 hours- Heather Miller comes out of her cell and sits at a table with other inmates. She doesn't appear to interact much with the other inmates
1649 hours- Ms. Miller walks back up the stairs and goes into her cell. She appears to navigate the stairs without complication
1652 hours- Ms. Miller walks back down the stairs without complication and sits down at the table
1655 hours- Ms. Miller retrieves her food tray from the deputy and sits back at the table
1657 hours- Ms. Miller stands up and walks back up the stairs to her cell without complication
1706 hours- Ms. Miller exits her cell and walks down the stairs, walks back up and back into her cell
1708 hours- Ms. Miller's cellmate, Sherry Ackerman, walks in and out of the cell
1714 hours- Ms. Ackerman again walks in and out of the cell
1716 hours- Ms. Ackerman again walks in and out of the cell. A few different inmates are seen standing by the door and talking
1730 hours- Ms. Ackerman enters the cell for lockdown
1737 to 1744 hours: The footage skips during this time
1745 to 1754 hours- The footage skips again during this time
1755 hours- The deputy is seen entering the section and walking up the stairs. He arrives at the top of the stairs at this time. At that time, someone is seen standing at the window of Ms. Ackerman and Ms. Miller's cell. That individual turns quickly to her left and leaves the view of the window. She then reappears. The deputy is at the first door at this time. He walks past the second cell and goes directly to K-12.
1756 hours- A second deputy arrives and the two deputies open the cell
1757 hours- Ms. Miller is seen laying on the ground inside her cell. She appears to be moving around as though in pain
1758 hours- A nurse arrives in the section
1803 hours- The jail staff leaves the section. It appears that Ms. Miller is no longer on the ground
1806 hours- The jail staff returns
1812 hours- Ms. Miller is seen back on the floor

18:13:22 hours- Ms. Miller leaves the cell
18:13:26 hours- Ms. Miller has to stop walking
18:13:31 hours- Ms. Miller has to stop walking again
18:13:41 hours- Ms. Miller arrives at the top of the stairs ****It takes about 19 seconds to walk the estimated 20 feet or so from her cell to the top of the stairs
18:16:00 hours- Ms. Miller begins sliding down the stairs, one by one
18:16:24 hours- Ms. Miller arrives at the bottom of the stairs and is assisted into the wheelchair. She is then removed from the section

**Lima Unit**

1816 hours- Nurse and deputy wheel Ms. Miller into Lima and place her on the bottom bunk of her cell
1817 hours- The nurse and deputy close the cell door and leave
18:18:34 hours- Ms. Miller moves from her bed to the floor
18:19:53 hours- Two deputies return and open the door to the cell. Ms. Miller is on the floor
18:20:03 hours- The two deputies close the door to the cell and leave
1831 hours- One deputy does a check of the section and looks through Ms. Millers cell window as he walks past
1901 hours - Inmates are let out of their cells and inmates begin to look into the window of Ms. Miller's celll, one by one, and talk to each other
1903 hours- Four inmates look in to the cell and talk to each other
1931 hours- A deputy enters the section and does a check of each cell, looking into Ms. Miller's cell window
1932-2004 hours- Footage skips
2009-2017 hours- Footage skips
2018 hours- Deputy enters and looks into Ms. Miller's cell window, walks away then immediately returns, looking back in. He does a check and then leaves. The deputy returns with a second deputy and they both look into the window
2027 hours- A third deputy arrives and opens Ms. Millers cell door.
2030 hours- Ms. Miller is seen laying on her back on the floor. She appears to not be clothed but is moving her legs back and forth. She also continues to put her feet and legs up on the bed or seat to the table
2032 hours- A deputy is seen bringing in a wheelchair and two male deputies and two female deputies lift Ms. Miller into the wheelchair
2034 hours- Ms. Miller is taken out of the section
**Medical**

2039 hours- Ms. Miller arrives in medical
2040 hours- Ms. Miller slides from the wheelchair onto the ground. The nurse is seen moving some medical instruments over to Ms. Miller and they begin to interact
2049 hours- EMS arrives
2058 hours- Ms. Miller is taken by EMS from the section

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED                5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 11

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **PANOSCAN**
Related date/time: **Feb-21-2017  (Tue.) 1229**

On February 21, 2017, SA A. Jones gave me a dvd containing the completed PanoScan photographs of sections Kilo and Lima, as well as cells K-12 and L-7. The dvd was added to the case file.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

| GO# AG 2017-86 CLOSED/COMPLETED | 5599-0 HEALTH-HEALTH AND SAFTEY FRE T |
|---|---|

**Follow Up Report # AG 1**

---

### Narrative Text Report # 12

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **ARREST REPORT**
Related date/time: **Feb-21-2017 (Tue.) 1236**

---

On February 21, 2017, I reviewed the arrest report and dash camera footage of Heather Miller's arrest, which took place during the early morning hours of December 20, 2016. The arrest is documented under Davis County Sheriff's Office incident report #D16-11540.

Upon reviewing the footage, it appears that Ms. Miller was compliant throughout the interaction. She does not appear to be in any physical distress or complain of any medical conditions. Aside from placing handcuffs on Ms. Miller, which they did with her compliance, the arresting deputies did not use force during their interactions.

The arrest report and footage were added to the case file.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFICE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

**Narrative Text Report # 13**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **ATTEMPTED CONTACT W/FRIENDS**
Related date/time: **Feb-21-2017  (Tue.) 1728**

Heather Miller listed Levina Masi (775-203-2594) as her emergency contact when booked into jail. Ms. Miller also listed 5856 South Vista Ridge Way in Kearns as her address. Ms. Hiller was arrested with Jason Johnson, who also listed that address as his home address.

On February 21, 2017, SA M. Thompson and I went to the Kearns address in an attempt to locate either Masi or Johnson. The home was found to be vacant. I called the number listed for Masi and left a voice mail message requesting a phone call back. I ran the phone number listed for Masi and could not find a name associated with it.

I ran a check on both individuals in an attempt to locate them. I could not find a Utah driver license, police involvements, or any other contact information in other databases for Masi.

I located a couple of police involvements consisting of traffic violations for Johnson. He listed the Vista Ridge Way address as a home address. I called the phone number listed for Johnson and got a voice mail belonging to a female named "Erin". I did not leave a voice mail message. I could not locate a Utah driver license for Johnson and all other addresses I could locate for him were old addresses in California.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED               5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

---

**Narrative Text Report # 14**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **JAIL MEDICAL RECORDS**
Related date/time: **Feb-21-2017  (Tue.) 1734**

---

On February 21, 2017, I reviewed the jail medical records for Heather Miller that were provided by jail staff to the initial Weber County Sheriff's Office investigators.

The records show that an initial "Medical Screening Sheet" was completed on December 20, 2016 at 0419 hours. The sheet does not note any medical conditions.
A "Health Assessment Form / Intake" shows to have been completed on December 20, 2016 at 1413 hours. The Interviewer is listed as Jaimie Hatch, RN. Nurse Hatch noted the blood pressure and pulse of Ms. Miller. She notes no medical concerns and, specifically, notes that Ms. Miller did not "expect to go through alcohol or drug withdrawals".

The "Chart Notes" for Ms. Miller contain two notes, one time-stamped December 21, 2016 at 1835 hours and the other time-stamped December 21, 2016 at 2241 hours. Both show to have been completed by Nurse Marvin Anderson, RN.

