IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CYNTHIA STELLA and the ESTATE OF HEATHER MILLER,<br><br>      Plaintiffs,<br>v.<br><br>DAVIS COUNTY, SHERIFF TODD RICHARDSON, MAVIN ANDERSON, and JAMES ONDRICEK,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTIONS IN LIMINE AND MOTION TO RECONSIDER**<br><br>Case No. 1:18-cv-00002-JNP-DBP<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Dustin B. Pead |

On June 7, 2022 the court granted both parties the opportunity to file additional motions in limine in order to resolve evidentiary issues before trial, where possible. Defendants filed four motions in limine pertaining to the following topics: (1) Todd Vinger's ("Vinger") opinions, (2) Dr. Kenneth Starr's ("Dr. Starr") opinions, (3) evidence of loss of consortium claims, and (4) evidence of Plaintiffs' loss of income claim. *See* ECF Nos. 185, 186, 187, 188. Defendants also filed a motion to amend the scheduling order and to reconsider. *See* ECF No. 182. The motion requested that the court amend the scheduling order to permit an additional expert and reconsider a prior order on several motions in limine that limited evidence of Miller's mental health diagnoses and drug use in order to permit the expert to offer opinions on those topics. The court rules as follows.

**I. TODD VINGER'S OPINIONS [ECF No. 188]**

Defendants move the court to preclude Vinger, Plaintiffs' corrections expert, from providing any opinions at trial. However, in their brief Defendants identify and argue only five

opinions that they deem objectionable. Accordingly, the court addresses only these enumerated opinions, not all of Vinger's opinions. The court states each allegedly objectionable opinion in the heading and then addresses it below.

> **A.** ***Defendants failed to secure the "crime scene" because the cells in the Kilo and Lima units that Ms. Miller had occupied were cleaned after her death.***

Defendants argue that this opinion is prejudicial because it leads the jury to conclude that Defendants must have engaged in criminal conduct. Plaintiffs respond that this statement is relevant because it explains why there is no evidence from Miller's cell.

The court agrees with Plaintiffs. As an initial matter, Vinger's report does not suggest any criminal conduct. Indeed, the term "crime scene" never appears in the report. Rather, Vinger notes that staff failed to "secur[e] the scene for an In-Custody Death review and investigation." ECF No. 188-1 at 13.

Vinger does note the fact that Sergeant Wall was informed that he should secure the scene but "failed to secure any areas [and] later advised Weber County Investigators that all areas had been cleaned." *Id.* But that fact does not give rise to an inference of criminal conduct. Rather, Vinger's report merely notes the failure to secure as one piece of evidence he considered in concluding that the facility did not conform with common practices for response and treatment of a patient who falls from a top bunk. Accordingly, the court DENIES Defendants' motion as to this statement.

> **B.** ***There is a "long term and widely known problem with individuals falling from bunks cause [sic] injury and now death," which Defendants failed to ameliorate.***

Defendants argue that this statement is contrary to the evidence and to the court's prior rulings. Defendants cite to two sentences from a prior order from the court, *see* ECF No. 60, that Defendants claim contradict Vinger's statement. Specifically, Defendants cite the court's statement

that "there is no evidence that inmates suffered significant injuries from these falls" and that "[t]he jail had a policy in place to limit bunk falls." *Id.* at 27.

But the court's prior order *does* align with Vinger's testimony. Just before the statements cited by Defendants, the court also wrote that "[t]here is evidence that inmates fell from a top bunk about once a month." *Id.* This comports with Vinger's observation that the jail had a "long term and widely known problem with individuals falling from the top bunks." ECF No. 188-1 at 7. And there is evidence that at least one inmate suffered an injury from those falls. *See, e.g.*, ECF No. 31-2 at 12-13 ("[A] kid fell off the bed and slipped, because he was wearing socks, and split his ear open."). Finally, it is undisputed that Miller died following her fall, which substantiates the final portion of the quoted material.

If Defendants disagree with Vinger's conclusions, they can explore those disagreements on cross examination. But the court's prior order does not preclude Vinger's testimony on this issue. Accordingly, the court DENIES Defendants' motion as to this statement.

