IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CYNTHIA STELLA and the ESTATE OF HEATHER MILLER, <br><br> Plaintiffs, <br> v. <br><br> DAVIS COUNTY, SHERIFF TODD RICHARDSON, MAVIN ANDERSON, and JAMES ONDRICEK, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER RE QUALIFIED IMMUNITY** <br><br> Case No. 1:18-cv-00002-JNP-DBP <br><br> District Judge Jill N. Parrish <br> Magistrate Judge Dustin B. Pead |

At trial, the court reserved the question of Marvin Anderson's entitlement to qualified immunity until the jury returned its findings of fact and verdict. After considering the jury's findings of fact along with the arguments made by both parties regarding qualified immunity prior to and at trial, the court finds that Anderson is not entitled to qualified immunity for the following reasons.

## BACKGROUND

This case stems from a death in Davis County Jail. Plaintiffs filed a complaint alleging three claims against Defendants: (1) that the individual Defendants were deliberately indifferent to Miller's serious medical need in violation of the United States Constitution; (2) that Davis County ignored a substantial risk of harm to Miller in violation of the United States Constitution; and (3) that all four Defendants subjected Miller to unnecessary rigor in confinement in violation of the Utah Constitution.

On January 11, 2019, Defendants filed a cross-motion for partial summary judgment seeking, in part, dismissal of the federal claims on grounds of qualified immunity. The court denied Plaintiffs' motion for summary judgment and granted in part and denied in part Defendants' motion for summary judgment. *See* ECF No. 60. The court determined that Richardson and Ondricek were entitled to qualified immunity on the federal claims, but that questions of fact remained as to Anderson's qualified immunity. Specifically, the court stated that "the question of whether Nurse Anderson was aware of the risk that Miller was seriously injured and needed to be monitored, but chose to ignore it, is hotly disputed." *Id.* at 21-22. Accordingly, the court found that Nurse Anderson was not entitled to qualified immunity at the summary judgment stage.

Anderson filed an interlocutory appeal to the Tenth Circuit, arguing that he was, in fact, entitled to qualified immunity. ECF No. 79 at 3. The Tenth Circuit dismissed the appeal, holding that it "lack[ed] jurisdiction to consider [Anderson's] sole adequately briefed argument, because it raises only an issue of evidence sufficiency."[1] *Id.*

In preparation for the trial, both parties briefed the question of how the court should handle qualified immunity at trial. Defendants argued that because the court found a contested issue of fact material to the subjective component of the deliberate indifference claim, the court must instruct the jury on qualified immunity and allow the jury to decide the question of qualified immunity itself. *See* ECF No. 209 at 6-7. Plaintiffs countered that the court should

---

[1] Specifically, the Tenth Circuit characterized "the thrust of Anderson's argument in his briefs" as that "the evidence did not suffice to establish his awareness of the need for greater attention to Ms. Miller—that is, the requisite state of his mind." ECF No. 79 at 7. But the Tenth Circuit rejected this appeal, noting that "[s]uch an argument, of course, is precisely what is barred from consideration on interlocutory appeal by *Johnson*." *Id.*

2

submit special interrogatories to the jury to establish the facts, but that the court should ultimately decide the legal question of qualified immunity. *See* ECF No. 135 at 15-16.

After considering the parties' arguments, and the Tenth Circuit's position that "allowing the jury to decide qualified immunity almost always generates an issue on appeal" and therefore, "that the better approach is for the court to submit special interrogatories to the jury to establish the facts," *Gonzales v. Duran*, 590 F.3d 855, 860 (10th Cir. 2009), the court added the following two questions to the verdict form:

- Do you find by a preponderance of the evidence that Anderson was aware that Miller faced a substantial risk of serious harm or is there enough circumstantial evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk to Miller?
- Do you find by a preponderance of the evidence that Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of a substantial risk of serious harm?

The jury answered both questions in the affirmative. ECF No. 236 at 2. With those findings of fact in mind, the court now addresses the legal issue of Anderson's qualified immunity.

