IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CYNTHIA STELLA, and the ESTATE OF HEATHER MILLER,<br><br>Plaintiffs,<br><br>v.<br><br>DAVIS COUNTY, SHERIFF TODD RICHARDSON, MARVIN ANDERSON, JAMES ONDRICEK,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MARVIN ANDERSON'S MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION TO ALTER JUDGMENT**<br><br>Case No. 1:18-cv-00002-JNP<br><br>District Judge Jill N. Parrish |

Before the court are a motion for judgment as a matter of law, motion for new trial, and motion to amend judgment filed by Defendant Marvin Anderson ("Anderson"). ECF No. 258. Anderson brings these motions pursuant to Federal Rules of Civil Procedure 50(b) and 59(a) through (e). For the reasons set forth below, the court DENIES each motion.

**BACKGROUND**

This case arises from the death of Heather Miller ("Miller") in the Davis County Jail. Plaintiff Cynthia Stella ("Stella") and Miller's Estate seek to hold Anderson and his co-Defendants to account for Miller's death under the U.S. and Utah Constitutions. On January 11, 2019, Defendants filed a cross-motion for partial summary judgment seeking, in part, dismissal of Plaintiffs' federal claims on grounds of qualified immunity. ECF No. 42. In its order on the motion, the court denied Anderson's request for immunity because questions of fact remained as to his ability to meet the requirements of the qualified immunity standard. *See* ECF No. 60. Specifically, the court stated that "the question of whether Nurse Anderson was aware of the risk that Miller

was seriously injured and needed to be monitored, but chose to ignore it, is hotly disputed." *Id*. at 21-22.

Soon thereafter, Anderson filed an interlocutory appeal of the court's denial of qualified immunity. ECF No. 79. Upon review of Anderson's briefing, the Tenth Circuit dismissed the appeal. It characterized "the thrust of Anderson's argument in his briefs" as claiming that "the evidence did not suffice to establish his awareness of the need for greater attention to Ms. Miller," and held that "[s]uch an argument, of course, is precisely what is barred from consideration on interlocutory appeal by *Johnson*." *Id*. at 7 (citing *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).

In preparation for trial, Plaintiffs and Defendants briefed the question of how the court should handle qualified immunity. Defendants argued that because the court found that there was a contested issue of fact material to the subjective component of the deliberate indifference claim, the jury needed to receive instructions on the law of qualified immunity and be allowed to directly decide the issue via a question on the verdict form. *See* ECF No. 209 at 6-7; ECF No. 135 at 15. Plaintiffs countered that the court should submit special interrogatories to the jury to resolve the factual disputes at the core of the qualified immunity issue, but that the court should ultimately decide the legal question of qualified immunity itself. *See* ECF No. 135 at 15-16.

The court considered the parties' arguments, as well as the Tenth Circuit's position that the best "approach is for the court to submit special interrogatories to the jury to establish the facts" because "allowing the jury to decide qualified immunity almost always generates an issue on appeal." *Gonzales v. Duran*, 590 F.3d 855, 860 (10th Cir. 2009). Ultimately, it decided to add the following two questions to the verdict form:

- Do you find by a preponderance of the evidence that Anderson was aware that Miller faced a substantial risk of serious harm or is there enough circumstantial evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk to Miller?

- Do you find by a preponderance of the evidence that Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of a substantial risk of serious harm?

ECF No. 236 at 2.

On July 18, 2022, the court began a five-day jury trial on Plaintiffs' allegations. At the close of Plaintiffs' case in chief, Defendants moved for judgement as a matter of law under Fed. R. Civ. P. 50(a). Trentadue Tr. 766:4-5. In their motion, Defendants requested that the court dismiss Plaintiffs' claim for punitive damages and Stella's claim for relief under the Utah State Constitution. *See* ECF No. 228. The court deferred ruling on these issues until after the jury returned its verdict, as permitted by Fed. R. Civ. P. 50(b). Court Tr. 766:6-12.