The medical forms and notes are contained in the case file, original binder from initial investigators.

This case is ACTIVE.

---



# UTAH ATTORNEY GENERAL'S OFFICE
## GENERAL OFFENSE HARDCOPY

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

### Narrative Text Report # 15

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/JESSICA MONTOYA**
Related date/time: Feb-22-2017  (Wed.) 1541

On February 15, 2017, SA A. Jones and I met with Jessica Montoya at the Farmington Police Department. Our interview was audio and video-recorded and is summarized below:

Jessica said that she was being housed in cell K-11 at the time of the incident. She said that the deputy came around and called for standing headcount. She heard someone in the cell next to her hit something that sounded like someone hitting the window on the door loudly. Jessica said she heard the cellmate next door say "she just fell off her bunk". She said the deputy waited at the door for medical to arrive before entering the cell.  Jessica heard the nurse ask Ms. Miller if she could get back on her bed and couldn't tell if Ms. Miller said anything in response.

Jessica said the nurse went to get a wheelchair and she heard staff ask Ms. Miller if she could walk. Jessica was standing at her door, looking out the window, and saw Ms. Miller trying to walk but she "kept dragging her feet" so they had her sit at the top of the stairs. She was asked if she could slide down the stairs and they helped Ms. Miller slide down the stairs and get into the wheelchair. She saw Ms. Miller "flop" her head back and Ms. Miller was taken out of the pod. Jessica said Ms. Millers face was "bruised" from hitting her head.

Jessica said the deputy doing rounds heard the fall and was at the door on the other side of K-12. She said the deputy said "what was that?" and the cellmate responded that Ms. Miller had fallen off of her top bunk. The deputy said "this is why I have you guys just sit up instead of jumping off your bunks real quick".Jessica said the fall was "loud" and that she only heard one bang.

Jessica said she didn't know Ms. Miller from any prior interactions and didn't interact with her while she was in jail. She said she didn't see Ms. Miller come out of her cell much in the day or two she was in jail. She said Ms. Miller didn't eat much.

Jessica said that she knew the cellmate, Sherry, because they had both been in jail for a few weeks. She said that she never saw Sherry have any problems with any of her cellmates. Jessica said the mood in the pod that night was fine and that there didn't seem to be any problems. She said that, prior to the fall, she didn't hear any discussions or arguments between Sherry and Ms. Miller.

Jessica said that she heard a deputy ask Ms. Miller if she could get back on the top bunk. She didn't hear many other interactions between Ms. Miller and the staff. She never heard Ms. Miller say what happened or where she was hurting.

Jessica said that in the days following the incident she has not heard anything that would make her suspect something else other than a fall from the bunk had happened.


Our interview ended at 1309 hours.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG 1**

### Narrative Text Report # 16

    Document: **MEMORANDUM OF INTERVIEW**
    Author: **183987 - Downey, Tyson**
    Subject: **INTERVIEW W/DANA MCCUBBIN**
    Related date/time: **Feb-22-2017 (Wed.) 1622**

On February 15, 2017, SA A. Jones and I met with Dana McCubbin at the Farmington Police Department. The interview was audio and video-recorded. The recording is contained in the case file. The interview is summarized below.

Our interview with Dana began at 1311 hours. Dana was being housed in L-14 at the time of the incident, which she said was the cell above the incident in Lima.

Dana said Ms. Miller was brought into the pod after dinner and placed in cell 7. Dana and a few of the other inmates were walking around and were looking into the cell to see if they knew who she was. She said Ms. Miller was laying on the floor of her cell without a shirt on, laying on her bag of personal property.

Dana said that after this, they were on lockdown and she was in her cell with her cellmate, Adelina. She said the deputy did one or two walk throughs and had checked on Ms. Miller. Dana said that at some point she heard Ms. Miller "scream out" and hit what sounded like the desk. She thought Ms. Miller was "just freaking out" because they get a lot of inmates who come in and start pounding on things.

Dana said that at one point she heard Deputy Lloyd come in and ask Ms. Miller if she was ok. Dana said she didn't hear a response but believed Ms. Miller responded because Deputy Lloyd said "ok, I just wanted to make sure". Deputy Lloyd did another walk through and Dana said she asked Deputy Lloyd if Ms. Miller was ok and he asked "why". Dana said she told him she thought they had heard her fall and Deputy Lloyd told her that he had asked her and she said she was.

Dana said that at some point after that she saw other deputies enter the pod. Dana said the deputies were Lloyd, Lucius, Wall, and Johnson. Dana said that, from her cell, she could see into Ms. Miller's cell through a reflection in a window. She noticed the deputies were trying to get her into a wheelchair and Ms. Miller wasn't wearing any clothing except her bra.

Dana said that when Ms. Miller was being wheeled out, Deputy Lucius was holding her head up and Corporal Johnson was hitting her on the arm telling her to wake up.

Dana said that Ms. Miller was "pale white", her lips were "dark", and that she "looked like she was dead".

Dana said that when she and the other inmates looked into Ms. Miller's cell to see who she was, she said Ms. Miller "looked fine". Dana said she did notice a small amount of blood on her pants. Dana said that they knocked on the window and Ms. Miller didn't respond, but they could tell she was breathing. Dana said they all felt that she was overdosing because it was common for someone who was overdosing to lay on the cold floor. They also thought Ms. Miller might be "high" because they didn't know how long she had been in jail.



Dana said that when the staff first brought Ms. Miller into the pod she looked "out of it" and looked like "someone on heroin" who is "nodding out".

This interview ended at 1331 hours.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 17

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/ADELINA TEJERO**
Related date/time: **Feb-22-2017  (Wed.) 1726**

On February 15, 2017, SA A. Jones and I met with Adelina Tejero at the Farmington Police Department. The interview was audio and video-recorded. The recording was added to the case file and is summarized below.

The interview began and 1334 hours. Adelina said that she was cellmates with McCubbins in Lima. Adelina said she and the other inmates went and looked into Ms. Miller's cell and she was laying on the ground without a shirt on. She said Ms. Miller was laying on her bedding and had "shallow breathing". They knocked on the window and received no response.

After lockdown, Deputy Lloyd had walked by "four times" and didn't say anything. Adelina heard a bang and Ms. Miller "scream". They though she was just "freaking out" and had just been brought into the jail. They suspected Ms. Miller was "coming down".

Deputy Lloyd came into the pod to do another walk through. Deputy Lloyd stopped at Ms. Miller's cell and asked "Are you ok? You're bleeding". Adelina didn't know if Ms. Miller responded. Deputy Lloyd then walked out and came back in with another deputy. They opened Ms. Miller's cell and Adelina could see she was laying on the ground. Another deputy brought in a wheelchair. Ms. Miller was lifted into the wheelchair and "looked dead". She had purple lips and "purple under her eyes". She was then wheeled out of the pod.

Adelina described the shallow breathing mentioned earlier as her "chest was barely moving". Adelina mentioned that after they all looked into the cell they were worried but suspected she was "just coming down".

Adelina said that it sounded like Ms. Miller had hit the desk in her cell. Adelina said she didn't hear much of the interactions between the staff and Ms. Miller.