> **C.    *Following her fall in the Kilo unit, Heather Miller should have been moved to the medical unit where there was an open bed and she would have been monitored; whereas she was housed in the Lima unit where she only received a "security check" "once an hour."***

Defendants argue that the evidence contradicts these conclusions because the evidence shows that Miller was on a thirty-minute medical watch. Not true. When asked if he knew whether Miller was assigned to have thirty-minute medical checks while in Lima, Officer Lloyd testified, "I don't remember if we put her one on her or not." ECF No. 31-2 at 32. And later when asked whether he did a medical check at 7:00, 7:30, and 8:00, Officer Lloyd responded that while "[t]hat's something we typically do" he "do[es]n't remember doing all those checks." ECF No. 31-2 at 64.

Accordingly, the evidence does not clearly contradict these conclusions and the court DENIES Defendants' motion as to this statement.

> **D.     *The medical staff was "indifferent" to Miller's medical condition and in the words of Greg Rogers' [sic] "lazy."***

Defendants argue that this conclusion is contrary to the evidence and to the court's prior rulings. Defendants do not explain what specific evidence contradicts this statement. And, because the court has allowed this case to proceed to trial, it has determined that there is at least some evidence that the medical staff failed to tend to Miller's medical condition.

Rather, Defendants' citations to the court's prior orders highlights their concern that Vinger will use the specific terms "deliberate indifference" or "lazy." In its prior order, the court prohibited Defendants' expert, Dr. Tubbs, from opining that the nurses at Davis County jail were not deliberately indifferent. Because "[t]he ultimate issue in this case is whether Defendants acted with deliberate indifference in violation of the Eighth Amendment," the court held that Dr. Tubbs could "not employ terminology that suggests a legal conclusion." ECF No. 59 at 2-3. For the same reasons, Vinger also cannot employ such terminology. Just as with Dr. Tubbs, Vinger "can still testify as to the opinions that form the basis for his view on the ultimate question," but he may not use the terminology of "deliberately indifferent" or "indifferent" during his testimony.

As to Rogers' comment that he thinks the nurses at Davis County jail are "lazy," the court has already ruled on this issue multiple times. Plaintiffs already stipulated that they "will not ask Clerk Rogers whether he thinks the nurses are lazy." ECF No. 150 at 2 (quoting ECF No. 131 at 1-2). Plaintiffs cannot smuggle that same comment in via Vinger. However, Vinger may testify to the underlying observations that led to Clerk Rogers' comment and any conclusions he draws from that evidence.

Accordingly, the court GRANTS Defendants' motion as to these statements. Vinger may not use the terminology "deliberate indifference" or "lazy" when testifying, although he may

testify as to opinions that form the basis for his view that the jail staff acted with indifference or laziness.

> **E.      The Jail failed to follow its own Policies/Protocols, and/or was otherwise noncompliant with the National Commission on Correctional Health Care (NCCHC).**

Finally, Defendants argue that this conclusion is contrary to the court's prior rulings and Tenth Circuit precedent. Defendants cite to ECF No. 151, in which the court held that Plaintiffs could not offer evidence regarding Davis County Jail's decision to reinstate written medical protocols following Miller's death. The court's opinion did not address whether an expert could compare the jail's (or its employee's) actions to its own policies or NCCHC policies. Accordingly, this opinion is not contrary to this court's prior ruling.

Defendants also include a conclusory statement that Vinger's conclusion violates Tenth Circuit precedent. Although Defendants cite a single, unreported case, they provide no analysis as to its applicability. In *Johnson v. Davis County*, No. 21-4030, 2022 WL 830202, *5 n.6 (10th Cir. Mar. 21, 2022), the Tenth Circuit held that national standards did not establish deliberate indifference, in part because the standards "do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." And, of course, Vinger's conclusion that the jail did not abide by NCCHC standards cannot itself establish deliberate indifference. The Tenth Circuit did not, however, comment on whether an expert can provide testimony as to whether a jail's actions complied with NCCHC standards. Accordingly, Vinger's opinion does not run afoul of Tenth Circuit precedent.

**II.     DR. KENNETH STARR'S OPINIONS [ECF No. 187]**

Defendants move the court to preclude Dr. Starr from testifying about the autopsy photograph of Miller's ruptured spleen and other matters related to Miller's ruptured spleen.