## LEGAL STANDARD

"Defendants who are unsuccessful in having a lawsuit dismissed on qualified immunity grounds before trial may reassert the defense at trial or after trial." *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996); *see also Maestas v. Lujan*, 351 F.3d 1001, 1009 (10th Cir. 2003) ("[T]he law is clear the defendant can reassert his qualified immunity claims at and after trial when the factual disputes have been resolved." (cleaned up and citation omitted)); *Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009) ("[W]e have allowed defendants to reassert qualified immunity claims post-trial where there were factual disputes requiring a jury determination.").

However, "[w]hen a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial."

3

*Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir. 1999); *see also Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739 (10th Cir. 2007) (adopting *Iacobucci*'s standard); *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) ("After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense.").

## ANALYSIS

To overcome a qualified immunity defense, Plaintiffs must show "(1) a violation of a constitutional right, and (2) that the right was clearly established." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). It is clearly established that a jail official's deliberate indifference to a pretrial detainee's serious medical needs violates the Due Process Clause of the Fourteenth Amendment. *Id.* Accordingly, the court need only consider whether Anderson violated that clearly established right.

"In considering whether the plaintiff was treated with deliberate indifference, we consider the objective severity of the harm suffered as well as the subjective mental state of the defendant with respect to such harms." *Id.* at 1043-44. "The objective component examines whether the medical condition or harm claimed by the inmate was 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Id.* at 1044 (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). The subjective component "considers whether the defendant knew of and disregarded the serious risk to the inmate's health" *Id.* (citing *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)). "In other words, the focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Id.*

I. **OBJECTIVE COMPONENT**

The objective component asks whether Miller suffered a "sufficiently serious" harm. *See Martinez*, 563 F.3d at 1088. A medical condition is "sufficiently serious" when "the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Al-Turki v. Robinson*, 762 F.3d 1188, 1192-93 (10th Cir. 2014) (citation omitted).

In this case, Plaintiffs easily satisfy the objective component. Miller died as a result of her medical condition. And "death, is, without doubt, sufficiently serious to meet the objective component." *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez*, 563 F.3d at 1088) (cleaned up); *see also Ernst v. Creek Cnty. Pub. Facilities Auth.*, 697 F. App'x 931, 933 (10th Cir. 2017) (unpublished) ("[D]eath . . . is recognized as a sufficiently serious harm to satisfy the objective standard."). Indeed, the Tenth Circuit has already held in this case that "there is really no question about satisfaction of the objective component since the claim is that Ms. Miller *died* as the result of Anderson's inattention." ECF No. 79 at 7.

Moreover, Miller's symptoms were sufficiently serious that a layperson could have easily recognized her need for medical attention. The video that Plaintiffs played at trial showed that Miller needed assistance to walk from her cell to the top of the stairs. *See also* Rogers Tr. 101:14-15 ("Q: And your observation was that Miller was having a hard time walking and standing? A: Yes, sir."); Plaintiffs' Exh. 28 ("Miller continued to not be able to stand or walk on her own so Nurse Marvin went and grabbed the wheelchair."). It also showed that Miller was unable to walk down the stairs on her own, but instead scooted down the stairs. *See also* Rogers Tr. 101:17-19 ("Q: [W]hen she got to the top of the stairs, she had to scoot down on her butt? A: Yes, sir."); *id.* 116:16-17 ("Q: [S]he couldn't walk down the stairs? A: No, sir."). Finally, it showed that once

Miller reached the bottom of the stairs, she stood then fell into the wheelchair that Anderson retrieved for her.