On July 22, 2022, the jury returned the verdict form to the court. ECF No. 236. It found Defendants Anderson and Davis County liable for violating Miller's rights under the Eighth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983 ("§ 1983") and Davis County liable for violating Miller's rights under Article I, Section 9 of the Utah Constitution. *Id*. The verdict awarded $8 million to Heather Miller's Estate and $2 million to Stella. The jury also answered both special interrogatories regarding the issue of Anderson's qualified immunity in the affirmative. *Id*. at 2.

On August 1, 2022, the court ruled on Defendants' Rule 50(a) motion. ECF No. 239. The decision declined to address Plaintiffs' eligibility for punitive damages as moot because the jury had chosen not to award this category of damages, *Id*. at 2, but it granted Defendants' request for judgment as a matter of law on Stella's claim under the Utah Constitution "because Stella suffered no distinct injury as a result of the government's actions." *Id*. The result of the court's decision was to reduce the jury's $10 million award to an $8 million award.

On September 14, 2022, the court addressed the legal issue of Anderson's qualified immunity after considering the jury's answers to its special interrogatories. ECF No. 244. In its memorandum decision and order, the court denied Anderson qualified immunity because Plaintiffs had successfully "demonstrated both the objective and subjective components of deliberate indifference as to Anderson," and shown that the constitutional right to adequate healthcare "was clearly established." *Id*. at 12.

Pursuant to the jury's verdict, the order partially granting judgment as a matter of law, and the order denying qualified immunity, on September 27, 2022, the court entered final judgment in favor of Miller's Estate against Marvin Anderson in the amount of $300,000 and against Davis County in the amount of $7.7 million. ECF No. 252. On October 23, 2022, Anderson filed the post-trial motions at issue in this memorandum decision. ECF No. 258.

## LEGAL STANDARD

Rule 59(a) through (e) sets out the procedure for a party to request a new trial or an alteration of judgment after the completion of a trial. Under Rule 59(a), "[t]he court may, on motion, grant a new trial . . . after a jury trial." Courts may only grant new trials in instances where a losing party has claimed "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving," and where these errors "may raise questions of law." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). When considering a motion for a new trial based on insufficiency of evidence, all evidence must be viewed in the light most favorable to the prevailing party. *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006). Because such a motion "involves a review of the facts presented at trial," district court rulings under Rule 59(a) are reviewed under the abuse of discretion standard. *Id*. at 1157.

Rule 59(e) permits a party to file a motion to alter or amend a judgment. "Relief under Rule 59(e) is appropriate where there is (1) an intervening change in the controlling law, (2) new evidence previously unavailable, or (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). A Rule 59(e) motion may also be granted when "the court has misapprehended the facts, a party's position, or the controlling law." *Id*.

**ANALYSIS**

Anderson challenges the court's judgment against him pursuant to Rule 59[1] on the following four grounds: 1) Plaintiffs presented insufficient evidence at trial to deny Anderson qualified immunity as a matter of law, 2) Plaintiffs presented insufficient evidence at trial to support the verdict against Anderson, 3) the court's decision to submit a question to the jury regarding punitive damages prejudiced the jury against Anderson, and 4) the court should have invoked the doctrine of equitable estoppel to prevent Plaintiffs from arguing that Anderson did not reasonably conclude that Miller's symptoms after her fall were a result of methamphetamine withdrawal. The court analyzes each issue below.

## I. IS ANDERSON ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW?

Anderson advances two arguments against the court's denial of qualified immunity. First, he contends that the court erred in not issuing a special interrogatory asking the jury whether Plaintiffs offered sufficient evidence to indicate that Anderson's treatment of Miller was

[1] Anderson does not specify whether he requests amendment to the court's judgment or a new trial as a remedy for any of his individual claims of error. Indeed, he does not even specify whether he advances each individual argument under Rule 59(a) or 59(e). He seems to suggest that the court will sort out which remedy and rule of civil procedure is appropriate if he prevails. Because the court rejects each of Anderson's arguments, there is no need to puzzle through Anderson's vague invocation of Rule 59.

objectively unreasonable in light of clearly established constitutional rights. Second, he maintains that the court's post-trial memorandum decision and order denying qualified immunity was flawed because it failed to properly analyze the evidence presented at trial. The court finds neither argument persuasive and declines to reverse its denial of qualified immunity for the following reasons.