The interview ended at 1125 hours.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED              5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

### Narrative Text Report # 18

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/SONYA LANGSTON**
Related date/time: Feb-22-2017  (Wed.) 1752

On February 16, 2017, SA M. Thompson and I made contact with Sonya Langston at her place of employment, the Layton Deseret Industries. Sonya was a witness inmate to the incident and had been interviewed by investigators previously. Our interview was conducted in a small conference room at the Deseret Industries and was audio-recorded. The audio-recording is contained in the case file. A summary is below:

Sonya stated that she was being held in K-13, the cell just next to Heather Miller's cell at the time of this incident. Sonya didn't have a cellmate at the time. She knew Sherry Ackerman but did not know the name of the cellmate who was injured. She later learned that her name was Heather.

Sonya said Heather had been in jail for around 3 days and that Heather had hardly come out of her cell the entire time. Sonya said that Sherry had stated she was worried about Heather because Heather had not eaten anything. Sonya said that they had tried to get Heather to eat but they could tell she was "coming down" and just wanted to sleep. Sherry eventually told Heather that if she didn't come out to get her dinner that she was going to get in trouble. Sherry told her that the jail makes a meal for each inmate and if the inmate doesn't eat the meal they get written up. Sherry did this to try to get Heather to eat. Heather came out of her cell and ate a couple of bites of food, then went back to her cell.

Sonya said that she could hear Sherry and Heather through the vent in her cell. At 6 pm headcount, she heard a "big bang" next door. Sonya said that she screamed and the deputy asked her what had happened. Sonya told him that it was "next door". The deputy ran next door and opened the door. Sonya could hear Heather "moaning". Sonya was removed from her cell to get a mop to clean up the coffee that was spilled.

Sonya said that, as she walked past the cell, she noticed Heather laying on the bottom bunk, facing towards the wall. Sonya said Heather was "turning pale" and saying "I'm hurting". Heather was "rocking" and saying her side was hurting. Heather was wearing her pants and a bra and Sonya was unsure if Heather was wearing socks. Sonya said that more staff was called and they were able to get her out of the cell to a wheelchair.

Sonya said Sherry was Heather's cellmate the entire time Heather was there and that Sherry and Heather did not appear to have any problems with each other. Sonya said that, to her knowledge, Sherry did not express any concerns about Heather to the staff.

Sonya said that getting up and down from the top bunk is difficult and that she feels that, if someone is withdrawing, they definitely would have a hard time getting up and down off of the bunk.

Sonya said that the deputy was right by her door when she heard the "bang". Sonya said that the deputies asked Heather if she hit her head and she said she did. I asked Sonya what she heard and saw while she was cleaning

up the coffee and the staff was attending to Heather. Sonya said that Heather was grabbing her side and saying "it hurts".

I asked Sonya if she ever heard Heather tell the deputies what had happened. Sonya said that she heard Heather say she "went to step down on the table and her foot slipped". I clarified that Sonya heard Heather say this and Sonya said Heather did say this.

Sonya said that the staff was asking her questions, asking if she was ok, what she hit, how much pain she had on a scale of 1 to 10, if she could walk, if she could walk down the stairs for them to take her to medical. Sonya said she noticed the nurse did have a "medical bag" but was unsure if they ever took anything out of it.

Sonya said that when the staff was moving her out they said they were taking Heather to medical. Sonya learned a few days later that Heather had passed away and that they heard from a girl in Lima that Heather had passed away there.

We thanked Sonya for her time and left.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 19

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/DEPUTY HARVEY**
Related date/time: Feb-23-2017  (Thu.) 751

On February 22, 2017, SA A. Jones and I met with Chase Harvey at the Farmington Police Department. The video recording system in the interview room was not available at the time of the interview so I made an audio-recording with my digital voice recorder. The recording was added to the case file and the interview is summarized below.

Chase has been a deputy with the Davis County Sheriff's Office for about one year. He worked for Gold Cross Ambulance for about six months prior to that. His current assignment is patrol work and he is a certified paramedic. He was one of the emergency responders to the jail in response to this incident and authored the EMS report.

Chase said that he and Deputy Pollock responded to the jail and were responsible for the patient medical care upon arriving and en route to the the hospital. Chase said that the call was dispatched to them as a possible poisoning or seizure. The information from the jail was that they thought Ms. Miller was "detoxing" and having a seizure.

Chase said that the times noted on the report are logged by dispatch. He said that when they arrive at the jail, they need to drop their police gear and duty belt and walk back to the medical area of the jail, which takes an extra five or six minutes. Chase said that while he and Deputy Pollock were en route, because of how the patient information was being transferred to them, Deputy Pollock requested that the patient be brought out to the sally port so they could just load her into the ambulance and head off to the hospital. Chase said that they were told to just respond to medical. Chase said that, in hindsight, the extra time this would have saved probably would not have made a difference because of Ms. Miller's condition, but he was still frustrated with this response from the jail.

Chase said that upon arriving, Deputy Pollock was already giving the patient care. Chase took the role of filling out the paperwork and gathering information. He spoke with a deputy at the jail and asked what had happened. He was told Ms. Miller had fallen from a top bunk and hit her left ribs and was complaining of pain. Several hours later they had found her on the ground in a new cell unresponsive and thrashing around. He did not know which deputy he got this information from.

Chase said that, upon seeing the patient, he immediately knew that she was not in good shape. He said that she was not breathing efficiently and her pupils did not respond to light. Based on this and the information they had been given about a possible head injury, they treated the patient as though she had a traumatic brain injury. She was unstable and they took vitals every five minutes through their interactions. Chase said that, on their way out of the jail, jail staff "tossed" a Promise to Appear at them and told them to make sure Ms. Miller got it, even though she was in bad shape. This frustrated Chase.



# UTAH ATTORNEY GENERAL'S OFFICE
## GENERAL OFFENSE HARDCOPY

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

Chase said that they got Ms. Miller en route to the hospital and, while en route, she went into cardiac arrest. They initiated cpr and used a defib. Chase said that Ms. Miller's care was then turned over to hospital staff. Chase said that he could tell Ms. Miller was not going to survive so he contacted his on-duty patrol sergeant, Claine Hawkins, who is also a paramedic. He said Sgt. Hawkins was at the hospital already on another call and they met.

Chase said he told Sgt. Hawkins about Ms. Miller's condition and that she had come from the jail. He told Sgt. Hawkins that she had "presented poorly", meaning that she was not in good shape when they arrived at the patient. He told Sgt. Hawkins that Ms. Miller had gone into cardiac arrest while en route to the hospital and was probably not going to survive. Sgt. Hawkins made a phone call to someone at the jail and told that person that the inmate was not going to survive and they needed to initiate proper response for in-custody death investigation. Sgt. Hawkins was told that the patient didn't pass away in custody and that they didn't need to worry about it. Sgt. Hawkins expressed his frustration with this to Chase.

Chase said that they went to McKay-Dee Hospital because she had a suspected head injury and that hospital was the one with the best resources for that injury. He said that, knowing now that her injury was an internal bleeding injury, he wouldn't have treated her any differently. He said that his role is to do what they can to stabilize her vitals and get her to a hospital for treatment, which they would have done the same way with an internal injury.

There is nothing further.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 20

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/NURSE ANDERSON**
Related date/time: **Feb-23-2017  (Thu.) 1709**

On February 23, 2017, SA M. Thompson and I met with Marvin Anderson at the Farmington Police Department. The interview was audio-recorded. The recording was added to the case file. A summary of the interview is below.