5

Defendants complain that to the extent the court prohibited Dr. Tubb's testimony regarding his opinions as to Miller's alleged methamphetamine withdrawal, it should also prohibit Dr. Starr's opinions as to Miller's ruptured spleen. But the reports differ in material ways.

As the court noted in its prior order, Federal Rule of Civil Procedure 26(a)(2)(B) requires that a party must submit each retained expert's written report, which must contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them." "Such disclosure is necessary to allow the opposing party 'a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (citation omitted).

Here, Dr. Starr clearly states his opinion that "[h]ad Ms. Miller's blunt abdominal injuries been recognized earlier, it is [his] professional opinion that this condition would have been surgically treated and she would have a very high likelihood of survival with no resultant sequelae." ECF No. 187-1 at 2. Indeed, it is clear from his report that Dr. Starr intends to offer a comprehensive expert explanation of splenic injuries and how rapid care can affect likely outcomes, and how that could have impacted Miller's situation. In fact, the whole point of Dr. Starr's report is to address splenic injuries, including Miller's splenic injury, and their treatment. In contrast, the summary of opinions in Dr. Tubb's declaration does not include any discussion of methamphetamine withdrawal.

Moreover, Dr. Starr cites the facts and data relied upon in forming his opinion, including the autopsy report that identified about "1.3 liters of blood" in the abdomen and the "near complete transection of the spleen," *id.*, the fact that blood loss leads to changes in vital signs, and the fact that splenic injuries are readily treatable at most emergency departments. Dr. Starr further notes

6

that he reviewed records that directly describe and document Miller's splenic injuries, including "the EMS records, the ER record, [and] the autopsy report" in reaching his opinions. *Id.* at 1.

And, most importantly, as Plaintiffs points out, the court put Defendants on notice as to the deficiencies regarding Dr. Tubb's opinion on methamphetamine withdrawal symptoms, and Defendants chose not to supplement Dr. Tubb's report. In contrast, Defendants waited until the eve of trial to raise Rule 26 concerns regarding Dr. Starr's report, despite having the Starr report for years. Defendants' decision to wait several years—until the eve of trial—to raise this concern suggests that Defendants' motion reflects tactical considerations rather than a concern for lack of information regarding Dr. Starr's testimony.

Accordingly, the court DENIES Defendants' motion as to Dr. Starr's opinions.

### III.   LOSS OF CONSORTIUM CLAIMS [ECF No. 186]

Defendants' motion contains two parts: Defendants move the court to (1) bar any evidence related to Stella's claim for loss of consortium with her daughter, Miller, as well as to (2) bar any evidence regarding a loss of consortium claim by Miller's estate with any family or friends outside of Stella.

#### A.   *Stella's Loss of Consortium Claim*

Defendants argue that caselaw from the Utah Supreme Court precludes a parent from recovering for loss of consortium with an adult child. Plaintiffs counter that the cases Defendants cite deal only with an independent cause of action for loss of consortium with an adult child, not the damages available for wrongful death of an adult child.

First, Defendants point to *Boucher* for the proposition that parents have no claim for the loss of consortium arising out of the injury or death of an adult child. But the issue identified by the Utah Supreme Court in *Boucher* was "does Utah recognize a claim of loss of filial consortium

7

that allows parents to recover for the loss of their adult child's society and affection caused by the child's *nonfatal* injuries." *Boucher ex rel. Boucher v. Dixie Med. Ctr.*, 850 P.2d 1179, 181 (Utah 1992) (emphasis added). In its discussion of the Bouchers' filial consortium claim, the Utah Supreme Court noted that it "view[s] wrongful death cases as distinguishable from consortium cases" and recognized that "Utah allows recovery for the loss of society and affection in wrongful death cases," *id.* at 1186, even while the court rejected filial consortium claims in the context of nonfatal tortious injuries. Accordingly, *Boucher* does not control the outcome of this motion and, if anything, suggests that Stella *does* have a cause of action for loss of consortium with an adult child who suffered fatal injuries.

Next, Defendants point to *Benda v. Roman Catholic Bishop of Salt Lake City*, 384 P.3d 207 (Utah 2016). In *Benda*, the Utah Supreme Court adopted a cause of action allowing parents to recover for loss of consortium due to tortious injury to their minor child. *Id.* at 210. But, again, *Benda* deals solely with a nonfatal injury, not a wrongful death action. And the Utah Supreme Court again recognized that "Utah law already recognizes a right to recovery for loss of filial consortium in wrongful death cases." *Id.* at 212.