Indeed, Plaintiffs presented evidence that several non-medical staff at the jail recognized that Miller needed medical attention at various junctures. First, Clerk Rogers testified that he had no medical training at the time of the incident. *See id.* 99:13-14. He observed Miller immediately after her fall and testified that he believed that Anderson should have taken Miller to the medical unit instead of depositing her in Lima. *See id.* 102:15-17 ("Q: [A]s a layman you thought she should have gone to medical? A: Sure. Yes, sir."). Second, Deputy Lloyd, also not a member of the medical staff, called medical after observing Miller lying naked on the ground. Instead of coming to the cell, nurses told Deputy Lloyd to keep an eye on Miller and to let them know if anything changed. *See* Lloyd Tr. 63:19-20. When Deputy Lloyd realized Anderson would not be coming to check on Miller, he went back to check her status, including opening her cell door and talking with her. *Id.* 70:11–72:14. Deputy Lloyd ultimately stated that he was not comfortable with "[t]he way she was acting, the way she was on the ground" and so he took Miller to medical in a wheelchair.[2] *Id.* 71:10, 71:18-20; *see also* Lucius Tr. 121:13-18 (testifying that Lloyd told him "that the nurses had told [him] not to look too much into her condition" and that "he was concerned about that" because he believed that "she needed to go to medical right away.").

At bottom, the Plaintiffs' evidence establishes that Rogers and Lloyd, both lay people, easily recognized that Miller needed medical attention at several points during the incident. Accordingly, the court finds that Plaintiffs established the objective component of deliberate indifference by Anderson.

---

[2] Elsewhere, Deputy Lloyd testified that when an inmate was obviously hurt, he would take them to medical. Lloyd Tr. 75:12-14. The jury could easily infer that Deputy Lloyd thought that Miller was obviously hurt—in other words, that he easily recognized the necessity for medical attention when he took Miller to the medical unit.

## II.   SUBJECTIVE COMPONENT

"The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). This component is "satisfied if the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. "The Supreme Court in *Farmer* analogized this standard to criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of serious harm." *Mata*, 427 F.3d at 752. "Deliberate indifference does not require a finding of express intent to harm," *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996), but rather a finding that the official "consciously disregard[ed] a substantial risk of serious harm," *Mata*, 427 F.3d at 752. Accordingly, "[a]n inmate 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Id.* (quoting *Farmer*, 511 U.S. at 842). Nor would an official "escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

### A.     *Awareness of a Substantial Risk of Serious Harm to Miller*

Here, the jury found that Anderson was either "aware of a substantial risk of serious harm to Miller or that there was enough circumstantial evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk to Miller." ECF No. 236 at 2.

Plaintiffs offered copious evidence of this fact at trial. As noted above, Plaintiffs played a video at trial showing that Miller was unable to walk on her own after the fall. And Anderson recognized during his initial assessment that Miller was nauseous and dizzy to the point that she had difficulty standing or walking on her own. *See* Anderson Tr. 141:18-23, 145:21-25. Plaintiffs' expert testified that a fall from a bunk bed onto a concrete floor, followed by symptoms of dizziness and inability to walk is evidence of a substantial risk of serious harm. Starr Tr. 338:16 – 339:4; 346:15-22 ("[W]ith the history of the fall, the complaints of nausea, dizziness, weakness, shortness of breath, can't stand up, that to me is a concerning clinical picture . . . . I certainly would expect them to either transfer the patient to the hospital or at least to a medical unit where they can do serial, continued, direct medical observations with some medical staff."). Indeed, Anderson himself testified that watching Miller scoot down the stairs scared him because of her dizzy state. *See* Anderson Tr. 101:14 – 102:17. Plaintiffs also offered evidence that, immediately following the fall, Miller "was on the ground rolling around saying her side hurts," Lloyd Tr. 53:25–54:1, and that she reported left side pain to Anderson. Anderson Tr. 141:9-10. In sum, Anderson was aware that Miller fell onto a concrete floor, that she was suffering from nausea and dizziness, that she had difficulty walking on her own, and that she was experiencing left side pain.

Finally, right after moving Miller to Lima, Anderson scheduled a priority one doctor's appointment for her the next day because he recognized that "she was really sick." *Id.* 154:7-8;

8

*see also* Ondricek Tr. 216:22-25 ("Q: And my point is the fact that he made the request [for a doctor's appointment] tells you he's aware of a problem that needs medical attention, at least at some point. A: That's true."). Together, this evidence demonstrates that Anderson was aware of a substantial risk of serious harm to Miller, or, at minimum, that there was enough circumstantial evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk to Miller.