### A. Objective Reasonableness Jury Instruction

Before trial, Defendants requested that the court settle the issue of Anderson's qualified immunity by asking the jury to answer the following proposed question on the verdict form: "Do you find that Nurse Anderson established that he held a reasonable belief that Ms. Miller was withdrawing from methamphetamine when he provided medical treatment to Ms. Miller?" ECF No. 125-4 at 2. The court declined to include this question on the verdict form because it did not align with the Tenth Circuit's test for qualified immunity as laid out in the Circuit's order dismissing Defendants' interlocutory appeal. *See* ECF No. 79. Anderson now requests a new trial and amendment of judgment because this court allegedly erred in rejecting his proposed question.

In its order dismissing Anderson's interlocutory appeal of the court's denial of qualified immunity, the Tenth Circuit laid out the test for qualified immunity in "deliberate indifference" cases. "To overcome a qualified-immunity defense, a plaintiff must show that '(l) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation.'" ECF No. 79 at 5-6 (citing *Quintana v. Santa Fe Cty. Bd. of Commissioners*, 973 F.3d 1022, 1028 (10th Cir. 2020). At no point has Anderson ever disputed that Plaintiffs satisfied the second prong of the qualified immunity test; that the right to adequate medical care was clearly established. The court will therefore focus its inquiry on the first prong of the qualified immunity test.

To meet the requirements of the first prong of the qualified immunity test, Plaintiffs needed to show that Anderson violated a constitutional right—in this case the right to be free of cruel and unusual punishment under the Eighth Amendment—by exhibiting "deliberate indifference to a substantial risk of serious harm to an inmate." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (internal quotation marks omitted). Deliberate indifference has two components: (1) "an objective component requiring that the pain or deprivation be sufficiently serious;" and (2) "a subjective component requiring that the offending officials act with a sufficiently culpable state of mind." *Mitchell v. Maynard*, 80 F.3d 1433, 1444 (10th Cir. 1996). As the Tenth Circuit noted in its order dismissing Defendants' appeal, "there is really no question about satisfaction of the objective component since the claim is that Ms. Miller died as the result of Anderson's inattention." *See Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009). Thus, the resolution of the qualified immunity issue rests on the subjective state of Anderson's mind.

To satisfy the subjective component of the deliberate indifference test, a defendant must have (1) known the inmate faced a "substantial risk of serious harm" and (2) "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). These components are questions of fact that, when disputed, ought to be answered by a jury. *Gonzales*, 590 F.3d at 860. In cases where a jury must weigh in on qualified immunity, courts should "submit special interrogatories to the jury to establish the facts." *Id*. Here, the court did just this by specifically asking jurors to address the two pending factual questions that would reveal the disposition of the deliberate indifference test, and thus the qualified immunity issue.[2] *See* ECF No. 236 at 2.

[2] As previously noted, the court included the following two questions on the verdict form:

- Do you find by a preponderance of the evidence that Anderson was aware that Miller faced a substantial risk of serious harm or is there enough circumstantial

But Anderson contends that the court's special interrogatories were not enough. He asserts that the jury also needed to address a separate "key component of qualified immunity"—the objective reasonableness of Anderson's actions. ECF No. 258 at 7. Anderson seems to be referring to an optional third element of the qualified immunity test that some circuit courts append to their qualified immunity analyses in select circumstances. This additional prong focuses on "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 n.2 (6th Cir. 2005). But there are two problems with Anderson's argument. First, the Tenth Circuit did not direct this court to use the "objective reasonableness" prong when it recounted the qualified immunity standard in its order on Anderson's interlocutory appeal. *See* ECF No. 79 at 5-6. Second, the court's special interrogatory asking the jury whether "Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of a substantial risk of serious harm" addresses the very question of whether Anderson's actions were "reasonable" posed by the "third prong." ECF No. 236 at 2.