Marvin is a registered nurse who currently works for the Davis County Jail. He has worked as a corrections nurse for about 18 years, 15 at the Utah State Prison and the last three at the Davis County Jail. Marvin was the on-duty nurse who responded to the incident involving Heather Miller.

Marvin said that around 6 pm, he got a call over the radio that a female had fallen off of a bunk. He went to the section and found Ms. Miller laying on the ground. He said Ms. Miller was complaining that she had fallen off the top bunk and hit her side. Ms. Miller's cellmate said she fell a second time while trying to get up.

Ms. Miller was conscious and responded to some of his questions about what had happened.

Ms. Miller got up and sat on her bed, or the lower bunk. He said she didn't act as though she was in much pain.

Marvin told her that they would take her to another section to have a bottom bunk. She put her shirt on and looked at her hair in the mirror. Ms. Miller tried to gather her items and they told her they would get it for her. He said that throughout the interaction in the cell she didn't act as though she was in pain.

Marvin asked if she was coming off drugs and she told him "meth". As they assisted her out of the cell she was acting dizzy and nauseous so they had her sit down at the top of the stairs. Marvin went to get a wheelchair and when he got back he noticed her scooting down the stairs.

Marvin felt that she was probably coming off of drugs. He took her to the Lima pod and asked her to tell him if things got worse and she told him "ok".

Marvin said he has a "jump bag" with equipment but he didn't take it with him because he didn't know how injured Ms. Miller was when he was called. Marvin said Ms. Miller did not have any visible marks anywhere and she didn't respond to any touching with indication of pain.

Marvin said that he and the corporal had a discussion about where to take Ms. Miller. Marvin said they have six medical beds in the infirmary and they had one left. He didn't look at Ms. Miller as though she was suffering from any trauma. The corporal said they had a lower bunk open in Lima so Marvin decided to have her taken there. He said that they may place medical or suicidal threats in Lima for additional observation, but mostly just suicidal. He said that no specific request was made to conduct extra checks on Ms. Miller. He and the other staff

members believed she was withdrawing. Marvin said that typically an inmate taken to the infirmary is visibly sick or injured.

Marvin said they took Ms. Miller to Lima and he told her to let him know if she experiences any pain. Marvin said that an hour or two later, another nurse, Dan, received a phone call from Lima. Marvin was present during the call. The deputy stated that the inmate was on the ground naked and was bleeding. Marvin said that they didn't feel "overly concerned" and that the deputy didn't relay any type of emergency so they told him to keep an eye on her.  Marvin said he didn't believe Dan knew everything that had happened but neither felt worried. He said he didn't know how much longer later, deputies called again saying that Ms. Miller "didn't look good" and that they were bringing her to medical. He said to bring her.

When they arrived at medical she "looked dead". He told the sergeant to call medics and he tried to get oxygen on her and tried to take vitals but she was moving around and he couldn't get a good vital reading. Marvin but on a c-collar and tried to support her neck because at this time he believed she must have hit her head.

He said that paramedics tried to get him to bring her out to the sally port and he told them no because he was working, trying to give care and get Ms. Miller stable.

Marvin said that people fall from bunks fairly regularly and his response is usually similar to what he did. When asked at what point is he supposed to take vitals and he said he should have done it when he saw her.  When asked if he usually does this on falls and he said "yes". He said that he definitely does when he takes someone to medical. Marvin insisted that, once he didn't notice any injury, he really felt that Ms. Miller was withdrawing. He said he has never dealt with anyone who had an internal injury.

I asked if he knew of specific symptoms of internal injury. He said that monitoring her blood pressure over time he would see it go down but he didn't feel that he would have noticed this by simply checking the blood pressure one time early after the incident.

He also said that he doesn't know why they didn't respond to the call about Ms. Miller bleeding and that they should have checked on her.

Marvin said that he is not aware of any "best practices" or specific policy that tells him what he always has to do, but that he just typically makes contact with the inmate and assesses the situation as he sees it.

There is nothing further.


### Narrative Text Report # 21

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **SCENE PHOTOS**
Related date/time: **Feb-28-2017  (Tue.) 728**

On February 28, 2017, I received a cd from SA C. Walden containing the scene photos taken by him at the jail. I added the cd to the case file.

Nothing further.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**       **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

---

**Narrative Text Report # 22**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **MEDICAL CELLS INFORMATION**
Related date/time: **Feb-28-2017  (Tue.) 733**

---

On February 24, 2017 I received an email from Lt. Callister stating that there are six medical cells in the Davis County Jail. He stated that, at the time of this incident, one of the cells was unoccupied. He sent me the booking sheets of the individuals who were being housed in medical at the time of the incident.

There is nothing further.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

### Narrative Text Report # 23

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/DEPUTY LLOYD**
Related date/time: **Mar-08-2017  (Wed.) 1240**

On February 22, 2017, SA A. Jones and I met with Deputy Zackery Lloyd  at the Farmington Police Department. Also present was Jesse Trentadue, outside legal counsel for Davis County. I explained to Lloyd that he didn't have to speak with us if he didn't want to and he said he understood. The interview was audio and video-recorded and is summarized below. The interview began at 0900 hours and ended at 0940 hours. See full recording in the case file for further detail.

Lloyd stated he has worked at the Davis County Jail for about 8 months. He had no prior law enforcement or corrections experience prior to that. His assignment at the time of this incident was as a floor officer, working general supervision of inmates.

Lloyd said that the day of this incident, he had just checked on duty and the incident occurred during his first rounds of the night. As he was conducting the "standing headcount" in the Kilo unit, he was walking up the stairs to the second tier and, just as he got to the top of the stairs, he heard a "thud". He said the sound was one he heard often and it sounded as though someone was jumping off of the top bunk.

The cellmate of Ms. Miller began "pounding" on the door so he walked over. The cellmate told Lloyd that Ms. Miller had fallen from the top bunk and "hit her head". Lloyd looked into the window of the door and noticed Ms. Miller on the ground. He said he didn't know Ms. Miller and hadn't had many, if any, interactions with her prior to this. Lloyd said that Ms. Miller was "rolling around" but that she was breathing and he couldn't see blood. He immediately called for medical to respond to the unit.

Lloyd said that the clerk who controls the doors opened the door to the cell, but Lloyd closed it again. He said he did this because the jail had a policy that a male couldn't enter a female cell alone so he wanted to wait for another deputy to respond. He did say that, at the time, Ms. Miller was moving so he didn't feel that he needed to enter immediately.

Lloyd said that nurse Marvin arrived "pretty quick", as did Corporal Johnson. They entered the cell and he observed Ms. Miller was still on the ground, rolling around. He heard her say "it hurts" and that she was "having trouble breathing". One of the others in the cell told Ms. Miller that, "if she was talking she was breathing". Lloyd said Ms. Miller was acting "loopy", which made deputies think she may have been under the influence of some substance.

While Ms. Miller was being treated, Corporal Johnson told Lloyd to retrieve new bedding for the cellmate, as her coffee had spilled on her bedding during the fall. He left to get the bedding and, upon returning, Ms. Miller had already been moved to the Lima unit.

Lloyd noticed Ms. Miller's cup had been left so he took it to her cell in Lima. He went in and placed the cup on her sink. He didn't have any interactions with Ms. Miller at that time and noticed she was laying on the ground. They then left.

Lloyd said he conducted the checks at 7 and 7:30 pm in Lima and, as he walked by, he noticed she was still on the ground but clothed. He said he didn't notice anything unusual during those checks and that none of the other inmates expressed any concerns to him.