The distinction between a fatal and nonfatal injury is critical. In dissenting from the majority's decision on loss of consortium claims in *Boucher*, Justice Stewart noted that "a parent's cause of action for the loss of the companionship, society, and affection (i.e., consortium) of a child as a result of a wrongful death has been deemed so important in Utah that it is protected by our Constitution." *Boucher*, 850 P.2d at 1187 (Stewart, J., concurring in part and dissenting in part). Indeed, the Utah Constitution provides that "[t]he right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided

8

for by law." UTAH CONST. art. XVI, § 5. And as the Utah Supreme Court has previously noted, the incorporation of the wrongful death cause of action into the Utah Constitution reflects "the perceived importance of the right and . . . a desire to remove any uncertainty in our state about its viability." *Bybee v. Abdulla*, 189 P.3d 40, 45 (Utah 2008).

Finally, in noting that Utah allows for loss of consortium claims in the wrongful death context, the Utah Supreme Court cited to *Jones v. Carvell*, 641 P.2d 105 (Utah 1982), a case to which Plaintiffs also draw the court's attention. In contrast with the cases cited by Defendants, *Jones* stemmed from a wrongful death claim. There, the Utah Supreme Court noted that, in a wrongful death action, "recovery may be had for 'the loss of affection, counsel and advice, the loss of deceased's care and solicitude for the welfare of his or her family and the loss of the comfort and pleasure the family of deceased would have received.'" *Id.* at 108 (citation omitted). And, critically, the Utah Supreme Court held that "[s]uch damages *are not limited to the period during which the deceased would have been a minor*." *Id.* (emphasis added). Accordingly, there is no doubt that Utah law permits Stella to bring a loss of consortium claim for loss of the companionship, society, and affection of Miller.

### B.  *Miller's Loss of Consortium Claim*

As to the second point, Defendants argue that Plaintiffs never disclosed that they intended to assert a claim for Miller's loss of consortium with other family members or friends beyond Miller's mother, Stella. Plaintiffs concede this point and agree that "[t]he Estate's claim for loss of consortium will be limited to her mother Cynthia Stella." ECF No. 192 at 1-2.

Defendants next argue that any loss of consortium claim by Miller's estate must be limited to Stella's life expectancy (30.82 years) instead of Miller's life expectancy (53.93 years). Defendants' position is grounded in reality because Stella would predecease Miller under the

average life expectancies for each woman. Plaintiffs concede as much, stating that "Plaintiffs also agree that [the estate's loss of consortium claim as to Stella] should be limited by Cynthia Stella's life expectancy" ECF No. 192 at 3. The court therefore orders that any loss of consortium claim by Miller's estate be so limited.

### IV. LOSS OF INCOME CLAIM [ECF No. 185]

Finally, Defendants move the court to preclude Plaintiffs from offering evidence related to a claim for loss of future income by Miller's estate. Defendants' motion stems from their assertion that Plaintiffs failed to disclose the damages computation for Miller's estate's loss of income claim, as required by Rule 26.

Rule 26(a) requires that parties make certain initial disclosures, including disclosing "a computation of each category of damages claimed by the disclosing party." FED. R. CIV. P. 26(a)(1)(A)(iii). Rule 26(e) imposes an ongoing duty to supplement or correct disclosures made under Rule 26(a). Finally, Rule 37(c)(1) provides for the exclusion of information not disclosed as required by Rules 26(a) and (e), "unless the failure was substantially justified or is harmless."

Plaintiffs concede that their initial Rule 26 disclosures did not specify a separate loss of income claim. Indeed, Plaintiffs did not specifically identify a loss of income computation until their second supplemental disclosure on March 28, 2022. Accordingly, the question for the court is whether Plaintiffs' failure to supplement their Rule 26 disclosures was substantially justified or is harmless. The court holds that the failure is harmless.