        B.     *Conscious Failure to Take Reasonable Measures to Address the Substantial Risk of Harm to Miller*

The jury also found that Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of a substantial risk of serious harm. ECF No. 2 at 2.

Again, the evidence presented at trial supports the jury's factual finding. First, Plaintiffs' experts, Dr. Starr and Nurse McQuillen, testified that Anderson did not conduct a sufficient medical evaluation when he arrived at her cell immediately following the fall. Starr Tr. 335:20–336:17 (referring to Anderson's course of action as "[a]n incomplete medical evaluation"); McQuillen Tr. 413:3-4 ("There was not a proper assessment."). Nurse McQuillen testified that "[a]ny time you have somebody fall, you always check the neurological signs as well as the vital signs, and we do that right away . . . . None of that was done here." McQuillen Tr. 413:7-15. Indeed, even Anderson admitted that his failure to take initial vital signs was improper. Anderson Tr. 179:15-18 ("Q: In this case, had you taken -- first of all, it was the policy of the jail that you should have taken Heather Miller's vitals? A: Correct."). Anderson further testified that if an inmate falls from a bunk, he normally would take her vital signs because failing to do so creates a "pretty obvious risk" that he might miss something important that could change his treatment decisions. *See* Anderson Tr. 137:24–139:4; *see also* Starr Tr. 336:23-25 (noting that taking vital

9

signs is "a very important part of an initial assessment on a trauma patient," in order to establish baseline vitals for future monitoring.); McQuillen Tr. 429:4-8 ("Q: [W]hat's the primary purpose of the initial vital? A: That's our baseline."). Even Defendant's expert, Dr. Tubbs, agreed that he "would expect when the nurses respond to a fall, an evaluation -- vital signs would be part of that evaluation."[3] Tubbs Tr. 11:22-23.

Second, the evidence demonstrated that Anderson did not conduct any medical monitoring of Miller after the fall. Following Miller's fall, Anderson placed Miller in a cell with a bottom bunk, instead of in the medical unit. Anderson did not order any monitoring by medical staff, nor did he conduct any himself. *See* Tubbs Tr. 672:17-21 ("Q: [T]here wasn't any medical check ordered, right? . . . A: Yes."). Officers, not nurses, conducted periodic "checks." But the video shown at trial demonstrated that these "checks" consisted merely of officers walking by the door of a cell and glancing through the cell window. The officer on duty did not open the cell door, speak with Miller, attempt to assess her neurological condition, take vital signs, or otherwise check on her status outside of a brief visual check. Dr. Starr testified that such a "check" does not qualify as "medical observation." Starr Tr. 354:13-16; *see also* McQuillen Tr. 458:18-21 ("That is not medical monitoring. That is, again, . . . delegating to an unlicensed personnel a duty that wasn't in their scope."). Indeed, after his initial assessment and decision to administer ibuprofen, Anderson provided no further medical care to Miller until he called an ambulance when officers brought her to medical after they found her mostly unresponsive and gray. Dr. Starr testified that had Anderson medically monitored Miller, then he "certainly would

---

[3] Although not binding on Anderson, nor dispositive of the constitutional issue, Dr. Tubb's own protocols in jails where he serves as the medical director state that "every patient should have their vital signs obtained if they complain of abdominal pain." Tubbs Tr. 692: 8-10.

have seen her gradual, rather brisk deterioration, vital sign changes, clinical changes in her behavior and her skin." Starr Tr. 354:9-12.

Third, Plaintiffs presented evidence that Anderson did not take any serial vital signs. Dr. Starr testified that had Nurse Anderson taken periodic vital signs, he would have observed a drop in Miller's blood pressure and an increase in her heart rate, which would have been evidence of an internal injury. *Id.* 354:20–355:5. Specifically, Dr. Starr testified that "if she had vital signs monitored over that three-hour period, they definitely would have seen a trend that would have been alarming and concerning." Starr Tr. 359:2-5.

And, fourth, when deputies identified a serious change in Miller's condition—gray skin, sweaty, cold to the touch, and barely responsive—and reported it to medical, Anderson never came down to examine Miller. Lucius Tr. 121:24–122:4; Tubbs Tr. 699:24–700:15; Plaintiffs' Exh. 28. Instead, when Deputy Lloyd called medical to report Miller's condition the "nurses told Lloyd not to think too hard about it." Plaintiffs' Tr. Exh. 28. Ultimately, deputies had to retrieve a wheelchair and transport Miller to medical, where Anderson immediately called emergency services after seeing Miller's condition.

At bottom, Dr. Starr testified that Defendants provided Miller "little to no medical care" after her fall. Starr Tr. 335:20-22. Dr. Starr testified that by "little to no medical care" he meant that "there wasn't really any concern about any serious possible injury," and that "there wasn't any meaningful assessment for monitoring done to evaluate or consider the possibility that she had any serious injury." *Id.* 336:3-7. Similarly, Nurse McQuillen testified that Nurse Anderson provided Miller "no medical care." McQuillen Tr. 417:24–418:2.

The evidence demonstrates that Anderson failed to take reasonable measures, such as conducting a complete initial assessment, engaging in periodic medical monitoring, completing

11

periodic vital sign checks, or attending to the patient when deputies called him, to address the substantial risk of harm to Miller. Together, these factual findings demonstrate that Anderson had a sufficiently culpable state of mind to satisfy the subjective component.[4]

*     *     *

The court thus finds that Plaintiffs have demonstrated both the objective and subjective components of deliberate indifference as to Anderson. Therefore, the court finds that Anderson violated Miller's constitutional rights. And, as noted above, that right was clearly established. Accordingly, Anderson is not entitled to qualified immunity. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022) (holding no qualified immunity available where Plaintiffs show "(1) a violation of a constitutional right, and (2) that the right was clearly established").

## CONCLUSION

---

[4] In crafting the jury instructions, the court encountered the question of whether to include a causation element, i.e., that Anderson's deliberate indifference caused Miller harm, in the deliberate indifference instruction. On the one hand, the Tenth Circuit has held that "under *Searles*, nominal damages are mandatory upon a finding of a constitutional violation." *Stoedter v. Gates*, 704 F. App'x 748, 758 (10th Cir. 2017) (unpublished) (citing *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001)). This position would suggest that a plaintiff need not establish an actual injury in order to recover nominal damages. On the other hand, the Tenth Circuit has also held that "[t]he prisoner must also prove that the acts performed with the culpable state of mind caused the serious harm." *Harris v. Morales*, 231 F. App'x 773, 775 (10th Cir. 2007) (unpublished). The Third Circuit addresses this tension in the comments to its model jury instructions, which do not include a causation element (although the Third Circuit notes that several other circuits do include such an instruction). *See* Model Civil Jury Instructions, Third Circuit, § 4.11.1 Section 1983 – Denial of Adequate Medical Care ("It is somewhat difficult to discern from the caselaw whether harm is a distinct element of an Eighth Amendment denial-of-medical-care claim, because courts often discuss harm (or the prospect of harm) in assessing whether the plaintiff showed a serious medical need."). Proceeding with caution, the court decided to include a causation element. *See* Final Instruction No. 26 ("As a result of Anderson's deliberate indifference to the serious risk to Miller's health and safety, Miller was harmed.").

To the extent the jury found that Anderson knew of and disregarded a substantial risk of serious harm to Miller, there is really no question that Miller suffered harm—death—as a result of that deliberate indifference. Indeed, both of the expert doctors who testified at trial agreed that Miller's injury was survivable had she received proper medical attention. Tubbs Tr. 718:6 ("This was a survivable injury."); Starr Tr. 403:7-8 ("I think she would have a very high probability of survival.")

In conclusion, the court holds that Anderson is not entitled to qualified immunity.

DATED September 13, 2022.

BY THE COURT:

_____
Judge Jill N. Parrish
United States District Court