Even had the court agreed to issue a special interrogatory specifically targeted at addressing the optional third prong of the qualified immunity test, it would not have used Anderson's proposed wording, which asked whether Anderson "held a reasonable belief that Ms. Miller was withdrawing from methamphetamine." No. 125-4 at 2. Alone, the fact that Anderson held a

---

evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk to Miller?

• Do you find by a preponderance of the evidence that Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of a substantial risk of serious harm?

ECF No. 236 at 2.

reasonable belief that Miller was in withdrawal is not sufficient for the court to find that Anderson is entitled to qualified immunity. Such a belief is only one factor that a jury might have considered in determining whether Anderson's actions were "objectively unreasonable in light of the clearly established constitutional rights." *City of Detroit*, 408 F.3d at 310 n.2. Under a neutral instruction based purely on the language of the third prong and with no reference to Miller's supposed withdrawal, a jury could well have decided that Anderson ought not be accorded immunity even had they agreed that Miller appeared as though she was in withdrawal.

In sum, the court finds no error in the verdict form.

### B. THE COURT'S ORDER DENYING QUALIFIED IMMUNITY

Anderson also challenges the court's memorandum decision and order denying qualified immunity on grounds that it is "flawed with respect to both the facts and the law." ECF No. 258 at 8; *see* ECF No. 244. This argument rests on two theories, both of which are lacking.

As an initial matter, "[w]hen a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial." *Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir. 1999); *see also Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739 (10th Cir. 2007). Though a defendant may be able to poke small factual holes in the court's denial of qualified immunity, if the evidence is sufficient to support the jury's factual conclusions that fulfill the requirements of the qualified immunity test, the court's decision must stand.

Anderson's first theory is that the court's failure to mention the words "methamphetamine," "meth," "withdrawing," and "withdrawal" in its memorandum decision denying qualified immunity means that it "misapplied the law." ECF No. 258 at 8. While it is indeed true that the court did not mention Miller's methamphetamine use in its decision, this omission was not the result of the court's oversight of a powerful argument advanced at trial. In

fact, the court fully understood that Defendant had advanced a theory that Anderson failed to treat Miller for blunt force trauma because he suspected that she was withdrawing from methamphetamine.

Whether or not Miller was withdrawing from meth at the time of her fall, a jury could reasonably find that Anderson deliberately ignored proper procedure for treating a patient experiencing her symptoms. Even Anderson admits that after the fall Miller could not walk and was experiencing extreme dizziness. *See* Anderson Tr. 141:18-23, 145:21-25. At this point, a jury could have found that Anderson should have taken Miller's vitals and decided to observe her at frequent and regular intervals. Additionally, the notion that Anderson *unambiguously* knew Miller was withdrawing from methamphetamine is unfounded. Anderson argues that he believed Miller's symptoms were a result of meth withdrawal because when he asked about her drug use after her fall, she stated that she was "coming off meth." Anderson Tr. 142:9-14. At trial, Nurse McQuillen explained the distinction between an individual who was "coming off meth" and one who was "withdrawing." McQuillen Tr. 420:2-8. According to McQuillen, "coming off, you can come off -- you know, you're antihypertensive. You get a headache and know that you've missed a dose. Withdrawal means that you're going to have some sort of identifiable symptoms." *Id*. The jury could have reasonably interpreted McQuillen's testimony to indicate that Anderson never should have assumed that Miller's symptoms were related to her drug use based on her statement. Moreover, Nurse McQuillen testified that dizziness was not a symptom of withdrawal from methamphetamines. *See* McQuillen Tr. 445:3-19. Based on this evidence, the jury could have found that it was not reasonable to interpret Miller's dizziness and inability to walk as a sign that she was in withdrawal. In brief, there is sufficient evidence to conclude that it was unreasonable

for Anderson to treat Miller as he did on the belief that Miller was withdrawing from methamphetamine.

Second, Anderson argues that the court's decision to deny qualified immunity was incorrect because it relied largely on testimony from Plaintiffs' medical expert witnesses and ignored the testimony of witnesses favoring Defendants. Specifically, Anderson asserts that Plaintiffs' expert witnesses only addressed whether he had committed medical malpractice by performing an incomplete medical evaluation. According to Anderson, "[t]here must be more. There must be evidence that [he] acted with a 'criminal reckless' state of mind." ECF No. 258 at 8-9. But there *is* more in the court's decision.

While it is true that the court relied heavily on testimony by Nurse McQuillen and Dr. Starr, it did not exclusively do so. Indeed, when discussing Anderson's knowledge of the risk of harm posed by Miller's fall, the court cited Anderson's own description of his response to Miller's fall. *See* Anderson Tr. 141:18-23, 145:21-25 (recounting how Anderson recognized during his initial assessment that Miller was nauseous and dizzy to the point that she had difficulty standing or walking on her own); Anderson Tr. 141:9-10 (explaining that Miller reported left side pain); Anderson Tr. 154:7-8 (describing how just after moving Miller to Lima, Anderson immediately scheduled a priority one doctor's appointment for her the next day because he recognized that "she was really sick."). The court also cited Deputy Lloyd's description of the events after Miller's fall, including the fact that Miller "was on the ground rolling around saying her side hurts," Lloyd Tr. 53:25–54:1, and Nurse Ondricek's impression of Anderson's response. *See* Ondricek Tr. 216:22-25 ("Q: And my point is the fact that he made the request [for a doctor's appointment] tells you he's aware of a problem that needs medical attention at least at some point. A: That's true."). All

of this testimony supported the jury's finding that Anderson was aware of substantial risk of serious harm that could befall Miller if he did not provide proper treatment.

The court also cited several pieces of evidence beyond the testimony of Plaintiff's expert witnesses to establish that Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of this risk. Most significantly, Defendants' own expert witness, Dr. Tubbs, testified that he "would expect when the nurses respond to a fall an evaluation [of] vital signs would be part of that evaluation,"[3] Tubbs Tr. 592:15-18, and agreed that "there wasn't any medical check ordered" once Anderson placed Miller in a cell that was not part of the medical unit. Tubbs Tr. 672:17-21. Indeed, even Anderson admitted that his failure to take initial vital signs was improper. *See* Anderson Tr. 179:15-18 ("Q: In this case, had you taken -- first of all, it was the policy of the jail that you should have taken Heather Miller's vitals? A: Correct.") Anderson also testified that if an inmate fell from a bunk, he would normally take her vital signs because failing to do so would create a "pretty obvious risk" that he might miss something important that could change his treatment decisions. *See* Anderson Tr. 137:24-39:4. Defendant's own witnesses, then, provided evidence indicating that Anderson can be held liable for Miller's death.

Even had none of the adverse evidence from Defendants' witnesses been presented, there would still be sufficient evidence for the court to deny qualified immunity. The jury has the right to disregard defense evidence that it finds unpersuasive and weigh a plaintiff's evidence more heavily in its decision. *See Taylor v. Gilmartin*, 686 F.2d 1346, 1354 (10th Cir. 1983) ("The jury is entitled to weigh conflicting evidence and inferences and determine the credibility of

[3] As noted in the memorandum decision and order denying qualified immunity, Dr. Tubbs's own protocols in jails where he serves as the medical director state that "every patient should have their vital signs obtained if they complain of abdominal pain." Tubbs Tr. 692: 8-10.

witnesses."). If the jury decided that Dr. Tubbs's testimony was not reliable (a reasonable choice), it would have been permissible to simply rely on testimony from Nurse McQuillen and Dr. Starr. These witnesses did far more than simply testify that Anderson could be found liable for malpractice. They established Anderson's indifferent state of mind by testifying that he had provided Miller "little to no medical care" even though he understood she was at significant risk of serious harm. Starr Tr. 335:20-22; *see* McQuillen Tr. 417:24-418:2 (explaining that Anderson provided Miller "no medical care.").

In sum, when taken in the light most favorable to the jury's verdict, the evidence shows that Anderson did not take reasonable measures to address the substantial risk of serious harm to Miller. Thus, Anderson had a sufficiently culpable state of mind to overcome Defendant's claim of qualified immunity.

## II. IS THE VERDICT SUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL?

Anderson next argues that the court should order a new trial on Plaintiffs' deliberate indifference claim based on insufficiency of the evidence. To obtain a new trial due to insufficiency of the evidence, a defendant must show that "the jury verdict is . . . clearly, decidedly, or overwhelmingly against the weight of the evidence." *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009) (citing *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999)). The court has already set out all the reasons why the evidence against Anderson was sufficient to find him liable for deliberate indifference to Miller's medical needs in its memorandum decision and order denying qualified immunity, ECF No. 244, as well the qualified immunity section of this order. Rather than recount the evidence against Anderson once more, the court briefly rebuts the specific arguments against the jury's verdict included in Anderson's

memorandum in support of this motion. All of Anderson's arguments were well discussed at trial, and apparently rejected by the jury.

First, Anderson argues that the jury could not find him liable for deliberate indifference because Miller lied about whether she was likely to experience withdrawal on her jail intake form. Anderson asserts that had Miller truthfully admitted that she was likely to experience withdrawal from methamphetamine when she arrived at Davis County Jail, she would have been assigned to a lower bunk from which a fall would not have ended her life. But whether or not Miller's fall was avoidable is simply irrelevant to the outcome of this action. To hold that Anderson is not liable under Defendant's theory would mean that the jails may refuse to provide healthcare for incarcerated individuals, allowing them to needlessly die, whenever an injury is the result of a victim's poor choice. This *cannot* be the law in a country with a constitution that guarantees incarcerated individuals, people who are at the full mercy of the state, a right to adequate medical care. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (stating that officers violate the Constitution when they are deliberately indifferent to the serious medical needs of prisoners because this "constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment.").

Relatedly, Anderson argues that he believed Miller's inability to stand, dizziness, and confusion after the fall were symptoms of methamphetamine withdrawal. As previously explained in the section of this memorandum decision addressing qualified immunity, Miller's alleged withdrawal from methamphetamine at the time of her fall did not provide Anderson a blank check to ignore proper procedure for treating a patient experiencing her symptoms. A jury could reasonably find that at the point Miller could not walk and exhibited signs of extreme dizziness, *see* Anderson Tr. 141:18 23, 145:21-25, Anderson should have taken her vitals and decided to

observe her at frequent and regular intervals. Additionally, the court rejects Anderson's strange assertion that it was "uncontested" at trial that he *reasonably* assumed that Miller was withdrawing from methamphetamine. ECF No. 258 at 5. Clearly this fact was contested. *See* McQuillen Tr. 445:3-19 (explaining that dizziness is not a symptom of methamphetamine withdrawal); McQuillen Tr. 420:2-8 (explaining the difference between "coming off meth" and withdrawing from methamphetamine).

Next, Anderson notes that the EMTs who transported Miller to the hospital took her vitals three hours after the fall and found that her blood pressure was 130/115 with a heart rate of 93 beats per minute. Anderson Tr. 753:10-754:7. According to Anderson, this seemingly normal set of numbers[4] is proof that tracking Miller's vitals during the "golden hour" would not have told him that his patient needed to be transported to a hospital. Anderson Tr. 756:10-15. The court and the jury were unconvinced that this evidence indicates that Anderson could not have known his patient was in dire need of medical assistance. On cross-examination, Anderson admitted that the EMT's initial 130/115 blood pressure reading was possibly incorrect. Anderson Tr. 759:21-23. He then agreed that shortly after this first test, Miller's blood pressure read 86/53, 63/44, 83/49, and 59/39; well below that expected for a healthy individual. Anderson Tr. 760:2-11. These readings could have easily convinced a jury that the initial blood pressure recorded in the ambulance to the hospital was in error, and that if Anderson had regularly monitored Miller's vitals during and after the "golden hour" he would have seen that her condition was rapidly deteriorating.

Finally, Anderson seems to argue that the jury could not have attributed Miller's death to Anderson because either her ruptured spleen was impossible to diagnose in time to save her life or

---

[4] Anderson testified that these readings were what he would have expected from someone experiencing withdrawal from methamphetamine. Anderson Tr. 754:10-24.

because the EMTs and emergency room staff assigned to Miller failed to provide care that would have saved her life despite Anderson's timely action. The court is unpersuaded by both arguments. In response to the first scenario, Dr. Starr testified that ruptured spleens are diagnosable and treatable if patients are transported to a hospital soon after their injury. Starr Tr. 360:7-9 ("I can say that this is a very highly treatable and survivable injury if definitive care is accessed in a very timely manner."). In response to the second scenario, Dr. Starr testified that Miller had arrived at the hospital too late for lifesaving procedures. In his words, "[s]he came into the hospital dead." Starr Tr. 384:5-6. Because care was so delayed, even if doctors had correctly diagnosed Miller's condition in the ambulance to the hospital she would have died anyway. Starr Tr. 384:2-3 ("Q. You're saying it's too late? A. Absolutely.")

In brief, none of Anderson's arguments are sufficient to show that Plaintiffs did not meet their burden. As the court has repeatedly explained,

> [t]he evidence demonstrates Anderson failed to take reasonable measures, such as conducting a complete initial assessment, engaging in periodic medical monitoring, completing periodic vital signs checks, or attending to the patient when deputies called him, to address the substantial risk of harm to Miller.

ECF No. 244 at 11-12.

## III. DID SUBMITTING THE ISSUE OF PUNITIVE DAMAGES PREJUDICE THE JURY?

Anderson contends that the court erred in deciding not to rule on the punitive damages issue in Defendants' Rule 50(a) motion because giving the jury the option to award punitive damages prejudiced the jury against him. The proper course of action, according to Anderson, was to bifurcate the trial on the issue of liability and punitive damages. The court disagrees.

Federal Rule of Civil Procedure 42(b) provides that a court may bifurcate a proceeding for the trial of separate issues "[f]or convenience, to avoid prejudice, or to expedite and economize." Courts have "broad discretion in deciding whether to sever issues for trial." *Easton v. City of*

*Boulder*, 776 F.2d 1441, 1447 (10th Cir. 1985). However, "bifurcation is an abuse of discretion if it is unfair or prejudicial to a party." *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993). Bifurcation should not be "routinely ordered," but it should "be encouraged where experience has demonstrated its worth." Fed. R. Civ. P. 42(b) advisory committee's note.

Here, the court's decision to allow the trial to proceed without bifurcation was not in error. Bifurcation would not have been convenient, expeditious, or economic. In fact, severing the issue of punitive damages would have required additional time-consuming proceedings that likely would have duplicated testimony already received on the question of liability. This is one of the reasons "[f]ederal courts routinely try actual and punitive damage issues together." *Baker v. Equifax Credit Info. Servs., Inc.*, No. CIV. A. 97-2214-KHV, 1998 WL 101829, at *2 (D. Kan. Feb. 6, 1998).

But Anderson warns that allowing the jury to hear "inflammatory argument associated with a claim for punitive damages" could have swayed the jury in its deliberations on the issue of liability. ECF No. 258 at 9-10. The court is not persuaded that evidence and argument related to punitive damages prejudiced the jury in this case. Punitive damages are available under § 1983 "only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003) (quoting *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992)). To be subject to punitive damages, a defendant need not "engage in any intentional misconduct beyond that required for him to be liable for compensatory damages under § 1983." *Eisenhour v. Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018). What is necessary is "evidence of an additional required mens rea—that [defendant] perceived that he was violating [the plaintiff's] federal rights . . . ." *Id.* This means, in short, that once the jury decided that Anderson was liable under § 1983, "awarding punitive damages would require only an additional finding

regarding [his] state of mind." *Zimmerman v. Univ. of Utah*, No. 2:13-CV-1131, 2018 WL 10152216, at *1 (D. Utah Aug. 8, 2018).

A finding of mens rea is usually "inferred from other evidence relevant to [a defendant's] liability." Thus, in a non-bifurcated trial, the jury is exposed to little evidence or argumentation that would not have been allowed but for the plaintiffs' claim for punitive damages. Indeed, in this case, Plaintiffs' only *specific* argument for punitive damages against Anderson was that he had admitted he was biased towards assuming that inmates were withdrawing from drugs rather than facing serious medical problems and that Anderson's co-workers admitted that Anderson should have checked Miller's vitals and sent her to the medical unit. Baczynski Tr. 850:14-15; 849:2-7. These pieces of evidence would have been introduced at trial in any event because they were admissible for purposes of establishing liability. And these arguments would have been made at closing no matter what because they strongly pointed towards a finding of liability.

For the reasons articulated above, the court finds that submitting to the jury the issue of punitive damages in conjunction with the questions of liability and compensatory damages was not prejudicial and therefore did not require bifurcation. A new trial or alteration of judgment is, thus, not warranted.

## IV. DOES EQUITABLE ESTOPPEL PRECLUDE LIABILITY?

Finally, Anderson argues that there is insufficient evidence to find that he is liable for Miller's death because Plaintiffs are equitably estopped from claiming that he acted with deliberate indifference. Under the doctrine of equitable estoppel, parties may not assume a position inconsistent with an earlier position upon which another party reasonably relied. *See Godwin v. Schramm*, 731 F.2d 153, 160 (3d Cir. 1984). Anderson points out that he reasonably relied on Miller's statement that she was withdrawing from methamphetamine when he assessed her after her fall. Because of this, Anderson contends that Plaintiffs are estopped from arguing that he did

not reasonably believe Miller was in danger from her injuries and merely exhibiting symptoms of methamphetamine withdrawal. The court is unconvinced by this argument.[5]

As previously noted, whether or not Anderson believed that Miller was suffering from methamphetamine withdrawal is beside the point when determining whether he was deliberately indifferent to Miller's suffering. As Plaintiff points out, even if Anderson reasonably believed Miller was suffering from methamphetamine withdrawal, there was sufficient evidence to find that he failed to assess, screen, and monitor Miller even when taking these steps was a basic requirement of his job as a nurse. *See* ECF No. 244 at 11-12.

Additionally, Plaintiffs' witness Nurse McQuillen drew a distinction between coming off methamphetamine and suffering symptoms of withdrawal. *See* McQuillen Tr. 420:2-8. The jury could have determined that it was not clear from Miller's statement that she was experiencing withdrawal symptoms when she informed Anderson that she was "coming off" methamphetamines. If Miller did not clearly claim that she was experiencing withdrawal symptoms, then the court cannot unilaterally find that Anderson had every right to act as though she was undoubtedly experiencing *only* symptoms from a withdrawal from methamphetamine. In sum, the doctrine of equitable estoppel does not entitle Anderson to a new trial or judgment as a matter of law.

---

[5] Although the court addresses the merits of Anderson's argument, there is no indication that he ever raised this issue in a motion before or during trial. The court could reject this argument because under Rule 59(a) "a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice will result," *Cyprus Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*, 638 F. App'x 751, 754 n.1 (10th Cir. 2016), and under Rule 59(e) a party may not "raise arguments or present evidence that could have been raised prior to the entry of judgment," but was not. *Nelson v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019).

**CONCLUSION & ORDER**

For the aforementioned reasons, the court DENIES Anderson's motion for judgment as a matter of law, motion for a new trial, and motion to alter judgment.

DATED August 18, 2023

BY THE COURT

Jill N. Parrish
United States District Court Judge