During his 8 pm rounds in Lima, Lloyd said he walked by Ms. Millers cell and noticed she was laying on the ground but was naked from the waist down. She was wearing a bra but it was only covering one of her breasts, with the other exposed. He noticed the way she was laying was "unusual", with one leg up on the toilet. He also noticed a "small amount" of blood on her chin, which he hadn't noticed during prior checks.

Lloyd set toilet paper on the ground for Ms. Miller and walked away, only to immediately turn back and knock on her door to check on her because of his concerns. He asked if she was "ok" and Ms. Miller gave him a "wave". Because he was still concerned, Lloyd walked into the clerk's pod to call medical on the telephone.

Lloyd said he called on the phone, rather than his radio, because "it didn't seem life threatening" but he was concerned. He spoke with, he believes, the other nurse, nurse Dan. Lloyd thought he also heard nurse Marvin in the background. Lloyd told nurse Dan that Ms. Miller was laying on the ground, was naked, and had "a little bit" of blood on her chin. He was asked if she was "moving and breathing" and he responded that she was. He was then told to "keep an eye on her". Lloyd said "I wanted them to come down and look at her" but didn't explicitly ask.

Lloyd went at got Deputy Lucius and asked him to come to Lima to make contact with Ms. Miller with him to make sure she was ok. Sgt. Wall and Corporal Johnson also responded to assist.

Lloyd said that they went into the cell and he noticed Ms. Miller was "cold" sweating "really bad", that her hair was "soaking wet", and her skin color was "not normal, lighter". Sgt. Wall stated that they needed to get Ms. Miller to medical and Lucius went to get a wheelchair while Wall and Johnson tried to get Ms. Miller to put on some clothes. Ms. Miller was "moving but not responding". The eventually covered her with a blanket and, when Lucius got back with a wheelchair, lifted Ms. Miller onto the wheelchair and took her to medical. Lloyd said that Ms. Miller stiffened up on the way to medical and they thought she was "seizing". When they got to medical they turned her over to the nurses.

Lloyd said that he has no special medical training beyond first responder training and basic CPR training. He said that when they have an incident in the jail they would typically just call for medical response.

Lloyd said that he doesn't know how common it is for someone to fall off of a bunk bed. He said that he has had it happen while he was on duty one other time, when he was new. He said that at that time, the inmate, a male, fell from a top bunk and split his ear open. He said that because of this, he no longer requires the inmates to climb off of the bunk during standing headcount, but asks that they sit up and show their faces.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED                5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

Lloyd said that when the male fell from the top bunk and split his ear, he was taken to medical, where he was given a furlough to go see a doctor.

Following the incident, Lloyd, Lucius, and Wall went to speak with the cellmate, who told them that Ms. Miller had fallen off of the bunk and hit her head. The cellmate told them that she tried to help Ms. Miller up and Ms. Miller fell back into the table a second time.

Lloyd said they were speaking with the inmates to try to find out if there were drugs in the jail. They later gave urine analysis test to the inmates in Kilo.

There is nothing further.



### Narrative Text Report # 24

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/CORPORAL JOHNSON**
Related date/time: **Mar-08-2017  (Wed.) 1500**

On February 22, 2017, SA A. Jones and I met with Corporal Tracy Johnson  at the Farmington Police Department. Also present was Jesse Trentadue, outside legal counsel for Davis County. I explained to Johnson that she didn't have to speak with us if she didn't want to and she said she understood. The interview was audio and video-recorded and is summarized below. The interview began at 0952 hours and ended at 1025 hours. See full recording in the case file for further detail.

Johnson said she has worked at the jail for 19 years and has been a corporal since 2007. She said, as corporal, she is a liaison between the line officers and administration. She also supervises the clerks.

Johnson said that the night of the incident, they were conducting their first headcount and she heard Lloyd call for medical. She said he was in the  Kilo unit, which is a female unit, so she responded to assist. She said Sgt. Wall was busy conducting headcount. Johnson said that Lloyd reported to medical that an inmate had fallen from a top bunk.

When Johnson arrived the clerk opened the cell door. Ms. Miller was on the ground. Johnson asked her how she was doing and she kept complaining that her "ribs hurt" and that she "can't breath". Johnson noted that Ms. Miller could speak so she was able to breath. Johnson said that nurse Marvin arrived and Ms. Miller got up and climbed onto the bottom bunk. Nurse Marvin checked Ms. Miller's eyes and head and didn't observe any visible injuries. They had Ms. Miller pull her shirt up and nurse Marvin palpated her ribs. Johnson said Ms. Miller didn't wince at this. Johnson said that Ms. Miller wasn't able to articulate any particular injury, but just kept saying "I hurt, I hurt".

Johnson said Ms. Miller's cellmate and Ms. Miller told them that she had been withdrawing from meth when she was booked. She was exhibiting behavior Johnson recognized as withdrawals. Johnson said she thought there were no available bunks in medical at the time so they arranged to move her to a lower bunk. Johnson said there was an available lower bunk in Lima so they decided to move her there. Johnson told Deputy Lloyd to retrieve new bedding for Ms. Miller's cellmate, which he did.

Johnson said nurse Marvin did not bring any medical equipment with him and did not check Ms. Miller's blood pressure. She said that the nurses didn't always check blood pressure on injured inmates,  but would typically first make contact and assess them. Johnson said that in that housing area, they have a small medical room with equipment they often take inmates to help bandage them up or to receive other treatment. They did not take Ms. Miller to this room.

Johnson said she and nurse Marvin walked with Ms. Miller as she walked across the top tier towards the stairs. She said Ms. Miller did not articulate any pain at that time, but was "dizzy" and had a hard time walking. They got her to the top of the stairs, where she sat down. As nurse Marvin went to get a wheelchair, Johnson said

she didn't want Ms. Miller to walk down the stairs so she asked her to "scoot", which she did. Johnson said Ms. Miller climbed into the wheelchair and they moved her to Lima.

When they got to Lima, the placed her on the lower bunk in a cell by herself. A short time later, Lloyd came back with Ms. Miller's cup so he and Johnson went into the cell to give it to her. Ms. Miller was on the floor at that time, which her shirt off tucked under her head like a pillow. Johnson said they asked her if she was ok and she didn't respond, but looked as though she was sleeping. They all felt that Ms. Miller was withdrawing. They then left.

Johnson said that she again responded when she heard Lloyd call for Sgt. Wall a couple hours later. Johnson responded as well, as she knew it was a women's unit. She said when she arrived in Lima at this time, Wall was already there. She noticed Ms. Miller was on the ground, naked, and she had her leg up on the stool. She said that she and Wall covered Ms. Miller with a blanket, then they tried to lift her into a wheelchair Deputy Lucius had retrieved. When they couldn't, Lucius and Lloyd assisted.

Johnson said that at that time, Ms. Miller's condition had worsened since they had taken her to Lima a couple of hours prior. She said Ms. Miller was "sweating, had cold skin, and an ashy color". Ms. Miller also had a "split" on her chin that she didn't have when they placed her in Lima. She said that as they pushed her to medical she was trying to talk to Ms. Miller but Ms. Miller would only groan.

They met the nurse at the door of medical and the nurse expressed "surprise" at Ms. Miller's worsened condition. Ms. Miller began to slide out of the wheelchair so they assisted her to the ground. Johnson said they tried to hold Ms. Miller still while the nurse attempted to take her blood pressure and check her oxygen.

I asked Johnson if Ms. Miller's condition was better or worse than someone else's condition after a fall and she said "probably worse" because "most get up".

Johnson said that inmates didn't fall off of the top bunk often but, when it happened, it was typically a female because of how high the bunk beds are. She said that typically if there was a medical issue with an inmate they would take the person to medical to be assessed. She also said that if someone reported withdrawals upon entering the jail they were placed on a bottom bunk or, in severe cases, placed in medical until they were better.

Johnson said that they all felt, after making sure there were no injuries from the fall, that Ms. Miller was suffering from withdrawals.

There is nothing further.



# UTAH ATTORNEY GENERAL'S OFFICE
## GENERAL OFFENSE HARDCOPY

**GO# AG 2017-86 CLOSED/COMPLETED**       **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

### Narrative Text Report # 25

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/CLERK ROGERS**
Related date/time: **Mar-08-2017  (Wed.) 1713**

On February 22, 2017, SA A. Jones and I met with Austen Rogers at the Farmington Police Department. Also present was Jesse Trentadue, outside legal counsel for Davis County. I explained to Rogers that he didn't have to speak with us if he didn't want to and he said he understood. The interview was audio and video-recorded and is summarized below. The interview began at 1052 hours and ended at 1125 hours. See full recording in the case file for further detail.

Rogers said he has worked as a clerk at the jail for about 10 months. As a clerk, he manages one of the "bubbles", or control centers. There, he opens doors and watches inmates. Rogers works full-time and was working a 3-11 pm shift at the time of this incident.

Rogers said that Deputy Lloyd had just come on duty and was performing the 6 pm headcount. Lloyd first did count in Lima then went to Kilo. When Lloyd got to the top tier the cellmate began banging on the door so Lloyd went to the door. Rogers "keyed in" to the cell at that point, which meant he could listen to the conversation.

Rogers said the cellmate told Lloyd Ms. Miller had fallen from the top bunk and hit her head. Rogers heard Lloyd call over the radio for medical to respond to the unit. Rogers opened the door to the cell but Lloyd closed it. Rogers said that it is generally against policy to enter the cell without a second person but that some deputies had told him to let them in if an emergency.

Rogers said that Johnson and Lucius responded, along with nurse Marvin. As Marvin assessed Ms. Miller Rogers did not listen in so he didn't hear any of the conversation.

Rogers said the "part that got weird" was that Ms. Miller was having a hard time walking and she had to "scoot on her butt" to get down the stairs to the wheelchair. He said she couldn't stand or walk but "they apparently didn't think she was fit for medical". He felt that something was wrong and if she couldn't walk or stand she should have gone to medical.

They deputies and nurse took Ms. Miller to the Lima unit and placed her in a bottom bunk cell. Rogers said when the nurse left he said "she's fine". Rogers said that they often house suicidal inmates, inmates who are a seizure risk, or are pregnant in Lima. He said that there is a formal process for putting someone on medical watch, but not for the other issues. He said that checks can be 15, 30, or 60 minute checks depending on what the inmate needs. He didn't recall any specific formal check placed for Ms. Miller.

Rogers said that during the 8 pm check, Lloyd came into the "bubble" and said that Ms. Miller was "not right" and that she needed to be taken to medical. Lloyd called medical on the phone in the "bubble" and told the nurse on the other end of the line that Ms. Miller was on the ground, not fully clothed, and she had "a little blood" on

her chin that wasn't there before. Rogers then heard Lloyd said "so I should just not think too much about it" and was told "yeah".

Rogers said that later that week, deputies had told him that he was the "talk of the jail" because he had put this in his report and had "basically called the nurses out for being lazy". Rogers said that both Wall and Johnson reviewed his report prior to him leaving that night and asked him about this part, asking "did that really happen" and he responded that it did". They then approved his report.

When Lloyd hung up the phone he told Rogers he was going to get Lucius to help check on Ms. Miller. While Lloyd was getting Lucius from another unit, Rogers said Ms. Miller keyed her intercom so Rogers began asking if she was ok. He could hear movement but she wasn't responding. He kept saying "Miller, Miller" and asked her what was wrong but received no response. This concerned him and he was going to call Lloyd but Lloyd returned with Lucius.

They walked in and then called Wall. When Wall responded she determined that Ms. Miller needed medical. Lloyd said Wall called for a nurse to respond and was told to bring Ms. Miller to medical so Lloyd and Lucius went to get a wheelchair.

Wall and Johnson were trying to get Ms. Miller to respond but she wouldn't. They covered her with a blanket, put her in the wheelchair, and took her to medical.

Rogers said he had never been involved when an inmate had fallen off of a bunk.

There is nothing further.


**Narrative Text Report # 26**

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/CELLMATE ACKERMAN**
Related date/time: **Mar-09-2017  (Thu.) 826**

On February 28, 2017, SA M. Thompson and I made contact with Sherry Ackerman at her brother's residence in Syracuse. Sherry was the cellmate to Ms. Miller at the time of this incident. At our request, she allowed us to speak with her about this incident. The interview was audio-recorded and is summarized below. The audio-recording was added to the case file.

Sherry said Ms. Miller had been booked into jail and was her cellmate the entire time. Sherry said Ms. Miller slept for 2 1/2 days. Sherry became worried so she began to get Ms. Miller up to eat. She ate breakfast the morning of the incident and dinner just prior to the incident. Ms. Miller ate "just a couple bites" then went back to sleep. Sherry said Ms. Miller told her that she had been arrested during a traffic stop with heroin and meth.

Sherry said that during the 6 pm headcount, Ms. Miller was trying to climb off of the top bunk with her back to the bed, facing out. Ms. Millers foot couldn't reach the step and her foot slipped. Ms. Miller hit the cement with either her back or head as she fell. Sherry said she turned to Ms. Miller to help her up and Ms. Miller stood up and fell back into the table.

Sherry said Ms. Miller had not been sick, but had been sleeping almost the entire time she was there. Sherry said that Ms. Miller told her she was "coming off of heroin and meth", then later said "just heroin".

Sherry said she had not seen Ms. Miller climb up and down from the bunk bed much while she was there.

Sherry said that at the time of the incident, she was standing right next to the table because she was making coffee at the table. She saw the first fall and said Ms. Miller hit the ground hard. Ms. Miller tried to grab the stool to get up and fell into the table. She spilled Sherry's coffee at that time. Sherry said Ms. Miller was very "incoherent".

Sherry said that after the fall, she began banging on the door and it took about 30-45 seconds for the deputy to get there. The medical staff came and Ms. Miller kept saying "I hurt, I hurt, my side hurts". Sherry was then removed from the cell.

Sherry demonstrated the fall, showing Ms. Miller sliding off of the bunk facing outwards, reaching her left foot towards the step stool. Her foot slipped and Sherry fell backwards and sideways, away from the table and to the floor. When she tried to get back up, she reached for the stool and fell into the corner of the table. Sherry did not believe Ms. Miller hit the table during the first fall.

Sherry said Ms. Miller didn't have any problems with anyone in the jail and didn't really even speak with anyone. Sherry said leading up to the incident Ms. Miller wasn't having problems moving around but she wasn't really paying much attention.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED               5599-0 HEALTH-HEALTH AND SAFTEY FRE T

There is nothing further.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

### Narrative Text Report # 27

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **ADDITIONAL INFORMATION**
Related date/time: **Mar-14-2017  (Tue.) 812**

On March 14, 2017 I received an Internal Affairs Report from Craig Webb with the Davis County Attorney's Office. The report outlined a conversation he had with Lieutenant Kenny Hammon of the Davis County Sheriff's Office. The report was added to the case file.

Nothing further.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

**Narrative Text Report # 28**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **DISPATCH/911 CALL**
Related date/time: **Mar-14-2017  (Tue.) 816**

On March 14, 2017 I reviewed the dispatch and 911 call recordings of the incident. The recordings were provided to me by Lieutenant Callister with the Davis County Sheriff's Office.

The first call reviewed was a 911 call made by a citizen reporting a possible DUI driver. The caller reported a drifting driver in a vehicle occupied by two occupants. The caller reported that the occupants were possibly smoking marijuana. The vehicle description was given as a blue Ford Taurus, license plate #9DF502.The information was then dispatched out to patrol officers as an "attempt to locate" a possible DUI driver.

Dispatch recordings of the traffic stop on the vehicle were provided. The stop was reported on the above license plate number, Nevada license plate. Nothing else remarkable were provided on the dispatch or 911 call recordings of the traffic stop.

A recording of the phone call Sgt. Wall made from the jail to Davis County dispatch was provided. Wall requests an ambulance for a female. She reported the inmate was "pale, lethargic, can't get her to stay awake, possible seizing". She stated the inmate was "stiffening up" and was "in and out, more out than in".

Wall reported the inmate had been "lashing out for the last hour or so". She reported normal breathing and that the inmate was talking periodically, stating that "her whole body hurt". Dispatch tells Wall that they will send medical.

The call is then dispatched to patrol officers. Nothing remarkable is heard on that recording.

The recordings were added to the case file.

Nothing further.


### Narrative Text Report # 29

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/NURSE LAYTON**
Related date/time: **Mar-14-2017  (Tue.) 1411**

On March 14, 2017 I met with Daniel Layton at the Davis County Sheriff's Office. Daniel is a registered nurse who works at the Davis County Jail full-time. Also present were Jesse Trentadue and Britton Butterfield, outside legal counsel for Davis County. The interview was audio-recorded and is summarized below. The recording is contained in the case file.

Daniel has been an RN for 13 years, 12 of which have been spent at the Davis County Jail. He said that on the night of this incident he had just come on duty, at 1800 hours.

Daniel said that at the time of the incident he was conducting med pass in pods 1, 2, and 3. He heard a deputy request medical to the Kilo unit for an inmate who had fallen off of bunk. Daniel didn't respond because he knew the other nurse on duty, Marvin, was supposed to be conducting med pass in that area of the jail at that time.

Upon returning back to medical, Daniel said that he couldn't recall any detailed, specific discussion he and Marvin had about the inmate who had fallen.

Daniel said that some time later they received a phone call from Pod 4. He believes the call came from Deputy Lloyd. He didn't recall who answered the phone but said that the call was placed on speakerphone and he believed Marvin was present. He said they were certain Lloyd was calling about the female who had fallen off of her bunk. Daniel said that Lloyd told them the female had a "spot of blood" on her chin. He said they asked if there was a cut or injury and were told no. Daniel said they asked if she had fallen or if "anything had changed". He was told Ms. Miller had taken off all of her clothes. Daniel said he trusted Marvin's experience and they felt that there was "nothing new" or "nothing significant". Daniel said that if she seemed ok not to worry about it. Daniel told Lloyd to let them know if "anything changes".

Daniel said that some time later, he was treating another inmate in medical in an exam room with the door closed. He said that deputies brought the inmate down to medical but he didn't interact with her because he was treating the other inmate. He did see Ms. Miller briefly and she was "thrashing" and her skin tone "wasn't healthy". He didn't assist in treating her in any way.

Daniel said he doesn't recall how many cells were available in medical the night of the incident but said they typically run "pretty full".

Daniel said that inmates fall off of their bunk beds "a few time a month". He said that inmates typically may slip and fall while climbing off of the bed. He said that the typical injury caused by this is either a head injury, broken bones, twisted ankle, or scrapes and bruises. He said that he has never seen massive internal trauma caused by a fall off of a bunk.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED      5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG 1

Daniel said that when they respond to this type of call they generally bring their "blood pressure machine" or other equipment to take vitals. However, he said they don't always take vitals, but that this is done based on what is observed. He said that the nurse makes contact with the inmate and asks them what happened, where they hurt, etc. They then make decisions based on what they observe after making contact with the injured inmate. He said that they don't necessarily have a checklist or direction as to what they are required to do each time they treat an inmate, but make decisions based on their experience.

Daniel said they don't have a way to diagnose internal trauma or bleeding. He did say that palpating or a blood pressure check could indicate internal bleeding because blood pressure could decrease.

Daniel said that a fall from a tier would alarm them more than a fall from a bunk and that, based on his experience, a fall from a bunk wouldn't make them think of "severe blunt force trauma".

I asked Daniel to call me if he thought of anything further that might be helpful to the investigation.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Narrative Text Report # 30**

Document: **MEMORANDUM OF INTERVIEW**
Author: **183987 - Downey, Tyson**
Subject: **INTERVIEW W/NURSE ONDRICEK**
Related date/time: **Mar-14-2017  (Tue.) 1519**

On March 14, 2017 I met with James Ondricek, Nurse Supervisor for the Davis County Jail. Also present were Jesse Trentadue and Britton Butterfield, outside legal counsel for Davis County. The interview was audio-recorded and is summarized below. The recording is contained in the case file.

James has worked for the Davis County Jail for 23 years and has been the supervisor for that whole time. He has been a registered nurse for about 25 years. James said that the nurses at the Davis County Jail are generally very experienced compared to other jails and that they have very few, if any, nurses with fewer than 5 years experience.

James said there is no medical policy beyond the jail policy. He said that the jail medical facility has six cells. They have 12 beds, two in each cell, but they can't always put two inmates in each cell depending on the reason they are in medical. He said that they are full "90% of the time". James said that originally, when the jail was designed, it was designed for 180 inmates. When it was built, the cells had two bunks each placed in them for a total inmate population of around 360 inmates. At this time, the jail had the six medical cells. The jail has since been expanded to be able to house around 900 inmates, with a regular population of around 750 inmates. He said that they still only have the six medical cells.

James said that the jail Lieutenant or shift watch commander generally determines where the inmates are housed within the jail. James said that even when medical is full, if an inmate is injured or sick they generally have someone in medical they can move out to general population to open up a bed for the sick or injured inmate. If they can't do this, they will put an inmate in a maximum lockdown area for more regular observation. For females, this unit would be Lima.

James said that jail nurses respond to reports of a fall from a top bunk around one time per month. His expectation as a supervisor would be that the responding nurse check for visible injuries, most commonly head injuries. If there are serious injuries they transport to the hospital. If there are no visible injuries they will "monitor them", including monitoring vital signs. He said that he has never seen an internal injury from this type of fall.

James said that the decision to move an inmate to medical for further observation would be made by the watch commander, although medical staff can advise or recommend movement.

James said that, in responding to a request for treatment, the nurses "always do first responder things, like checking for vitals", checking pupils and neuro checks if they have hit their head, etc. If there are back, spinal or neck injuries they always call for paramedics. If the person is walking around they won't do that, but will check vital signs and for injuries. James said when they check vitals they check blood pressure, pulse, and respirations.

**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**
GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

James said that when an inmate comes into the jail they are seen by an RN in medical for a medical screening prior to being placed in housing. This screening is to assist in identifying a baseline for an individual, as well as identify any medical needs.

James said that the only way they would have to identify internal bleeding at the jail would be by monitoring blood pressure, which would drop over time. He said that their level of alertness would also indicate a problem.

I asked James if it would be his expectation, as a supervisor, for a nurse to bring an inmate to medical or provide further observation if an inmate can't walk or if the inmate needs to be wheeled or carried out of a unit. He said "absolutely".

After the interview and my turning off the audio recorder, James said that he has never had any concerns about the level of care nurse Marvin Anderson provides to inmates.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG 1**

**Narrative Text Report # 31**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **CELL MEASUREMENTS**
Related date/time: **Mar-14-2017  (Tue.) 1519**

On March 14, 2017 I reviewed the cell sketch/measurements taken by SA M. Thompson when we went to the jail. The measurements taken were of cell K12. I added pertinent measurements to photos taken of the cell. The photos containing the measurements, as well as the full sketch, are contained in the case file. Some of the measurements included are:

- Floor to top edge of bottom bunk (20")
- Floor to top edge of top bunk (56")
- Floor to top edge of seat (18 1/2")
- Floor to top of table (30")
- Width of seat (12")
- Top edge of top bunk to top of table (26")
- Top edge of top bunk to top of seat (37 1/2")

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

Follow Up Report # AG  1

### Narrative Text Report # 32

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **NURSE POLICY REVIEW**
Related date/time: **Mar-14-2017  (Tue.) 1529**

On March 14, 2017 I received the following report from SA K. Wallentine in reference to his review of the Davis County Jail nurse and medical policy:

On February 14, 2017, I was assigned to assist SA Downey with Case 17-86. I was asked to review the operational policies of the Davis County Jail that pertain to medical services for inmates and to examine whether any portion of the policies, adherence or disregard of the policies would reasonably inform an assessment of criminal negligence in this case.

I received a digital copy of the Davis County Correctional Facility Policy 400.00.49-09.07, "Medical and Health Services."  I am generally familiar with similar policies.  I noted a number of references to the National Commission on Correctional Health Care Correctional Health Care Standards and the American Correctional Association Jail Standards, which both attempt to document best practices in correctional health services.  A copy of the policy provided to me is attached.

I reviewed the policies provided.  On February 28, 2017, I interviewed Dean Healey, a Division of Occupational and Professional Licensing nurse investigator.

A number of sections of the Davis County Correctional Facility Policy manual suggest that a correctional health nurse would reasonably be required to assess fall and cut injuries.  For example, Davis County Correctional Facility Policy 405.01(F) provides that, "Inmates with any signs of serious head injuries will be refused admission to the jail. . . . If there is a serious cut or bruise on the head, do not accept the inmate."  The victim suffered the cut to her head after booking.  This policy provision does not directly apply, but it does indicate the serious nature of a cut to the head.

Davis County Correctional Facility Policy 405.05 prescribes the duty to respond to medical requests.  Insofar as the nursing staff believed the victim's falls and injuries did not constitute emergencies, the provisions of these policy sections illustrate the jail administration expectation for the nursing staff response.

Investigator Healey informed me of standard protocols for assessment and triage of fall and head injuries.  I conferred with the other investigators and discussed the information that was reportedly communicated by corrections deputies to the nursing staff.  It does not appear that the conduct of the nursing staff demonstrated that any nurse could reasonably be believed to be criminally negligent as defined in Utah Code Ann. 76-2-103(4) (A person engages in conduct "With criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint.).  I do not believe that there is sufficient evidence



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED          5599-0 HEALTH-HEALTH AND SAFTEY FRE T

**Follow Up Report # AG  1**

to recommend criminal prosecution of nursing staff on the basis that the staff violated any statute requiring a culpable mental state of criminal negligence.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

### Narrative Text Report # 33

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **SCREENING**
Related date/time: **Mar-21-2017  (Tue.) 1737**

On March 21, 2017 I screened this case with prosecutors from the Utah Office of the Attorney General's Special Prosecutions Unit, including Greg Ferbrache, Janise Macanas, Steve Wuthrich, and Tegan Troutner. They decided on using further time to review the case in detail. I provided my entire case file along with a copy of my case report to Janise Macanas.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

**<u>Narrative Text Report # 34</u>**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **SECOND SCREENING**
Related date/time: **Apr-18-2017  (Tue.) 1404**

On April 18, 2017, I presented this case for screening of charges with Chief Deputy Attorney General S. Austin, AAG Craig Barlow, AAG G. Ferbrache, AAG J. Macanas, AAG S. Wuthrich, and AAG C. Peterson. Their determination was that there was not enough evidence to support criminal charges in this case.

This case is ACTIVE.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**      **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG 1**

### Narrative Text Report # 35

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **CELL PHONES**
Related date/time: **Apr-19-2017 (Wed.) 1054**

On April 19, 2017, I reviewed two cell phones sent to me by Cindy, Heather Miller's mother. They were the cell phones found in Ms. Miller's possession when arrested and were turned over to Cindy. She had sent them to me for review to attempt to locate anything that may be pertinent to this incident.

I first reviewed a silver LG cell phone. The phone was locked and I was not able to get into it to view any information.

The second cell phone was a Samsung Galaxy Note 5, which had been factory reset and had not information on it.

I booked the phones into evidence for safekeeping.

Nothing further.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

**GO# AG 2017-86 CLOSED/COMPLETED**          **5599-0 HEALTH-HEALTH AND SAFTEY FRE T**

**Follow Up Report # AG  1**

**Narrative Text Report # 36**

Document: **INVSTGTR F/U**
Author: **183987 - Downey, Tyson**
Subject: **DECLINATION**
Related date/time: **May-02-2017  (Tue.) 838**

On April 28, 2017, a declination letter was issued in this case. The letter was signed by AAG G. Ferbrache. A copy of the letter is contained in the case file.

This case is CLOSED.



**UTAH ATTORNEY GENERAL'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# AG 2017-86 CLOSED/COMPLETED                    5599-0 HEALTH-HEALTH AND SAFTEY FRE T

## Related Property Report(s)

### Report Information

**Property Report #: 3941**
Property case status: **SEIZED**
Submitted on: **Apr-19-2017  (Wed.)**    by: **Downey, Tyson**
Authority for disposal: **Downey, Tyson**    Org unit: **Special Investigations**
**Related:**
Offense: **GO  AG  2017- 86**
Related items: **1**

### Articles

Status: **SEIZED**                              Tag #: **AG3941- 1**
Article: **OTELEPH- OFFICE EQUIPMENT**
Make: **SAMSUN**
Model: **CELL PHONE**                           # of pieces:
Serial # 1: **NONE**                            OAN:
Value: **$0.00**                                Color:
Description: **(2) CELL PHONES/SAMSUNG & LG/HOLD FOR OWNER/SA DOWNEY**
Recovered date: **-**                           Recovered value: **$0.00**
Current Location: **PR PHONE BOX**

Flags = d (disposed) x (x-reference) n (entered on NCIC) *e (evidence)



**\*\*\* END OF HARDCOPY \*\*\***