Defendants have long been on notice that Plaintiffs intended to seek loss of income damages. Indeed, Defendants specifically asked about a loss of income claim in their expedited discovery and Plaintiffs clearly stated, on January 13, 2022, that they intended to bring a loss of income claim and outlined their proposed formula. *See* ECF No. 184 at 3-4. Moreover, in their

10

January 28, 2022 brief, Defendants noted that "[a]nother category of damages the Estate of Heather Miller is seeking are loss of income damages 'based off Miller earning minimum wage of $7.25 for 40 hours over 50 weeks ($15,080 a year) over the remainder of her working life and until the retirement age of 70 (41 years).'" ECF No. 127 at 5 (citation omitted). Accordingly, had Defendants wanted to retain an expert to explore Miller's earning capacity, they had months to do so. Moreover, well before January 2022, Defendants conducted discovery, including requesting Miller's tax returns, that indicated that Defendants understood Miller's income to be at issue in this case. And, more recently, the court freely provided Defendants the opportunity to conduct additional expedited discovery, including issuing additional discovery requests and conducting a deposition. *See* ECF No. 104. Accordingly, the court finds Plaintiffs' Rule 26 neglect harmless.

Defendants also complain that Plaintiffs failed to designate an expert regarding loss of income. But Defendants provide no citation to a case or rule requiring such an expert opinion. Indeed, other courts have declined to require an expert and have instead permitted documentary evidence alone to establish loss of future earnings. *See, e.g.*, *Palmer v. Owners Ins. Co.*, No. 18-cv-1953, 2019 WL 7370372, at *7 (D. Colo. Nov. 6, 2019) (permitting plaintiff's testimony and historical wage documents to establish future income loss). Accordingly, the court DENIES Defendants' motion in limine as to evidence of the loss of income claim.

However, this motion dovetails with Defendants' motion to amend the scheduling order and reconsider the court's order precluding evidence of Heather Miller's psychological/mental conditions. *See* ECF No. 182. In that motion, Defendants ask the court to permit designation of Richard Hoffman as an expert on Plaintiffs' loss of income claim. Defendants represent that Hoffman will opine as to the reduction in damages due to Miller's personal consumption and the

discount rate to present value, as well as his opinion that Miller's bipolar disorder, ADHD, and drug use would have had a significant detrimental effect upon her work-life earnings.

An expert must be qualified to give an opinion on a topic. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) ("[T]he district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." (quoting FED. R. EVID. 702)). Hoffman is an accountant. Accordingly, he is qualified to offer an opinion on personal consumption estimates and the discount rate to present value. *See Johnson v. Nault*, No. 4:20-cv-60, 2022 WL 2191662, at *1 (D. Utah June 17, 2022) ("Utah courts require future damages to be discounted to present value.") *see also id.* at * 2 (noting that "another court in the Tenth Circuit held it is the defendant's burden, not the plaintiff's, to produce evidence to establish the discount rate"). Moreover, Plaintiffs' delay in identifying their loss of income claim justifies the late addition of an expert opinion as to the discount rate and personal consumption estimates. But Hoffman's status as an accountant simply does not entitle him to opine on the effects of mental health and drug usage. Indeed, his opinions on the subject appear to essentially recapitulate several studies from drug addiction and mental health experts—of which Hoffman is not one. Accordingly, Hoffman may opine as to the discount rate and personal consumption amount but not the effect of drug use and mental health on earning capacity.

Defendants also ask the court to reconsider its order on Plaintiffs' motions in limine regarding Miller's mental health diagnoses and substance abuse. In that order, the court excluded evidence of Miller's mental health diagnoses under Rule 403. ECF No. 152 at 6-7. It permitted evidence of Miller's substance abuse but stated that "while the court will permit sufficient evidence of drug use necessary for Defendants' arguments related to damages, the court will not permit cumulative evidence of Miller's drug use." *Id.* at 8.

Nothing that Defendants have submitted alters the court's opinion. As it already stated, the court will not permit evidence regarding Miller's mental health diagnosis because Defendants have not submitted evidence tying Miller's specific mental health diagnoses to a shortened life expectancy or lowered earning potential. Nor will it permit cumulative and prejudicial evidence about Miller's drug use. However, to the extent that Plaintiffs elect to move forward with a loss of income calculation that assumes a consistent income, then they open the door to arguments regarding the effect of drug use on earning capacity, as the court noted in its prior order. Specifically, Defendants may argue in closing that the jury can take into account Miller's drug use in evaluating her earning capacity.

DATED July 1, 2022.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge